LIONEL Z. GLANCY (#134180)
MICHAEL GOLDBERG (#188669)
ROBERT V. PRONGAY (#270796)
**GLANCY BINKOW & GOLDBERG LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
E-mail: info@glancylaw.com
        lglancy@glancylaw.com
        mmgoldberg@glancylaw.com
        rprongay@glancylaw.com

Marc I. Gross
Jeremy A. Lieberman
**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile:  (212) 661-8665
E-mail:  migross@pomlaw.com
         jalieberman@pomlaw.com

Patrick V. Dahlstrom
**POMERANTZ LLP**
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile:  (312) 377-1184
E-mail: pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ABDUL AWAD, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>HERBALIFE LTD., MICHAEL O. JOHNSON, DESMOND WALSH, JOHN DESIMONE, and RICHARD GOUDIS,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Abdul Awad ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Herbalife Ltd. ("Herbalife" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired Herbalife securities between May 4, 2010 and April 11, 2014, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against the Company and certain of its top officials.

2.     Herbalife is a network marketing company that sells weight management, nutritional supplement and personal care products.  The Company sells its products globally through a network of independent distributors, which are typically individuals with little marketing expertise that were induced by the Company to purchase the Company's products in the hope that they would be able to resell the product to other consumers or distributors.   Herbalife also sells literature and promotional materials to these distributors.

3.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company's operations were based on a pyramid scheme whereby its distributors generate revenue by recruiting other distributors rather than selling Herbalife's diet and nutritional products to the general public; (ii) the Company engaged in deceptive trade practices where it unduly pressured its members to purchase more products to resell as one of its "distributors"; and (iii) as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

4.     On December 19, 2012, CNBC reported that Bill Ackman ("Ackman"), Founder and Chief Executive Officer of Pershing Square Capital Management, L.P.

("Pershing") considers Herbalife to be a pyramid scheme after spending a year researching the Company's fundamentals.

5.      On this news, Herbalife stock declined $5.16 per share, or over 12%, to close at $37.34 per share on December 19, 2012.

6.      On December 20, 2012, Ackman conducted a presentation concerning Herbalife at the Sohn Investment Conference where he affirmed his conclusion that Herbalife is a pyramid scheme as its distributors make more money by recruiting other distributors than selling the Company's products to the general public. Specifically, Ackman alleged that since the founding of the Company, approximately 1.9 million distributors have failed to make any money from selling Herbalife products, costing them a net loss of $3.8 billion.

7.      On this news, Herbalife stock declined an additional $10.07 per share, or over 27%, over the next two trading sessions, to close at $27.27 per share on December 21, 2012.

8.      On January 9, 2013, the New York Times reported that the Securities and Exchange Commission had opened an investigation into the Company.

9.      On January 15, 2014, a leading Chinese newspaper reported that Nu Skin Enterprises, Inc. ("Nu Skin"), a company that operates in the same industry and uses a similar business model as Herbalife, was an illegal pyramid scheme in China, and employs unlawful and immoral business practices in violation of PRC law.

10.     Then, on January 16, 2014,  Nu Skin disclosed that its business practices were indeed under investigation by Chinese authorities, stating in relevant part:

> We are aware that Chinese regulators have now initiated investigations to review issues raised by recent news reports. The government regularly monitors all businesses in this rapidly growing marketplace, and as is our practice, we will continue to communicate openly with regulators to address any questions they may have.

11.     On this news, Herbalife stock, over the two trading days of January 15, 2014, and January 16, 2014, declined $9.16 or over 11%, to close at $71.63.

12.     On January 23, 2014, U.S. Senator Edward J. Markey of Massachusetts sent letters to federal regulators, including the SEC and the FTC urging them to investigate  Herbalife. Mr. Markey also sent a letter to Herbalife's chief executive, Michael O. Johnson asking several questions about the company's business, including pointed requests that reflected the concerns raised by Ackman  in December 2012. Some of the questions asked in the letter to Herbalife include: (1) "How much profit (net earnings after expenses) can the average distributor expect to make from retailing to non-distributors (i.e., people who are not directly involved in Herbalife themselves)?"; and (2) "What's the correct number of sales outside the network as a percentage of total sales" for each of the last five years and information on these sales measured by product, quantity and dollars.

13.     Senator Markey urged both the FTC and SEC to examine whether Herbalife was a legitimate multilevel marketing Company, whose revenues are

ultimately generated by sales to the general public; or whether Herbalife was a pyramid scheme, whose revenues were dependent on continuous recruitment of other distributors, which were ultimately left sustaining substantial losses on their purchases of the Company's weight loss products.  To highlight evidence that Herbalife may indeed operate as a pyramid scheme, Senator Markey pointed to instances where residents of Massachusetts suffered crushing financial setbacks as a result of the Company's marketing practices.   According to the Senator, one family in Norton, MA lost $130,000 from its investments in the Company's products.  Another woman said she was pressured to recruit family members and spend more money to buy more Herbalife products so she could qualify as a "supervisor" in the Herbalife system.

14.    On this news, Herbalife stock declined $7.61 per share, or over 10%, to close at $65.92 per share on January 23, 2014.

15.    On April 11, 2014, the Financial Times reported that the United States Department of Justice and Federal Bureau of Investigation had opened a criminal probe of Herbalife.  On this news, shares of Herbalife spiraled downward from $59.84 to $51.48, more than 13%.

16.    As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

17.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

18.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

19.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as Herbalife's principal place of business is located within this District.

20.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

21.     Plaintiff as set forth in the attached Certification, acquired Herbalife securities at artificially inflated prices during the Class Period and has been damaged upon the revelation of the alleged corrective disclosures.

22.     Defendant Herbalife is a Cayman Islands corporation with principal executive offices located in this District.  Herbalife's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "HLF."

23.     Defendant Michael O. Johnson ("Johnson") served at all relevant times as the Company's the Chairman of the Board of Directors ("Board") and Chief Executive Officer.

24.     Defendant Desmond Walsh ("Walsh") served at all relevant times as the Company's President.

25.     Defendant John DeSimone ("DeSimone") served at all relevant times as the Company's Chief Financial Officer.

26.     Defendant Richard Goudis ("Goudis") served at all relevant times as the Company's Chief Operating Officer.

27.     The defendants referenced above in ¶¶ 23 - 26 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

28.     Herbalife is global network marketing company that sells weight management, nutritional supplement, energy, sports & fitness products and personal care products. The Company purports to offer science-based products in four principal categories: weight management, targeted nutrition, energy, sports & fitness and Outer Nutrition. Weight management, targeted nutrition, energy, sports & fitness and Outer Nutrition accounted for 62.5%, 22.8%, 4.9% and 4.3% of its net sales in fiscal year 2011, respectively.  The Company is one of the largest network marketing companies

in the world with net sales of approximately $4.07 billion for the fiscal year ended December 31, 2012.

## Materially False and Misleading
## Statements Issued During the Class Period

29.    On May 3, 2010, after the market closed, Herbalife issued a press release announcing its financial and operating results for the quarter ended March 31, 2010. For the quarter, the Company reported net income of $51.9 million, or $0.83 diluted earnings per share ("EPS") and net sales of $619 million, as compared to net income of $41.5 million, or $0.67 diluted EPS and net sales of $522 million for the same period a year ago.

30.    On May 3, 2010, the Company filed a quarterly report for the period ended March 31, 2010 on Form 10-Q with the SEC, which was signed by Defendant DeSimone, and reiterated the Company's previously announced quarterly financial results and financial position.   In addition, the Form 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Johnson and DeSimone, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

31.    On August 2, 2010, Herbalife issued a press release announcing its financial and operating results for the quarter ended June 30, 2010. For the quarter, the Company reported net income of $81.9 million, or $1.32 diluted EPS and net sales

of $688.8 million, as compared to net income of $48.3 million, or $0.77 diluted EPS, and net sales of $571.8 million for the same period a year ago.

32. On August 2, 2010, the Company filed a quarterly report for the period ended June 30, 2010 on Form 10-Q with the SEC, which was signed by Defendant DeSimone, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Johnson and DeSimone, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

33. On November 1, 2010, Herbalife issued a press release announcing its financial and operating results for the quarter ended September 30, 2010. For the quarter, the Company reported net income of $75.7 million, or $1.22 diluted EPS, and net sales of $688.4 million, as compared to net income of $57.9 million, or $0.91 diluted EPS, and net sales of $600.2 million for the same period a year ago.

34. That same day, the Company filed a quarterly report for the period ended September 30, 2010 on Form 10-Q with the SEC, which was signed by Defendant DeSimone, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Johnson and DeSimone, stating that the

financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

35.   On February 22, 2011, Herbalife issued a press release announcing its financial and operating results for the quarter and year ended December 31, 2010. For the quarter, the Company reported net income of $81 million, or $1.31 diluted EPS and net sales of $738.4 million, as compared to net income of $55.7 million or $0.88 diluted EPS and net sales of $630.9 million for the same period a year ago.  For the year, the Company reported net income of $290.5 million, or $4.67 diluted EPS and net sales of $2.7 billion, as compared to net income of $203 million, or $3.22 diluted EPS, and net sales of $2.3 billion for the same period a year ago.

36.   That same day, the Company filed an annual report for the period ended December 31, 2010 on Form 10-K with the SEC, which was signed by, among others, Defendants Johnson and DeSimone, and reiterated the Company's previously announced annual financial results and financial position.  In addition, the Form 10-K contained signed certifications pursuant to SOX by Defendants Johnson and DeSimone, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

37.   The Company represented the following in relevant part concerning its Network Marketing Program:

We are focused on building and maintaining our distributor network by offering financially rewarding and flexible career opportunities through sales of quality, innovative and efficacious products to health conscious consumers. We believe the income opportunity provided by our network marketing program appeals to a broad cross-section of people throughout the world, particularly those seeking to supplement family income, start a home business or pursue entrepreneurial, full or part-time, employment opportunities. Our distributors, who are independent contractors, can profit from selling our products and can also earn royalties and bonuses on sales made by the other distributors whom they recruit to join their sales organizations.

\*\*\*

To become a distributor in most markets, a person must be sponsored by an existing distributor and must purchase an International Business Pack, or IBP. The IBP is a distributor kit available in local languages. The product and literature contents in the kits vary slightly to meet individual market needs. An example is the large size U.S. IBP, which costs $90.95 and includes a canister of Formula 1 shake mix, two bottles of nutritional supplements, Herbal Concentrate (Tea), *Liftoff* ® (an energy drink), and Hand Sanitizer, along with a handy tote, booklets describing us, our compensation plan and rules of conduct, various training and promotional materials, distributor applications and a product catalog. The smaller U.S. version costs $54.95 and includes sample products, a handy tote, and essentially the same print and promotional materials as included in the larger kit version. To become a sales leader, or qualify for a higher level, including the Qualified Producer level introduced in October 2009, distributors must achieve specified volumes of product sales or earn certain amounts of royalty overrides during specified time periods and must re-qualify for the levels once each year. To attain sales leader status, a distributor generally must be responsible for sales of products representing at least 4,000 volume points in one month or 2,500 volume points in two consecutive months. An additional optional qualification, introduced globally in October 2009, allows for a distributor to achieve sales leader level by personally placing orders with Herbalife that accumulate to 5,000 Volume Points within 12 months.

38.     On May 2, 2011, Herbalife issued a press release announcing its financial and operating results for the quarter ended March 31, 2011.  For the quarter, the Company reported net income of $87.6 million, or $1.41 diluted EPS, and net sales of $795 million, as compared to net income of $51.9 million, or $0.83 diluted EPS and net sales of $619 million for the same period a year ago.

39.     On May 2, 2011, the Company filed a quarterly report for the period ended March 31, 2011 on Form 10-Q with the SEC, which was signed by Defendant DeSimone, and reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Johnson and DeSimone, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

40.     On August 1, 2011, Herbalife issued a press release announcing its financial and operating results for the quarter ended June 30, 2011. For the quarter, the Company reported net income of $111.2 million, or $0.88 diluted EPS, and net sales of $879.7 million, as compared to net income of $82.2 million, or $0.65 diluted EPS, and net sales of $688.8 million for the same period a year ago.

41.     That same day, the Company filed a quarterly report for the period ended June 30, 2011 on Form 10-Q with the SEC, which was signed by Defendant DeSimone, and reiterated the Company's previously announced quarterly financial

results and financial position.   In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Johnson and DeSimone, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

42.    On October 31, 2011, Herbalife issued a press release announcing its financial and operating results for the quarter ended September 30, 2011.  For the quarter, the Company reported net income of $108 million, or $0.87 diluted EPS, and net sales of $895 million, as compared to net income of $78.9 million, or $0.63 diluted EPS and net sales of $688.4 million for the same period a year ago.

43.    That same day, the Company filed a quarterly report for the period ended September 30, 2011 on Form 10-Q with the SEC, which was signed by Defendant DeSimone, and reiterated the Company's previously announced quarterly financial results and financial position.   In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Johnson and DeSimone, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

44.    On February 21, 2012, Herbalife issued a press release announcing its financial and operating results for the quarter and year ended December 31, 2011. For the quarter, the Company reported net income of $105.4 million, or $0.86 diluted EPS and net sales of $884.6 million, as compared to net income of $86.3 million or $0.69

diluted EPS and net sales of $738.4 million for the same period a year ago.  For the year, the Company reported net income of $412.6 million, or $3.30 diluted EPS and net sales of $3.5 billion, as compared to net income of $299.2 million, or $2.37 diluted EPS and net sales of $2.7 billion for the same period a year ago.

45.     On February 21, 2012, the Company filed an annual report for the period ended December 31, 2011 on Form 10-K with the SEC, which was signed by, among others, Defendants Johnson and DeSimone, and reiterated the Company's previously announced annual financial results and financial position.  In addition, the Form 10-K contained signed certifications pursuant to SOX by Defendants Johnson and DeSimone, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

46.     The Company represented the following in relevant part concerning its Network Marketing Program:

> We are focused on building and maintaining our distributor network by offering financially rewarding and flexible career opportunities through sales of quality, innovative and efficacious products to health conscious consumers. We believe the income opportunity provided by our network marketing program appeals to a broad cross-section of people throughout the world, particularly those seeking to supplement family income, start a home business or pursue entrepreneurial, full or part-time employment opportunities. Our distributors, who are independent contractors, can profit from selling our products and can also earn royalties and bonuses on sales made by the other distributors whom they recruit to join their sales organizations.

***

Our products are distributed through a global network marketing organization comprised of approximately 2.7 million independent distributors in 79 countries as of December 31, 2011, including China where, due to regulations, our sales are conducted through Company operated retail stores, sales representatives, sales officers and independent service providers. In China, in the areas where we have a direct selling license, our representatives, officers and independent service providers can sell Herbalife product outside the retail establishments. In addition to helping our distributors achieve their goals of health and wellness through use of our products, we offer our distributors, who are independent contractors, attractive income opportunities. Distributors may earn income on their own sales and can also earn royalties and bonuses on sales made by the distributors in their sales organizations. We believe that our products are particularly well-suited to the network marketing distribution channel because sales of weight management and health and wellness products are strengthened by ongoing personal contact and coaching of retail consumers by distributors. We believe our continued commitment to developing innovative, science-based products will enhance our ability to attract new distributors as well as increase the productivity and retention of existing distributors. Furthermore, our international sponsorship program, which permits distributors to sponsor distributors in other countries where we are licensed to do business and where we have obtained required product approvals, provides a significant advantage to our distributors in developing and growing their businesses.

47.    On April 30, 2012, Herbalife issued a press release announcing its financial and operating results for the quarter ended March 31, 2012.  For the quarter, the Company reported net income of $108.2 million, or $0.88 diluted EPS, and net sales of $964.2 million, as compared to net income of $88 million, or $0.70 diluted EPS and net sales of $795 million for the same period a year ago.

48.    On April 30, 2012, the Company filed a quarterly report for the period ended March 31, 2012 on Form 10-Q with the SEC, which was signed by Defendant

DeSimone, and reiterated the Company's previously announced quarterly financial results and financial position.   In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Johnson and DeSimone, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

49.   On May 1, 2012, the Company held an analyst conference call to discuss its first quarter 2012 financial results.   During the Q&A session, David Einhorn, Chairman of Greenlight Capital Re. Ltd. asked a series of questions:

> Einhorn: I got a couple questions for you.  First is, how much of the sales that you've made, in terms of final sales, are sold outside the network, and how much are consumed within the distributor base?
>
> Walsh: So David, we have a 70% custom rule, which is – which effectively says that 70% of all products is sold to consumers or actually consumed by distributors for their own personal use.  So obviously, what we've seen with nutrition clubs is that we now have visibility for the first time to our customers.  You know that we reported on this call for the first time the number of commercial clubs around the world, which is in excess of 30,000, so that has given us visibility to the tremendous amount of products that are being sold directly to the consumers, and we see that as a growing trend in our business.
>
> Einhorn: So what is the percentage that actually sold to consumers that are not distributors?
> Walsh:  So we don't have an exact percentage, David, because we don't have visibility to that level of detail.
>
> Einhorn: Do you have an approximation?
>
> Walsh: So well, again, going back to our 70% rule, we believe that it's that 70% or potentially in excess of that.

Einhorn: Okay.  What is the incentive for a supervisor to sign somebody up to become a distributor as opposed to – if they're just going to consume for themselves – as opposed to just selling them the product for the markup.  How does the distributor – how does a supervisor come out better?

Walsh: Sure, And so, I think there's two reasons for that.  So we know from our business today that many of our future supervisors and business builders come in as customers and then they become distributors.  So the benefit from a supervisor is the ability for greater retention of that customer/distributor because they are now earning a 25% discount.

The second issue is that it preserves lineage.  So obviously, if I sign you up, David, as a distributor, my hope and my expectation is that based on the tremendous product result that you're going to achieve, that you'll have friends and families go to you and say, gosh, David, you look great, what are you on; you're going to respond and say, "I'm on Herbalife." And that will encourage you to say, wow, maybe this is a business opportunity I could be interested in.  So the benefit for me as your supervisor is, one the discount that that you would get and therefore my greater likelihood of retaining you as a permanent customer; and secondly, the hope that at some stage, you will decide to do the business and, therefore, that you are already in my lineage and as part of my group.

Einhorn: Right.  But just so I understand this clearly, if I sell to a customer – I bought at – I'm a supervisor; I buy at a 50% discount; I sell to a customer; I make 50 points, if he pays the full price.  If he signs up as a distributor and buys it himself, I get  - he gets a 25% discount, and I get seven points as a royalty.  Is that how it works?

Walsh: No, you would get – you would get the other 25%.

Einhorn: I'd get 25% plus the 7.

Walsh: So unless you're in royalties, you would simply earn in the difference.  So you earn a 50% discount, you're selling at a 25% discount, and so the difference between the two.

Einhorn: Right

Walsh: Is your profit is on that sale.

Einhorn: Right, So if he signs up as a distributor and buys it for himself from Herbalife, I still get the 25%?

Walsh: That is correct.

Einhorn: Okay.  Good.  One last question.  When you had your previous 10-K, you disclosed three groups of distributors at the low-end.  You called 29% self consumers, 57% small retailers, and 14% potential sales leaders.  And then that disclosure did not repeat in the subsequent 10-K. So I've got two questions.  First of all, how do you track that and how do you characterize and know which ones are which?  And second, why did you stop disclosing that in the last 10-K?  Is that something that you've stopped tracking or just stopped disclosing?

DeSimone: David, hi.  This is John.  The criteria for grouping distributors into different classes was based off of their volume purchases, and we're making assumptions that people below a certain volume weren't doing the business, they were buying self-consumption – and I don't remember the exact amounts, but I can get it to you after the call – is how we delineated between the three classes.

And one- the reason we took it out of the 10-K is a change in CFO from Rich to me.  I didn't view it as valuable information to the business or to the investors.  However, we can easily provide the exact same breakout going forward if you'd like….

50.    As a result of Einhorn's stated skepticism regarding the Company's business model, Herbalife declined $14.02 per share or nearly 20%, to close at $56.30 per share on May 1, 2012.  The stock declined an additional $10.10 per share or nearly 18%, to close at $46.20 per share on May 3, 2012.

51.    On July 30, 2012, Herbalife issued a press release announcing its financial and operating results for the quarter ended June 30, 2012. For the quarter,

the Company reported net income of $133.4 million, or $1.10 diluted EPS, and net sales of $1 billion, as compared to net income of $111.2 million, or $0.88 diluted EPS and net sales of $879.7 million for the same period a year ago.

52.    On July 30, 2012, the Company filed a quarterly report for the period ended June 30, 2012 on Form 10-Q with the SEC, which was signed by Defendant DeSimone, and reiterated the Company's previously announced quarterly financial results and financial position.    In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Johnson and DeSimone, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

53.    On October 29, 2012, Herbalife issued a press release announcing its financial and operating results for the quarter ended September 30, 2012.   For the quarter, the Company reported net income of $117.8 million, or $1.04 diluted EPS, and net sales of $1 billion, as compared to net income of $108 million, or $0.87 diluted EPS and net sales of $895 million for the same period a year ago.

54.    That same day, the Company filed a quarterly report for the period ended September 30, 2012 on Form 10-Q with the SEC, which was signed by Defendant DeSimone, and reiterated the Company's previously announced quarterly financial results and financial position.    In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Johnson and DeSimone, stating that the

financial information contained in the Form 10-Q was accurate and disclosed any

material changes to the Company's internal control over financial reporting.

## THE TRUTH BEGINS TO EMERGE

55.   On December 19, 2012, CNBC reported that Ackman considers

Herbalife to be a pyramid scheme after spending a year researching the Company's

fundamentals.

56.   On this news, Herbalife stock declined $5.16 per share, or over 12%, to

close at $37.34 per share on December 19, 2012.

57.   On December 20, 2012, Ackman conducted a presentation concerning

Herbalife at the Sohn Investment Conference, alleging that the Company has been

misrepresenting sales figures, misleading distributors about potential earnings and

selling a commodity product at inflated prices.  Ackman said that since the founding

of the Company, approximately 1.9 million distributors have failed to make any

money from selling Herbalife products, costing them about $2,000 each in the process

for supplies, training and sales leads, for a total net loss of $3.8 billion.  Ackman

concluded that Herbalife is a pyramid scheme as its distributors make more money by

recruiting other distributors than selling the Company's products to the general public.

Moreover, the top 1% of Herbalife distributors earn a greater share of total

commissions compared to other multi-level marketing companies.

58.   On this news, Herbalife stock declined $10.07 per share, or over 27%, over the next two trading sessions, to close at $27.27 per share on December 21, 2012.

59.   On January 18, 2013, Herbalife issued a press release announcing its financial and operating results for the quarter and year ended December 31, 2012. For the quarter, the Company reported net income of $117.8 million, or $1.05 diluted EPS and net sales of $1.1 billion, as compared to net income of $105.4 million or $0.86 diluted EPS and net sales of $884.6 million for the same period a year ago.  For the year, the Company reported net income of $477.2 million, or $4.05 diluted EPS and net sales of $4.07 billion, as compared to net income of $412.6 million, or $3.30 diluted EPS and net sales of $3.45 billion for the same period a year ago.

60.   On February 19, 2013, the Company filed an annual report for the period ended December 31, 2012 on Form 10-K with the SEC, which was signed by, among others, Defendants Johnson and DeSimone, and reiterated the Company's previously announced annual financial results and financial position.  In addition, the Form 10-K contained signed certifications pursuant to SOX by Defendants Johnson and DeSimone, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

61.   The Company represented the following in relevant part concerning its Network Marketing Program:

Our products are distributed through a global network marketing organization comprised of approximately 3.2 million independent distributors, many of whom are simply discount customers, operating in 88 countries as of December 31, 2012. In China, due to local regulations, our sales are conducted through Company operated retail stores, sales representatives, sales officers and independent service providers; in the areas where we have a direct selling license, our representatives, officers and independent service providers can sell Herbalife product outside of the retail establishments.

In addition to helping our distributors and their customers achieve their goals of health and wellness through consumption of our products, we offer our distributors, who are independent contractors, a potential income opportunity. Distributors may earn income on their own retail sales and can also earn commissions, such as royalties and bonuses, based on purchases of our products made by their sales organization for consumption or resale.

***

To become a distributor in most markets, a person must be sponsored by an existing distributor and must purchase an International Business Pack, or IBP. The IBP is a distributor kit available in local languages which typically includes product samples, a handy tote, booklets describing us, our compensation plan and rules of distributor conduct, various training and promotional materials, distributor applications and a product catalog, The cost of an IBP varies by market and provides a low cost entry for incoming distributors. IBPs have no Volume Point value and therefore do not generate any distributor compensation and cannot be used for distributor qualifications or recognition purposes under the Company's marketing plan. Volume Points are point values assigned to each of our products for use by the Company to determine a distributor's sales achievement level. We assign a Volume Point value to a product when it is first introduced into a market and the value is unaffected by subsequent exchange rate and price changes. The specific number of Volume Points assigned to a product, generally consistent across all markets, is based on a Volume Point to suggested retail price ratio for similar products in the market.

***

To become a sales leader, or qualify for a higher level, distributors must achieve specified volume thresholds of product sales or earn certain amounts of royalty overrides during specified time periods and must re-qualify once each year. To attain sales leader status, a distributor generally must be responsible for sales of products representing at least 4,000 volume points in one month or 2,500 volume points in two consecutive months. An additional optional qualification, introduced globally in October 2009, allows for a distributor to achieve sales leader level by personally placing orders with Herbalife that accumulate to 5,000 volume points within 12 months.

62.     On April 29, 2013, Herbalife issued a press release announcing its financial and operating results for the quarter ended March 31, 2013.  For the quarter, the Company reported net income of $118.8 million, or $1.10 diluted EPS and net sales of $1.1 billion, as compared to net income of $108.2 million, or $0.88 diluted EPS and net sales of $964.2 million for the same period a year ago.

63.     That same day, the Company filed a quarterly report for the period ended March 31, 2013 on Form 10-Q with the SEC, which was signed by Defendant DeSimone, and reiterated the Company's previously announced quarterly financial results and financial position.   In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Johnson and DeSimone, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

64.     On July 29, 2013, Herbalife issued a press release announcing its financial and operating results for the quarter ended June 30, 2013. For the quarter, the Company reported net income of $143.2 million, or $1.34 diluted EPS, and net

sales of $1.2 billion, as compared to net income of $133.4 million, or $1.10 diluted EPS and net sales of $1 billion for the same period a year ago.

65.     That same day, the Company filed a quarterly report for the period ended June 30, 2013 on Form 10-Q with the SEC, which was signed by Defendant DeSimone, and reiterated the Company's previously announced quarterly financial results and financial position.   In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Johnson and DeSimone, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

66.     On October 28, 2013, Herbalife issued a press release announcing its financial and operating results for the quarter ended September 30, 2013.   For the quarter, the Company reported net income of $142 million, or $1.32 diluted EPS, and net sales of $1.2 billion, as compared to net income of $117.8 million, or $1.04 diluted EPS and net sales of $1 billion for the same period a year ago.

67.     That same day, the Company filed a quarterly report for the period ended September 30, 2013 on Form 10-Q with the SEC, which was signed by Defendant DeSimone, and reiterated the Company's previously announced quarterly financial results and financial position.   In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Johnson and DeSimone, stating that the

financial information contained in the Form 10-Q was accurate, and disclosed any material changes to the Company's internal control over financial reporting.

68.     On January 15, 2014, a leading Chinese newspaper reported that Nu Skin Enterprises, Inc. ("Nu Skin"), a company that operates in the same industry and uses a similar business model as Herbalife, was an illegal pyramid scheme in China, and employs unlawful and immoral business practices in violation of PRC law.

69.     Thereafter, on January 16, 2014, Nu Skin disclosed that its business practices were indeed under investigation by Chinese authorities, stating in relevant part:

> We are aware that Chinese regulators have now initiated investigations to review issues raised by recent news reports. The government regularly monitors all businesses in this rapidly growing marketplace, and as is our practice, we will continue to communicate openly with regulators to address any questions they may have.

70.     On this news, Herbalife stock, over the two trading days of January 15, 2014, and January 16, 2014, declined $9.16 or over 11%, to close at $71.63.

71.     On January 23, 2014, U.S. Senator Edward J. Markey of Massachusetts sent letters to federal regulators, including the SEC and the FTC urging them to investigate  Herbalife. Mr. Markey also sent a letter to Herbalife's chief executive, Michael O. Johnson asking several questions about the company's business, including pointed requests that reflected the concerns raised by Ackman in December 2012. Some of the questions asked in the letter to Herbalife included: (1) "How much profit

(net earnings after expenses) can the average distributor expect to make from retailing to non-distributors (*i.e.*, people who are not directly involved in Herbalife themselves)?"; and (2) "What's the correct number of sales outside the network as a percentage of total sales" for each of the last five years and information on these sales measured by product, quantity and dollars.  Moreover, Senator Markey pressed the FTC and SEC to investigate whether Herbalife operated a pyramid scheme, providing specific examples of deceptive and harmful trade practices occurring in Massachusetts.

72.    On this news, Herbalife stock declined $7.61 per share, or over 10%, to close at $65.92 per share on January 23, 2014.

73.    On April 11, 2014, the Financial Times reported that the United States Department of Justice and Federal Bureau of Investigation had opened a criminal probe of Herbalife.  On this news, shares of Herbalife spiraled downward from $59.84 to $51.48, more than 13%.

74.    The statements referenced in ¶¶ 29-54 and 59-67 above, were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them, including that: (i) the Company operated a pyramid scheme whereby its distributors primarily generated revenue by recruiting other distributors rather than selling Herbalife's diet and nutritional products to the general public; (ii) the

Company engaged in deceptive trade practices as it unduly pressured its customers to purchase more products to resell as one of its "distributors"; and (iii) as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

75.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Herbalife securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

76.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Herbalife securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Herbalife or its transfer agent and may be notified of the pendency of this action by

mail, using the form of notice similar to that customarily used in securities class actions.

77.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

78.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

79.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Herbalife;

- whether the Individual Defendants caused Herbalife to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Herbalife securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

80.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

81.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Herbalife securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Herbalife securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

82.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I

### (Against All Defendants For Violations of
### Section 10(b) And Rule 10b-5 Promulgated Thereunder)

83.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

84.    This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

85.   During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Herbalife securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Herbalife securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

86.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Herbalife securities.  Such reports, filings, releases and statements were materially false and

misleading in that they failed to disclose material adverse information and misrepresented the truth about Herbalife's finances and business prospects.

87.     By virtue of their positions at Herbalife, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

88.     Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Herbalife securities from their personal portfolios.

89.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of Herbalife, the Individual Defendants had knowledge of the details of Herbalife's internal affairs.

90.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Herbalife.   As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Herbalife's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Herbalife securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Herbalife's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Herbalife securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

91.     During the Class Period, Herbalife securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Herbalife securities at prices artificially inflated by defendants' wrongful conduct.  Had Plaintiff and the other members of the

Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Herbalife securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Herbalife securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

92.    By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

93.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

94.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

95.     During the Class Period, the Individual Defendants participated in the operation and management of Herbalife, and conducted and participated, directly and indirectly, in the conduct of Herbalife's business affairs.   Because of their senior positions, they knew the adverse non-public information about Herbalife's misstatement of income and expenses and false financial statements.

96.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Herbalife's financial condition and results of operations, and to correct promptly any public statements issued by Herbalife which had become materially false or misleading.

97.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Herbalife disseminated in the marketplace during the Class Period concerning Herbalife's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Herbalife to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Herbalife within the meaning of Section 20(a) of the Exchange Act.   In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Herbalife securities.

98.     Each of the Individual Defendants, therefore, acted as a controlling person of Herbalife.  By reason of their senior management positions and/or being directors of Herbalife, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Herbalife to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Herbalife and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

99.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Herbalife.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and

other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: April 14, 2014

**GLANCY BINKOW & GOLDBERG LLP**

By:  *s/ Lionel Z. Glancy*
Lionel Z. Glancy
Michael Goldberg
Robert V. Prongay
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
E-mail: info@glancylaw.com
        lglancy@glancylaw.com
        mmgoldberg@glancylaw.com
        rprongay@glancylaw.com

**POMERANTZ LLP**
Marc I. Gross
Jeremy A. Lieberman
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
migross@pomlaw.com
jalieberman@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
pdahlstrom@pomlaw.com

***Attorneys for Plaintiff***

## CERTIFICATION PURSUANT
## <u>TO FEDERAL SECURITIES LAWS</u>

1.    I, ABDUL AAL AWAD, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.   I have reviewed a Complaint against Herbalife Ltd. ("Herbalife" or the "Company"), and authorize the filing of a comparable complaint on my behalf.

3.   I did not purchase or acquire Herbalife securities at the direction of plaintiffs counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.    I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Herbalife securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.   To the best of my current knowledge, the attached sheet lists all of my transactions in Herbalife securities during the Class Period as specified in the Complaint.

6.   During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.   I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.

**Executed** _____   APRIL 12, 2014

(Date)

_____

**(Signature)**

ABDUL AAL AWAD

**(Type or Print Name)**

**HERBALIFE INTERNATIONAL, INC.**                    **Awad, Abdul**

### LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|------|------------------|-------------------|-----------------|
| 12/06/2013 | PUR | 100 | $74.3300 |
| 12/30/2013 | PUR | 150 | $77.3000 |
| 01/24/2014 | PUR | 100 | $63.2600 |
| 01/28/2014 | SLD | 100 | $62.0500 |
| 02/19/2014 | SLD | 100 | $66.6201 |
| 03/03/2014 | SLD | 50 | $65.5600 |