1  JONATHAN C. DICKEY, SBN 88226
   JDickey@gibsondunn.com
2  GIBSON, DUNN & CRUTCHER LLP
   1881 Page Mill Road
3  Palo Alto, California  94304-1211
   Telephone:  650.849.5300
4  Facsimile:   650.849.5333

5  DANIEL S. FLOYD, SBN 123819
   DFloyd@gibsondunn.com
6  ALEXANDER K. MIRCHEFF, SBN 245074
   AMircheff@gibsondunn.com
7  GIBSON, DUNN & CRUTCHER LLP
   333 South Grand Avenue
8  Los Angeles, California  90071-3197
   Telephone:  213.229.7000
9  Facsimile:   213.229.7520

10

11 Attorneys for Defendants
   Herbalife Ltd., Michael O. Johnson,
   Desmond Walsh, and John DeSimone
12

13             UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA
14                  WESTERN DIVISION

15

16 IN RE HERBALIFE, LTD.            Case No. 2:14-CV-02850-DSF (JCGx)
   SECURITIES LITIGATION
17                                  **NOTICE OF MOTION AND
                                    MOTION OF DEFENDANTS TO
18                                  DISMISS PLAINTIFFS' AMENDED
                                    COMPLAINT; MEMORANDUM OF
19                                  POINTS AND AUTHORITIES IN
                                    SUPPORT THEREOF**
20
                                    Hearing:      February 9, 2015
21                                  Time:         1:30 p.m.
                                    Place:        Courtroom 840
22                                                255 East Temple St.
23                                                Los Angeles, CA 90012

24                                  Judge:        Hon. Dale S. Fischer

25                                  [Appendices A through D, Declaration
                                    of Daniel S. Floyd, Request for Judicial
26                                  Notice filed concurrently herewith]

27

28

Gibson, Dunn &
Crutcher LLP

─────────────────────────────────────────────
       MOTION TO DISMISS THE AMENDED COMPLAINT

### NOTICE OF MOTION AND MOTION

NOTICE IS HEREBY GIVEN that on February 9, 2015 at 1:30 p.m., or as soon thereafter as the matter may be heard in the courtroom of the Honorable Dales S. Fischer of the above-entitled Court, Courtroom 840, 255 East Temple Street, Los Angeles, CA 90012, Defendants Herbalife Ltd., Michael O. Johnson, Desmond Walsh, and John DeSimone, shall and hereby do move the Court for an order dismissing without leave to amend Plaintiffs' Amended Complaint.

This Motion is made under Federal Rules of Civil Procedure 12(b)(6) and 9(b) on the ground that Plaintiffs have failed adequately to plead claims consistent with the requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA").  As explained further below, the Complaint should be dismissed on multiple grounds: (i) Plaintiffs have alleged no material misrepresentations in violation of Section 10(b) of the Securities Exchange Act ("the '34 Act"); (ii) there are no allegations supporting an inference of scienter, much less the required strong inference; (iii) there is no pleading of loss causation because there has been no disclosure that Plaintiffs' allegations are true (because they are not); and (iv) because Plaintiffs have failed to plead a primary violation of Section 10(b), none of the Defendants can be held liable as control persons under Section 20(a).  Moreover, even without reaching the merits, the Complaint can be dismissed for lack of standing.

This Motion is made following the conference of counsel pursuant to L.R. 7-3 on October 20 and 27, 2014.


DATED:  November 3, 2014          GIBSON, DUNN & CRUTCHER LLP


                                  By:   */s/ JONATHAN C. DICKEY*
                                        JONATHAN C. DICKEY

                                  Attorneys for Defendants Herbalife Ltd.,
                                  Michael O. Johnson, Desmond Walsh, and
                                  John DeSimone

1

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................. 1

II.   SUMMARY OF ARGUMENT .......................................................... 4

III.  FACTUAL BACKGROUND ............................................................. 7

    A.   Herbalife's Business Model ..................................................... 7

    B.   The Complaint's Core Allegation that Herbalife is a
        "Pyramid Scheme" .................................................................. 9

    C.   The Complaint's Scienter Allegations .................................. 11

    D.   The Complaint's Loss Causation Allegations........................ 12

IV.   ARGUMENT ................................................................................... 13

    A.   Plaintiffs Fail to State a Claim Under Rule 10b-5(b) ............ 13

        1.   The Complaint Pleads No Actionable Misstatements ................... 13

        2.   The Complaint Fails to Plead a Strong Inference of
            Scienter ................................................................................. 21

        3.   The Complaint Fails to Plead Loss Causation............................ 28

    B.   Plaintiffs Fail to State a Claim Under Rule 10b-5(a) or (c)....................32

    C.   Plaintiffs Fail to State a Claim for Control Person Liability .................. 33

    D.   Plaintiffs Cannot Assert These Claims .................................. 33

        1.   Oklahoma Has Violated the PSLRA's Presumptive
            Bar on "Professional Plaintiffs"....................................... 33

        2.   Neither Plaintiff Has Established Standing Under the
            PSLRA ................................................................................ 34

V.    CONCLUSION................................................................................. 35

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MOTION TO DISMISS THE AMENDED COMPLAINT

# TABLE OF AUTHORITIES

<u>Page</u>

## CASES

*Abbate v. Wells Fargo Bank, N.A.*,
  2011 WL 9698215 (C.D. Cal. Nov. 17, 2011) ........................................................... 32

*Abuhamdan v. Blyth, Inc.*,
  9 F. Supp. 3d 175 (D. Conn. 2014) ................................................. 3, 17, 18, 20, 21, 33

*Amirhamzeh v. Chase Bank USA, N.A.*,
  2014 WL 641705 (C.D. Cal. Feb. 7, 2014) ................................................................ 34

*Arenson v. Broadcom Corp.*,
  2004 WL 3253646 (C.D. Cal. Dec. 6, 2004) .............................................................. 34

*Aronson v. McKesson HBOC, Inc.*,
  79 F. Supp. 2d 1146 (N.D. Cal. 1999) ........................................................................ 34

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1998) ..................................................................................................... 31

*Bd. of Trustees of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v.
  Mechel OAO*,
  811 F. Supp. 2d 853 (S.D.N.Y. 2011) ........................................................................ 28

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ....................................................................................... 26

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
  506 Fed. App'x 32 (2d Cir. 2012) ............................................................................... 20

*Brody v. Transitional Hosps. Corp.*,
  280 F.3d 997 (9th Cir. 2002) ....................................................................................... 19

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
  880 F. Supp. 2d 1045 (N.D. Cal. 2012) ................................................................ 23, 24

*Desai v. Deutsche Bank Sec. Ltd.*,
  573 F.3d 931 (9th Cir. 2009) .................................................................................. 32, 33

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005) ..................................................................................................... 29

MOTION TO DISMISS THE AMENDED COMPLAINT

*Espinoza v. Whiting*,
   --- F. Supp. 2d ----, 2014 WL 1057295 (E.D. Mo. Mar. 18, 2014) ...........................28

*FTC v. BurnLounge, Inc.*,
   753 F.3d 878 (9th Cir. 2014)...........................................................................21, 27

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   134 S. Ct. 2398 (2014) ................................................................................13, 31

*Heliotrope Gen., Inc. v. Ford Motor Co.*,
   189 F.3d 971 (9th Cir. 1999).................................................................................16

*Howard v. Everex Sys., Inc.*,
   228 F.3d 1057 (9th Cir. 2000).............................................................................33

*In re Apollo Grp., Inc. Sec. Litig.*,
   2012 WL 2376378 (D. Ariz. June 22, 2012)........................................................13

*In re Apple Computer Sec. Litig.*,
   886 F.2d 1109, 1116 (9th Cir.1989)....................................................................32

*In re Cutera Sec. Litig.*,
   610 F.3d 1103 (9th Cir. 2010)...............................................................................21

*In re Express Scripts, Inc., Sec. Litig.*,
   2010 WL 2671456 (E.D. Mo. June 30, 2010)....................................................16, 30

*In re McKesson HBOC, Inc. Sec. Litig.*,
   97 F. Supp. 2d 993 (N.D. Cal. 1999) ....................................................................34

*In re NVIDIA Corp. Sec. Litig.*,
   2011 WL 4831192 (N.D. Cal. Oct. 12, 2011).......................................................24

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014)..............................................21, 25, 26, 28, 33

*In re PetSmart, Inc. Sec. Litig.*,
   61 F. Supp. 2d 982 (D. Ariz. 1999)........................................................................17

*In re REMEC Inc. Sec. Litig.*,
   702 F. Supp. 2d 1202 (S.D. Cal. 2010)..................................................................28

*In re Silicon Graphics Inc. Sec. Litig.*,
   183 F.3d 970 (9th Cir. 1999)......................................................21, 22, 24, 32

MOTION TO DISMISS THE AMENDED COMPLAINT

Gibson, Dunn &
Crutcher LLP

*In re Software Toolworks Inc. Sec. Litig.*,
  789 F. Supp. 1489 (N.D. Cal. 1992)
  *rev'd in part on other grounds by* 50 F.3d 615 (9th Cir. 1994) ................................28

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
  2000 WL 1727377 (N.D. Cal. Sept. 29, 2000) ...........................................32, 33

*In re Stac Elects. Sec. Litig.*,
  89 F.3d 1399 (9th Cir. 1996) ...................................................................2, 16, 18

*In re Toyota Motor Corp. Sec. Litig.*,
  2011 WL 2675395 (C.D. Cal. 2011) .................................................................19

*In re Ubiquiti Networks, Inc. Sec. Litig.*,
  --- F. Supp. 2d ----, 2014 WL 1254149 (N.D. Cal. Mar. 26, 2014) ..........................26

*In re Vantive Corp. Sec. Litig.*,
  283 F.3d 1079 (9th Cir. 2002) .......................................................................23

*In re VeriFone Holdings, Inc., Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012) ........................................................................24

*In re Wet Seal, Inc. Sec. Litig.*,
  518 F. Supp. 2d 1148 (C.D. Cal. 2007) ...........................................................19

*In re Worlds of Wonder Sec. Litig.*,
  35 F.3d 1407 (9th Cir. 1994) ....................................................................13, 28

*Karam v. Corinthian Colls., Inc.*,
  2012 WL 8499135 (C.D. Cal. Aug. 20, 2012) ....................................................20

*Lipton v. Pathogenesis Corp.*,
  284 F.3d 1027 (9th Cir. 2002) .......................................................................23

*Loos v. Immersion Corp.*,
  762 F.3d 880 (9th Cir. 2014) ...........................................6, 7, 28, 29, 30, 31

*Loritz v. U.S. Ct. of Appeals for the Ninth Circuit*,
  382 F.3d 990 (9th Cir. 2004) ........................................................................34

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
  540 F.3d 1049 (9th Cir. 2008) ...............................................................22, 23, 29

*Meyer v. Greene*,
  710 F.3d 1189 (11th Cir. 2013) ...............................................................30, 31

MOTION TO DISMISS THE AMENDED COMPLAINT

Gibson, Dunn & Crutcher LLP

*Okla. Firefighters Pension & Ret. Sys. v. IXIA*,
   2014 WL 4978568 (C.D. Cal. Oct. 6, 2014) ...........................................................22

*Permutter v. Intuitive Surgical, Inc.*,
   2011 WL 566814 (N.D. Cal. Feb.15, 2011) ...........................................................34

*Plevy v. Haggerty*,
   38 F. Supp. 2d 816 (C.D. Cal. 1998) ...................................................................16

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) .................................13, 16, 18, 20, 21, 22, 26

*Reinschmidt v. Zillow*,
   No. 12-cv-02084-RSM (N.D. Cal. Oct. 20, 2014) .............................................17

*SEC v. Ralston*,
   346 U.S. 119 (1953) .....................................................................................5, 13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ...............................................................................2, 21, 26

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*,
   655 F.3d 1039 (9th Cir. 2011) .............................................................................32

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ...........................................................22, 25, 26, 28

## STATUTES

15 U.S.C. § 78u-4(a)(2)(A)(iii) ...............................................................................35

15 U.S.C. § 78u–4(b)(2)(A) .....................................................................................21

Private Securities Litigation Reform Act of 1995,
   Pub. L. 104-67, 109 Stat. 737 ........................................................................i, 3, 4

Securities Exchange Act of 1934, Section 10(b),
   15 U.S.C. § 78j(b) ..............................................................................i, 4, 19, 33

Securities Exchange Act of 1934, Section 20(a),
   15 U.S.C. § 78t(a).....................................................................................i, 4, 33

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**RULES**

Fed. R. Civ. P. 12(b)(6) ............................................................... i, 13

Fed. R. Civ. P. 9(b) ..................................................................... i, 13

MOTION TO DISMISS THE AMENDED COMPLAINT

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Herbalife Ltd. ("Herbalife" or the "Company") is a successful worldwide company focused since its founding in 1980 on providing high quality, science-based products to members and their customers who seek an active and healthy lifestyle. Herbalife's weight management products, nutritional supplements, energy, sports & fitness, and personal care products generate *billions* in annual sales and hundreds of millions in annual earnings.  Herbalife's diversified products are sold through a multi-level marketing network across more than 90 countries, comprised of approximately 3.9 million independent members—including hundreds of thousands engaged in the business opportunity and millions more who simply joined to receive a 25% discount on products for their own use.

The material aspects of Herbalife's structure, operations, and financial results have been fully disclosed to investors, along with a number of risk factors unique to Herbalife.  Investors who choose to purchase Herbalife stock know that they are not investing in a traditional brick-and-mortar business; on the contrary, they know full well that Herbalife's remarkable success has been built on selling its products through its network marketing program.  But Plaintiffs contend that Herbalife, notwithstanding its many successful products, history, size, and financial success, is an uncharged "pyramid scheme," and that the Company and its senior officers—namely, Chief Executive Officer Michael O. Johnson, President Desmond Walsh, and Chief Financial Officer John DeSimone (collectively, the "Individual Defendants" and, with Herbalife, "Defendants")—committed securities fraud by "misrepresent[ing] the nature, scope and legality of the Company's business and operations."  Compl. ¶ 1.

Plaintiffs' contentions are not remotely supported by reality, or by the facts alleged in the Amended Complaint ("Complaint").  In fact, Plaintiffs' conclusory allegations of securities fraud are directly contradicted by Herbalife's many disclosures concerning the nature of its business, and the risks associated with an investment in

Herbalife stock.[1]  Herbalife consistently has described how its direct selling network helps foster a grass-roots, personalized approach to health and fitness.  Herbalife has disclosed how its members sell a wide variety of products supporting good health, recognizing that millions struggle with obesity and the harmful effects of sedentary lifestyles.  The Company also has described how its business model provides opportunities for its members not only to consume its products and further their own health and fitness goals, but also to participate in the business offered by the Company's network marketing program.  This entrepreneurial component is a cornerstone of Herbalife's business model, providing a genuine business opportunity for its members, and an easy way to return products and exit the business if they decide to do so.  Plaintiffs fail to plead that any of these core aspects of Herbalife's business model works differently than as disclosed, or that the Company's model is unlawful in any way (let alone that it has been found to be unlawful).  Simply calling Herbalife a "pyramid scheme" is insufficient as a matter of law to plead securities fraud.

In reality, the complaint filed by Plaintiffs is not a securities fraud complaint at all.  Rather, the Complaint simply challenges Herbalife's business model as being somehow unfair and unsustainable.  But these *shareholders* are not trade regulators; the securities laws give them no roving commission to challenge Herbalife's business practices.  Instead, Plaintiffs are investors who chose to buy Herbalife stock after being fully informed about what Herbalife does, how it operates, the source of its revenues, and the legal and regulatory risks to its business.  For example, in its Form 10-K filed in February 2011 (Ex. 2 at 62–63, 67, 72) Herbalife specifically disclosed that:

- its "network marketing program is subject to a number of federal and state regulations administered by the FTC and various state agencies in the United

---

[1]  Plaintiffs' defective claims need not be analyzed in a "vacuum."  This Court may properly consider all of the disclosures made in the documents Plaintiffs have referenced and which are subject to judicial notice.  *E.g.*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007); *In re Stac Elects. Sec. Litig.*, 89 F.3d 1399, 1410 (9th Cir. 1996); *see also* Defendants' Request for Judicial Notice, filed herewith.

States as well as regulations on direct selling in foreign markets administered by foreign agencies," which "generally are directed at preventing fraudulent or deceptive schemes, often referred to as 'pyramid' or 'chain sale' schemes, by ensuring that product sales ultimately are made to consumers and that advancement within an organization is based on sales of the organization's products rather than investments in the organization or other non-retail sales-related criteria";

- there is a risk that "in one or more markets, our marketing system could be found not to be in compliance with applicable regulations," which "do not include 'bright line' rules and are inherently fact-based";

- the Company could be subject to "private party challenges to the legality of [its] network marketing program"; and

- the Company's "success depends in significant part upon [its] ability to recruit, retain and motivate a large base of distributors."

These disclosures are repeated throughout the Company's filings with the Securities and Exchange Commission ("SEC") during the putative class period, and are entirely accurate. In fact, Herbalife's disclosures have been even more robust—and have received even wider media attention—than disclosures that very recently led the District of Connecticut to dismiss without leave to amend identical securities fraud allegations against another alleged "pyramid scheme," because the defendant "fully informed the market that [the company] was a multi-level marketing company whose growth was driven, at least in part, by the addition of new promoters" and "sufficiently warned of the risks . . . associated with [the company's] business model." *Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 193, 197 (D. Conn. 2014). *Abuhamdan* understandably was not appealed and is now a highly persuasive final judgment.

Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Plaintiffs have the burden to plead specific, particularized facts establishing a strong inference that Defendants intentionally made material misrepresentations concerning the core legitimacy of Herbalife's business. But the Complaint falls miserably short of doing so. Rather, the Complaint merely cribs from the very public, unproven, and

Gibson, Dunn & Crutcher LLP

1    entirely self-interested accusations of William A. Ackman and his hedge fund,

2    Pershing Square Capital Management L.P.  Ackman began an assault on the

3    Company's business model in December 2012, when he publicly announced a $1

4    billion short sale—a bet that the Company's stock price would drop—while accusing

5    Herbalife of being a pyramid scheme.  Plaintiffs now trumpet the fact that Herbalife

6    has been attacked by Ackman, and they base their claims almost entirely on Ackman's

7    charges.  Yet this is precisely the type of accusation that the Company repeatedly

8    warned its investors might be made.[2]  All investors were informed of this risk, and no

9    investor purchased Herbalife stock without full knowledge of the material aspects of

10   the Company's business and operations.

11          Thus, as explained further below, the Complaint should be dismissed on

12   multiple grounds: (i) Plaintiffs have alleged no material misrepresentations in violation

13   of Section 10(b) of the Securities Exchange Act ("the '34 Act"); (ii) there are no

14   allegations supporting an inference of *scienter*, much less the required strong

15   inference; (iii) there is no pleading of loss causation because there has been no

16   disclosure that Plaintiffs' allegations are true (because they are not); and (iv) because

17   Plaintiffs have failed to plead a primary violation of Section 10(b), none of the

18   Defendants can be held liable as control persons under Section 20(a).  Moreover, even

19   without reaching the merits, the Complaint can be dismissed for lack of standing.

## II.    SUMMARY OF ARGUMENT

21          ***Plaintiffs fail to state a claim for securities fraud.***  Plaintiffs fail to plead

22   securities fraud with the particularity required under the PSLRA.  *First*, Plaintiffs do

23   not properly allege that any of Herbalife's statements were false.  Rather, Plaintiffs

24   allege that Herbalife's truthful statements "omitted" the supposed "fact" that Herbalife

25

26          [2] *See generally* Ex. 26 (*Bill Ackman and His Hedge Fund, Betting Big*, N.Y. Times (Oct.
27   25, 2014) ("[E]ven one of [Ackman's] closest advisers has called his theatrics on the
     subject . . . a mistake.")).  "Ex." refers to Exhibits to the Declaration of Daniel S. Floyd,
28   filed herewith.

was in reality an uncharged pyramid scheme.  *See, e.g.*, Compl. ¶¶ 138, 144, 150, 157, 162, 166.  Plaintiffs plead no particularized facts to support this allegation.  In leveling conclusory attacks at the structure of Herbalife's operations, Plaintiffs have confused a claim for unfair trade practices with a claim for securities fraud.  They miss the limited purpose of the '34 Act—to "protect investors by promoting full disclosure of information thought necessary to informed investment decisions."  *SEC v. Ralston*, 346 U.S. 119, 124 (1953).  And, more importantly, they omit any mention of the fact that Herbalife disclosed to investors what it does and how it does it, as well as the *specific* risk that "pyramid scheme" challenges could be made against it.  When that risk materialized with allegations by Ackman or others, investors like Plaintiffs could hardly have been surprised—it was the very risk the Company had warned them about.

*Second*, the Complaint fails to establish the necessary "strong inference" that any of the Defendants had the requisite *intent* to defraud investors or "scienter."  Plaintiffs offer no facts to substantiate their contention that Defendants knew or were deliberately reckless in somehow misleading investors about the pyramid scheme issue (which was fully disclosed in any event).  Instead, Plaintiffs rely on two sets of allegations that fall far short of establishing a plausible—much less a strong— inference of scienter under controlling Ninth Circuit authority:

- Plaintiffs rely on the Individual Defendants' stock sales.  But the Complaint—which has an exceptionally long class period and thus sweeps in a large number of trades—fails to include the minimal trading information that this Circuit requires to evaluate whether the challenged trading is suspicious.  In any event, the *actual* trading data (reflected in judicially noticeable Forms 4 filed with the SEC) show that the challenged trades were not remotely suspect in timing or amounts.

- Plaintiffs also rely on allegations derived from two "Confidential Witnesses," involved in the recruiting process and data analysis, respectively, who say little more than that the Company spoke of recruiting as part of its overall sales and marketing efforts—but *not* that recruiting was the *sole or primary* focus of the Company's business model, let alone the sole or primary source of members' commissions—which it is not—or that the Defendants believed it was an unlawful pyramid scheme.

Gibson, Dunn & Crutcher LLP

Far from demonstrating a strong inference of scienter, the Complaint and judicially noticeable facts support the far more compelling inference that Defendants believed they had appropriately disclosed the nature and risks of Herbalife's business model—promoting global health and fitness through direct selling of science-based health and nutrition products, emphasizing one-on-one relationships and social support to help individuals achieve health and wellness goals, and relying on an MLM compensation plan designed to compensate sales leaders who grow their business and mentor others.

*Third*, the Complaint fails to plead loss causation. To this day, there has never been a "corrective" disclosure demonstrating that any statements Herbalife has made about its business model were false, or that any stock decline was proximately caused by any such allegedly "corrective" disclosure. On the contrary, the Complaint is based on nothing more than self-interested *accusations by others*—which Herbalife specifically warned about. None of those allegations "revealed" as opposed to speculated (incorrectly) that Herbalife was operating as an uncharged pyramid scheme. Recently, the Ninth Circuit emphatically rejected materially identical attempts to base loss causation on the mere disclosure of a government investigation—the premise upon which the original complaint in this matter was based. *Loos v. Immersion Corp.*, 762 F.3d 880, 890 n.3 (9th Cir. 2014) ("[T]he announcement of an investigation 'standing alone and without any subsequent disclosure of actual wrongdoing,' does not reveal to the market the pertinent truth of anything, and therefore does not qualify as a corrective disclosure."). *Loos* similarly rejected attempts to premise loss causation on an announcement of "disappointing earnings" that "simply reveal that [the company] had failed to meet its revenue goals," as such disclosure "do[es] not tend to suggest that the company had engaged in fraud[]." *Id.* at 887–88. Plaintiffs in this case allege no more. No losses were caused by fraud here.[3]

---

[3] Plaintiffs have attempted to avoid the devastating impact of the Ninth Circuit's holding in *Loos* by changing their theory. The original complaint ended with the disclosure by a third party of a government investigation. Dkt. 1 ¶¶ 1, 5, 73. To avoid *Loos*, Plaintiffs

[Footnote continued on next page]

1    ***Plaintiffs cannot assert these claims.***  The Complaint should also be dismissed

2    because the two lead plaintiffs are unqualified to serve in that capacity.  First,

3    Oklahoma Firefighters Pension and Retirement System ("Oklahoma") is statutorily

4    *ineligible* to serve as a lead plaintiff in this case; it never informed the Court that it

5    violated the PSLRA's prohibition that no shareholder may serve as lead plaintiff if it

6    has done so in more than five cases within the last three years.  Oklahoma has far

7    exceeded that presumptive limit, yet it failed to advise the Court of its facial lack of

8    statutory standing to serve as lead plaintiff here.  Second, the lead plaintiff certification

9    filed by City of Atlanta Firefighter's Pension Fund ("Atlanta") shows that it was a *net*

10   *gainer* during the proposed class period and therefore lacks standing.  Oklahoma likely

11   suffers from the same infirmity, as it has sold off shares during the class period at a

12   profit, but has critically failed, as required, to disclose its transactions leading up to the

13   earnings statement in July of this year that Plaintiffs claim was a "corrective

14   disclosure" of supposed fraud.

### III.    FACTUAL BACKGROUND

**A.    Herbalife's Business Model**

17          All of the information that Plaintiffs cite in support of their unqualified

18   statement that the Company is an uncharged pyramid scheme has long been a part of

19   the public record, as Plaintiffs (and Ackman) admit.  *See, e.g.*, Pl. Ex. A (12/20

20   presentation) at slide 2 ("The information and opinions expressed in this presentation

21   . . . is based on publicly available information about Herbalife.").  Yet by omitting key

22   facts and distorting others, Plaintiffs depict a different company than Herbalife really

23   is.  Herbalife's actual public disclosures (for example, the February 22, 2011 Form 10-

24   K issued just before the class period begins, *see* Ex. 2 at 58–59), state as follows:

[Footnote continued from previous page]
      have now extended the class period to end with an alleged "corrective disclosure" in
      the form of the Company's "disappointing" July 28, 2014 earnings announcement.  But as
      *Loos* also makes clear, this type of unsubstantiated assertion based solely on "bad"
      earnings is equally untenable.  *See infra*.

Herbalife, founded 34 years ago, is a highly successful, worldwide nutrition company that sells "weight management, nutritional supplement, energy, sports & fitness products and personal care products."  The Company distributes and sells its products through a network of independent members using the direct selling channel.  The majority of members buy Herbalife products for self-consumption and to realize their own health and fitness goals.  *See also* Ex. 24 (cited in Compl. ¶¶ 22, 195) at 461–62, 465 (referencing market study finding that 70+% of members in the U.S. were discount purchasers).  Other members choose to participate in the business opportunity that the Company's network marketing plan offers; those members are referred to as "sales leaders" and, in addition to buying the product for themselves, they also market and sell the product to other members and/or non-member consumers.  As of December 31, 2013, Herbalife, a 7,000-employee company, sold its products in more than 90 countries to and through a network of approximately 3.7 million members.  Ex. 5 (Feb. 18, 2014 10-K at 4, 25) at 168, 177.  The Company's success is apparent.  Its product sales—including its meal replacement shake, the market leader in a category including Kellogg's and Nestle (*see* Ex. 24 (cited in Compl. ¶¶ 22, 195) at 451)— generate billions in sales and hundreds of millions in earnings annually.

The Company believes that its success throughout its 34-year operating history is based in large part on enhanced consumer awareness and the demand for Herbalife products due to the "global obesity epidemic," coupled with the effectiveness of the Company's direct selling distribution network and actively engaged members who strive to realize the health and fitness goals that Herbalife promotes.  The frequent "personal contact" between members and their customers enhances consumers' understanding about the importance of nutrition and health and "motivate[s them] to begin and maintain wellness and weight management programs."  Further, because members selling the products also use and consume them, they are well-suited to "provide first-hand [accounts] of the [products'] effectiveness . . . to consumers"—"a powerful sales tool."

Individuals become Herbalife members for different reasons.  Most join to receive a discount on the products, which they and their families consume directly.  Others assume the sales leader position so that they can earn part- or full-time income by selling the products directly or through others in their sales organizations.

Herbalife is a legitimate multi-level marketing company that meets or exceeds the industry standard in each applicable respect:

- All compensation is based solely upon product sales, not mere recruitment;

- There are no minimum purchase requirements to enroll or remain a member;

- Rather, Herbalife members can easily enter and exit the business, including through a robust buy-back and return policy, through which the Company not only covers the product cost but also (as of summer 2013) return shipping fees and costs;

- Herbalife's buy-back policy is accompanied by a claw-back provision that discourages inventory loading; and

- While member-consumers are legitimate consumers in and of themselves, nevertheless, Herbalife also has a significant non-member consumer base, including millions of purchasing households in the U.S.[4]

**B.     The Complaint's Core Allegation that Herbalife is a "Pyramid Scheme"**

Plaintiffs' core allegation is that the Company's statements over several years about its financial results, business practices and marketing plan, regulatory compliance, and internal controls are materially false because the Company failed to disclose that it "did not operate as a legitimate MLM as it claimed but rather as an illegal pyramid scheme," in that:

(i) Herbalife's primary emphasis to its members and the primary source of income for its distributors is through recruitment of new members rather than true retail operations to non-affiliated consumers;

---

[4]  Exs. 22 (*Herbalife Announces Results of Study on Distributors and End Users in the U.S.*, Herbalife Press Release (June 11, 2013)); 24 at 457 (referencing another outside market study finding over five million purchasing U.S. households in the past three months).

MOTION TO DISMISS THE AMENDED COMPLAINT

Gibson, Dunn & Crutcher LLP

(ii) the Company had no demonstrated revenue from retail sales;

(iii) Herbalife's products were not unique in the market place and were inappropriately priced at levels for which such products were not selling in the marketplace;

(iv) the Company obtained new members primarily through extravagant promises of high returns, easy money and passive income;

(v) Herbalife's retail sales and related financial results were the result of increasing levels of buy-ins required of its members to obtain rewards from its complex commission structure.

Compl. ¶ 138; *see also id.* ¶¶ 146–57, 163–66.  Plaintiffs thus claim that virtually all of the Company's SEC filings and earnings statements during the class period are actionable as fraud for failure to admit the supposed "fact" that it was a pyramid scheme.  But these accusations are offered in a conclusory manner, unsupported by the required particularized facts, and they do not satisfy the requirements of the PSLRA.

Contrary to Plaintiffs' core premise, the Company has had many years of success and has never been the subject of a finding that it operates unlawfully.  The Company has also provided extensive, transparent disclosures concerning its business model, including its benefits and risks, to inform investors of the risks associated with buying Herbalife stock.  *See supra*.  Notably, the risk that the Company might be accused of pyramid scheme violations was repeatedly disclosed before and throughout the class period.  For example, in its annual report for 2010, filed with the SEC the day before the class period begins, the Company stated, as it had in prior filings, that it is "subject to the risk of private party challenges to the legality of our network marketing program," including with respect to "pyramid scheme" allegations.  Ex. 1 at 25–26; *see also id.* at 35–36; Ex. 2 at 63, 72 (same).  This warning appears in each of the SEC filings referenced in Plaintiffs' Complaint.[5]

---

[5]  A more complete description of the Company's disclosures on this topic is found in **Appendix A.**  Moreover, throughout the class period, the allegedly concealed information described in the allegations of the Complaint also has been discussed in the public domain

[Footnote continued on next page]

**C.     The Complaint's Scienter Allegations**

*Insider Trading.*  Plaintiffs attempt to allege scienter based primarily on the assertion that the Individual Defendants had financial motives to commit fraud and engaged in insider trading to "capitalize[] on their insider knowledge and the artificial inflation in the price of Herbalife's common stock."  Compl. ¶¶ 167–68.

But as reflected in **Appendix C**, the judicially noticeable Forms 4 filed with the SEC documenting the stock sales of each of the Individual Defendants before and during the class period, including the challenged sales, conclusively show that none of the Individual Defendants traded in suspicious amounts at suspicious times, contrary to the pleading standards in the Ninth Circuit for insider trading to support an inference of scienter.  The sales were routine.

*Confidential Witnesses ("CWs").*  CW 1 allegedly is Herbalife's former Vice President of Worldwide Events.  She "reiterated that the clear message presented during the Extravaganza events was that the business opportunity involved recruiting new distributors" and that Johnson would state that "if the low-level distributors"— which comprised the vast majority of attendees—wanted to "move up to better seating" in the President's Club or Millionaire Club they needed to "build their organization" by recruiting new distributors.  Compl. ¶ 49.  CW 2 allegedly is Herbalife's former Business Analyst-Worldwide Sales, Strategy and Analysis, who allegedly stated that "the Company's emphasis was on recruitment as a means of advancing within its hierarchy" and "Herbalife's goal was to recruit new people and encourage nutrition."  *Id.* ¶ 54.  Neither CW is alleged to have directly reported to any of the Individual Defendants, nor to have said that members' commissions were based

---

[Footnote continued from previous page]
through numerous publications, media reports, and other public sources, some of which even predated the class period.  Investors thus purchased Herbalife stock with full knowledge of the allegations raised in this Complaint.  Examples of such third-party disclosures are found in **Appendix B**.

Gibson, Dunn &
Crutcher LLP

solely or even primarily on recruitment.  In fact, neither CW asserts that Herbalife is a pyramid scheme or that it was knowingly engaged in any fraudulent business practices.

**D.      The Complaint's Loss Causation Allegations**

The Complaint recites the following events as having triggered stock price declines, and implies that they somehow revealed the alleged "truth" about Herbalife:

- Investor David Einhorn's question to the Company on its May 1, 2012 earnings conference call and the Company's response through its May 2, 2012 Form 8-K stating that the Company does not track the number of retail sales to non-member consumers, *id.* ¶¶ 81–83, 172;

- Ackman's December 19, 2012 public announcement and December 20, 2012 public presentation of his $1 billion short of the Company and his short thesis, *id.* ¶ 173;

- U.S. Senator Edward Markey's January 23, 2014 public letters to the SEC, FTC, and Herbalife, respectively, "urging [the SEC and FTC] to investigate Herbalife," and asking the Company "several questions about the Company's business, including pointed requests that reflected the concerns raised by Ackman in December 2012," *id.* ¶¶ 100–05, 174;

- Herbalife's March 12, 2014 announcement of a FTC investigation of the Company, *id.* ¶¶ 107, 174; and

- the Company's July 28, 2014 earnings announcement, which "marked the first time since 2008 that Herbalife missed estimates," *id.* ¶¶ 132–33, 175.

These allegations differ materially from the original complaint, which portrayed a news report alleging an investigation in April 2014 as the "corrective" disclosure that caused losses to Herbalife investors and ended the class period.

But critically, the Complaint points to no "corrective" disclosures that were contrary to anything the Company disclosed in its SEC filings or other public statements.  Indeed, as shown in **Appendix D**, the allegedly "corrective" disclosures to which Plaintiffs point took place over a period of *two years,* during which Herbalife's stock price also *increased* as much as it *decreased,* even after the alleged disclosure of a government investigation in March 2014—the very disclosure upon which the original complaint relied to allege loss causation.

# IV.   ARGUMENT

## A.   Plaintiffs Fail to State a Claim Under Rule 10b-5(b)

To survive a motion to dismiss under Rule 12(b)(6), a complaint alleging securities fraud must adequately plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1057 (9th Cir. 2014) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014)).  Plaintiffs "must satisfy both the pleading requirements of the PSLRA and the heightened pleading standard of Rule 9(b), which requires that the complaint 'state with particularity the circumstances constituting fraud.'"  *Id.* at 1057–58 (quoting Fed. R. Civ. P. 9(b)).  The PSLRA also imposes "more exacting pleading requirements including, among other things, that the complaint state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id.* at 1058.  Plaintiffs fall far short of these standards here.

### 1.   The Complaint Pleads No Actionable Misstatements

Plaintiffs' entire Complaint challenges the *structure* of Herbalife's operations, as if this action were a consumer fraud or unfair trade practices action.  This is a critical failure:  the securities laws do not regulate *how* a company operates; rather, they prohibit companies from *misleading investors* about their operations.  *E.g.*, *Ralston*, 346 U.S. at 124; *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425 (9th Cir. 1994); *In re Apollo Grp., Inc. Sec. Litig.*, 2012 WL 2376378, at *n.4 (D. Ariz. June 22, 2012).  The disconnect between the Complaint and the rigorous pleading standards under the PSLRA is that Plaintiffs never plead how an investor could be misled by anything Herbalife or its officers did or said.  Instead, Plaintiffs rely on an "investor alert" listing pyramid-scheme "hallmarks," which states "[i]t is neither a legal interpretation nor a statement of SEC policy," and is not directed at investors in

MOTION TO DISMISS THE AMENDED COMPLAINT

1  publicly traded stock but rather to potential participants in businesses (unlike

2  Herbalife) with "[n]o genuine product or service."  Compl. ¶ 39.  But even the

3  allegations concerning these "hallmarks" are not adequately pled.

4       ***The Pyramid Scheme Allegations.***  Plaintiffs' conclusory recitation of the

5  Ackman accusations does not properly plead under PSLRA standards that the

6  Company is on the wrong side of what Plaintiffs call the "gray area" between a lawful

7  MLM business and a pyramid scheme.  *Id.* ¶ 40.  They offer no internal reports,

8  knowledgeable confidential witness testimony, or other particularized facts to support

9  their core assertion that the Company merely recruits for recruiting's sake and not for

10  the purpose of finding effective distributors for real products for which there is genuine

11  demand.  To the contrary, Plaintiffs concede that "*Herbalife's. . . product[s]*

12  *generate[] billions in sales.*"  *Id.* ¶ 67.  While Plaintiffs allege that those products sell

13  at higher price points compared to supposedly similar products sold in brick-and-

14  mortar "stores," *id.*—and they do not—this ignores the Company's repeated

15  disclosures that its success is built on a personalized approach to health and fitness

16  enabled by the MLM business model.  *See supra.*  The sellers are also users—they are

17  walking and talking testaments to the quality of the products.  The MLM model is thus

18  an alternative distribution arrangement to retail stores and traditional advertising

19  campaigns based on face to face marketing, minimizing employee, infrastructure, and

20  marketing expenses, allowing for higher margins and greater efficiency.  Herbalife has

21  embraced and perfected a very successful business model in the United States and

22  abroad, providing returns to its investors while improving the lives of its member and

23  non-member customers.  It is a win-win alternative to the traditional way of selling

24  products, and it is not fraudulent or unlawful.

25       As a result, Plaintiffs do not allege *any* particularized facts establishing the

26  threshold premise of a pyramid scheme, much less supporting a claim of securities

27  fraud.  Even more fundamental to the failure of their securities fraud allegations is that

28  all of the purportedly concealed "facts" that allegedly rendered Defendants' statements

false or misleading were part of the public record through the Company's own disclosures and Ackman's attacks (which were explicitly based on those disclosures).[6] As detailed more fully in Appendix A, Herbalife made extensive disclosures about the pyramid scheme issue and was extraordinarily transparent about its business model and the risks associated with it.  The Company's SEC filings throughout the class period (and since even before its 2004 IPO) have repeatedly disclosed the specific risks that Plaintiffs complain of:

- that its marketing program was subject to a number of state and federal regulations, as well as foreign regulations, and that there was a risk that "in one or more markets, our marketing system could be found not to be in compliance with applicable regulations";

- that the Company could be subject to "private party challenges to the legality of [its] network marketing program," including with respect to pyramid scheme allegations;

- that adverse publicity surrounding the Herbalife network marketing program could negatively affect the Company's revenues;

- that regulations applicable to network marketing organizations "generally are directed at preventing fraudulent or deceptive schemes, often referred to as 'pyramid' or 'chain sale' schemes, by ensuring that product sales ultimately are made to consumers and that advancement within an organization is based on sales . . . rather than . . . non-retail sales-related criteria";

- that those regulations "do not include 'bright line' rules and are inherently fact-based";  and

- that certain foreign markets like China permit direct selling but not MLM-based compensation and, as such, to comply with Chinese law, the Company's compensation plan in that market is "different from that which [it] offer[s] in other markets."

Additionally, Ackman's December 2012 presentation accusing Herbalife of being a pyramid scheme and his $1 billion bet against the Company were widely

_____

[6] *See, e.g., id.* at 1; ¶¶ 6, 8, 65, 68, 72, 78, 86–91, 96, 98–100, 111–12, 114–22, 126–27, 129–31, 173; nn.9–11, 15–16, 18–20, 25, 30–31, 34–35, 38–50, 52, 64–68, 70, 72–82, 86, 89, 91–92, 134 (all citing Ackman).

1    reported in numerous prominent media outlets, including the New York Times, the

2    Wall Street Journal, Bloomberg, BusinessWeek, Vanity Fair, and the New York Post.

3    Any purported government inquiries—or private parties urging the government to

4    conduct an inquiry—were widely reported as well.[7]

5        Under controlling Ninth Circuit authority, these extensive public disclosures

6    demolish Plaintiffs' allegations that Herbalife made any material misrepresentations,

7    because "'the market already knew' of the [alleged] difficulties facing [the defendant]

8    through the [third party reports] and other sources," including through the Company's

9    own disclosures in the SEC filings referenced in the Complaint.  *Police Ret. Sys.*, 759

10   F.3d at 1060 (holding that securities fraud plaintiff failed to sufficiently plead that

11   challenged statements were actionable for these reasons); *Heliotrope Gen., Inc. v. Ford*

12   *Motor Co.*, 189 F.3d 971, 976–77 (9th Cir. 1999) (same); *In re Stac Elects. Sec. Litig.*,

13   89 F.3d 1399, 1410 (9th Cir. 1996) (no fraud where SEC filings referenced in the

14   complaint disclosed the allegedly concealed information).[8]  No reasonable investor can

---

16   [7]  *See, e.g.*, Exs. 27–31 (*Ackman Outlines Bet Against Herbalife*, N.Y. Times (Dec. 20,

17   2012) (reporting Ackman's argument that Herbalife was a pyramid scheme); *What's at the*
     *Center of the Debate Over Herbalife*, N.Y. Times (Jan. 10, 2013) (noting that major

18   investors seem to disagree over whether Herbalife has a growth business model or is a

19   pyramid scheme); *S.E.C. Opens Investigation Into Herbalife*, N.Y. Times (Jan. 9, 2013)
     (stating that the SEC inquiry is "likely to examine the company's sales practices" which

20   consist of a "network of independent resellers who are incentivized to recruit others" and

21   that the inquiry follows on Ackman's enormous bet against Herbalife and his allegations
     that it is the "best managed pyramid scheme in the history of the world"); *FTC Herbalife*

22   *meeting spicy*, N.Y. Post (July 17, 2013) (reporting that the FTC told consumer activists
     that it was "looking into" the company); *In Herbalife 'Short War,' Hedge Funds Miss the*

23   *Target*, N.Y. Times (Mar. 5, 2013) (stating that the "star-studded battle among hedge fund
     titans over . . . Herbalife became the talk of Wall Street when it erupted," and "spawned a

24   media circus")).

25   [8]  *See also, e.g.*, *Plevy v. Haggerty*, 38 F. Supp. 2d 816, 833 (C.D. Cal. 1998) (dismissing

26   complaint upon finding that the market was aware of the relevant risks associated with the
     defendant's business); *In re Express Scripts, Inc., Sec. Litig.*, 2010 WL 2671456, at *16–

27   17 (E.D. Mo. June 30, 2010) (holding Section 10(b) complaint failed to plead any
     actionable misstatements when it "put the proverbial cart before the horse" by

28   "presum[ing] the truth of the allegations contained in [a regulator's] suit," which the

[Footnote continued on next page]

Gibson, Dunn &
Crutcher LLP

MOTION TO DISMISS THE AMENDED COMPLAINT

be deemed to have purchased Herbalife stock in ignorance of the Company's

disclosures, and highly visible public attacks by Ackman and others, on the question of

whether Herbalife operates as an uncharged pyramid scheme.

In fact, a district court in Connecticut recently rejected nearly identical

allegations because the defendant's "Form 10-K disclosed that [the company] might be

considered a pyramid scheme in some markets, the very feature of its business that the

Complaint suggests was concealed from investors." *Abuhamdan*, 9 F. Supp. 3d at 196.

There, as here, the defendants' disclosures "fully informed the market that [the

company] was a multi-level marketing company whose growth was driven, at least in

part, by the addition of new promoters" and "sufficiently warned of the risks that

Plaintiffs allege were associated with [the company's] business model." *Id.* at 193,

196. Herbalife's disclosures on this topic were at least as robust as in *Abuhamdan*:

- *Compare id.* at 193 (disclosing "'the risk that, in one or more markets, our network marketing program could be found not to be in compliance with applicable law or regulations,' including regulations 'directed at preventing fraudulent or deceptive schemes, often referred to as pyramid or chain sales schemes'"), *with* Ex. 2 (Herbalife Form 10-K for 2010 at 30) at 72 (same);

- *Compare Abuhamdan*, 9 F. Supp. 3d at 193 ("[a]ctual results could differ materially due to various factors, including . . . risks associated with our ability to recruit new independent sales consultants"), *with* Ex. 2 (Herbalife Form 10-K for 2010 at 25) at 67 (stating under "Risk Factors": "The loss of a significant number of distributors for any reason could negatively impact sales of our products and could impair our ability to attract new distributors.");

- *Compare Abuhamdan*, 9 F. Supp. 3d at 193 (company's "'distribution system depends upon the successful recruitment, retention and motivation of a large number of independent consultants and distributors to offset frequent

_____

[Footnote continued from previous page]

company disputed); *In re PetSmart, Inc. Sec. Litig.*, 61 F. Supp. 2d 982, 996 (D. Ariz. 1999) (dismissing complaint because Form 10-K "thoroughly discuss[ed]" the issues, so "it [was] not even clear that plaintiffs ha[d] pleaded an omission"); *Reinschmidt v. Zillow*, No. 12-cv-02084-RSM, slip op. at 10–14 (N.D. Cal. Oct. 20, 2014) (dismissing claim where "investors were well informed" about allegedly concealed information).

turnover'"), *with* Ex. 2 (Herbalife Form 10-K for 2010 at 25) at 67 (stating under "Risk Factors" that "our success depends in significant part upon our ability to recruit, retain and motivate a large base of distributors");

- *Compare Abuhamdan*, 9 F. Supp. 3d at 193 ("[defendant] and its subsidiaries compete with other companies for promoters, and . . . the loss of a leading promoter or a substantial number of promoters could result in a decline in sales"), *with* Ex. 2 (Herbalife Form 10-K for 2010 at 26) at 68 (stating under "Risk Factors":  "The loss of a group of leading sales leaders, together with their downline sales organizations, or the loss of a significant number of distributors . . . , could negatively impact sales of our products, impair our ability to attract new distributors and harm our financial condition and operating results.");

- *Compare Abuhamdan*, 9 F. Supp. 3d at 197–98 ("The disclosure of 'frequent turnover'—though . . . the price turnover rate" was "not quantif[ied]" nor was "the raw data to calculate such a rate" provided—"was sufficient to inform investors that the turnover rate among promoters posed a risk to [defendant's] future performance."), *with* Ex. 2 (Herbalife Form 10-K for 2010 at 26) at 68 (under "Risk Factors":  "Our distributor organization has a high turnover rate . . . .  The turnover rate of our distributors, and our operating results, can be adversely impacted if we, and our senior distributor leadership, do not provide the necessary mentoring, training and business support tools for new distributors to become successful sales people in a short period of time.");

*See also Stac*, 89 F.3d at 1407 (no material misstatement where "the Prospectus describe[d] the phenomenon of channel-filling with its attendant risks, spell[ed] out Stac's liberal return policy, [and] warn[ed] investors of Stac's exposure to the risk of product returns").  This kind of extensive disclosure about Herbalife's operations and the specific risk of being alleged to constitute a pyramid scheme (which is all that has materialized) defeats Plaintiffs' claims of material misstatements.  *E.g.*, *Police Ret. Sys.*, 759 F.3d at 1060; *Abuhamdan*, 9 F. Supp. 3d at 193–95.

Herbalife disclosed to investors that its business model could be challenged as a pyramid scheme.  Ackman challenged Herbalife as a pyramid scheme.  A securities fraud claim cannot be premised on the very event that the Company warned investors might happen.  The securities laws do not immunize investors from risk (or companies

from challenge); rather, they ensure that all market participants are adequately informed so that they can make their own investment decisions.

*The Financial Results.*  As a tack-on to their theory that Herbalife is a pyramid scheme, Plaintiffs assert that Herbalife's financial results were misleading.  *See* Compl. ¶¶ 140–44.  Yet they do not claim that the Company's reported revenues or net sales, for example, were not real or contained accounting errors.  Nor do they plead particularized facts demonstrating that the Company's results depended exclusively or primarily on recruiting.  Rather, Plaintiffs concede that Herbalife had billions in product sales, and the sole basis for asserting that the challenged financial results were materially false is that they "would not have been realized without the Company's illegitimate operations."  *Id.* ¶ 140.  These claims lack merit for the same reasons discussed above, and because the Complaint lacks *facts* showing that the Company's reported revenues and earnings were fictitious or otherwise accounted for improperly.  Though they purport to take issue with the *disclosed* definition of "retail sales," Plaintiffs do not claim that Herbalife did not use that metric as disclosed or that Herbalife violated GAAP.  The securities laws do not require any particular definition of "retail sales," and in any event, Herbalife always received clean audit opinions.[9]

As this Court has recognized, when "accurate financial data did nothing to 'affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exist[ed]'" such data cannot give rise to a claim under Section 10(b).  *In re Toyota Motor Corp. Sec. Litig.*, 2011 WL 2675395, at *3 (C.D. Cal. 2011) (Fischer, J.) (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)); *see also, e.g.*, *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1163 (C.D. Cal. 2007).  Likewise, the Second Circuit has "easily rejected" the premise, upon which Plaintiffs here rely, that a defendant's "statements about its earnings were actionable, even though literally true, because they did not acknowledge

---

[9]  Ex. 1 at 45–51; Ex. 2 at 80–86; Ex. 3 at 119–24; Ex. 4 at 156–61; Ex. 5 at 193–98.

the long-term unsustainability of its business model." *Boca Raton Firefighters & Police Pension Fund v. Bahash,* 506 Fed. App'x 32, 38 (2d Cir. 2012) ("Whatever the scope of the responsibility not to make statements that constitute 'half-truths,' that surely does not apply to the reporting of unmanipulated corporate earnings.").  And *Abuhamdan* rejected a similar argument based on pyramid scheme allegations, because where the "raw numbers" have "been revealed to the market" defendants are under "no duty to characterize that information in a particular way or disparage their own competitive position in the market."  9 F. Supp. 3d at 200.  The undisputed accuracy of Herbalife's actual numbers is one more fatal flaw in the Complaint.  *Id.*

   ***Business practices, regulatory compliance, and internal controls.***  Plaintiffs also fail to allege that other challenged statements regarding the Company's business practices, regulatory compliance, and internal controls are false or misleading on their face.  They merely provide a laundry list of quotes from Form 10-Ks, Form 10-Qs, and earnings calls on each of these subjects, and then recite a virtually identical and conclusory list of unsupported reasons why the quoted statements are materially false or misleading.  *See, e.g.*, Compl. ¶¶ 138, 146–50 (business practices and marketing plan allegations); 151–57 (compliance allegations); 163–66 (internal control allegations).  As a matter of law, such generic allegations of falsity should be rejected.  *E.g.*, *Karam v. Corinthian Colls., Inc.*, 2012 WL 8499135, at *10 (C.D. Cal. Aug. 20, 2012) (rejecting allegations that statements about defendant's "commit[ment] to regulatory compliance" were materially misleading because "[m]any of the challenged statements . . . [were] too generic and indefinite" and plaintiffs "failed to allege particularized facts" that "statements regarding legal compliance were misleading").[10]

_____

[10] The Complaint further fails because many of the challenged statements are generalized statements about the Company's performance, member relationships, and/or compliance and, as such, epitomize non-actionable opinions.  This Circuit has repeatedly rejected attacks on such statements, holding that they are "too general to cause a reasonable investor to rely upon them," and constitute "puffery."  *Police Retire. Sys.,* 759 F.3d at 1060 (puffery included optimism that opportunity for favorable outcomes was "very, very

[Footnote continued on next page]

### 2.     The Complaint Fails to Plead a Strong Inference of Scienter

Plaintiffs have also failed to plead that any of the statements were made with "scienter," that is, "a mental state embracing intent to deceive, manipulate, or defraud" investors. *Police Ret. Sys.*, 759 F.3d at 1061 (citation omitted).  In this Circuit, scienter requires a showing at minimum of "deliberate recklessness," which must "reflect[] some degree of intentional or conscious misconduct,'" *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1053 (9th Cir. 2014) (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 977 (9th Cir. 1999)).  To plead scienter, "the complaint must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Police Ret. Sys.*, 759 F.3d at 1061 (quoting 15 U.S.C. § 78u–4(b)(2)(A)).  The inference of scienter "must be more than merely reasonable or permissible—it must be cogent and compelling, thus strong in light of other explanations." *Tellabs*, 551 U.S. at 322–24.

Here, despite claiming that there is a "factual gray area" between a lawful MLM plan and an illegal pyramid scheme, Compl. ¶ 40, Plaintiffs allege no specific facts known to Defendants supposedly demonstrating Herbalife clearly fell on the wrong side of the line.  And there are no such facts, and no such illegality.  In fact, Plaintiffs ignore this Circuit's most recent opinion distinguishing legitimate MLMs from unlawful pyramid schemes, which explained that internal sales for self-consumption were real sales reflecting genuine consumer demand for a product or service. *FTC v. BurnLounge, Inc.*, 753 F.3d 878, 887 (9th Cir. 2014).  Instead, Plaintiffs seek to establish scienter through two sets of meritless allegations: (i) alleged evidence of insider trading, Compl. ¶¶ 167–69; and (ii) information derived from two "confidential

_____

[Footnote continued from previous page]

large"); *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1110–11 (9th Cir. 2010) (puffery included optimism that "we believe our employee relations are good").  The District of Connecticut rejected similar statements as puffery in *Abuhamdan*.  9 F. Supp. 3d at 190 (statements by alleged pyramid scheme "about [company's] business model [were] too general to induce reliance by a reasonable investor").  This Court should likewise do so here.

witnesses," *id.* ¶¶ 46–54, 57, 66.  Neither set of allegations remotely creates the requisite strong inference of scienter.

### a.   Insider Trading Allegations

Although evidence of insider trading can serve as circumstantial evidence of scienter, such trading "'is suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'" *Police Ret. Sys.*, 759 F.3d at 1063 (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1005 (9th Cir. 2009)); *see also Silicon Graphics*, 183 F.3d at 986.  "Three factors are relevant to this inquiry: (1) the amount and percentage of the shares sold; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's trading history." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008).

Plaintiffs' "allegations that the [I]ndividual [D]efendants . . . made significant profits from the sale of [Herbalife] stock do not raise an inference of scienter, let alone a strong inference." *Police Ret. Sys.*, 759 F.3d at 1064.  The Complaint contains *no* allegations regarding (1) the "[D]efendants' prior trading history," *id.*; (2) "the total number of shares held by [the Individual Defendants] at the beginning or end of the pre-class period"; or (3) "the percentage of shares sold during the pre-class period," *Okla. Firefighters Pension & Ret. Sys. v. Ixia*, 2014 WL 4978568, at *27–28 (C.D. Cal. Oct. 6, 2014).  These failures are fatal. *Id.* at *28.  "[F]undamentally, absent allegations of pre-class period holdings, the court cannot determine whether plaintiffs have adequately alleged that class period sales were 'dramatically out of line with prior trading practices.'" *Police Ret. Sys.,* 759 F.3d at 1063 (quoting *Zucco*, 552 F.3d at 1005).

Moreover, the judicially noticeable facts show that the challenged stock sales during the class period were *not* suspicious in timing or amount, and were otherwise consistent with Defendants' trading history. *See* Appendix D; Exs. 19–21. *E.g.*, *Silicon Graphics,* 183 F.3d at 986; *City of Royal Oak Ret. Sys. v. Juniper Networks,*

MOTION TO DISMISS THE AMENDED COMPLAINT

*Inc.*, 880 F. Supp. 2d 1045, 1059 (N.D. Cal. 2012) (granting request for judicial notice of Forms 4 evidencing defendant's stock sales).[11]  The "timing of [the Individual Defendants'] stock transactions was not suspicious" because, like most "officers of publicly traded companies commonly" do, the Individual Defendants frequently traded in Company stock before, during, and after the class period.  *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002).  The following summarizes Defendants' sales (with the underlying data in Appendix C and in the Forms 4 attached as Exs. 19–21):

| | Johnson | Walsh | DeSimone |
|---|---|---|---|
| Total holdings at start of class period[12] | 1,066,514 | 148,708 | 56,628 |
| Total holdings at close of class period | 1,091,281 | 97,599 | 18,690 |
| Closest sale before July 28, 2014 earnings statement | 2.5 mos. | 5 mos. | 2 years, 3 mos. |
| % of individual's class period sales under 10b5-1 trading plan | 100% | 100% | 80.6% |

As the first two rows of the foregoing chart reflect, Defendants' overall challenged sales were merely a fraction of their collective net holdings in Herbalife stock.  Indeed, Johnson's net holdings actually *increased* during the class period, and Walsh's decreased by less than 35%; neither was suspicious at all.  *Metzler*, 540 F.3d at 1067 (no scienter where individual defendants sold 37% and 100% of their stock, respectively, because sales were not timed "particularly suspicious[ly]" and the Ninth Circuit "typically require[s] larger sales amounts—and corroborative sales by other defendants—to allow insider trading to support scienter"); *In re NVIDIA Corp. Sec.*

---

[11]  Moreover, "[t]he class period alleged is so long . . . that it becomes difficult to see how particular stock sales would strengthen allegations that particular statements were uttered with deliberate recklessness at the times they were made."  *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1093 (9th Cir. 2002).

[12]  For ease of comparison, Defendants' total holdings at the start of the class period are adjusted upwards to account for Herbalife's 2:1 stock split on May 17, 2011.

1  *Litig.*, 2011 WL 4831192, at *10 (N.D. Cal. Oct. 12, 2011) (court "rejected

2  [defendant's] stock sales as evidence of scienter, as he was a net acquirer of stock

3  during the class period"). And DeSimone's sales cannot support scienter because they

4  constituted an "insignificant" portion—less than 2%—"of the total stock sales with

5  which [Plaintiffs are] concerned." *Silicon Graphics*, 183 F.3d at 987; *see also* Compl.

6  ¶ 168. Moreover, virtually all of the sales (excepting less than 20% of the tiny fraction

7  that DeSimone sold) were not suspicious for the additional reason that they were

8  pursuant to Rule 10b5-1 trading plans and thus predetermined as to amount and

9  timing—"stock sales [that] took place under preexisting trading plans and were not out

10  of line with prior trading volume." *In re VeriFone Holdings, Inc., Sec. Litig.*, 704 F.3d

11  694, 701 (9th Cir. 2012); *see also* Appendix C.[13] As a matter of law, these trades

12  support no inference of scienter.

### b.    Confidential Witness Statements

14       Plaintiffs claim that two Confidential Witnesses—allegedly former Herbalife

15  employees—"confirm that the Company focused almost exclusively on pushing

16  recruitment as the means for its members to achieve financial success." Compl. ¶

17  46. But the CWs fail to support the claim of scienter. They do not assert that the

18  Company is a pyramid scheme or engaged in any fraudulent business practices; at

19  most, they make unsubstantiated remarks that the Company emphasized the

20  importance of recruitment at certain sales and marketing events, and/or tracked data

21  concerning members' sales performance. *See, e.g.*, *id.* ¶ 47 (CW1 says that the

22  Company's Extravaganza events "were designed to promote recruitment of new

23  distributors and retention of current distributors"); *id.* ¶ 53 (CW2 says that "based on

24  the practices [CW2] saw during her tenure, distributors make more money at Herbalife

---

25
26  [13] Rule 10b5-1 trading plans allow executives to provide advance instructions for disposition
      of their stock in order to safeguard against accusations that trades were made on the basis
27      of material non-public information. "[C]ourts may take judicial notice of SEC Forms 4,
      even when not referenced in the pleading, to prove that stock sales were made pursuant to
28      a Rule 10b5-1 trading plan." *E.g.*, *Royal Oak*, 880 F. Supp. 2d at 1059 (citation omitted).

by recruiting new distributors as opposed to selling products to consumers"). The CWs' statements do not provide any basis to infer that Herbalife's business model was based primarily—or *at all*—on mere recruitment of members, not product sales, much less that the Individual Defendants knew or deliberately disregarded that they were making material misstatements about whether the Company was an unlawful pyramid scheme. In short, the CWs' "experiences do not contribute to an inference of scienter" because "[t]heir accounts are unspecific and speculative." *In re NVIDIA Corp.*, 768 F.3d at 1061; *Zucco*, 552 F.3d at 995 (CW "statements . . . with sufficient reliability and personal knowledge must themselves be indicative of scienter").

Moreover, CW1 did not work in any relevant areas of the business such as the departments responsible for the Company's marketing plan, distributor compensation, distributor practices, and/or compliance. Rather, CW1 was a "Vice President of Worldwide Events," allegedly tasked with "overseeing the production of Herbalife's three-day Extravaganza events"—in effect, an *event planner*. Compl. ¶ 46. As for CW2, a former business analyst in the Company's Worldwide Sales, Strategy, and Analysis department, her job duty was to "review[] global distributor data from an online system" and to "prepare[] monthly reports created by this internal online system, including tracking the number of worldwide distributors classified as active World team members and their productivity." *Id.* at n.14. This narrow job function did not give her any direct access to senior management, nor any basis to have any firsthand knowledge of what any of the Individual Defendants knew or were told that would support a plausible inference or scienter. In fact, while CW2 allegedly was "privy to the extent of distributors' revenue activities," she nowhere provides any *facts* showing that the distributors' revenues were based solely or even primarily on recruitment. *See id.* ¶ 54. To the extent the Complaint claims that CW2 provided a "report" to management, that allegation is irrelevant because "[m]ere access to reports

1  containing undisclosed sales data is insufficient to establish a strong inference of

2  scienter." *Police Ret. Sys.*, 759 F.3d at 1063 (citing *Zucco*, 552 F.3d at 1001).[14]

3          In sum, the CWs' statements do not support an inference of scienter because

4  they are merely "snippets of information, not a view of the [C]ompany's overall

5  [operations]; and the witnesses lack first-hand knowledge regarding what the

6  individual defendants knew or did not know about" Herbalife's operations, business

7  practices, and the propriety of their disclosures. *Police Ret. Sys.*, 759 F.3d at 1063; *In*

8  *re NVIDIA Corp. Sec. Litig.*, 768 F.3d at 1061 (explaining that CWs' "experiences

9  d[id] not contribute to an inference of scienter" in part because "some witnesses never

10  worked for [defendant,] [a]nd those who did either stopped working there long before

11  the [problem] arose or worked in an area unrelated to it").[15]

12  ────────────────

13  [14] Allegations derived from these two CWs should be given little or no weight for the
    additional reason that neither CW worked at the Company throughout the class period, let

14  alone up through the alleged corrective disclosure on July 28, 2014. According to the
    Complaint, CW1 was at the Company for 1.5 years of the class period, while CW2 was at

15  the Company for less than five months total, Compl. n.12 & n.15. Indeed, it is entirely
    *implausible* that CW2 has any credible basis to allege that Herbalife is a pyramid scheme,

16  given her extremely limited time at the Company.

17  [15] Nor does the Complaint purport to invoke the "core operations" theory, which is
    inapplicable here in any event. Plaintiffs' failure to support their claim with particularized

18  facts also means that this is not the "rare circumstance" where the court might invoke the
    core operations theory to simply infer that management knew the supposed "falsity of the

19  information" they were providing to investors. *Police Ret. Sys.*, 759 F.3d at 1062; *Zucco*,

20  552 F.3d at 1001. The Ninth Circuit has limited the core operations inference to instances
    where adverse facts about the defendant's business were so prominent—indeed,

21  crippling—that it would be "*absurd*" to suggest that management was ignorant of them.
    *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987–88 (9th Cir. 2008); *In re Ubiquiti*

22  *Networks, Inc. Sec. Litig.*, --- F. Supp. 2d ----, 2014 WL 1254149, at *19 (N.D. Cal. Mar.

23  26, 2014). Here, the core operations doctrine does not create an inference of scienter
    because the underlying facts are clearly lacking. And neither does the Ninth Circuit's

24  conclusion in *Webster v. Omnitrition*, 79 F.3d 776, 785 (9th Cir. 1996), that "[a] jury

25  could rationally conclude that the promotion of a pyramid scheme demonstrates the
    necessary fraudulent intent." *Omnitrition* did not involve anything like the extensive

26  disclosures provided by Herbalife. Nor did it apply the strict pleading requirements of the
    PSLRA, under which the inference of scienter must be more than "rational[]," it must be

27  "strong." *E.g.*, *Tellabs*, 551 U.S. at 322–23.

28

### c.    The Far More Compelling, Non-Culpable Inference

Against this backdrop, the far more compelling inference is that Defendants believed they were appropriately disclosing the material facts about Herbalife's business model.  This is true for numerous reasons.

*First*, the MLM, direct-selling business model is one that has been successfully pursued over the years by a variety of well-established companies.  It is particularly well suited to consumer products where personal interaction between distributors and their customers can drive sales.  Herbalife adopted a variant of this model in 1980.  Far from "collapsing," Herbalife has performed exceedingly well for more than three decades now selling billions of dollars of scientifically based nutrition and fitness products.  Indeed, its strongest growth has been in its most mature markets, including in the United Kingdom, Ex. 24 (cited in Compl. ¶¶ 22, 195) at 468–69.  Pyramid schemes are unsustainable over extended—even brief—periods of time.  Yet Herbalife has 34 years of successful experience and continues to thrive.

*Second*, MLM businesses are closely scrutinized by federal and state authorities.  While Herbalife's operations have been rigorously scrutinized—including at the behest of Ackman, a self-interested short-seller trying to destroy the Company—no regulator has ever found it to be an unlawful pyramid scheme.  The fact that Herbalife never has been pursued under the 1986 Consent Order with the California Attorney General cited by Plaintiffs (Compl. ¶ 96 & n.40)—which explicitly approved the business practice at the heart of Plaintiffs' (and Ackman's) allegations—supports the much more plausible inference that Defendants had the good faith belief that the Company's sales to members did not cross any legal lines, and were consistent with the operation of a lawful MLM.  *See also BurnLounge, Inc.*, 753 F.3d at 887 ("participants were the 'ultimate users' of the merchandise and . . . this internal sale alone does not make [the defendant] a pyramid scheme").  Where, as here, a complex regulatory landscape applies to Defendants' business, merely conducting that business does not lead to an

inference that the Individual Defendants were intentionally trying to violate applicable rules and regulations, let alone make misstatements.[16]

*Third*, Defendants made numerous disclosures about the MLM business model and the risks concerning pyramid scheme issues; even if those disclosures are somehow found inadequate (which they should not be) their specificity and detail refute any intent to defraud investors. *E.g.*, *Espinoza v. Whiting*, --- 8 F. Supp. 3d ----, 1142, 1151–53 (E.D. Mo. Mar. 18, 2014); *In re Software Toolworks Inc. Sec. Litig.*, 789 F. Supp. 1489, 1500 (N.D. Cal. 1992), *rev'd in part on other grounds by* 50 F.3d 615 (9th Cir. 1994). The inference of well-meaning executives believing they were making complete and appropriate disclosures of the results, prospects, and risks is overwhelming. And this belief is further confirmed by the concededly accurate financial results and the Company's long history of clean audit opinions. *E.g.*, *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1246 (S.D. Cal. 2010).

In sum, the Complaint's allegations, alone and collectively, "do not give rise to a strong inference that [Defendants] acted with intent to mislead investors, or recklessly disregarded an obvious danger of misleading investors" by not proclaiming Herbalife an unlawful pyramid scheme. *In re NVIDIA Corp.*, 768 F.3d at 1059.

### 3. The Complaint Fails to Plead Loss Causation

Plaintiffs' Complaint also fails to allege loss causation. As the Ninth Circuit recently reaffirmed in *Loos* (which Plaintiffs have tried to plead around by manipulating the class period), loss causation requires "alleg[ations] that the decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectations, or

---

[16] *Bd. of Trustees of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 876 (S.D.N.Y. 2011) (no scienter where defendants operated in complex statutory framework "subject to varying interpretations"); *see also Zucco*, 552 F.3d at 1001 (affirming dismissal and describing uncertainties inherent in GAAP provisions as undercutting any inference of scienter); *In re Worlds of Wonder*, 35 F.3d at 1426 (affirming summary judgment on similar grounds).

1   other unrelated factors."  762 F.3d at 887 (citing *Metzler*, 540 F.3d at1062).  "In other

2   words, the plaintiff must plausibly allege that the defendant's fraud was '*revealed* to

3   the market and caused the resulting losses.'"  *Id.* (quoting *Metzler*, 540 F.3d at 1063;

4   *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)).  The allegations thus

5   must establish that the market "'learned of and reacted to th[e] fraud, as opposed to

6   merely reacting to reports of the defendant's poor financial health generally.'"  *Id.*

7   (quoting *Metzler*, 540 F.3d at 1063).  Plaintiffs' allegations fail to do so.

8           A cornerstone of Plaintiffs' loss causation theory is that Herbalife's

9   "disappointing earnings" announcement on July 28, 2014 disclosed that the Company

10  was a "fraud."  Compl. ¶ 175.  This alleged earnings "miss" was a small one, and the

11  Company still had growing net sales.  This earnings announcement did not reveal or

12  even suggest that the Company was an unlawful pyramid scheme, or that any of the

13  Company's business practices were fraudulent, much less that the many class period

14  statements challenged by Plaintiffs were false at the time they were made.  *See* Ex. 23

15  (July 28, 2014 earnings announcement).  As a result, under controlling Ninth Circuit

16  law, Plaintiffs' reliance on Herbalife's "disappointing financial results [is] insufficient

17  to establish loss causation as a matter of law."  *Loos*, 762 F.3d at 887–88 (holding that

18  defendant's disappointing earnings for four quarters "d[id] not tend to suggest that the

19  company had engaged in fraudulent accounting practices").  As in *Loos*, Herbalife's

20  "disappointing" earnings "results do not reveal any information from which [a pyramid

21  scheme] fraud might reasonably be inferred."  *Id.* at 888.  In fact, Herbalife's results

22  are even more removed from any inference of loss causation than in *Loos* because here

23  there is no allegation that the Company's financial results were inaccurate or subject to

24  any accounting irregularities.  Rather, all that Plaintiffs assert is that the otherwise

25  accurate financial results "would not have been realized without the Company's

26  illegitimate operations."  Compl. ¶ 140.  The Complaint, however, does not point to

27  *any* factual evidence that the Company is in fact a pyramid scheme, let alone assert any

28  "plausible connection between the disappointing earnings and the alleged

fraud." *Loos*, 762 F.3d at 888 (internal citation omitted).  Here, at most, the Company's July 2014 earnings announcement "simply reveal[ed] that [Herbalife] failed to meet its revenue goals."  *Id.*

The other alleged partial disclosures—Einhorn's questions, Ackman's presentation, the Markey letters, and the FTC investigation announcement—are also, alone and collectively, insufficient to establish loss causation as a matter of law. Defendants address each of these allegedly "corrective" disclosures below.

**FTC Investigation.**  Starting with the most recent disclosure alleged to be "corrective," the Company's announcement of a FTC investigation, as a matter of law, cannot serve as a corrective disclosure because, as this Circuit recently held in *Loos*, "[t]he announcement of an investigation does not 'reveal' fraudulent practices to the market.  Indeed, at the moment an investigation is announced, the market cannot possibly know what the investigation will ultimately reveal."  *Id.* at 890.  At most, "the disclosure of an investigation . . . simply puts investors on notice of a potential future disclosure of fraudulent conduct," and, as such, "any decline in a corporation's share price following the announcement of an investigation can only be attributed to market speculation about whether fraud has occurred."  *Id.*  "This type of speculation cannot form the basis of a viable loss causation theory."  *Id.*  Accordingly, where, as here, there has been no "subsequent disclosure of actual wrongdoing," an announcement of an investigation "does not reveal to the market the pertinent truth of anything, and therefore does not qualify as a corrective disclosure."  *Id.* at n.3 (quoting *Meyer v. Greene*, 710 F.3d 1189, 1201 n.13 (11th Cir. 2013)); *In re Express Scripts, Inc.*, 2010 WL 2671456, at *16–17 (plaintiff failed to plead loss causation by claiming that the "truth was revealed" when the New York Attorney General "filed a lawsuit . . . *alleging* that [the company] had engaged in improper behavior").

**Markey Letters.**  Likewise, the January 2014 Markey letters did not constitute a corrective disclosure, as nothing about them stated that the Company was an unlawful pyramid scheme, let alone "disclosed" as much.  Pl. Exs. F–H.  The letters asked for

investigations into allegations about certain of the Company's business practices and necessarily could not be deemed to have revealed anything about the Company, particularly because Sen. Markey said that he "take[s] no position on the merits of these allegations." *Id.*  Markey's request for clarification is directly analogous to the announcement of a government investigation, and as the Ninth Circuit has held, "the announcement of an investigation, 'standing alone,' . . . does not qualify as a corrective disclosure"; *a fortiori*, to the extent that the letters called for an investigation of the Company, such a request cannot form the basis of a corrective disclosure for purposes of loss causation.  *See Loos*, 762 F.3d at n.3 (quoting *Meyer*, 710 F.3d at 1201 n.13).

***Ackman Presentation.***  Similarly, Ackman's December 2012 presentation, which concededly was based on publicly available information already "reflect[ed]" in the stock price, cannot be considered a corrective disclosure as a matter of law. *Halliburton*, 134 S. Ct. at 2405 (citing *Basic Inc. v. Levinson*, 485 U.S. 224 (1998)); *Loos*, 762 F.3d at 889–90 & n.3 (approvingly citing *Meyer*, 710 F.3d at 1192–93 (rejecting theory that accounting fraud was revealed to the market in part "by a prominent stock market analyst" because the analyst's information had been derived "entirely from public filings" of which the stock market was presumed to be aware)). Herbalife's stock price might have moved on Ackman's claims, but that can be attributed to many factors—including mere uncertainty—and is not evidence supporting loss causation.  The most that can be said of the Ackman presentation is that it was an *accusation,* not a revelation of any "truth."

***Einhorn Questions.***  Finally, the Einhorn *questions* in May 2012, and the Company's responses thereto, do not constitute a partial disclosure.  Einhorn's mere *question* whether the Company officially tracked sales to non-members, or the Company's responses, hardly qualify as having revealed the alleged "truth," or support a conclusion that any losses were caused by fraud.

***Other Stock Price Declines.***  Given the infirmities of each of the arguments for loss causation discussed above, Plaintiffs point, without explanation, to certain stock

1   price declines throughout the class period as showing loss causation.  Throughout the

2   Complaint, Plaintiffs portray Herbalife's stock price as consistently decreasing over

3   the course of the class period, as the alleged "truth" steadily leaked into the

4   marketplace.  *See* Compl. ¶¶ 171–77.  Plaintiffs ignore that, throughout the class

5   period, the stock price also experienced substantial increases, including throughout

6   most of 2011 and 2013.  *See* Appendix D.  This Court may not infer that Plaintiffs'

7   cherry-picked stock declines establish loss causation.  *In re Apple Computer Sec.*

8   *Litig.*, 886 F.2d 1109 (9th Cir. 1989) ("[E]vidence of stock price movements provides

9   no rational basis for determining whether [the product's] risks were adequately

10  conveyed to the public.").

11          All of these defects are independently fatal to the claim under Rule 10b-5(b).

12  **B.      Plaintiffs Fail to State a Claim Under Rule 10b-5(a) or (c)**

13          Plaintiffs do no better with their conclusory attempts to plead claims under Rule

14  10b-5(a) and (c) for a supposed fraudulent "device, scheme, and artifice" and "course

15  of business that operated as a fraud."  Compl. ¶ 190.  Claims under Rule 10b-5(a) and

16  (c) still must be pled with particularity and meet the PSLRA's stringent standards for

17  pleading a strong inference of scienter.  *E.g.*, *In re Splash Tech. Holdings, Inc. Sec.*

18  *Litig.*, 2000 WL 1727377, at *5 n.2 (N.D. Cal. Sept. 29, 2000) (citing *Silicon*

19  *Graphics*, 183 F.3d at 975–77).  The Ninth Circuit has squarely held that scheme

20  liability must "encompass[] conduct beyond . . . misrepresentations or omissions."

21  *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057–58

22  (9th Cir. 2011); *Abbate v. Wells Fargo Bank, N.A.*, 2011 WL 9698215, at *3 (C.D. Cal.

23  Nov. 17, 2011).  "Manipulative conduct . . . includes activities designed to affect the

24  price of a security artificially by simulating market activity that does not reflect

25  genuine investor demand."  *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 940–41

26  (9th Cir. 2009).

27          Here, even assuming Plaintiffs had pled the existence of a pyramid scheme with

28  particularity (they have not), their only theory of fraud or injury is through alleged

misstatements—not that Defendants somehow manipulated the price of Herbalife stock through market activities or somehow deceived Plaintiffs into becoming members.  *Cf. Desai*, 573 F.3d at 939–41 (manipulative acts in violation of 10b–5(a) or (c) are generally "practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity"); *Omnitrition*, 79 F.3d at 785 (addressing distributors' claims).  And the failure to plead scienter and loss causation is fatal to the Rule 10b-5(a) and (c) claims as well.  *E.g.*, *In re Splash Tech. Holdings*, 2000 WL 1727377, at \*5; *Abuhamdan*, 9 F. Supp. 3d at 188.

## C.     Plaintiffs Fail to State a Claim for Control Person Liability

For all these reasons, Plaintiffs also fail to state a claim under Section 20(a) of the '34 Act, which provides for liability of a "controlling person."  15 U.S.C. § 78t(a).  Because the Plaintiffs have failed to establish "a primary violation of . . . Section 10(b) or Rule 10b–5," they have also necessarily failed to "show that the [Defendants] exercised actual power over the primary violator."  *In re NVIDIA Corp.*, 768 F.3d at 1052 (citing *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000)).  The Section 20(a) claims should be dismissed as well.

## D.     Plaintiffs Cannot Assert These Claims

### 1.     Oklahoma Has Violated the PSLRA's Presumptive Bar on "Professional Plaintiffs"

Under the statutory provisions of the PSLRA, Oklahoma filed a Lead Plaintiff certification in this case that demonstrates that it should be disqualified from serving as lead plaintiff, because it has been a lead plaintiff eight times during the relevant period, exceeding the statutory maximum of five times in the three years.  15 U.S.C. § 78u-4; *see* Dkt 34-2 at 2–3.  Although courts can grant exemptions from the presumptive statutory bar on "professional plaintiffs," Oklahoma's lead plaintiff motion did not mention the rule, much less seek an exemption.  A frequent securities class action plaintiff, Oklahoma should know that the statute "contains no flat exemption for institutional investors"; to the contrary, it reflects Congress's "desire to increase client

1   control over plaintiff's counsel, and allowing simultaneous prosecution of six

2   securities actions is inconsistent with that goal." *Aronson v. McKesson HBOC, Inc.*,

3   79 F. Supp. 2d 1146, 1156 (N.D. Cal. 1999) (disqualifying institutional investor as lead

4   plaintiff for exceeding presumptive limit). Under these circumstances, Oklahoma

5   should be disqualified from serving as a lead plaintiff. *Id.*

6           **2.    Neither Plaintiff Has Established Standing Under the PSLRA**

7           Atlanta suffers from a different standing infirmity. During the class period, it

8   *profited* from its trades in Herbalife stock: during that time, and before the supposed

9   corrective disclosure in July 2014, Atlanta purchased $3,236,790—and then sold

10  $3,455,458—in Herbalife shares, for a total net gain. *See* Dkt 34-2 at 6. Because it

11  experienced *gains* from its Herbalife trading during the class period, Atlanta suffered

12  no compensable damages recoverable under the PSLRA, and it should therefore be

13  dismissed from this action.[17]

14          Oklahoma has also failed to carry its "burden of alleging specific facts sufficient

15  to satisfy the standing elements." *Loritz v. U.S. Ct. of Appeals for the Ninth Circuit*,

16  382 F.3d 990, 992 (9th Cir. 2004); *Amirhamzeh v. Chase Bank USA, N.A.*, 2014 WL

17  641705, at *5 (C.D. Cal. Feb. 7, 2014). Oklahoma has so far disclosed that it bought

18  68,157—then sold 65,847—shares of Herbalife during the *original* class period

19  that ended in April 2014, leaving it with only 2,300 shares as of May 29, 2014. *See*

20  Dkt. 34-2. But Oklahoma has never disclosed its transactions in Herbalife stock after

21  June 16, 2014, even though the amended Complaint extended the class period to end

22  on July 29, 2014, and even though the PSLRA obligates lead plaintiffs to disclose all

23  of their transactions "in the security that is the subject of the complaint during the class

24  _____

25  [17]  *See Arenson v. Broadcom Corp.*, 2004 WL 3253646, at *2 (C.D. Cal. Dec. 6, 2004)
      (granting summary judgment where claimed damages were offset by amounts plaintiffs

26  profited during class period); *In re McKesson HBOC, Inc. Sec. Litig.*, 97 F. Supp. 2d 993,
      996–97 (N.D. Cal. 1999) (net gainer was inappropriate lead plaintiff because it was

27  subject to the defense of no cognizable injury); *Permutter v. Intuitive Surgical, Inc.*, 2011
      WL 566814 (N.D. Cal. Feb.15, 2011) (similar).

28

1  period specified in the complaint." 15 U.S.C. § 78u-4(a)(2)(A)(iii).  Given that

2  Oklahoma apparently believed Herbalife was an illegal business, it is entirely possible

3  that Oklahoma sold even more shares after May 29, 2014, but before the end of the

4  class period, and that it also was a "net gainer" without standing.[18]

5  ## V.   CONCLUSION

6        In hindsight, it is perhaps unsurprising that only two movants maintained an

7  interest in pursuing this action.  There appears to be no path for a viable securities

8  fraud claim in light of the Company's robust disclosures, the controlling Ninth Circuit

9  authority in *Loos*, and the persuasive, strikingly similar case in *Abuhamdan*.  Although

10  orders dismissing Section 10(b) claims typically allow leave to amend at least once,

11  there appears to be no possible theory of relief based on the events that have transpired

12  involving Herbalife.  Absent a clear explanation from Plaintiffs how they would cure

13  their defective pleadings, Defendants respectfully submit that this case should be

14  dismissed with prejudice.

15  DATED:  November 3, 2014          GIBSON, DUNN & CRUTCHER LLP

16

17

18  By:   */s/ JONATHAN C. DICKEY*
                    JONATHAN C. DICKEY

19  Attorneys for Defendants Herbalife Ltd.,
20  Michael O. Johnson, Desmond Walsh, and
    John DeSimone

21

22

23

24

25

26  [18]  Moreover, Oklahoma's trading pattern is inconsistent with its theory of fraud:  it bought a
27  substantial amount of Herbalife stock *after* certain of the alleged partial disclosures,
    including 29,769 shares after Ackman's December 2012 presentation, and 3,400 shares
28  after the January 23, 2014 Markey letters.  *See* Dkt. 34-2.