1  **SAXENA WHITE P.A.**
   Maya Saxena (*pro hac vice*)
2  Lester R. Hooker (SBN 241590)
   5200 Town Center Circle, Suite 601
3  Boca Raton, FL  33486
   Telephone:  (561) 394-3399
4  Facsimile:  (561) 394-3382
   E-mail:      msaxena@saxenawhite.com
5               lhooker@saxenawhite.com

6  *Lead Counsel for the Class and*
   *Counsel for the Firefighters' Pension Funds*
7
   **TOSTRUD LAW GROUP, P.C.**
8  Jon A. Tostrud (SBN 199502)
   1925 Century Park East, Suite 2125
9  Los Angeles, California 90067
   Telephone:  (310) 278-2600
10 Facsimile:  (310) 278-2640
   E-mail:      jtostrud@tostrudlaw.com
11
   *Local Counsel for the Class and*
12 *Counsel for the Firefighters' Pension Funds*

13              **UNITED STATES DISTRICT COURT**

14              **CENTRAL DISTRICT OF CALIFORNIA**

15                    **WESTERN DIVISION**

16 IN RE HERBALIFE, LTD.               ) No. 2:14-CV-02850-DSF (JCGx)
   SECURITIES LITIGATION               )
17                                      ) **CLASS ACTION**
                                        )
18                                      ) **LEAD PLAINTIFFS'**
                                        ) **MEMORANDUM OF POINTS**
19                                      ) **AND AUTHORITIES IN**
                                        ) **OPPOSITION TO DEFENDANTS'**
20                                      ) **MOTION TO DISMISS THE**
                                        ) **AMENDED COMPLAINT**
21                                      )
                                        ) Hearing:  February 9, 2015
22                                      ) Time:      1:30 P.M.
                                        ) Place:     Courtroom 840
23                                      )            255 East Temple St.
                                        )            Los Angeles, CA 90012
24                                      ) Judge:     Hon. Dale S. Fischer
                                        )
25 _____        )

26

27

28

1

## **TABLE OF CONTENTS**

2  TABLE OF AUTHORITIES ..................................................................................... iv

3  I.   INTRODUCTION ......................................................................................... 1

4  II.  FACTUAL BACKGROUND ........................................................................ 4

5      A.   THE NATURE OF HERBALIFE'S FRAUDULENT BUSINESS MODEL ............ 4

6          1.   Background Of Herbalife ............................................................ 4

7          2.   Epitome of a Pyramid Scheme—Herbalife Meets The
                SEC's Tell-tale Hallmarks Of An Illegitimate MLM ................ 4
8
           3.   Herbalife's International Illegal Practices ................................ 6
9
       B.   THE HERBALIFE SCHEME IS SLOWLY REVEALED ................................. 7
10
    III. LEGAL STANDARD ................................................................................. 11
11
    IV.  ARGUMENT ............................................................................................ 11
12
       A.   PLAINTIFFS ADEQUATELY ALLEGE CLAIMS UNDER SECTION
13          10(b) ........................................................................................ 11

14         1.   Defendants' Materially False and Misleading Statements
                and Omissions ........................................................................... 11
15
                (i)   Defendants Falsely Reported The Company's
16                    Business Practices and Operations ................................ 11

17               (ii)  Defendants Lied About Herbalife's Internal
                      Controls .......................................................................... 14
18
           2.   Defendants' Purported Disclosures Were Not Sufficient
19              To Disclose Herbalife's True Risks .......................................... 15

20         3.   Defendants' Purported "Opinions" Are Actionable ................ 17

21     B.   THE COMPLAINT PLEADS A STRONG INFERENCE OF SCIENTER .......... 19

22         1.   The Standard for Evaluating Scienter—A Tie Favors the
                Plaintiff ..................................................................................... 19
23
           2.   The Complaint Alleges Compelling Facts Evidencing
24              Defendants' Knowledge and Recklessness .............................. 20

25                (i)   The CW Statements Support Scienter ............................ 20

26               (ii)  Insider Trading Supports Scienter ................................. 23

27                      a.   The Individual Defendants' Suspicious
                           Trading ................................................................. 23
28

b.    Defendants' 10b5-1 Trading Plan Defense is
Not Applicable ...................................................25

(iii)   Core Operations: The Importance Of the Pyramid
Scheme To Herbalife's Success Supports Scienter........27

3.    Plaintiffs Allege Scienter Against Herbalife ...........................28

C.    PLAINTIFFS HAVE ADEQUATELY PLEADED LOSS CAUSATION ............30

D.    DEFENDANTS' STANDING ARGUMENTS ARE MERITLESS ...................32

V.    CONCLUSION ........................................................................34

# **TABLE OF AUTHORITIES**

## *Cases*

*Abuhamdan v. Blyth, Inc.*,
  9 F.Supp.3d 175 (D. Conn. 2014) ................................................................ 16, 17

*Allstate Life Ins. Co. v. Robert W. Baird & Co.*,
  756 F. Supp. 2d 1113 (D. Ariz. 2010) ........................................................ 28

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................................... 11

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) .................................................................................... 14

*Batwin v. Occam Networks, Inc.*,
  2008 WL 2676364 (C.D. Cal. Jul. 1, 2008) ................................................ 23

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) .................................................................. 18, 20

*Blaich v. Employee Solutions, Inc.*,
  1997 WL 842417 (D. Ariz. 1997) ................................................................ 32

*Bruce v. Suntech Power Holdings Co. Ltd.*,
  2014 WL 3956608 (N.D. Cal. Aug. 12, 2014) ............................................ 19

*Commc'ns Workers of Am. Plan for Employees' Pensions & Death Benefits
  v. CSK Auto Corp.*,
  525 F. Supp. 2d 1116 (D. Ariz. 2007) ........................................................ 19

*Cunha v. Hansen Natural Corp.*,
  2009 WL 2029797 (C.D. Cal. 2009) ............................................................ 32

*Cunha v. Hansen Natural Corp.*,
  2011 WL 8993148 (C.D. Cal. May 12, 2011)............................................. 18

*Eastwood Enters. LLC v. Farha*,
  2009 WL 3157668 (M.D. Fla. Sept. 28, 2009) ............................................ 28

*Eminence Capital, LLC v. Aspeon, Inc.*,
  316 F.3d 1048, 1052 (9th Cir. 2003)............................................................ 35

*Fecht v. Price Co.*,
  70 F.3d 1078 (9th Cir. 1995) ........................................................................ 23

*Feyko v. Yuhe Intern., Inc.*,
  2013 WL 816409 (C.D. Cal. Mar. 5, 2013) ................................................ 18

*FTC v. Burnlounge, Inc.*,
  753 F. 3d 878 (9th Cir. 2014) ...................................................................... 20

*Howard v. Everex Sys., Inc.*,
    228 F.3d 1057 (9th Cir. 2000) ...................................................... 19

*In re 2TheMart.com, Inc. Securities Litigation*,
    114 F.Supp.2d 955 (C.D. Cal. 2000) .......................................... 17

*In re Able Labs. Sec. Litig.*,
    2008 WL 1967509 (D.N.J. Mar. 24, 2008) ................................ 26

*In re Cabletron Sys., Inc.*,
    311 F.3d 11 (1st Cir. 2002) .......................................................... 25

*In re Cadence Design Sys., Inc. Sec. Litig.*,
    692 F. Supp. 2d 1181 (N.D. Cal. 2010) ..................................... 28

*In re Campbell Soup Co. Sec. Litig.*,
    145 F. Supp. 2d 574 (D.N.J. 2001) ............................................ 22

*In re Cardinal Health, Inc. Securities Litigation*,
    226 F.R.D. 298 (S.D. Ohio 2005) ............................................... 34

*In re Connetics Corp. Secs. Litig.*,
    257 F.R.D. 572 (N.D. Cal. 2009) ................................................ 34

*In re Daou Sys., Inc.*,
    411 F.3d 1006 (9th Cir. 2005) ........................... 11, 20, 21, 23, 30

*In re Diamond Foods, Inc., Securities Litigation*,
    281 F.R.D. 405 (N.D. Cal. 2012) ............................................... 33

*In re Dura Pharm., Inc. Sec. Litig.*,
    452 F. Supp. 2d 1005 (S.D. Cal. 2006) ................................. 17, 21

*In re EVCI Colls. Holding Corp. Sec. Litig.*,
    469 F. Supp. 2d 88 (S.D.N.Y. 2006) .......................................... 28

*In re Gemstar-TV Guide Intern., Inc. Securities Litigation*,
    209 F.R.D. 447 (C.D. Cal. 2002) ........................................... 32, 33

*In re Juniper Networks, Inc. Sec. Litig.*,
    542 F. Supp. 2d 1037 (N.D. Cal. 2008) ..................................... 19

*In re LDK Solar Sec. Litig.*,
    584 F. Supp. 2d 1230 (N.D. Cal. 2008) ..................................... 11

*In re Lehman Bros. Sec. & ERISA Litig.*,
    2013 WL 440622 (S.D.N.Y. Jan. 23, 2013) .............................. 33

*In re Merck & Co. Sec. Litig.*,
    432 F.3d 261 (3d Cir. 2005) ........................................................ 21

*In re Netflix, Inc., Securities Litigation*,
    2012 WL 1496171 (N.D. Cal. Apr. 27, 2012) ........................... 33

*In re Northpoint Commc'ns Grp., Inc., Sec. Litig.*,
221 F. Supp. 2d 1090 (N.D. Cal. 2002).................................................27

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) ...........................................................21

*In re Providian Financial Corp. Sec. Litig.*,
2004 WL 5684494 –5 (N.D. Cal. Jan. 15, 2004) .................................34

*In re Questcor Sec. Litig.*,
2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) ..................................26, 32

*In re Silicon Graphics Inc. Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999) ..............................................................24

*In re SunPower Sec. Litig.*,
2011 WL 7404238 (N.D. Cal. Dec. 19, 2011) .....................................28

*In re Toyota Motor Corp. Sec. Litig.*,
2011 WL 2675395 (C.D. Cal. July 7, 2011) ........................................18

*In re Vantive Corp. Sec. Litig.*,
283 F.3d 1079 (9th Cir. 2002) ............................................................23

*In re Verifone Holdings, Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012) ..............................................................19

*Johnson v. Alijan*,
394 F. Supp. 2d 1184 (C.D. Cal. 2004)...............................................23

*Kyung Cho v. UCBH Holdings, Inc.*,
890 F. Supp. 2d 1190 (N.D. Cal. 2012) ..............................................29

*Loos v. Immersion Corp*,
762 F.3d 880 (9th Cir.2014) ...............................................................31

*Loritz v. Exide Technologies*,
2014 WL 4058752 (C.D. Cal. Aug. 7, 2014) ......................................22

*Matrixx Initiatives, Inc. v. Siracusano*,
131 S. Ct. 1309 (2011)...................................................................11, 18

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008) ............................................................31

*Meyer v. Greene*,
710 F.3d 1189 (11th Cir. 2013) ..........................................................31

*Mulligan v. Impax Labs., Inc.*,
2014 WL 1569246 (N.D. Cal. Apr. 18, 2014)......................................27

*N.M. State Inv. Council v. Ernst & Young LLP*,
641 F.3d 1089 (9th Cir. 2011) ............................................................19

*Naiditch v. Applied Micro Circuits Corp.*,
   2001 WL 1659115 (S.D. Cal. Nov.2, 2001)........................................................33

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W.*
   *Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ...........................................................................24

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ............................................................................22

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004) ....................................................................15, 23

*Oregon Public Employees Retirement Fund v. Apollo Group Inc.*,
   2014 WL 7139634 (9th Cir. Dec. 16, 2014) .......................................................30

*Plevy v. Haggerty*,
   38 F. Supp. 2d 816 (C.D. Cal. 1998).................................................................15

*Plumbers v. Union Local No. 12 Pension Fund v. Ambassador's Group*,
   717 F.Supp.2d 1170 (E.D. Wash. 2010) ............................................................23

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) .........................................................................21

*Public Employees Retirement System of Mississippi, Puerto Rico Teachers'*
   *Retirement System v. Amedisys, Inc.*,
   769 F.3d 313 (5th Cir. 2014) ...........................................................................32

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014) .....................................................................passim

*Richardson v. TVIA, Inc.*,
   2007 WL 1129344 (N.D. Cal. Apr. 16, 2007)......................................................34

*S. Ferry LP, No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008)......................................................................24, 26

*Stocke v. Shuffle Master, Inc.*,
   615 F. Supp. 2d 1180 (D. Nev. 2009) ................................................................26

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*,
   531 F.3d 190 (2d Cir. 2008) ............................................................................28

*Teamsters Local 617 Pension & Welfare Funds v. Apollo Grp., Inc.*,
   633 F. Supp. 2d 763 (D. Ariz. 2009).................................................................30

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ..............................................................................passim

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981(9th Cir. 2009),............................................................................20

### *Statutes & Regulations*

15 U.S.C. § 78u .......................................................................................... 11, 32

17 C.F.R. § 240.10b5-1 .................................................................................. 26

# I.   __INTRODUCTION__[1]

This securities class action seeks to redress the damages suffered by the Company's investors as a result of Defendants' continuous and deliberate misrepresentations and omissions concerning the fundamental nature, scope and legality of Herbalife's business.   Throughout the Class Period, Defendants characterized Herbalife as a bastion of beneficial consumer health products aimed at fighting the "global obesity epidemic," while also touting the purportedly limitless business opportunities available through its multi-level marketing ("MLM") program aimed at selling nutrition and weight-management products. Defendants portrayed Herbalife as "the world's best business opportunity" that provided prospective members with a golden chance to live the American dream and earn substantial amounts of income from the comfort of their own homes.

While Defendants continuously argue that the Company operates as a legitimate MLM with genuine demand for its products, these representations are belied by the increasing clamor amongst investors, activists, regulators, consumers and politicians, which revealed Herbalife as "the best-managed pyramid scheme in the history of the world."   As the Complaint demonstrates, Herbalife's operations fit each of the SEC's seven tell-tale "hallmarks" of a pyramid scheme disguised as an MLM, including: (i) an emphasis in Herbalife's marketing and promotions on recruitment rather than retail activities; (ii) inappropriate and illogical pricing of the Company's products at points two and three times that of its name-brand

---

[1]   Lead Plaintiffs the Oklahoma Firefighters Pension and Retirement System ("Oklahoma") and the City of Atlanta Firefighters' Pension Fund ("Atlanta" and, together with Oklahoma, "Lead Plaintiffs") respectfully submit this Memorandum of Points and Authorities in Opposition to the Motion to Dismiss of Defendant Herbalife, Ltd. ("Herbalife" or the "Company") and Individual Defendants Michael O. Johnson ("Johnson"), John DeSimone ("DeSimone") and Desmond Walsh ("Walsh") (the "Individual Defendants" and, together with Herbalife, "Defendants") ("Mot."). All "¶__" references herein are to the Amended Class Action Complaint for Violation of the Federal Securities Laws (the "Complaint") (ECF No. 55).   All capitalized terms not defined herein have the meanings as defined in the Complaint.

---

competitors who have more convenient offerings backed by exponentially larger marketing budgets; (iii) extravagant promises touting the luxurious lifestyles of a very limited number of upper-echelon members; (iv) no demonstrated retail sales despite frequent calls for this information; (v) a buy-in required in the form of mandatory introductory kits along with inventory purchase requirements for commissions; and (iv) a highly complex commission structure.

The Complaint details the various shocking revelations of the last two years that have slowly exposed Herbalife's illegitimacy, including: (i) various investigative exposés and presentations by activist investors of the Company; (ii) letters from Massachusetts Senator Edward Markey to the FTC and SEC urging the agencies to launch formal investigations of Herbalife; and (iii) a litany of government and regulatory actions, including civil ***and criminal*** probes against the Company by no less than the FTC, SEC, DOJ, FBI, various states attorneys general and Canadian regulators, which remain pending at the time of this filing.

Against this backdrop, Defendants ask the Court to dismiss the Complaint at the pleading stage, arguing that Plaintiffs fail to state a claim for securities fraud because Plaintiffs have not established falsity, scienter or loss causation.  However, as discussed in detail below, Defendants' Class Period statements were materially false and misleading as they were either derived from or failed to disclose the inherent illegitimacy of the Company's pyramid-scheme structure.  Among other unpersuasive arguments, Defendants brazenly suggest that purported risk language concerning the possibility of "pyramid scheme challenges" somehow absolves them of liability. Defendants' head-in-the-sand approach patently ignores Plaintiffs' well-pled allegations establishing that Herbalife's success was built on the back of illegal business practices, rather than a mere self-interested mud-slinging campaign with no basis in reality.  Defendants' misrepresentations were

1   fraudulent and material, and served to artificially inflate Herbalife's stock price

2   during the Class Period.

3        The Complaint further establishes a strong inference that Defendants either

4   knew or were reckless in not knowing of Herbalife's scheme.   This strong

5   inference is cogent and at least as compelling as Defendants' proffered opposing

6   inference: that they genuinely believed Herbalife's health and fitness business

7   model was legitimate.  The Complaint provides detailed information demonstrating

8   the Individual Defendants' direct involvement in and knowledge of the fraud.

9   These allegations are corroborated by the independent, detailed and highly-

10  incriminating accounts of two high-level former employees with direct knowledge

11  of Herbalife's business practices and the Individual Defendants' actions during the

12  Class Period, one of which stated that "*[a]nybody who says Herbalife is not in the*

13  *business of recruitment is not telling the truth*."  ¶53.

14       The Complaint's scienter allegations are further bolstered by a staggering

15  amount of insider sales during the Class Period of over $187 million, including the

16  sales of $150 million by the Individual Defendants alone, all at prices significantly

17  higher than Herbalife's stock price at the end of the Class Period.  When accepted

18  as true, taken together and viewed holistically, as required, the allegations of the

19  Complaint raise a strong inference of Defendants' scienter that is cogent and at

20  least as compelling as any opposing inference of non-fraudulent intent.   *See*

21  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007).

22       Defendants' loss causation arguments are similarly unavailing.  Here, the

23  Complaint satisfies the applicable pleading rules and alleges drops in Herbalife's

24  stock price due to a series of corrective disclosures and a causal connection to the

25  underlying fraud.  As demonstrated herein, Plaintiffs' allegations are sufficient to

26  survive a motion to dismiss, and Defendants' motion should be denied.[2]

27

28  ---
    [2] Defendants also challenge the Court-approved Oklahoma and Atlanta.  However,
    Defendants' arguments fail as a matter of law and have been repeatedly rejected by

## II.    FACTUAL BACKGROUND

### A.    THE NATURE OF HERBALIFE'S FRAUDULENT BUSINESS MODEL

#### 1.    Background Of Herbalife

Herbalife, a network marketing company that sells health products through a global network of distributors, purportedly operates as an MLM that encourages its members to recruit new distributors by paying existing distributors a percentage of recruits' sales. ¶¶19, 32. The MLM business model is controversial as illegal pyramid schemes feign proper MLM status, instead using money from new recruits to provide compensation to individuals at the top of the scheme. ¶¶33-34. The SEC defines a pyramid scheme as a plan "where the money you make is based primarily on the number of distributors you recruit and your sales to them, rather than on your sales to people outside the plan who intend to use the products." ¶36. The Complaint demonstrates Defendants' exploitation of the gray area between MLMs and pyramids—exemplifying Herbalife's focus on recruitment rather than sales.

#### 2.    Epitome of a Pyramid Scheme—Herbalife Meets The SEC's Tell-tale Hallmarks Of An Illegitimate MLM

In addition to the FTC's "Bottom Line About Multilevel Marketing Plans and Pyramid Schemes," the SEC's Office of Investor Education and Advocacy issued an Investor Alert entitled "Beware of Pyramid Schemes Posing as Multi-Level Marketing Programs" noting the "hallmarks of a pyramid scheme." ¶¶38-39. The hallmarks are comprised of the following: (i) no genuine product or service; (ii) promises of high returns in a short time period; (iii) easy money or passive income; (iv) no demonstrated revenue from retail sales; (v) buy-in required; (vi) complex commission structure; and (vii) emphasis on recruiting. ¶39.

---

courts in this Circuit and nationwide, and are demonstrative of the deficiencies in Defendants' motion. Indeed, the inapplicable "professional plaintiff" challenges to Oklahoma should be viewed in the context of Oklahoma's extremely successful track record of recovering *over $1 billion* for injured shareholders in recent years, as detailed in Section IV(D) below.

---

Herbalife's business model meets each of the above factors.  First, the Company's products are speculative and inappropriately priced.  True MLMs sell products that are appropriately priced to consumers who are not enrolled in the program itself.  ¶67.  Herbalife, on the other hand, has one primary product—a nutritional supplement called Formula 1—that suffers from debilitating competitive disadvantages and costs 2-3 times more than well-known comparable products.  ¶¶67-68, 71-75.  Indicative of a lack of a genuine product, the Company had "de minimis" product advertising support and reported in 2011 that spending on R&D is "not material."[3]  ¶¶70-71.

In regards to the second and third factors—extravagant promises and passive income—Herbalife is notorious for promoting recruitment rather than retailing through a variety of methods including: (i) extravaganzas; (ii) lead generation; and (iii) testimonials.  ¶¶42-60.  As confirmed by former employees, Herbalife holds international extravaganzas encouraging attendees to "***get a piece of the American dream***" by establishing a "downline" of recruits. ¶¶45-54.   Also, for more than a decade, Herbalife engaged in "lead generation" where it sold "leads" to distributors for up to $130 each using "radio, print and Internet ads to lure victims with promises of an unnamed 'business opportunity' that assures financial freedom." ¶43.  Further, Herbalife enticed would-be distributors through rags-to-riches tales that included testimonials such as:  "***Our income hit $350,000 and our second year, I turned 30 and Mike turned 25 and our income hit $1.1 million***;" "***You know, it's really amazing.  I step out of the Ferrari, the Bentley, or whatever, and people go—'what does that guy do for a living?'—and I go, 'I'm an Herbalife independent distributor,' and people are absolutely amazed***." ¶¶55-58.

Fourth, the SEC advises scrutiny of MLMs with no demonstrated revenue

---

[3] Additionally, the Company stated in the past that it was the first to market and develop a nitric oxide product—claims proved unfounded. ¶71.  Herbalife also misleadingly boasted about its UCLA-led research efforts, but only donated approximately $1.5 million with a miniscule portion for clinical studies. *Id*.

from retail sales. ¶¶61-66. For years, investors have pleaded Defendants to provide retail sales information; however they have failed to properly do so, as confirmed by a former employee who described how Herbalife did not track consumer demand. *Id.* Further, Herbalife indeed required a member pack or "buy in" sold of upwards of $100. ¶¶76-77. Herbalife's frequently revised sales and marketing plan includes over 126 pages of text and forms; 150 rules; 60,000 words; 10 levels of distributors; 5 forms of compensation, which only obfuscates the prospects for prosperity of the low-income demographic upon which Defendants prey. ¶78.

The Company is elusive in regards to providing information as to most of its vital practices, including nutrition clubs, which served as Herbalife's replacement for the lead generation system and which exemplified the Company's emphasis on recruiting. ¶129. Nutrition clubs are exploited to (i) further deceive income claims; (ii) mislead "trainees" into believing they are "investing" in an education with a valuable pay-off—a substantial cost in time and money for the trainee; (iii) demand duplication for success; (iv) create fake club traffic consisting of 'trainees' and their family members and friends; (v) promote inventory loading; and (vi) violate federal labor laws applicable to unpaid employees. ¶131.

### 3. Herbalife's International Illegal Practices

To sustain its business model and further the façade of a legitimate, lasting MLM, Herbalife exploits markets by targeting the fiscally unsophisticated on a global basis, pursuant to which it entered fourteen countries with an average GDP per capita of $4,260, endeavoring to sell weight loss products in areas plagued with poverty and famine. ¶¶111-113. Further, Herbalife faced accusations of enabling criminal enterprises and violating direct-selling and anti-pyramid laws. ¶¶111-128.

In China, Herbalife's deceptive practices violate the country's stringent anti-pyramid regulations, including prohibited multi-level commission-based royalty payments, use of the deceptive term "hourly consulting pay" to circumvent PRC

laws, and requiring recruits to pay fees to obtain qualification for participation. ¶¶114-122. Chinese distributors have corroborated Herbalife's illegitimate business practices, confirming the nominal nature of retail profits and characterizing the Company's approach to recruiting as a pyramid or a sun—a boundless number of pyramids. ¶¶119-120. In Venezuela, Herbalife has been accused of manipulating currency factors in order to present false and misleading financial results. ¶¶124-126. While companies such as Ford and Coca Cola have taken charges on Venezuela's devalued currency, the Bolivar, Herbalife has been scrutinized for continually using exchange rates unavailable in the Venezuelan market.[4] *Id.* Lastly, in Mexico, Herbalife has been accused (including by the *New York Times*) of enabling drug cartels to launder money. ¶127-128.

## B.   THE HERBALIFE SCHEME IS SLOWLY REVEALED

The Company's issues began to come to light when the first pivotal inquiry into Herbalife's fraudulent business practices took place on May 1, 2012. On that date, Greenlight Capital Chairman David Einhorn questioned Herbalife on three topics relevant to whether it was a pyramid scheme: (i) the amount of final sales actually sold outside the distributor network to consumers; (ii) the incentive for supervisors to recruit others as distributors; and (iii) the method of accounting for the bottommost distributors and reasoning for no longer disclosing that information in Company financial reports. ¶81. Due to Einhorn's line of questioning and both Defendants Walsh's and DeSimone's clear inability to readily provide fundamental information to the investing public, the Company's stock price tumbled more than 20% or $14.02 per share. ¶82. Herbalife's stock price fell an additional 18% or $10.10 per share to close at $46.20 on May 3, 2012. *Id.* Threatened by Einhorn's

---

[4] An April 28, 2014 *Seeking Alpha* article stated the following: "***Seemingly trying to 'double down' on Venezuela, you can also see a line item where the company invested in Venezuelan bonds***. Interesting tactic for a country whose currency is worth less not than in 2013. ***What is the purpose of this? Trying to tie the money up so it can continue to be valued at disingenuous rates?***" ¶126.

queries, Defendants materially misrepresented Herbalife's business affairs, belatedly responding to Einhorn in two press releases where Herbalife dismissed this information as not "valuable to the business or to investors." ¶¶83-84.

On December 19, 2012, CNBC broadcasted that after an exhaustive year-long investigation Pershing Square Capital Management ("Pershing") CEO Bill Ackman concluded that Herbalife is a pyramid scheme. ¶86. On this news, Herbalife stock price declined 13% to close at $37.34 per share on December 19, 2012. *Id.* On the same day, Defendant Johnson craftily appeared on CNBC to dissuade the public from continuing to sell off Herbalife shares, meanwhile threatening Ackman personally, stating that "[t]he United States will be better when Bill Ackman [is] gone." ¶87. During the interview, Johnson also misstated the percentage of Herbalife sales outside the distributor network as "90%."[5] *Id.* On December 20, 2012, Ackman, Pershing analyst Shane Dinneen and senior counsel David Klafter led a detailed 334-slide presentation explaining the financial and legal basis for their conclusions on Herbalife. ¶¶88-89. These revelations caused Herbalife stock to decline 27% over the next two trading sessions. ¶90.

Inquiries into Company practices continued over 2013. On January 9, 2013, the *New York Times* and *Wall Street Journal* reported that the SEC's enforcement unit had commenced an investigation into the Company. ¶92. A total of 192 FTC complaints[6] against Herbalife were released on February 4, 2013, which included declarations that "*it was a pyramid* and they wanted me to stock merchandise," "everything about [H]erbalife from prescreening and watching initial videos to sign up, through training process have been ***nothing but a scam***," and "it was my

---

[5] Johnson took weeks to retract his misrepresentation: "It was a misstatement. 90% of our distributors—ok—who are buying our product—let me just try to clarify this—buy it for one reason, and they buy it for self-consumption, and that was a misstatement on that day, I was kind of hyped up that day, wasn't I?" ¶63.

[6] Furthermore, on March 11, 2013, the FTC released 94 consumer complaints regarding Herbalife recruitment methods, including lead generation issues. ¶97.

intent to recruit rather than to sell retail, as ***I was told there was much more money to be made in recruiting***." ¶95.  Also in February 2013, Pershing released thirty-eight pages of questions to Herbalife, including comparisons to legitimate MLM businesses that released detailed retail information.  ¶96.  In March 2013, Pershing used analytical framework and legal standards that the FTC and Attorneys Generals from Kentucky, North Carolina and Illinois used to prosecute Fortune Hi-Tech Marketing to conclude that Herbalife was a pyramid scheme.[7]  ¶98.

In January 2014, U.S. Senator Edward J. Markey of Massachusetts sent letters to SEC Chair Mary Jo White, FTC Chairwoman Edith Ramirez and Defendant Johnson describing reports from Massachusetts residents suggesting that "Herbalife is a pyramid scheme," and detailing other group's conclusions on Herbalife.  ¶¶100-104.  Specifically, Markey noted that leading Hispanic groups including MANA, concluded that Herbalife "***prey[s] on our most vulnerable***" with MANA president having "seen some of my own friends in my home state of Texas ***fall victim to these terrible practices***."  ¶102.  After news of the Markey letters surfaced, Herbalife stock declined $7.61, or over 10% on January 23, 2014.  ¶105.

In 2014, Herbalife was hit with numerous domestic and international civil and criminal investigations.  ¶¶106-110.  On January 28, 2014, the *New York Post* reported that Canada's top consumer regulator launched a formal probe into complaints that Herbalife runs a pyramid scheme.  ¶106.  On this news, the Company's stock price dropped from $64.06 on January 27, 2014 to $62.54 on January 28, 2014.  ¶106.  On March 12, 2014, the FTC's civil investigation into

---

[7]  On November 22, 2013, Pershing published its "Robin Hood in Reverse" presentation outlining the SEC's October 2013 Investor Alert warning investors to beware of "pyramid schemes posing as multi-level marking programs," and how Herbalife's operations meet the "hallmarks" of a pyramid scheme. ¶99.  After the filing of the Complaint, on November 17, 2014, Pershing released an internal Herbalife video in which an Herbalife Chairman's Club Member made statements such as, "We sell people on a dream business that they can make it, yet deep down inside what do we really know?  Yeah, we know the reality of that most of them are not going to make it."  *See* http://www.benzinga.com/media/cnbc/14/12/5088176/bill-ackman-reveals-internal-video-that-proves-herbalife-is-basically-a-pyr.

1    Herbalife was announced.  ¶107.  As a result, the Company's stock was halted,

2    falling as much as 17% and closing more than 7% lower on March 12, 2014.  *Id*.

3    On April 11, 2014, the *Financial Times* reported that the DOJ and FBI opened

4    ***criminal probes*** into the Company.  ¶108.  Herbalife's stock price dropped more

5    than 14%, closing at $51.48 on April 11, 2014.  *Id*.   In mid-April 2014, two

6    additional investigations were announced by New York Attorney General Eric

7    Schneiderman and Illinois Attorney General Lisa Madigan.  ¶¶109-110.

8         On July 28, 2014,[8] Defendants shocked the investing public with quarterly

9    earnings and revenue that fell far short of Wall Street estimates, the first miss since

10   2008.  ¶¶132-133.  Herbalife also stated that 2014 sales would grow by 8.5%-

11   10.5%, slower than the 10%-12% range predicted in April. *Id*.   Moreover,

12   Defendants disclosed issues with its U.S. operations, revelations regarding the

13   Venezuelan money transfer scheme and corresponding market decline in the

14   region.  ¶133.  As a result, Herbalife's shares plummeted nearly 14% from a close

15   of $67.48 on July 28, 2014 to close at $58.35 on July 29, 2014.  ¶132.

16        In response to Defendants' announcements and the resulting stock price

17   declines, analysts dissected Herbalife's business practices.   A July 29, 2014

18   *Seeking Alpha* article highlighted concerns with Defendants' practices, including

19   manipulation of the Company's stock price through a large stock buyback

20   initiative.  ¶135.  Significantly, a July 29, 2014 *New York Post* article stated that

21   "*[i]nvestors are no longer buying Herbalife's growth story*."  ¶134.[9]

22

23   [8] Also in July 2014, Pershing held a webcast on its investigation into Herbalife's
     nutrition clubs, focusing on the impact the Company's practices have and continue
24   to have on the Hispanic and African American communities.  ¶¶129-131.

25   [9]  In the recent settlement between Herbalife and its distributors—wherein the
     allegations included violations of California's endless chain scheme law under
26   California Penal Code Section 327 and California Civil Code Section 1689.2;
     violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C.
27   §§ 1962); and unfair and deceptive business practices and false advertising under
     California Business and Professions Code—following the denial of its motion to
28   dismiss, the Company agreed to pay $15,000,000 into a settlement fund, as well as
     establish  a  separate  product  return  fund  of  up  to  $2,500,000,  and  undergo

## III.   <u>LEGAL STANDARD</u>

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation (or omission); (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005). The PSLRA requires plaintiffs to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading[.]" 15 U.S.C. § 78u-4(b)(1). Rule 9(b) requires that a complaint must state with particularity the circumstances constituting fraud or mistake.  In a securities fraud class action, courts must consider the complaint in its entirety, "[a]ssum[e] the complaint's allegations to be true" and construe them in the light most favorable to plaintiff. *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1322 (2011).  The question is not whether a plaintiff will prevail in the action, but whether it is entitled to offer evidence in support of its claim. *See In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1241 (N.D. Cal. 2008).  A complaint should not be dismissed if it contains factual matter that, if accepted as true, states a claim for relief that is plausible on its face. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).

## IV.   <u>ARGUMENT</u>

### A.   PLAINTIFFS ADEQUATELY ALLEGE CLAIMS UNDER SECTION 10(b)

#### 1.   Defendants' Materially False and Misleading Statements and Omissions

##### (i)   Defendants Falsely Reported The Company's Business Practices and Operations

To plead falsity, a complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." *Reese v. Malone*, 747 F.3d 557, 567 (9th Cir. 2014) (quoting 15 U.S.C. § 78u–4(b)(1)(B)).  Plaintiffs identify the statements that were false and/or misleading

significant changes in its distributorship practices. *See Bostick v. Herbalife International of America Inc.*, 13-cv-02488 (C.D. Cal. 2014) (Dkt. 95 at 6-10).

and the reasons for falsity. *See* ¶¶140-166. Plaintiffs challenge much more than the structure of Herbalife, as defendants contend. Mot. at 13. The Complaint properly alleges that Herbalife's representations concerning the legitimacy of its business practices and operations were false and misleading. ¶¶32-60. Plaintiffs' allegations are also sufficient regarding Herbalife's claims about its marketing program, compliance with government rules and regulations, and its nutrition clubs. The Complaint sets forth these allegations in great detail. Specifically, the allegations demonstrate how Herbalife's filings mischaracterized the Network Marketing Program, masked overseas compliance measures in countries such as China (where direct selling is not permitted), and lied about the purpose and success of nutrition clubs. ¶¶146-62. Defendants praised the Network Marketing Program as central to the growth of the Company, yet repeatedly and purposefully mischaracterized it:

> We are focused on building and maintaining our distributor network *by offering financially rewarding and flexible career opportunities through sales of quality, innovative and efficacious products to health conscious consumers*. . . *Our distributors, who are independent contractors, can profit from selling our products and can also earn royalties and bonuses on sales made by the other distributors* whom they recruit to join their sales organizations.[10]

> In addition to helping our distributors achieve their goals of health and wellness through use of our products, *we offer our distributors, who are independent contractors, attractive income opportunities.* Distributors may earn income on their own sales and can also earn royalties and bonuses on sales made by the distributors in their sales organizations.[11]

Again, as it did with the definition of "retail sales", Herbalife changed the way it described the Network Marketing Program in 2012:

> . . . We believe our continued commitment to develop high-quality, science-based products will enhance our distributors' [Members'] ability to attract new distributors [Members] and consumers. Our sales are generated primarily from distributor [Member] purchases that are for reasons other than earning multi-level compensation under the Company's marketing plan.

---

[10] *See* ¶146. (citing 2010 Form 10-K at 5; 2011 Form 10-K at 5).

[11] *See* ¶147 (citing 2010 Form 10-K at 11-12; 2011 Form 10-K at 12-13).

*The majority of our distributors [Members] have not sponsored another distributor [Member] and do not earn compensation relating to products sales made by or to other distributors [Members].*

All of the above representations along with other numerous statements were false and misleading because the primary source of income for distributors *is through recruitment of new members rather than true retail operations*, evidenced by the fact that Herbalife had *no demonstrated revenue from retail sales from actual customers* and, through its membership requirement, materially inflated the Suggested Retail Price of products in order to overstate retail sales. ¶150.  Herbalife purposefully did not track retail sales to non-affiliated individuals and therefore manipulated the true scope of its retail sales. *Id.*  Also contrary to the excerpts above and throughout the Complaint, the Company's products were not "unique" in the marketplace, were inappropriately priced and were sold to new members through a system that overpromised and under-delivered.[12]

Likewise, Herbalife's statements regarding compliance were materially false and misleading.  For example, Herbalife offered the following statement several times over in various forms: "Our network marketing program is subject to a number of federal and state regulations . . . *When required by law, we obtain regulatory approval of our network marketing program or, when this approval is not required, the favorable opinion of local counsel as to regulatory compliance*."  ¶¶128, 143, 151.  The Complaint specifies each instance of this compliance assurance.  These statements were false and misleading specifically because, despite their repeated assurances of regulatory compliance, Herbalife's sales operations and related financial results were the result of increasing levels of buy-ins required of members to obtain rewards from a deceptively complex

---

[12] The Company's misleading statements effectively prevented the investing public from knowing how many true customers purchase Herbalife's products based on demand, rather than new recruits who are required to do so in order to advance in the organization.  Similarly, Defendants failed to disclose that Herbalife's products were overpriced and not unique in the marketplace, and that by deriving profits through recruitment, Herbalife was not operating as a legitimate MLM.

1   commission structure.   ¶157.   This reality was in direct contravention to the

2   controlling regulations in both China and the U.S.   The Complaint fully details

3   Defendants' misleading statements about operations in China, which range from

4   official filings to earnings calls and interviews.   ¶¶154-157.[13]

5                    **(ii)    Defendants Lied About Herbalife's Internal Controls**

6               Defendants repeatedly made and signed off on certifications attesting to

7   Herbalife's effective and adequate financial controls, including that the

8   information fairly present[ed] ***"all material respects the financial condition,***

9   ***results of operations and cash flows***" of Herbalife.   ¶¶163-169.   These

10  certifications pursuant to the Sarbanes-Oxley Act of 2002 were false and

11  misleading because the controls and procedures were in fact nonexistent or, at, best

12  highly deficient, all of which permitted Defendants to carry out Herbalife's

13  scheme.   ¶166.   The allegations concerning the Company's controls demonstrate

14  falsity and materiality, permitting Defendants to attribute Herbalife's sales, growth

15  potential, and overall financial health to these illicit business practices and

16  operations.   Clear from Defendants' own discussion of these items is the fact that

17  each is ***critical*** to Herbalife's business.   The Complaint's allegations support the

18  inference of a substantial likelihood that the disclosure of the omitted facts—here

19  central details surrounding vital aspects of the business—would have been viewed

20  by the reasonable investor as having "significantly altered the total mix of

21

22

---

23  [13] Statements about Herbalife's vital metrics were materially misleading or failed
    to disclose material information necessary to make such statements not false and
24  misleading because each metric (Reported Net Income, Reported Net Sales, and
    Reported Retail Sales, among others) was partly or entirely based on figures
    derived through known business practices that emphasize recruitment efforts rather
25  than true retail operations.   ¶140 (table of figures with citations to SEC filings).
    Herbalife's true revenue from non-affiliated retail sales was limited, and the
26  Company posted revenue figures based on a model which uses a materially inflated
    Suggested Retail Price and thus overstates retail sales in filings.   Unlike legitimate
27  MLMs, Herbalife did not track retail sales to non-affiliated individuals and did not
    accurately represent retail sales. ¶96.
28

information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988). The Complaint's allegations thus plead materiality and falsity.

### 2. Defendants' Purported Disclosures Were Not Sufficient To Disclose Herbalife's True Risks

Defendants' boilerplate disclosures did not adequately disclose the problems and risks faced by Herbalife. Defendants claim that "extensive public disclosures" serve to "demolish" Plaintiffs' allegations. Mot. at 16. But such "disclosures" in this case were nothing more than carefully-worded attempts to evade mounting scrutiny and conceal Herbalife's true nature for as long as possible. Defendants claim that their false and misleading statements cannot be actionable due to "facts" coming to light through various sources. Mot. at 15. The Ackman presentations, along with various other sources questioning Herbalife, set forth detailed findings about Herbalife as a company. ¶87. Unlike the cases cited by Defendants,[14] this case involves matters existing at the time of the challenged statements (rather than third-party predictions). Defendants cannot argue that investors were warned of the fraud given their vigorous denials.

Likewise the highly generalized corporate disclosures offered by Herbalife did nothing to reveal the true material risks in its business. As presented in their memorandum and in Appendix A—billed as "extensive disclosures"[15]—these statements are nothing more than boilerplate language that avoids addressing the true risks faced by Herbalife. For example, one commonly repeated instance states that Herbalife is "subject to the risk of private party challenges to the legality of [its] network marketing program." Mot. at 10. Another states that Herbalife is:

---

[14] Defendants cite to *Plevy v. Haggerty*, 38 F. Supp. 2d 816, 833 (C.D. Cal. 1998), which concerned future projections made by third parties and not the defendants themselves. Under similar circumstances as here, the Ninth Circuit described a comparison to *Plevy* as "inapt". *See Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004).

[15] Mot. at 10, 18, and 26.

affected by extensive laws, governmental regulations, administrative determinations, court decisions and similar constraints both domestically and abroad, and our failure or our distributors' failure to comply with these constraints could lead to the imposition of significant penalties or claims, which could harm our financial condition and operating results.

Mot., Appx. A.  These "disclosures" are far from "extraordinarily transparent" as labeled by Defendants.  Other excerpts loosely gloss over Herbalife's business practices and do nothing more.  Specifically, one such excerpt attempts to linguistically dance around the fact that Herbalife's success is completely dependent on recruiting new members, and ***wholly excludes the fact that said members, should they wish to participate in Herbalife's commission structure, must sell (become distributors) and thus recruit new members who in turn become distributors***.  Rather than this simple truth, Herbalife stated:

> Our failure to establish and maintain distributor relationships for any reason could negatively impact sales of our products and harm our financial condition and operating results . . . To increase our revenue, we must increase the number of, or the productivity of, our distributors. Accordingly, our success depends in significant part upon our ability to recruit, retain and motivate a large base of distributors. There is a high rate of turnover among our distributors, which is a characteristic of the network marketing business.[16]

While Defendants draw from *Abuhamdan v. Blyth, Inc.*, 9 F.Supp.3d 175 (D. Conn. 2014), an opinion from the District of Connecticut, it is a strained comparison at best that is factually distinguishable.  First, the company in *Blyth* was not facing scrutiny from government regulators, investors, or members of the U.S. Senate; its international practices were not the subject of regulatory concern; and the opinion considered ***how to classify certain straightforward data,*** while this case concerns ***fundamentally misleading practices and a lack of available information***.[17]  Most critically, the court in *Blyth* based its opinion primarily on the

---

[16] *See* Mot. Appx. A.

[17] The *Blyth* opinion makes clear that these were the only challenged statements regarding the company's business model: "(1) Our targeted new products and services support the growth and success of our Promoters, Leaders and customers as we build ViSalus into a leading lifestyle brand together. . . (2) ViSalus's market model and technology savvy is truly transforming the health and direct selling industries;  and  (3)  First  and  foremost,  nothing  in  Blyth's  or  ViSalus's

availability of information.  Indeed, even a cursory reading of *Blyth* shows that the plaintiffs ***made allegations regarding certain calculations, but everyone possessed the underlying data***.  *Blyth*, 9 F.Supp.3d at 200.  The critical difference here is that Plaintiffs, along with so many others, have been stymied by Defendants who ***purposefully did not collect or disclose the relevant data***, which in itself was nothing more than a clever attempt to engineer practices and data as part of a larger subterfuge.  In fact, other MLM companies keep this very data—including the company challenged in *Blyth*.

Finally, Defendants' exhaustive, repetitive argument that the Ackman presentation functioned as a risk disclosure is fundamentally incorrect.  The Ackman presentation, along with other publicly-known inquiries, reiterated the same serious questions that Defendants refused to answer.  Indeed, and missing from Defendants' reasoning, is the fact this Court (along with others) has recognized that "***facts demonstrating public interest in withheld information support its materiality***."  *Reese*, 747 F.3d at 569; *See In re 2TheMart.com, Inc. Securities Litigation*, 114 F.Supp.2d 955, 961 (C.D. Cal. 2000).

### 3.   Defendants' Purported "Opinions" Are Actionable

Defendants argue, in a footnote, that the Complaint "fails because many of the challenged statements constitute puffery."  Mot. at 20.  Statements of puffery employ "terms that are not measurable and not tethered to facts that a reasonable person would deem important to a securities investment decision."  *In re Dura Pharm., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1033 (S.D. Cal. 2006).  Defendants' statements here were objective and misrepresented or omitted crucial facts including:  Herbalife's business structure and the efficacy of that structure as stated at the time; the propriety of its product pricing; that Herbalife's products were not

---

fundamentals has changed." (internal quotes, parentheticals omitted).  *Blyth*, 9 F.Supp.3d at 190.  In contrast, the Complaint challenges more segments as they specifically relate to the misstatements at issue (business practices, operations, financials, internal controls, compliance).

1   unique to the marketplace; that the primary driver of distributor income was

2   recruitment; that new members were recruited through extravagant promises of

3   high returns; and the effect of increasingly high buy-ins on Herbalife's complex

4   commission structure.  ¶138.  These misrepresentations are actionable since they

5   "affirmatively created an impression of a state of affairs that differed in a material

6   way from the one that actually existed." *Reese*, 747 F.3d at 570 (quoting *Berson v.*

7   *Applied Signal Tech., Inc.,* 527 F.3d 982, 990 (9th Cir. 2008)).

8        Defendants misinterpret *In re Toyota Motor Corp. Sec. Litig.,* 2011 WL

9   2675395 (C.D. Cal. July 7, 2011).  Mot. at 19.  In *Toyota*, the Court found that

10  "nothing in the complaint suggests that Defendants were knowingly trading quality

11  and safety for financial results." *Id.* at *3.  Here however, the Complaint's detailed

12  allegations demonstrate that Defendants' representations were false and misleading

13  due to Herbalife's illicit corporate structure.  Moreover, the "positive financial

14  results" here are based on metrics that are inaccurate as Herbalife inflates its

15  Suggested Retail Price and did not track retail sales to non-affiliated individuals.

16  To have an accurate picture of Herbalife's sales and overall health, all of the

17  underlying relevant information regarding the Company's operations and revenue

18  was "necessary in order to make the statements made, in light of the circumstances

19  under which they were made, not misleading.'" *Matrixx*, 131 S. Ct. at 1317.  There

20  is no question that Defendants selective approach to informing the shareholders

21  and the public about the way it operates was in violation of the securities laws.[18]

22

23

_____

24  [18] Moreover, "[m]ateriality is rarely appropriate to decide at the motion to dismiss
    stage." *Feyko v. Yuhe Intern., Inc.*, 2013 WL 816409, at *5 (C.D. Cal. Mar. 5,
25  2013).   Likewise, "[t]he Court is under no obligation to evaluate every
    misrepresentation that was made in the CAC, because Plaintiff can survive a
26  motion to dismiss by alleging a single material misrepresentation." *Feyko*, 2013
    WL 816409, at *4; *Cunha v. Hansen Natural Corp.*, 2011 WL 8993148, at *4
27  (C.D. Cal. May 12, 2011) (holding that where the Court finds at least one
    actionable misstatement it is under no obligation to individually examine all
28  remaining statements).

### B.   THE COMPLAINT PLEADS A STRONG INFERENCE OF SCIENTER

#### 1.   The Standard for Evaluating Scienter—A Tie Favors the Plaintiff

To establish scienter, the Ninth Circuit requires a plaintiff to "'state with particularity facts giving rise to a strong inference' that defendants acted with the intent to deceive or with deliberate recklessness as to the possibility of misleading investors." *Berson*, 527 F.3d at 987.  A plaintiff may establish scienter by alleging facts indicating that the defendants "knew, or should have known" of the falsity of their statements.  *See N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1098 (9th Cir. 2011).  In the Ninth Circuit, recklessness "has long sufficed to establish scienter for § 10(b) purposes."  *In re Juniper Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037, 1046 (N.D. Cal. 2008).[19]  "[A]n actor is [deliberately] reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort."  *See Reese*, 747 F. 3d at 569 (quoting *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000)).

The Supreme Court cautions that, in evaluating scienter, a court ***must*** "accept all factual allegations in the complaint as true" and determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Verifone*, 704 F.3d at 701 (citing *Tellabs*, 551 U.S. at 322-23 (emphasis in original)).  Thus, "the strength of an inference cannot be decided in a vacuum." *Id.* (citing *Tellabs* at 323-324).  Moreover, an inference of scienter "need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences."   *Tellabs* at 324 (internal quotation marks omitted).   Instead, an

---

[19] "Recklessly turning a 'blind eye' to impropriety is equally as culpable as actual knowledge under Rule 10b-5." *Bruce v. Suntech Power Holdings Co. Ltd.*, 2014 WL 3956608, at *3 (N.D. Cal. Aug. 12, 2014) (quoting *In re Verifone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012)).

inference of scienter is "strong" when it is *as likely* as an opposing inference—in effect awarding a draw to the plaintiff. *See id.* at 314; *see also Commc'ns Workers of Am. Plan for Employees' Pensions & Death Benefits v. CSK Auto Corp.*, 525 F. Supp. 2d 1116, 1120 (D. Ariz. 2007) ("The Supreme Court has now made clear, however, that a tie goes to the Plaintiff"). Analyzed in the proper "holistic" manner—the Complaint easily pleads a strong inference of scienter.[20]

### 2. The Complaint Alleges Compelling Facts Evidencing Defendants' Knowledge and Recklessness

### (i) The CW Statements Support Scienter

The Ninth Circuit has laid out a two-part test to determine whether the accounts of confidential witnesses contribute to an inference of scienter. First, a confidential witness must be "described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Daou*, 411 F.3d at 1015 (internal quotation marks omitted). Confidential witnesses need not be in a position to know facts "first-hand" so long as they are described with "sufficient particularity to support the probability" the witnesses were "in a position to infer" or "could reasonably deduce" the facts attributed to them. *Berson*, 527 F.3d at 985 ("entirely plausible" that a witness without a "first-hand" position still "would know, or could reasonably deduce," attributed information). Second, the confidential witness statements "must themselves be indicative of scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009), as amended (Feb. 10, 2009).

---

[20] Defendants state that *FTC v. Burnlounge, Inc.*, 753 F. 3d 878, 887 (9th Cir. 2014) distinguishes "legitimate MLMs from unlawful pyramid schemes, [] explain[ing] that internal sales for self-consumption were real sales reflecting genuine consumer demand for a product or service." Mot. at 21. However, the Ninth Circuit clarified that "it is incorrect to conclude that all rewards paid on these sales were related to the sale of products to ultimate users." *Burnlounge* at 887. The Ninth Circuit, in finding that Burnlounge was an illegal pyramid scheme, stated that "the fact that some sales occurred that were unrelated to the opportunity to earn cash rewards does not negate the evidence that the opportunity to earn cash rewards was the major draw of the Burnlounge Mogul scheme." *Id.* at 888.

In *Daou*, the Ninth Circuit provided several examples of proper descriptions of confidential witnesses that "sufficiently met the PSLRA's requirements," including descriptions similar to those here that provided the witness' title, job responsibilities and the executive to which the witness reported.  411 F.3d at 1016. Plaintiffs' CW descriptions here are at least as detailed, if not more so, than the descriptions approved in *Daou*:

| CW | Position | Basis For Knowledge |
|---|---|---|
| CW1 (¶46) | Former Herbalife VP of Business Worldwide Events | CW 1 worked at Herbalife from January 2006 through September 2012. Responsible for overseeing the Extravaganzas and other high-profile events, CW 1 worked directly with Defendants Walsh and Johnson. Managing 25 to 30 personnel, CW1 also oversaw a video production group which prepared distributor training videos during her six-year tenure.[21] |
| CW2 (¶54) | Former Herbalife Business Analyst-Worldwide Sales, Strategy and Analysis | CW 2 was employed at Herbalife from November 2013 through March 2014.  CW 2 was responsible for reviewing global distributor data, including the statistics regarding distributors' downlines and overall gross revenue produced by each distributor as well as distributors' downlines. |

The CWs provide specific, particularized accounts of Defendants' involvement in the fraud.[22]  Moreover, the Complaint cites additional sources of information corroborating each CW's accounts.  *Daou*, 411 F.3d at 1015 ("[C]riteria for assessing reliability of confidential witnesses" include "the corroborative nature of the other facts alleged (including from other sources) . . .").

---

[21] Defendants' attempt to discredit CW 1 as an "event planner" is absurd.  Mot. at 25.  CW 1 was a former Vice President, worked at Herbalife for six years and worked directly with Defendants Walsh and Johnson, giving her access to and first-hand knowledge about the Individual Defendants' actions and beliefs.  ¶46.

[22] The cases that Defendant cite to are inapposite.  The extent of the confidential witness account in *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, was a mere "single statement by a lone witness, a clinical sales representative in Florida who worked for Intuitive for three months."  759 F.3d 1051, 1063 (9th Cir. 2014). In *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1064 (9th Cir. 2014), the CW reported on hearsay of who "his/her boss communicated with," not personal knowledge and experience as is the case here.

Nothing more is required at this stage.[23]   Defendants' scienter is confirmed by the following accounts:

- CW 1 summarized the Individual Defendants' knowledge of Herbalife's practices as "*willful ignorance*," stating: "*[a]nybody who says Herbalife is not in the business of recruitment is not telling the truth*." ¶53.

- CW 1 stated that top distributors and Herbalife executives, including Defendant Johnson, constantly instructed attendees to focus on "*building your organization*"—meaning recruiting new distributors.  ¶48.

- CW 1 also reiterated the focus on recruiting new distributors, stating that Johnson would tell Extravaganza attendees that if they wanted to "move up to better seating" in the President's Club or Millionaire Club they needed to "*build their organization*" by recruiting new distributors. ¶49.

- CW 1 confirmed that event speakers allured new distributors through lavish tales of yachts, mansions and vacations–promised opportunities that "*never come true.*" ¶57.

- CW 1 recalled Johnson stating that Herbalife retained 51% of its Distributors from year-to-year—a number dubious to CW 1 as a different sales organization she worked at had an 85% retention rate.  ¶51.

- CW 1 recalled that based on the practices she saw during her tenure, distributors make more money at Herbalife by recruiting new distributors as opposed to selling products to consumers. ¶53.

- CW 2 corroborated CW 1's detailed, remarking that it was "*very difficult, if not impossible*" for distributors to advance within the Herbalife hierarchy and that it was "*absolutely*" necessary to recruit in order to do so.[24]  ¶54.

- CW 2, who received data and trends and also reported to Johnson and DeSimone,[25] acknowledged that the Company purposefully did not track consumer demand and non-affiliate revenue data.  ¶66.

---

[23] Defendants attack the CWs on the basis of the length of their tenure during the Class Period.  Mot. at 26.  However, "post-class-period data and pre-class data could be used to 'confirm what a defendant should have known during the class period.'"   *In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 272 (3d Cir. 2005) (quotation omitted)); *see In re Dura Pharms., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1023 (S.D. Cal. 2006) (facts outside the class period are relevant to establish elements of fraud).  Further, issues of "the credibility of witnesses" and "any genuine issues of fact" must be saved for the jury. *Tellabs*, 551 U.S. at 328.

[24] *See also  Loritz v. Exide Technologies*, 2014 WL 4058752, at *10 (C.D. Cal. Aug. 7, 2014) (a complaint establishes confidential witness statements' reliability and personal knowledge "[b]y providing background on each CIs position within the company, and by corroborating each CI with other CI statements").

[25] CW 2's connection to the Individual Defendants is clear.  Regardless, there is no requirement that a CW have personal contact with an individual defendant for the CW's information to support a complaint's allegations.  Rather, it is sufficient that

1

(ii)     **Insider Trading Supports Scienter**

2

a.     **The Individual Defendants' Suspicious Trading**

3        "[P]ersonal financial gain may weigh heavily in favor of a scienter

4   inference." *Tellabs*, 551 U.S. at 325. "Unusual trading or trading at suspicious

5   times or in suspicious amounts by corporate insiders has long been recognized as

6   probative of scienter." *Daou,* 441 F.3d at 1022-25. "To evaluate suspiciousness of

7   stock sales, [courts] consider, *inter alia*, three factors: (1) the amount and

8   percentage of shares sold; (2) timing of the sales; and (3) consistency with prior

9   trading history." *Oracle*, 380 F.3d at 1232. The insider selling here is compelling.

10       The amount and percentage of holdings sold by Defendants during the Class

11   Period were extremely suspicious.[26]   *See Johnson v. Alijan*, 394 F. Supp. 2d 1184,

12   1199 n. 10 (C.D. Cal. 2004) ("the Court considers the amount **and** percentage of

13   the shares sold") (emphasis in original).  Herbalife insiders sold **over 3 million**

14   shares of the Company's common stock, reaping enormous profits of $187.5

15   million, $152 million of which was sold by the Individual Defendants.  ¶167 ¶168.

16   Amounts much smaller have been found to be indicative of scienter.  *See, e.g.,*

17   *Fecht v. Price Co.,* 70 F.3d 1078, 1084 (9th Cir. 1995) ($1.6 million by two

18   insiders); *Plumbers v. Union Local No. 12 Pension Fund v. Ambassador's Group*,

19   717 F.Supp.2d 1170, 1179 (E.D. Wash. 2010) (approximately $4 million in profit

20

21
_____

22   the CW's information demonstrates that the individual defendants *had access* to
     information contradicting their public statements. *See  Novak v. Kasaks*, 216 F.3d

23   300, 314 (2d Cir. 2000); *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574,
     599 (D.N.J. 2001).

24   [26] Defendants cite to an inapplicable case to bemoan the Class Period's length.
     Mot. at 23 (citing *In re Vantive Corp. Sec. Litig*., 283 F.3d 1079, 1093 (9th Cir.

25   2002)).  The "length of the Class Period in this case suggests not that Plaintiffs are
     grasping for straws to build their case, but rather that Defendants were able to ride

26   the wave of their misleading marketing for the entire Class Period."  *See In re*
     *Questcor Sec. Litig*., 2013 WL 5486762, at *15 (C.D. Cal. Oct. 1, 2013) (citing

27   *Batwin v. Occam Networks, Inc.,* 2008 WL 2676364, at *14 (C.D. Cal. Jul. 1,
     2008) (finding that **suspicious stock sales supported inference of scienter for**

28   **nearly 3.5–year Class Period**)).

from stock sales indicated of scienter).  Notably, there were **no purchases** on the open market by the Individual Defendants during the Class Period.

Defendants attempt to minimize the Individual Defendants' trading activity by asserting that they owned roughly the same number of shares before and after the Class Period.  This argument actually supports Plaintiffs' allegations and disregards that Defendant Johnson sold 2,369,473 shares during the Class Period while making no open market purchases.  If anything, the fact that Defendants "practically sold every share that [they] acquired during the Class Period" amplifies the inference of scienter.  *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 939 (9th Cir. 2003).[27]

Lastly, the trades are unusual in timing as Defendants sold their shares at prices significantly higher than Herbalife's stock price of $58.35 at the end of the Class Period.  Walsh and DeSimone did not sell stock at a price below $69.40.[28] ¶168.  Defendant Johnson notably sold *2.37 million shares* for proceeds of over *$141.1 million*—representing 78% of all shares sold by insiders—during the first portion of the Class Period, prior to the investigation announcements and when Defendants' scheme was much easier to maintain.  Indeed, Defendant Johnson was labeled in news articles as America's highest paid Chief Executive Officer in 2011, as his total pay was $89.4 million due to exercising 1.8 million stock options for a profit of almost $77 million.

---

[27] Defendants cite to *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 977 (9th Cir. 1999); however, following *Tellabs*, the Ninth Circuit explained that the legal authority Defendants rely upon sets too high a burden for pleading scienter.  *See S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) (*Tellabs* "suggests that perhaps *Silicon Graphics, Vantive,* and *Read-Rite* are **too demanding and focused too narrowly in dismissing vague, ambiguous, or general allegations outright**."); Mot. at 22, 24.  Moreover, *Silicon Graphics* is distinguishable as the two officers who sold in that case did not have suspicious sales as one of the officers was not in contact with any of the company's other officers or involved in the company's operations and did not make any of the misleading statements, and the other officer had only been with the company for a year.  *Id* at 977-78.

[28] Defendant Walsh sold nearly 100,000 shares for over $7.7 million in proceeds and DeSimone sold over 49,000 shares for proceeds of over $3.8 million.

Moreover, Johnson's last sale from 2011 through 2012 was on May 1, 2012, the day the stock dropped significantly on the Pershing questioning of the Company.  That very day, Johnson sold 175,580 shares for proceeds of nearly $12 million, after having sold no shares on the same day the month prior or in April.  The stock opened at $70.40 that day and closed at $56.30.  Johnson sold at prices of $66 per share to $71 per share.  After May 1, 2012, Johnson did not sell again until 2014, until a mere two months before the July 2014 disclosure.  Notably, Johnson profited $13 million on those sales alone, clearly capitalizing on his insider knowledge and the artificial inflation in the price of Herbalife's common stock.  The following charts demonstrate Johnson's considerable insider selling during the Class Period as compared to the years prior:



### b. Defendants' 10b5-1 Trading Plan Defense is Not Applicable

In a self-serving attempt to avoid liability, Defendants argue that scienter may be negated where sales are made pursuant to Rule 10b5-1 trading plans.[29]  Mot. at 24.  However, "a 10b5-1 trading plan does not provide an absolute defense

---

[29] *See In re Cabletron Sys., Inc.*, 311 F.3d 11, 40 (1st Cir. 2002) (finding that trades contributed to an inference of scienter despite "a plausible innocent explanation for large stock sales").

to a claim of insider trading.  Rather, it requires an additional factual finding of good faith.  Not only can this Court not make such factual findings when considering a motion to dismiss, but this Court must also draw all inferences in favor of the non-moving party." *Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1193 (D. Nev. 2009) (quoting *In re Able Labs. Sec. Litig.*, 2008 WL 1967509, at *27 n.40 (D.N.J. Mar. 24, 2008)).  Courts have held that 10b-5 plans are not get-out-of-jail-free cards.  Rule 10b5-1 only establishes an affirmative defense, and Defendants have the burden of proof of establishing its elements.  *See* 17 C.F.R. § 240.10b5-1.

Sales pursuant to a trading plan should occur with a prescribed, regular pattern or be made at regular intervals.  Such was not the case here.  The Individual Defendants sold irregular amounts of shares at their whim under the 10b5-1 plans. Further, although the Individual Defendants filed reports on SEC Form 4s disclosing their trades and indicating that they were pursuant to trading plans, the 10b5-1 plans are not public and Defendants have not provided information as to what the plan entailed.  *See Questcor*, 2013 WL 5486762, at *16 (10b5-1 trading plan created near beginning of class period did not negate suspicious nature of stock sales).  Without discovery, investors cannot understand the vital details pertaining to the plans' creation and amendments, whether any trades pursuant to the plans were canceled, or what criteria such as share price may have triggered sales pursuant to the plans.  In sum, the fact that insider trading is effectuated pursuant to a trading plan is not an absolute defense and not one which can be supported by the facts here.[30]

---

[30] Defendants acknowledge that the Form 4s evidencing Defendants' stock sales are judicially noticeable facts.  Mot. at 22-24; *see* Dkt. Nos. 62-19, 62-20, 62-21.

### (iii)   Core Operations: The Importance Of the Pyramid Scheme To Herbalife's Success Supports Scienter

"[W]here the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter," scienter may be inferred.  *S. Ferry LP, No. 2*, 542 F.3d at 786.  The facts set forth in the Complaint support a strong inference of scienter, particularly where—as here—Defendants' false statements concern the Company's "core operations."[31] The Ninth Circuit has recently addressed application of the "core operations" doctrine.  *See Reese*, 747 F.3d at 569 (It is "reasonable to conclude that high-ranking corporate officers have knowledge of the critical core operation of their companies.").[32]

Here, it is difficult to imagine how the Defendants did not know that Herbalife is a pyramid scheme that would eventually be unable to meet analyst expectations.  Moreover, that Defendants spoke directly to the issues of Herbalife's pyramid scheme, combined with the significance of those issues to investors, belies any inference that they did not have access to underlying information.  *See Reese*, 747 F.3d at 572 ("the inference that [defendant] did not have access to the corrosion data is directly contradicted by the fact that she specifically addressed it in her statement").  For the Individual Defendants to claim ignorance—when they were the ones leading the charge—is simply nonsensical.  *See Impax,* 2014 WL 1569246, at *20-21 (motion to dismiss denied where plaintiff alleged scienter under core operations theory, finding it "absurd" to think that the CEO and CFO would be unaware of the fraud); *In re Northpoint Commc'ns Grp., Inc., Sec. Litig.*, 221 F. Supp. 2d 1090, 1104 (N.D. Cal. 2002) ("it strains credulity" to believe that the top officers were unaware of improper activities).

---

[31] *See Mulligan v. Impax Labs., Inc.*, 2014 WL 1569246, at *20-21 (N.D. Cal. Apr. 18, 2014) (motion to dismiss denied where plaintiff alleged scienter under core operations theory).

[32] Contrary to Defendants' mistaken belief, Plaintiffs never alleged claims under Rule 10b-5(a) and (c).

### 3.   Plaintiffs Allege Scienter Against Herbalife[33]

To raise an inference of scienter as to a corporate defendant, a complaint generally pleads: (1) scienter as to the company's individual executives or directors; or (2) "facts indicating that the company's 'named officers' are 'directly responsible for . . . day-to-day operations' and that the subject-matter of the alleged misleading statement is, 'by its nature, the type of transaction of which it would be hard to believe senior officials were unaware.'"  *Allstate Life Ins. Co. v. Robert W. Baird & Co.*, 756 F. Supp. 2d 1113, 1144 (D. Ariz. 2010).[34]

Here, the Complaint establishes Herbalife's scienter, as each of the Individual Defendants were top executives and acted with the requisite level of deliberate recklessness.[35]   However, irrespective of the scienter of the Individual Defendants, the Complaint establishes Herbalife's scienter, as the cumulative knowledge of its employees, as well as the collective fraudulent practices within the Company, can be imputed to Herbalife in support of a finding of corporate scienter.  *See In re SunPower Sec. Litig.*, 2011 WL 7404238, at * 5 (N.D. Cal. Dec. 19, 2011) (denying defendant's motion to dismiss and finding that "[t]he contrary inference—that lower level employees managed to carry out the scheme without

---

[33] Defendants argue that the legitimacy of the Company is bolstered by the fact that no regulator has found it unlawful.  However, the fact that the FTC, SEC, DOJ, FBI, various states attorneys general and Canadian regulators have launched civil and criminal probes of the Company ***supports*** scienter.  *See Eastwood Enters. LLC v. Farha*, 2009 WL 3157668, at *4 (M.D. Fla. Sept. 28, 2009) ("the pendency of an investigation serves to suggest that a fraud may have occurred") *In re EVCI Colls. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 97-100 (S.D.N.Y. 2006).

[34] *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 192 (2d Cir. 2008) (a corporation can be liable where the fraud is so pervasive that at least *some* member of management must have known).

[35] *See In re Cadence Design Sys., Inc. Sec. Litig.*, 692 F. Supp. 2d 1181, 1193 (N.D. Cal. 2010) ("The inference of scienter against the other Individual Defendants . . . does not arise from any presumption or theory of collective action or collective knowledge.  Rather, it arises because of the likelihood that [a vice president] would have told other executive officers that these important deals involved factors that rendered their classification . . . highly questionable").

detection by, or involvement of, management despite the alleged efforts it made to monitor and control cost…is certainly plausible as well, but not more so").[36]

In sum, the Complaint provides a strong inference of scienter that is cogent and at least as compelling as any opposing inference of non-fraudulent intent:

| Paragraph(s) | Inference of Scienter |
|---|---|
| ¶¶46-54, 57 | Reports from CWs, as discussed above, confirm Herbalife's culture of non-compliance, encouraging recruiting over retail sales. |
| ¶¶111-113 | The Individual Defendants knew the Company's growth could not be sustained by product demand as Herbalife followed the "pop-and-drop" method. Accordingly, Herbalife requires new recruits to sustain its model, hence its exploitation of new markets. |
| ¶¶21-22, 163-166 | Defendants Herbalife, Johnson and DeSimone falsely certified the effectiveness and adequacy of Herbalife's internal controls in the Company's annual and quarterly SEC filings during the Class Period—certifications that the Individual Defendants knew, or were severely reckless in not knowing, were false. |
| ¶¶49, 51, 159, 161 | Defendants cultivated Herbalife's recruitment-centric nature. For example, Johnson emphasized recruiting at Extravaganza events, and DeSimone and Walsh discussed nutrition clubs in detail at various consumer conferences and analyst summits. |
| ¶96 | The California injunction restricting compensation plans in which compensation "is based upon anything other than the retail sale of defendants' products," also highlights Defendants' awareness of the Company's issues with its business model. |
| ¶¶5, 167-169 | The Individual Defendants' personal motives, including substantial insider trading activity while the Company's stock was inflated. |
| ¶¶63-64, 84, 123, 152 | Defendants' vehement denials of the information disclosed by Einhorn's queries and Ackman's reports, as well as Defendant's affirmative statements to the contrary also support a strong inference of scienter. |
| ¶¶7, 100-105 | Senator Markey's letters to the FTC and SEC, as well as to Defendant Johnson. |
| ¶¶132-135 | The Company's earnings miss is indicative of severe recklessness at a minimum as the Company "had to have known the quarter was |

[36] *See Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1205 (N.D. Cal. 2012) ("In light of the imputation of [officer's] scienter through respondeat superior, the Court finds that Plaintiffs have sufficiently alleged a primary violation of Section 10(b) and Rule 10b-5[].").

| Paragraph(s) | Inference of Scienter |
|---|---|
| | going to be disappointing and the stock would go down yet it decided to spend huge sums of vital shareholder money to what seems like [] an attempt to manage the stock price and more-so manage the earnings per share figure." |
| ¶¶86-91, 96, 98, 99, 114-122, 129-131 | Critical investigative reports by Pershing into Herbalife's business practices, including focus into the Company's Chinese practices and nutrition clubs bolster Plaintiffs' scienter allegations. |
| ¶¶106-110 | Numerous domestic and international civil and criminal investigations—including by the Competition Bureau, DOJ, FBI, FTC, New York Attorney General, and Illinois Attorney General—which remain pending, provide additional compelling evidence of scienter. |

### C.   PLAINTIFFS HAVE ADEQUATELY PLEADED LOSS CAUSATION

To plead loss causation in the Ninth Circuit, a plaintiff must set forth specific facts which "demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury" and do so with particularity. *Oregon Public Employees Retirement Fund v. Apollo Group Inc.*, 2014 WL 7139634, *4 (9th Cir. Dec. 16, 2014) (holding that Rule 9(b) applies to loss causation).[37]  Plaintiffs have met their burden here.

Plaintiffs have alleged multiple drops in Herbalife's share price as the truth emerged in piecemeal fashion.  ¶¶82, 172-73.  In the Ninth Circuit, "[a] plaintiff is not required to show that a misrepresentation was the sole reason for the investment's decline in value in order to establish loss causation." *Daou Sys.*, 411 F.3d at 1025.   "As long as the misrepresentation is ***one substantial cause*** of the investment's decline in value[.]"  *Id.*  Here, there is no question that Defendants' false and misleading statements were substantial causes of the shares' decline in value.  Thus the Complaint adequately alleges loss causation.

---

[37]  Loss causation under the corrective disclosure approach is based on "partial revelations that do not uncover the complete extent of the falsity of specific prior statements." *Teamsters Local 617 Pension & Welfare Funds v. Apollo Grp., Inc.*, 633 F. Supp. 2d 763, 823 (D. Ariz. 2009).

Defendants assert that Plaintiffs' loss causation allegations are insufficient, stating that the various announcements revealing the fraud are insufficient to serve as corrective disclosures.  Defendants' arguments are inconsistent as at once they state that these partial disclosures are sufficient to warn investors that Herbalife may be found a pyramid scheme, yet later Defendants state that these same disclosures failed to reveal the fraud.  Defendants cannot have it both ways.

Defendants argue that *Loos v. Immersion Corp*, 762 F.3d 880 (9th Cir.2014), presumptively renders Plaintiffs' allegations insufficient.  Mot. at 29.  *Loos* involved claims based on a one-time restatement which arose from premature revenue recognition uncovered when the company, on its own initiative, launched an internal investigation of its accounting policies.  *Loos*, 762 F.3d at 885.  The alleged disclosure in *Loos* was based on accounting errors in a single department that "reveal[ed] very little about the reason for the underlying problem" (*id* at 888), and held that an internal investigation, standing alone, is insufficient to establish loss causation (*id*. at 890).  In fact, Defendants fail to mention that the Ninth Circuit issued an amendment to its opinion in *Loos* where it stated: "***We do not mean to suggest that the announcement of an investigation can never form the basis of a viable loss causation theory***."  *Loos*, 762 F.3d at 890 n. 3 (quoting *Meyer v. Greene*, 710 F.3d 1189, 1201 n.13 (11th Cir. 2013)).  In fact, Ninth Circuit law clearly provides that "neither *Daou* nor *Dura* require an admission or finding of fraud before loss causation can be properly pled."  *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 (9th Cir. 2008).[38]

More analogous to the facts here, the Fifth Circuit recently held that a series of partial disclosure, including a negative report, high level resignations, a negative *Wall Street Journal* article, government investigations, and a poor earnings report,

---

[38] Defendants wrongly claim that Plaintiffs have "chang[ed] their theory" on loss causation.  Mot. at 6 n. 3.  However, Plaintiffs did not file the original complaint and, in any respect, the Complaint is operative.

1    are ***collectively*** adequate to show loss causation even if any single disclosure alone

2    is inadequate. *Public Employees Retirement System of Mississippi, Puerto Rico*

3    *Teachers' Retirement System v. Amedisys, Inc*., 769 F.3d 313, 324 (5th Cir. 2014)

4    ("Taking the above facts as true. . . [the disclosures] collectively constitute and

5    culminate in a corrective disclosure that adequately pleads loss causation for

6    purposes of a Rule 12(b)(6) analysis. ***This holding can best be understood by***

7    ***simply observing that the whole is greater than the sum of its parts***."). The

8    *Amedisys* opinion cited to this Court's holding counseling against Defendants'

9    suggested narrow interpretation: "[t]o require, in all circumstances, a conclusive

10   government finding of fraud would effectively reward defendants who are able to

11   successfully conceal their fraudulent activities by shielding them from civil suit."

12   *Questcor*, 2013 WL 5486762, at *22.

13            **D.    DEFENDANTS' STANDING ARGUMENTS ARE MERITLESS**

14            In a final attempt to evade liability, Defendants resort to deriding Oklahoma

15   as a "professional plaintiff." Mot. at 33. In reality, Plaintiffs are exactly the type

16   of institutional investor that the PSLRA and Congress prefer to serve as lead

17   plaintiff. Although Defendants imply the opposite, there is no doubt that "the

18   PSLRA expressly authorizes courts to waive the restriction on professional

19   plaintiffs to achieve the objectives of the statute." *In re Gemstar-TV Guide Intern.,*

20   *Inc. Securities Litigation*, 209 F.R.D. 447, 454 (C.D. Cal. 2002) (citing 15 U.S.C. §

21   78u–4(a)(3)(B)(vi)). Oklahoma's service is in no way adverse to its standing under

22   the PSLRA, as "the general restriction of serving in more than five cases as a lead

23   plaintiff was not intended to apply to institutional investors[.]"[39] As in *Gemstar*,

24   the record here "contains no evidence that the pension funds could not assume the

25   duties of lead plaintiffs." *Gemstar*, 209 F.R.D. at 454. Plaintiffs here exhibit the

26   _____
     [39] *Blaich v. Employee Solutions, Inc.*, 1997 WL 842417, at *2 (D. Ariz. 1997); *see*
27   *Cunha v. Hansen Natural Corp.*, 2009 WL 2029797, at **4-5 (C.D. Cal. 2009)
     ("[S]urpassing the limits placed in 15 U.S.C. § 78u–4(a) (3)(B)(vi) does not
28   automatically require denying appointment of said plaintiff.").

requisite willingness, ability, and resources to pursue this case.[40]   In fact, Oklahoma's previous experience actually supports its appointment here.  *Id.*  ("The fact that other courts have allowed [plaintiff] in particular to act as lead plaintiff in more than five securities class actions demonstrates that it is equipped to do so.").[41]

Indeed, it is perhaps Oklahoma's highly successful track record of obtaining significant victories on behalf of shareholders which prompts Defendants' challenge.  Indeed, in recent years, Oklahoma has served as lead plaintiff in cases which have resulted in over ***$1 billion*** in recoveries.  *In re Lehman Bros. Sec. & ERISA Litig.,* No. 08-CV-5523-LAK (S.D.N.Y.) (Apr. 16, 2014) ($600 million total recovery, $99 million recovery against auditor); *Wyatt et al., et al. v. EL Paso Corporation, et al.,* No. 4:02-cv-02717 (S.D. Tex.) (Mar. 9, 2007) ($285 million total recovery); *Minneapolis Firefighters' Relief Ass'n v. Medtronic, Inc.* No. 0:08-cv-06324 (D. Minn. Nov. 8, 2012) ($85 million recovery); *In re Jefferies Group, Inc. Shareholders Litigation*, C.A. No. 8059-CB (Del. Ch.) ($70 million recovery). Notably, Oklahoma was the *only* plaintiff certified as an adequate class representative after deposition and class discovery in the auditor claim portion of the landmark case against Lehman brothers. *In re Lehman Bros. Sec. & ERISA Litig.,* 2013 WL 440622 (S.D.N.Y. Jan. 23, 2013).

---

[40] *See In Re Edwards Lifesciences Corp. Securities Litigation*, 8:13-cv-01463-JLS-RNB, (C.D. Cal. 2014) (finding that Oklahoma satisfied the lead plaintiff requirements under the PSLRA); *Oklahoma Firefighters Pension & Retirement System v. Student Loan Corporation et al*, 1:12-cv-00895-NRB, (S.D.N.Y. 2013) (same); *see also In re Diamond Foods, Inc., Securities Litigation*, 281 F.R.D. 405, 412 (N.D. Cal. 2012) (institutional investor permitted to serve as lead plaintiff, after having been appointed in **nine times in three year period**); *Naiditch v. Applied Micro Circuits Corp.*, 2001 WL 1659115 *2 (S.D. Cal. Nov.2, 2001) (**eleven times**);  *Gemstar*, 209 F.R.D. at 447 (**seven times**);  *In re Netflix, Inc., Securities Litigation*, 2012 WL 1496171, at *2 (N.D. Cal. Apr. 27, 2012) (**six times**).

[41] Defendants state that Oklahoma's Lead Plaintiff Motion did not seek an exemption to the rule.  Mot. at 33.  No authority requires Oklahoma or any prospective lead plaintiff to do so.  Weighing the propriety of an exemption is an exclusive, discretionary function of the court.  Oklahoma, through its Certification and in full satisfaction of the PSLRA, set forth each instance in which it moved for and was appointed lead plaintiff.  *See* Dkt 34-2 at 9.

---

Defendants also challenge standing by arguing that Atlanta "experienced a total net gain," and that Oklahoma may suffer from the same purported defect. Mot. at 34.  Atlanta can only be considered a net seller, which occurs where the net amount of shares sold exceeds the amount of shares purchased.  While Atlanta is a net seller, it is not a net gainer, as it suffered a substantial loss due to Defendants' fraud.  *See Richardson v. TVIA, Inc.*, 2007 WL 1129344, at \*3 (N.D. Cal. Apr. 16, 2007) (explaining that a "net seller[] [is one] who sold more shares than purchased during the Class Period[.]"); *In re Cardinal Health, Inc. Securities Litigation*, 226 F.R.D. 298, 308 (S.D. Ohio 2005) (Net gainers "end[] the class period with a positive balance.").  Courts have consistently found that net sellers who are also net losers are appropriate lead plaintiffs.  *See id.* (collecting cases).

Similarly, Defendants' mere speculation of Oklahoma's possible sales, and its purchase after a partial disclosure, are insufficient to challenge Oklahoma's standing.  *In re Connetics Corp. Secs. Litig.*, 257 F.R.D. 572, 577 (N.D. Cal. 2009)("[T]he weight of authority appears to favor the position that the purchase of stock after a partial disclosure is not a per-se bar to satisfying the typicality requirement.");  *In re Providian Financial Corp. Sec. Litig.*, 2004 WL 5684494, \*4–5 (N.D. Cal. Jan. 15, 2004) (same).  Defendants' arguments against Plaintiffs' standing accordingly fail.[42]

# V.    **CONCLUSION**

For all of these reasons, Defendants' motion to dismiss the Complaint should be denied in its entirety.[43]

---

[42] The Individual Defendants do not dispute their status as "controlling persons" within the meaning of §20(a) of the Exchange Act, stating that because the Plaintiffs have failed to establish "a primary violation of . . . Section 10(b) or Rule 10b–5," they have also necessarily failed to "show that the [Defendants] exercised actual power over the primary violator." Mot. at 33.  Because Plaintiffs' §10(b) claims are sufficiently alleged, they have also established their §20(a) claim.

[43] Should the Court grant Defendants' motion in any respect, Plaintiffs respectfully request leave to amend. "Dismissal with prejudice and without leave to amend is not appropriate unless it is clear on de novo review that the complaint could not be saved by amendment," while "[a]dherence to these principles is especially

1    Dated: December 18, 2014          Respectfully submitted,

2

3                                       By: */s/ Jon A. Tostrud*

4                                       **TOSTRUD LAW GROUP, P.C.**
                                        Jon A. Tostrud (SBN 199502)
5                                       1925 Century Park East, Suite 2125
                                        Los Angeles, CA 90067
6                                       Telephone:   (310) 278-2600
                                        Facsimile:   (310) 278-2640
7                                       E-mail:      jtostrud@tostrudlaw.com

8
                                        *Local Counsel and Counsel for the*
9                                       *Firefighters' Pension Funds*

10                                      **SAXENA WHITE P.A.**
                                        Maya Saxena (*pro hac vice*)
11                                      Lester R. Hooker (SBN 241590)
                                        5200 Town Center Circle, Suite 601
12                                      Boca Raton, FL 33486
                                        Telephone:   (561) 394-3399
13                                      Facsimile:   (561) 394-3382
                                        E-mail:      msaxena@saxenawhite.com
14                                                   lhooker@saxenawhite.com

15                                      *Lead Counsel and Counsel for the*
                                        *Firefighters' Pension Funds*
16

17

18

19

20

21

22

23

24

25

26

27    important in the context of the PSLRA." *Eminence Capital, LLC v. Aspeon, Inc.*,
      316 F.3d 1048, 1052 (9th Cir. 2003).
28

**PROOF OF SERVICE VIA ELECTRONIC POSTING PURSUANT TO CENTRAL DISTRICT OF CALIFORNIA LOCAL RULES AND ECF GENERAL ORDER NO. 10-07**

I, the undersigned, say:

I am a citizen of the United States and am employed in the office of a member of the Bar of this Court. I am over the age of 18 and not a party to the within action. My business address is 1925 Century Park East, Suite 2125, Los Angeles, California 90067.

On December 18, 2014, I caused to be served the following documents:

- **LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

All signatories listed in this filing, and on whose behalf the filings are submitted, concur in the filings' content and have authorized the filings.

By posting the document to the Electronic Case Filing ("ECF") Website of the United States District Court for the Central District of California, participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 18, 2014, at Los Angeles, California.

*/s/ Jon A. Tostrud*
Jon A. Tostrud