UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## MEMORANDUM

| Case No. | CV 14–2850 DSF (JCGx) | Date | 3/16/15 |
|---|---|---|---|
| Title | In re Herbalife, Ltd. Securities Litigation | | |

| Present: The Honorable | DALE S. FISCHER, United States District Judge |
|---|---|

| Debra Plato | Not Present |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:**  (In Chambers) Order GRANTING Defendants' Motion to Dismiss (Docket No. 60)

In their Amended Class Action Complaint (ACAC), Plaintiffs allege that Herbalife, Ltd. and officers Michael O. Johnson, Desmond Walsh, and John DeSimone violated federal securities laws by misrepresenting "the nature, scope and legality of [Herbalife's] business and operations." (ACAC ¶ 1.) According to Plaintiffs, Defendants violated § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 by misrepresenting Herbalife as a legitimate multi-level marketing company (MLM) when it is actually an illegal pyramid scheme.[1]

"Violations of § 10(b) and Rule 10b-5 give rise to a cause of action in favor of any purchaser or seller of securities who has been injured by a company's fraudulent practices." Loos v. Immersion Corp., 762 F.3d 880, 886 (9th Cir. 2014). To prevail under § 10(b) and Rule 10b-5, a plaintiff must prove six elements: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation and the purchase or sale of a security; (4) reliance on the misrepresentation; (5) economic loss; and (6) loss causation. Id. at 886-87.

Under the Private Securities Litigation Reform Act (PSLRA), which governs this

---

[1] Plaintiffs also allege Control Person liability under 15 U.S.C. § 78t(a) against the individual Defendants. In light of the Court's conclusion that Plaintiffs have not established a violation of Section 10(b) and Rule 10b-5, Plaintiffs' Control Person claims fail and are DISMISSED.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## MEMORANDUM

action, a plaintiff who alleges that a defendant made a false or misleading statement must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," 15 U.S.C. § 78u–4(b)(1), and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," id. § 78u–4(b)(2). The plaintiff must also satisfy "the heightened pleading standard of [Federal Rule of Civil Procedure] 9(b), which requires that the complaint 'state with particularity the circumstances constituting fraud.'" Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc., 759 F.3d 1051, 1057-58 (9th Cir. 2014). "Rule 9(b) applies to all elements of a securities fraud claim, including loss causation." Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc., 774 F.3d 598, 605 (9th Cir. 2014).

Defendants contend that Plaintiffs have failed to establish three elements of their securities fraud claims: (1) a material misstatement or omission, (2) scienter, and (3) loss causation. The Court concludes that Plaintiffs have not adequately pled loss causation. Given this conclusion, the Court need not consider Defendants' alternative arguments.

### Loss Causation

To establish loss causation, a plaintiff "must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the" plaintiff. Apollo Grp. Inc., 774 F.3d at 608. In other words, the plaintiff must establish "that the defendant's fraud was *revealed* to the market and *caused* the resulting losses." Loos, 762 F.3d at 887 (emphasis in original) (internal quotation marks omitted). At the pleading stage, "the plaintiff need only allege that the decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectations, or other unrelated factors." Id.; Metzler Inv. GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1063 (9th Cir. 2008) (plaintiff must "allege that the defendant's 'share price fell significantly after the truth became known'") (citation omitted). Either a single event or a "series of disclosures" can establish loss causation. Metzler, 540 F.3d at 1071 n.6. The key is adequately alleging that the event or series, by revealing a previously unknown fraud, caused defendant's stock price to decline.

In order to survive a motion to dismiss, a "plaintiff is not required to allege an outright admission of fraud . . . ." Loos, 762 F.3d at 888-89. Still, a disclosure that reveals only "a 'risk' or 'potential' for widespread fraudulent conduct" does not, in itself, establish loss causation. Metzler, 540 F.3d at 1064. For this reason, "the announcement of an investigation, standing alone and without any subsequent disclosure of actual wrongdoing, does not reveal to the market the pertinent truth of anything, and therefore

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## MEMORANDUM

does not qualify as a corrective disclosure." Loos, 762 F.3d at 890 n.3 (internal quotation marks omitted). "An expression of concern, moreover, does not constitute a corrective disclosure and a public admission of . . . alleged fraud." Apollo Grp. Inc., 774 F.3d at 608. "To the extent the announcement contains an express disclosure of actual wrongdoing, the announcement alone might suffice." Loos, 762 F.3d at 890 n.3.

Plaintiffs contend that Defendants artificially inflated Herbalife's stock price by misrepresenting that the company was a legitimate MLM when it was actually an illegal pyramid scheme. According to the ACAC, a series of partial disclosures running from May 2012 through July 2014 revealed that Herbalife was a pyramid scheme and triggered corresponding declines in Herbalife's stock price.[2] Plaintiffs argue that the following events constitute corrective disclosures that revealed Herbalife's fraud and establish loss causation:

(1) May 2012: Greenlight Capital Inc. Chairman David Einhorn questions Herbalife during earnings conference call (ACAC ¶¶ 81-85, 172);

(2) December 2012: Pershing Square Capital Management, L.P. releases report announcing its conclusion that Herbalife is a pyramid scheme (id. ¶¶ 86-90, 173)[3];

(3) January 2014: Massachusetts Senator Edward Markey sends letters to government agencies communicating concerns about Herbalife's practices (id. ¶¶ 100-04, 174);

---

[2] The ACAC's section on loss causation opens with the allegation that during the Class Period, Herbalife's stock "traded as high as $81.81 per share on January 10, 2014, and plummeted $14.02, or a stunning 20%, on May 1, 2012 . . . and fell an additional . . . $10.10 per share or nearly 18% to close at $46.20 per share on May 3, 2012." (ACAC ¶ 172.) Plaintiffs do not explain how Herbalife's high during the Class Period, which apparently occurred in January 2014, is related to drops in May 2012 or otherwise evidences that events in 2012 and 2013 revealed Herbalife's allegedly unlawful practices to the market.

[3] The ACAC relies heavily on Pershing's December 2012 Report, which the Court may consider without converting Defendants' motion to dismiss into a Rule 56 motion for summary judgment. See Van Buskirk v. Cable News Network, Inc., 284 F.3d 977, 980 (9th Cir. 2002). The Court may also take judicial notice of "matters in the public record," Lee v. City of Los Angeles, 250 F.3d 668, 689 (9th Cir. 2001) (citation omitted), which include Herbalife's SEC filings and other corporate disclosures, see Fed. R. Evid. 201; Metzler, 540 F.3d at 1064 n.7.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**MEMORANDUM**

(4) March 2014: Herbalife discloses that the FTC has begun a civil investigation into the company's practices (id. ¶¶ 107, 174);

(5) July 2014: Herbalife's quarterly earnings miss market estimates (id. ¶¶ 132, 175).[4]

The above events, which the Court addresses in greater detail below, are insufficient to constitute corrective disclosures. Principally, Plaintiffs do not explain what new information concerning Herbalife's business practices the individual events revealed or how the announcements otherwise exposed Herbalife as a pyramid scheme. Rather, Plaintiffs respond to Defendants' motion to dismiss by challenging the internal consistency of Defendants' arguments, offering unsubstantiated conclusions, and arguing that Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Teachers Ret. Sys. v. Amedisys, Inc., 769 F.3d 313, 324 (5th Cir. 2014), supports their position. (Pls.' Opp. at 30-32.)

Amedisys offers general propositions that abstractly support Plaintiffs' claims. For instance, the court noted that to "require, in all circumstances, a conclusive government finding of fraud merely to plead loss causation would effectively reward defendants who are able to successfully conceal their fraudulent activities by shielding them from civil suit." Amedisys, 769 F.3d at 325 (quoting In re Questcor Sec. Litig., No. SA CV 12–01623 DMG (FMOx), 2013 WL 5486762, at *22 (C.D. Cal. Oct. 1, 2013)). Even assuming that this proposition comports with Ninth Circuit precedent, see Loos, 762 F.3d at 888-89, 90 n.3, Amedisys is not particularly helpful to Plaintiffs. Amedisys differs from this case in at least two relevant respects. First, the Fifth Circuit applied the more lenient plausibility standard, not Rule 9(b)'s heightened pleading requirements. Amedisys, 769 F.3d at 320 & n.7; see also Questcor, 2013 WL 5486762, at *20, 22

---

[4] Although absent from the ACAC's section on loss causation, the ACAC contains additional allegations that arguably relate to loss causation. For instance, Plaintiffs allege that on January 28, 2014, the *New York Post* reported that Canada's top consumer regulator had launched a formal probe concerning Herbalife and that, "[o]n this news, Herbalife's stock price dropped approximately 3%." (ACAC ¶ 106.) Plaintiffs also allege that on April 11, 2014, the *Financial Times* reported that the United States DOJ and the FBI had opened a criminal probe of Herbalife, and that Herbalife's stock price dropped by 14% from the previous day. (Id. ¶ 108.) Similar to the events referenced in the ACAC's loss causation section, see ACAC ¶¶ 170-77, these events do not constitute corrective disclosures because they did not reveal relevant new information to the market. Absent a disclosure of wrongdoing, announcements that agencies were investigating Herbalife only exposed the possibility of fraudulent conduct. See Loos, 762 F.3d at 889-90; Meyer v. Green, 710 F.3d 1189, 1199 (11th Cir. 2013).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**MEMORANDUM**

(applying "Ninth Circuit's less stringent pleading standard for loss causation"). As noted above, the Ninth Circuit recently clarified that Rule 9(b) applies to every element of a § 10(b) securities fraud claim, including loss causation. See Apollo Grp. Inc., 774 F.3d at 605.

Even assuming that this distinction is immaterial, several significant facts that influenced the Amedisys court are absent here. For instance, the Amedisys plaintiffs identified a *Wall Street Journal* (*WSJ*) article as a partial disclosure that revealed new information about the defendant company's Medicare fraud. The district court determined that the article could not constitute a corrective disclosure because it was "based on publicly available" information. Amedisys, 769 F.3d at 323. The Fifth Circuit disagreed: "While it is generally true that in an efficient market, any information released to the public is presumed to be immediately digested and incorporated into the price of a security," the *WSJ* article plausibly contained "complex economic data understandable only through expert analysis . . . [and] may not be readily digestible by the marketplace." Id. In other words, notwithstanding the disclaimer that the article was based on public information, the market was plausibly unaware of "the hidden meaning of the Medicare data [because it] required expert analysis" and "the data itself [wa]s only available to a narrow segment of the public . . . ." Id.[5] The *WSJ* article materially differs from the multiple Pershing presentations at issue here. Each presentation was based on publicly available information and, unlike in Amedisys, the ACAC provides no basis to conclude that Pershing's conclusions required expert analysis or that the underlying information was not available to the public.[6]

A second notable factual distinction is that Amedisys involved findings of wrongdoing. Specifically, a Senate Finance Committee Report "concluded that three of the four companies under investigation[, including defendant,] ha[d] been taking advantage of the Medicare regulations." See Amedisys, 769 F.3d at 324 n.4, 6

---

[5] The Amedisys plaintiffs submitted a declaration "to show that the Medicare data . . . was difficult to obtain and that [the *WSJ* article's] analysis required significant professional expertise to accomplish." Amedisys, 769 F.3d at 323 n.3.

[6] At the parties' March 9, 2015 hearing, Plaintiffs' counsel suggested that the Pershing Report was based, at least in part, on information unavailable to the public. To the extent this might be true, the claim is contrary to Pershing's own disclosure, see ACAC, Ex. A at 2, and appears to be absent from the ACAC. It is Plaintiffs' obligation to plead such matters with particularity; it is not the Court's obligation to review hundreds of pages of exhibits searching for support for Plaintiffs' claims.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**MEMORANDUM**

(distinguishing Amedisys and other cases involving "companies found to be abusing the Medicare system" from a case in which there was a *WSJ* article and government investigations, but no specific allegations of fraud or disclosure of actual misconduct). In contrast, Plaintiffs have not alleged that a government investigation or inquiry determined that Herbalife is a pyramid scheme. Given Herbalife's express disclosures that its operations and business model render it susceptible to regulatory and private challenges, see Dkt. 62-2 at 73, the absence of any findings that Herbalife is a pyramid scheme – the heart of Plaintiffs' misrepresentation theory – materially distinguishes this case from Amedisys.

A more analogous case is Meyer v. Green, 710 F.3d 1189 (11th Cir. 2013), which the Ninth Circuit recently followed in Loos, 762 F.3d at 889-90. In Meyer, the plaintiff alleged that a real estate developer had committed fraud by failing to properly depreciate the value of its real estate holdings. 710 F.3d at 1192-93. The plaintiff premised loss causation on three purported corrective disclosures: (1) Short-seller David Einhorn's assessment that the defendant's real estate holdings were substantially overvalued; (2) the defendant's disclosure of an SEC investigation; and (3) the defendant's announcement that the SEC investigation had ripened into a "private order of investigation." Id. at 1197. Even though the defendant's stock price dropped after each event, the Eleventh Circuit concluded that the plaintiff had not adequately pled loss causation.

The court first explained that Einhorn's presentation could not constitute a corrective disclosure because it was based on publicly available information. Id. at 1198 ("The Einhorn Presentation contained a disclaimer . . . that all of the information in the presentation was 'obtained from publicly available sources.' Indeed, the material portions of the Einhorn Presentation were gleaned entirely from public filings and other publicly available information."). Since "any information released to the public [in an efficient market] is immediately digested and incorporated into the price of a security . . . [the] disclosure of confirmatory information – or information already known by the market – will not cause a change in stock price." Id. at 1197.[7] The court reasoned that

---

[7] The Meyer plaintiff argued that the Einhorn Presentation constituted a corrective disclosure because it offered previously unavailable "expert analysis" of publicly available information. The court rejected this argument, explaining that "the mere repackaging of already-public information by an analyst or short-seller is simply insufficient to constitute a corrective disclosure." Meyer, 710 F.3d at 1199 (citing, inter alia, In re Omnicom Grp., Inc. Sec. Litig., 597 F.3d 501, 512 (2d Cir. 2010)). "After all, if the information relied upon in forming an opinion was previously disclosed to the market, the only thing actually disclosed to the market when the opinion is released *is the opinion itself*, and such an opinion, standing alone, cannot

**MEMORANDUM**

this rule is particularly appropriate when stock prices decline following announcements from analysts and short-sellers. "If every analyst or short-seller's opinion based on already-public information could form the basis for a corrective disclosure, then every investor who suffers a loss in the financial markets could sue under § 10(b) using an analyst's negative analysis of public filings as a corrective disclosure." Id. at 1199.

The court then rejected plaintiff's claim that disclosing the SEC investigations constituted a corrective disclosure. According to the court,

> the commencement of an SEC investigation, without more, is insufficient to constitute a corrective disclosure for purposes of § 10(b). The announcement of an investigation reveals just that – an investigation – and nothing more. To be sure, stock prices may fall upon the announcement of an SEC investigation, but that is because the investigation can be seen to portend an added risk of future corrective action. That does not mean that the investigations, in and of themselves, reveal to the market that a company's previous statements were false or fraudulent.

Id. The Ninth Circuit concurred with this sentiment, noting that "[w]hile the disclosure of an investigation is certainly an ominous event, it simply puts investors on notice of a *potential* future disclosure of fraudulent conduct. Consequently, any decline in a corporation's share price following the announcement of an investigation can only be attributed to market speculation about whether fraud has occurred." Loos, 762 F.3d at 890 (emphasis in original).

### Greenlight Capital Questions

During a quarterly earnings conference call on May 1, 2012, Greenlight Capital Inc. Chairman David Einhorn asked questions concerning three topics: (1) final sales sold outside the network versus those within the network; (2) supervisors' incentive to recruit other distributors; and (3) methods for tracking certain distributor groups. (ACAC ¶ 81.) That day, Herbalife's stock price dropped $14.02, or 20%, to close at $56.30 per share. (Id. ¶ 82.) On May 3, 2012, the stock price dropped an additional $10.10, or nearly 18%,

---

reveal to the market the falsity of a company's prior factual representations." Id. (quoting FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d 1282, 1311 n.28 (11th Cir. 2011) (emphasis in original) (internal quotation marks and brackets omitted)); see also Meyer, 710 F.3d at 1199 n.10.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**MEMORANDUM**

to close at $46.20 per share. (Id.)

Einhorn's questions do not constitute corrective disclosures. Even assuming that the exchange prompted by Einhorn's questions triggered the subsequent drop in Herbalife's stock price, it is unclear what claims made by the Defendants were invalidated. See Apollo Grp. Inc., 774 F.3d at 608. Beyond generally asserting that Einhorn's questions commenced the erosion of Herbalife's MLM facade and offering the unsupported conclusion that the subsequent drop was "a result of Einhorn's line of questioning," Plaintiffs do not explain how Einhorn's questions exposed any prior misrepresentations. Einhorn's questions concerning sales to non-distributors arguably relate to Herbalife's sustainability as a legitimate MLM. But even if Einhorn's questions prompted the disclosure that Herbalife does not track certain information, Plaintiffs do not claim that this conduct was unlawful or offer particularized facts to establish that it revealed that Herbalife was a pyramid scheme. Recognizing that Einhorn's inquiry related to Herbalife's business model – and by extension Plaintiffs' pyramid scheme theory – is different from concluding that Einhorn's questions revealed that Herbalife is a pyramid scheme or that Defendants had previously misrepresented Herbalife's business operations.

Plaintiffs cite multiple articles that discuss Einhorn's questions. Contrary to Plaintiffs' claim, these articles reflect that the market was already aware that Herbalife might be a pyramid scheme – the only relevant information Einhorn's questions could have revealed. One article, for instance, referenced a federal judge's 2009 conclusion that a triable question existed concerning whether Herbalife was an illegal pyramid scheme. (ACAC ¶ 85.)

Pershing Accusations

On December 19, 2012, CNBC reported that Bill Ackman, head of Pershing Square Capital Management, L.P., had concluded that Herbalife was a pyramid scheme. Herbalife's stock price dropped roughly 13% that day, to close at $37.34.[8] (ACAC ¶ 86.) On December 20, Ackman presented a 334-page slide show documenting Pershing's conclusion that Herbalife is a pyramid scheme. (Id. ¶ 88, Ex. A.) Over the next two days, Herbalife's stock price declined $10.07, or nearly 27%, to close at $27.27 per share.

---

[8] Pershing and Ackman hold a short position - purportedly $1 billion - in Herbalife common stock, and therefore profit if Herbalife common stock declines but lose if Herbalife's common stock price increases. (ACAC ¶ 134, Ex. A at 2.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**MEMORANDUM**

(Id. ¶ 90.)

Even assuming that a short-seller's assessment could constitute a corrective disclosure,[9] Plaintiffs provide no reason to believe this is such an instance. As in Meyer, "[t]he information and opinions expressed in [Pershing's] presentation . . . [were] based on publicly available information about Herbalife."[10] (ACAC, Ex. A at 3.) The ACAC and Plaintiffs' related arguments are insufficient to compel the conclusion that the Pershing presentation was based on previously unavailable information or that the information could not be understood absent expert analysis.[11] This is not surprising; seemingly all of Pershing's conclusions arise from information readily obtainable from Herbalife's public filings and other publicly available documents. (See, e.g., id., Ex. A at 10-14 (citing source of information as, inter alia, public company filings, Euromonitor, sell-side research and Pershing Square estimates).) The Pershing presentation was not a corrective disclosure.

---

[9] "We need not reach the question of whether an analyst or short-seller's opinion can ever constitute a corrective disclosure. Just as black swans may exist, there may theoretically be some form of opinion that is factual or revelatory in nature such that it qualifies as a corrective disclosure. But at the very least, such an opinion would need to reveal to the market something previously hidden or actively concealed. That is not this case, and we need not delve into that metaphysical question here. Einhorn's opinion reveals no fact to the market. Nothing suggests that the Company obfuscated or concealed the information on which Einhorn relied. We need not go further. We merely note that if they do exist, such opinions – like black swans – will be the exception, not the rule." Meyer, 710 F.3d at 1199 n.10.

[10] In addition to Pershing's December 2012 Presentation, Pershing challenged Herbalife's operations on various occasions and in various formats throughout the Class Period. (See, e.g., ACAC ¶¶ 96, 98-99, 114.) As with the December 2012 Presentation, these additional presentations were based on publicly available information and therefore did not inject new information into the market. (See, e.g., id., Ex. I at 2 ("The information and opinions in the Presentation are based on publicly available information about Herbalife and other companies and persons.").) Plaintiffs do not appear to allege that Herbalife's stock price declined as a result of these other Pershing presentations.

[11] As noted above, Plaintiffs' counsel argued that the Pershing Report is actually based on information that is unavailable to the public. See supra n.6. Absent more particularized allegations that identify the purportedly unavailable information that the Pershing Report revealed to the public, the Court disregards this argument.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

# MEMORANDUM

### Senator Markey Letters

On January 23, 2014, Massachusetts Senator Edward J. Markey sent letters to the SEC and the FTC communicating concerns about Herbalife's practices and urging the agencies to investigate Herbalife. (Id. ¶ 100-03, Exs. F, G.) That day,[12] Herbalife's stock price dropped $7.61, or over 10%, to close at $65.92 per share. (Id. ¶ 105.)

In his letters, Markey buttresses his concern that Herbalife might be a pyramid scheme with references and citations to Herbalife's SEC filings, civilian complaints, letters to the FTC, lawsuits against Herbalife, and other articles regarding the possibility that Herbalife is a pyramid scheme. (Id., Exs. F, G.) Markey's concerns and the contents of his letters appear premised entirely on publicly available information. Absent any indication that the Markey letters introduced new information to the market, publicly disclosing these letters does not constitute a corrective disclosure or support Plaintiffs' loss causation claim.

### Herbalife Discloses FTC Investigation

On March 12, 2014, Herbalife disclosed that the FTC had begun a civil investigation into the company's practices. (Id. ¶ 107.) That same day, Herbalife's stock price declined 7% to close at $60.57 per share. On March 13, 2014, Herbalife's stock price dropped to $57.31 per share. (Id.) Plaintiffs contend that news of the FTC investigation constituted a corrective disclosure, but that Herbalife's "stock price remained inflated due to Defendants' continued false and misleading statements and omissions of material information." (Id. ¶ 174.) Disclosure of the investigation, unaccompanied by any contemporaneous or subsequent finding or admission of fraud, does not establish loss causation. See Loos, 762 F.3d at 888-91.

### July 2014 Earnings Report

According to Plaintiffs, on July 28, 2014, Herbalife "posted quarterly earnings and revenue that fell significantly short of Wall Street estimates. Notably, the earnings marked the first time since 2008 that Herbalife missed estimates. The Company also stated that 2014 sales would grow by 8.5 percent to 10.5 percent, slower than the range of 10 percent to 12 percent it predicted in April." (ACAC ¶ 132.) Plaintiffs further allege

---

[12] Although not alleged by Plaintiffs, the Court assumes that the Markey letters were publicly disseminated on the same day they were sent to the SEC and the FTC.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## MEMORANDUM

that the "earnings announcement included several disclosures demonstrating Herbalife's troubling practices, including significant issues in the Company's U.S. operations, revelations concerning Herbalife's Venezuelan issues with regard to the money transfer scheme and the corresponding huge market decline in the region." (Id. ¶ 133.) On July 29, 2014, Herbalife's stock price dropped nearly 14%, to close at $58.35. (Id. ¶ 132.)

Plaintiffs argue that Herbalife's July 2014 earnings report confirmed to the market that Herbalife was not a legitimate MLM, but rather an unsustainable and illegal pyramid scheme. (Id. ¶ 136.) None of Plaintiffs' factual allegations supports this conclusion. First, Plaintiffs' vague description of the earnings report, see id. ¶¶ 133, 175, does not satisfy Rule 9(b)'s particularity requirement. Second, the earnings report does not appear to reflect poor financial health; Herbalife reported second quarter net sales of $1.3 billion. (Defs.' Mot. to Dismiss, Ex. 23 at 1.) Even if Herbalife's failure to meet "Wall Street estimates" could plausibly suggest poor financial health, see ACAC ¶ 132, Plaintiffs offer no facts to support the claim that the drop in Herbalife's stock price was caused by new information regarding Herbalife's purported fraud "as opposed to merely reacting to reports of the defendant's poor financial health generally." Loos, 762 F.3d at 887-88.

The comments following Herbalife's earnings report suggest that Herbalife was overvalued because of corporate buy-backs and other related activities – not because Defendants falsely stated that Herbalife was a legitimate MLM. (ACAC ¶ 135.) The absence of any indication that the earnings report revealed Herbalife's purported fraud materially distinguishes this case from Amedisys, in which the court found it plausible to assume that disappointing earnings were the product of increased regulatory oversight that precluded the defendant company from maintaining its Medicare fraud. See 769 F.3d at 323-24 ("Once Amedisys was placed under the spotlight of government scrutiny for Medicare fraud, its earnings dropped significantly because its employees could no longer continue exploiting Medicare reimbursements."). Plaintiffs have not alleged that Herbalife failed to meet market estimates because scrutiny from law suits or government investigations forced the company to alter or abandon its purportedly unlawful business operations. In other words, Plaintiffs have not alleged facts sufficient to support the conclusion that the July 2014 earnings report revealed new information concerning Herbalife's allegedly fraudulent operations. The earnings report is not a corrective disclosure and is insufficient to establish loss causation.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**MEMORANDUM**

Additional Events

The ACAC's inclusion of additional events that purportedly revealed Herbalife's fraudulent practices, but were not included in the ACAC's loss causation section, reinforces the Court's conclusion that Plaintiffs have not established loss causation. The majority of these events, which Plaintiffs allege slowly exposed Herbalife as a pyramid scheme, were not followed by a significant – or perhaps any – decline in Herbalife's stock price. The additional events include:

(1) January 9, 2013: The *New York Times* and *WSJ* reports that the SEC opened a formal inquiry into Herbalife (ACAC ¶¶ 92-93);

(2) February 4, 2013: The *New York Post* releases 192 FTC complaints filed against Herbalife (id. ¶ 95);

(3) February 7, 2013: Pershing releases thirty eight pages of "pointed" questions for Herbalife and its officers (id. ¶ 96);

(4) March 11, 2013: The FTC releases ninety four consumer complaints about methods used to recruit Herbalife distributors (id. ¶ 97);

(5) March 14, 2013: Pershing gives a presentation comparing Herbalife to a company that the FTC and several attorneys general had prosecuted and determined was a pyramid scheme (id. ¶ 98);

(6) March 11, 2014: Pershing presents findings of an investigation that it had conducted into Herbalife's practices in China (id. ¶¶ 114-23);

(7) April 14 and 17, 2014: News outlets announce that Attorneys General from New York and Illinois are investigating Herbalife (id. ¶¶ 109-110);

(8) April and May 2014: Articles question Herbalife's operations in Venezuela and Mexico (id. ¶¶ 126-28); and

(9) July 22, 2014: Pershing holds a webcast on its investigation into Herbalife's nutrition clubs (id. ¶ 129).

The absence of an allegation that these events affected Herbalife's stock price undercuts Plaintiffs' loss causation theory. These events are in many ways

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## MEMORANDUM

indistinguishable from the events that Plaintiffs identify as corrective disclosures. Given Plaintiffs' theory of the case, these events – as additional disclosures – should have triggered corresponding declines in Herbalife's stock price. The absence of corresponding stock price declines suggests that these events, much like the alleged corrective disclosures, did not reveal to the market that Herbalife was a pyramid scheme.

Plaintiffs have not established loss causation. The ACAC is DISMISSED.

Given the Court's loss causation determination, it need not address Defendants' arguments concerning material misrepresentation and scienter. Nonetheless, the Court notes that Defendants' scienter and material misrepresentation arguments are generally unpersuasive; dismissal likely would have been proper on either basis. At the parties' March 9, 2015 hearing, Plaintiffs' counsel acknowledged that Plaintiffs must prove that Herbalife is a pyramid scheme in order to prevail in this action. Even assuming that Plaintiffs plausibly plead under Rule 9(b) that Herbalife is a pyramid scheme, the Court is uncertain that such allegations would establish securities fraud. One primary hurdle is the fact that Herbalife has consistently disclosed that - as an MLM - it is susceptible to legal challenge because its business model contains multiple components that resemble those found in illegitimate pyramid schemes. (Defs.' Mot. to Dismiss, Ex. 2 at 63, 72-73.) Plaintiffs themselves admit that Herbalife operates in the "gray area" between legitimate MLM and unlawful pyramid scheme. (Pls.' Opp. at 4.) Given Defendants' representations and the market's awareness that Herbalife might be a pyramid scheme, any amended pleading will likely fail absent allegations that identify particular misrepresentations concerning specific components of Herbalife's operations. Plaintiffs' current scienter allegations are also suspect. A significant portion of these allegations focus on marginally relevant confidential witness testimony and insider trading history, neither of which appears sufficient to establish a strong inference of scienter.

At the hearing on this matter, Plaintiffs' counsel suggested that the Court could alter the putative class period. In the absence of an appropriate motion and briefing, the Court declines to do so. In any event, it is unclear how a shortened class period would strengthen any of Plaintiffs' claims.

If Plaintiffs elect to amend, they must file and serve the amended complaint no later than April 8, 2015. Failure to file and serve by that date will waive the right to do so. The Court does not grant leave to add new defendants or new claims. Leave to add defendants or claims must be sought by a separate, properly noticed motion. Defendants' response will be due April 29, 2015.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## MEMORANDUM

IT IS SO ORDERED.