1
2
3
4
5
6

**SAXENA WHITE P.A.**
Maya Saxena (*pro hac vice*)
Lester R. Hooker (SBN 241590)
Brandon T. Grzandziel (*pro hac vice*)
5200 Town Center Circle, Suite 601
Boca Raton, Florida  33486
Telephone:   (561) 394-3399
Facsimile:   (561) 394-3382
E-mail:       msaxena@saxenawhite.com
                  lhooker@saxenawhite.com
                  brandon@saxenawhite.com

7
8

*Lead Counsel for the Class and*
*Counsel for Lead Plaintiff*

9
10
11
12

**TOSTRUD LAW GROUP, P.C.**
Jon A. Tostrud (SBN 199502)
1925 Century Park East, Suite 2125
Los Angeles, California 90067
Telephone:   (310) 278-2600
Facsimile:   (310) 278-2640
E-mail:       jtostrud@tostrudlaw.com

13

*Local Counsel for the Class and*
*Counsel for Lead Plaintiff*

14

**UNITED STATES DISTRICT COURT**

15

**CENTRAL DISTRICT OF CALIFORNIA**

16

**WESTERN DIVISION**

17
18
19
20
21
22

| IN RE HERBALIFE, LTD. SECURITIES LITIGATION | ) ) ) ) ) ) ) ) ) ) ) | No. 2:14-CV-02850-DSF (JCGx) **CLASS ACTION** **SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** **DEMAND FOR JURY TRIAL** |
|---|---|---|

23
24
25
26
27
28

# **TABLE OF CONTENTS**

I.     Introduction ...................................................................................1

II.    Jurisdiction And Venue.................................................................5

III.   Parties ...........................................................................................6

       A.    Lead Plaintiff ...................................................................... 6

       B.    Defendants........................................................................... 6

       C.    Non-Party Actors ................................................................ 9

IV.    Defendants' False And Misleading Statements ...........................10

       A.    Herbalife's Distributor Base And Retail Sales .................10

             1.    Background Of False Statements Concerning Retail Sales
                   And Herbalife's Distributor Base.............................10

             2.    False Statements Concerning Sales Of Herbalife Products
                   Within The Company's Distributor Base ................16

             3.    False And Misleading Statements Concerning The
                   Composition Of Herbalife's Distributor Base .........20

             4.    Loss Causation:  May 1 and May 2, 2012:  Herbalife's
                   Partially Corrective Disclosures Send the Stock Tumbling .....28

       B.    Herbalife Distributors' Business And Income Opportunities.............30

             1.    Background To False Statements Concerning Distributors'
                   Business And Income Opportunities ........................30

             2.    False And Misleading Statements Concerning Distributors'
                   Income And Lifestyle Opportunities ........................37

       C.    The Price Of Herbalife Products ........................................45

             1.    Background To False Statements Concerning Product
                   Pricing ......................................................................45

             2.    False Statements Concerning Herbalife Product Pricing .........46

D.    Herbalife's Nutrition Clubs ................................................. 49

    1.    False Statements Concerning Nutrition Clubs ........................ 49

    2.    Additional Information Is Revealed About The Nutrition Clubs Deceptive Practices Which Further Demonstrates Defendants' Knowledge of the Fraud ...................................... 54

E.    Herbalife's Purported Compliance With Laws And Regulations ....... 56

    1.    Background To False Statement Regarding Compliance ......... 56

    2.    False Statements Concerning Herbalife's Compliance With Laws And Regulations ........................................................... 60

F.    Loss Causation:  Pershing Square's December 20, 2012 Report Reveals That Herbalife Lied About Its Business Practices And Operations ............................................................................. 64

G.    False Statements Concerning Herbalife's Chinese Operations ......... 67

H.    Loss Causation:  The China Presentation Causes A Further Stock Price Decline ...................................................................... 76

V.    Loss Causation ............................................................................ 79

A.    The Revelation Of Defendants' Wrongful Conduct Directly Caused Harm To The Class ............................................................. 79

B.    Herbalife's Investor Day Presentation Does Nothing to Buoy Its Devestated Share Price ................................................................ 80

VI.    Post Class Period Events Confirm Herbalife's Fraudulent Practices .......... 80

VII.    Johnson's Highly Unusual And Suspicious Stock Sales Support A Strong Inference of Scienter ........................................................... 90

A.    The Value And Amount of Sales Were Highly Unusual ................. 90

    1.    Johnson's Extraordinary Amount And Percentage Sold ......... 90

    2.    The Sales Were Inconsistent With Prior Trading .................. 91

    3.    The Timing Of The Stock Sales Was Suspicious .................. 92

B.     The Trading Plans Adopted By Johnson Cannot Shield Him From Liability ................................................................................. 94

VIII.  Applicability of the Presumption Of Reliance: The Fraud On The Market Doctrine ........................................................................... 96

IX.    Inapplicability Of The Statutory Safe Harbor ................................................. 98

X.     Class Action Allegations .......................................................................... 98

XI.    Claims Brought Pursuant To The Exchange Act ........................................ 100

XII.   Prayer For Relief ................................................................................... 105

XIII.  Jury Demand ....................................................................................... 105

# I.    <u>Introduction</u>[1]

1.      Herbalife is a direct-selling company specializing in nutrition and weight management products.  The Company prides itself on being larger than life, a theme set by controversial founder Mark Hughes,[2] a cult-like figure who routinely promised million-dollar incomes to frenzied crowds of recruits at confetti-filled Herbalife "Extravaganza" events.  The Company has continued to operate in this vein, parading out its few top distributors who act as paid ambassadors of Herbalife at these Extravaganzas, which are replete with fireworks and rock music.  The chosen distributors attest to incredible success stories and lives filled with Ferraris and ocean-front mansions.

2.      While the Company attempts to cloak its practices in a veil of legitimacy, at its core Herbalife is a pyramid scheme where only those at the very top of the pyramid earn any meaningful income.  Distributors earn vastly more from recruitment than they do from selling the Company's overpriced diet shakes to bona fide retail customers, and are incentivized to aggressively and deceptively

---

[1] Lead Plaintiff the Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters"), on behalf of itself and all persons or entities that purchased or otherwise acquired the common stock of Herbalife, Ltd. ("Herbalife" or the "Company") between February 23, 2011 and March 10, 2014, inclusive (the "Class Period") and were damaged thereby (the "Class"), alleges the following upon personal knowledge as to themselves and their acts, and upon information and belief as to all other matters, based upon the investigation of counsel.  Lead Counsel's investigation included, among other things: (i) a review of public filings and press releases by Herbalife with the United States Securities and Exchange Commission ("SEC"); (ii) media and analyst reports about the Company; and (iii) publicly available data relating to Herbalife common stock.  Many of the facts related to the claims and defenses in this action are known only by the Defendants, or are exclusively within their custody or control.  Lead Plaintiff believes that substantial additional evidentiary support for its allegations will be developed after a reasonable opportunity for discovery.

[2] http://www.factsaboutherbalife.com/mark-hughes-5-billion-company/.

recruit new participants into the scheme.  The only reason that Herbalife can sell more than $1 billion worth of its non-unique and overpriced powder-based drinks per year is because distributors buy it with the hopes and dreams of achieving financial freedom.  Distributors rely on extravagant income promises that are virtually always unfulfilled, despite CEO Michael Johnson's affirmation that Herbalife is "*building the best business opportunity on the face of the earth*."[3]

3.     Herbalife is accustomed to hyperbole in its sales and recruiting practices, and the harm to failed distributors who have been misled into believing Herbalife presented a viable business opportunity to change their lives is evident.[4] Defendants' statements to investors, just like their unfounded promises to potential distributors, are similarly lacking a foundation in reality.

4.     Throughout the Class Period, Defendant Johnson and other top Herbalife insiders repeatedly assured investors that, amongst other things: (1) the Company was in compliance with federal regulations regarding the operation of multilevel marketing companies ("MLM"), which require, among other things, that a legitimate operation emphasize sales of merchandise in its compensation system over recruitment rewards; (2) that most of Herbalife's customers were outside the distribution network; (3) that the Herbalife business opportunity for distributors was a valuable one; and (4) that the Company's operations in China were being conducted in accordance with local law.

5.     In response to the Company's assurances, the stock price of Herbalife was materially and artificially inflated during the Class Period.  While artificially inflated, Defendant Johnson (the highest paid CEO in America in 2011) *sold over*

---

[3] 1Q 2010 Herbalife earnings call.

[4]  Consumer class actions have been brought on behalf of Herbalife distributors. *See, e.g., Bostick, et al. v. Herbalife International of America, Inc., et al.*, Case No. 2:13-cv-02488-BRO-RZ (C.D. Cal.).

*2 million shares of Herbalife stock for over $126 million, exercising an astonishing 90% of his acquired stock options.*  These sales were highly suspicious in that: (1) they were far out of line with his pre-class period trades; and (2) were done pursuant to multiple, overlapping 10b5-1 trading plans designed to allow him to divest himself of shares as quickly as possible at a time when the Company had authorized and was actively buying back Herbalife shares.

6.    While Johnson was able to cash out over a hundred million dollars, investors who purchased Herbalife stock relying on assurances regarding the legitimacy of its practices suffered significant losses.

7.    The Company's deceptions first surfaced on May 1, 2012, when Herbalife revealed that it did not maintain required information about retail sales to distributors and to non-distributors, and nonetheless grossly misrepresented the amount of sales outside the network as 70%.[5]  Despite the marked ability to provide this information due to the Company's technological sophistication and record-keeping requirements imposed on the distributors, Herbalife continually refused to reveal the "true" number of retail sales outside of its distribution network.   Instead, Defendants provided investors inconsistent answers ranging from 70%, to 90%, to "we don't track this number."

8.    While investors now had cause for concern regarding the Company's lack of verifiable retail sales outside the distribution network, additional information was subsequently revealed that demonstrated that Herbalife had materially misrepresented the nature and scope of its business practices.   On December 20, 2012, Pershing Square founder and CEO Bill Ackman, a well-known hedge fund manager, along with two other Pershing Square employees, presented an expose on Herbalife at a Sohn Conference Foundation Special Event

---

[5] The More product that is sold within an MLM's business network, the more likely it is to fall within the definition of a pyramid scheme.

in New York.  The presentation, entitled *Who Wants to be a Millionaire?* (the "*Millionaire* Presentation"), was extraordinarily detaled based on a lengthy investigation and expert analysis.[6]

9.    As a result of the *Millionaire* Presentation, Pershing Square exposed, for the first time, unfair and fraudulent practices that were hidden from investors, law enforcement and consumers, along with a litany of false statements by Herbalife officials.  Another Pershing Square presentation on March 11, 2014, entitled *Herbalife in China* (the "*China* Presentation"), revealed for the first time that Herbalife is operating illegally in China because its distributor compensation model violates the country's stringent direct marketing laws.[7]

10.    After the Pershing Square presentations, numerous regulators launched investigations into the Company's business practices and operations, including investigations by the FTC, the Canadian Competition Bureau, the New York Department of Justice, the New York Attorney General's Office, and the Illinois Attorney General's Office.  According to the Company's Form 10-Q filed on May 5, 2015, the Department of Justice is now seeking additional information about Herbalife's business practices from the Company as well as its distributors. The investigations not only concern the deceptive nature of Herbalife's business

---

[6] The slideshow for the *Millionaire* Presentation is attached as Exhibit B (the "*Millionaire* Slides"), while the transcript is attached as Exhibit C (the "*Millionaire* Transcript"), and the Executive Summary as Exhibit D (the "*Millionaire* Executive Summary").

[7] The slideshow for the *China* Presentation is attached as Exhibit E (the "*China* Slides"), while the transcript is attached as Exhibit F (the "*China* Transcript"). Another of Pershing Square's presentations, entitled *The Big Lie*, is attached as Exhibit G (the "*Big Lie* Slides").

practices but also Defendants' statements to the investing public, as evidenced by the ongoing investigation by the SEC.[8]

11. Events subsequent to the Class Period confirm the accuracy of the Pershing Square presentations' conclusions, and confirm that the Herbalife pyramid is slowly collapsing. For example, the Company's net income for FY 2014 dropped 41% compared with 2013, while its earnings per share declined by 30%. The disastrous results continued into 2015, when it announced that net sales saw double-digit declines for every geographic area but China. Ominously, Herbalife also announced at this time that the Company's bank lending syndicate was beginning to reduce its exposure to the Company, prompting widespread analyst concern. Most significantly, Herbalife has had to radically revise its marketing program practices in light of their exposure by Pershing Square and in the face of overwhelming regulatory scrutiny, which has caused several earnings misses, as well as a re-shifting of earnings guidance and valuation of the Company. Thus, investors are no longer buying the previously-touted Herbalife growth story, and have already sustained significant damages even without any final government action.

II. **Jurisdiction And Venue**

12. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a), 78t-1) and the rules and regulations promulgated thereunder, including Rule 10b-5 (17 C.F.R. § 240.10b-5).

13. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

---

[8] Rather than admit to the falsity of their statements, Defendants instead hired former top government officials in an attempt to delay and shield themselves from inevitable government action.

14.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act.  Herbalife maintains its corporate headquarters in this District, and many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

15.     In connection with the acts and omissions alleged in this Second Amended Class Action Complaint for Violations of the Federal Securities Laws ("Complaint"), Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

### III.   Parties

#### A.   Lead Plaintiff

16.     Lead Plaintiff Oklahoma Firefighters purchased publicly-traded Herbalife common stock at artificially inflated prices during the Class Period and has been damaged thereby.  As of June 30, 2012, Oklahoma Firefighters held over $1.7 billion in net assets for the benefit of over 23,000 members who have actively participated in firefighting activities in the state of Oklahoma.  Evidence of Oklahoma Firefighters' transactions in the Company's common stock during the Class Period is attached as Exhibit A.

#### B.   Defendants

17.     Defendant Herbalife, Ltd. ("Herbalife" or the "Company") is a network marketing company that sells weight management, nutritional supplement and personal care products through a global network of independent distributors. The Company was founded in 1980, is based in George Town, the Cayman Islands and has its principal executive offices in this District, in Los Angeles.  Herbalife's

common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "HLF."

18.     Herbalife operates as a multi-level marketing company ("MLM"). According to the Company's 2013 Form 10-K filed with the SEC on February 19, 2014, Herbalife "distributes and sells its products through a network of independent members, or Members, using the direct selling channel." In an MLM, distributors primarily make money through direct sales of products to customers. MLMs also encourage their existing distributors to recruit new distributors by paying the existing distributors a percentage of their recruits' sales.[9]  The recruits are known as a distributor's "downline," while the distributor is known as a recruit's "upline."  Distinct from, but related to MLMs, "pyramid schemes" take advantage of the public by pretending to engage in legitimate multi-level marketing.  These pyramid schemes use money from new recruits to pay the people at the top level.  Hence, pyramid schemes are usually denoted by their greater focus on recruitment rather than on product sales.

19.     Defendant Michael O. Johnson ("Johnson") has served as the Chief Executive Officer ("CEO") at Herbalife since he joined the Company in April 2003 and as the Company's Chairman of the Board of Directors ("Board") since May 2007.

20.     Defendants Herbalife and Johnson are collectively referred to herein as "Defendants."

21.     Because of Johnson's position, he had access to the adverse undisclosed information about Herbalife's financial results, business, operations and practices, via access to internal corporate documents, conversations and contact with other corporate officers and employees, attendance at meetings and

---

[9] *Investopedia*, "Multi-Level Marketing," http://www.investopedia.com/terms/m/multi-level-marketing.asp (last accessed May 8, 2015).

via reports and other information provided to them.  Johnson, by virtue of his high-level position, was directly involved in the day-to-day operations of Herbalife at the highest levels and was privy to confidential information concerning the Company and its business, operations and practices, including the misstatements alleged herein. His position of control and authority as an officer and director enabled Johnson to control the content of the SEC filings, press releases, and other public statements of Herbalife during the Class Period.  Accordingly, Johnson bears responsibility for the accuracy of the public reports and press releases detailed herein and is therefore primarily liable for the misrepresentations and omissions contained therein.  Moreover, Johnson had continuous and systematic contacts with the United States and California through Herbalife's conduct of its business and its Los Angeles corporate headquarters.

22.    Johnson was obligated to refrain from falsifying Herbalife's books, records, and accounts and were prohibited from using the instrumentalities of interstate commerce or the mails to (a) employ any device, scheme, or artifice to defraud; (b) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engage in any act, practice, or course of business which operates or would operate as a fraud upon any person.   Johnson's conduct violated the Exchange Act and SEC regulations promulgated thereunder in connection with the purchase or sale of Herbalife common stock.

23.    Johnson is liable as a participant in a fraudulent scheme and course of business whose primary purpose and effect was to operate as a fraud and deceit on purchasers of Herbalife common stock by disseminating materially false and misleading statements and/or concealing material adverse facts about the Company's operations.

24.    Defendants' scheme deceived the investing public regarding Herbalife's operations, finances and financial statements, and the intrinsic value of the Company's common stock and caused Lead Plaintiff and other members of the Class to be damaged as a result of their purchases of Herbalife common stock at artificially inflated prices.

25.    Because of his position of control and authority as an officer and of Herbalife, Johnson was able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  He was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Johnson is responsible for the accuracy of the public reports and releases detailed herein, and is therefore primarily liable for the representations contained therein.

### C.    Non-Party Actors

26.    John DeSimone ("DeSimone") has served as Chief Financial Officer ("CFO") of the Company since January 2010.  Previously, Mr. DeSimone served as Senior Vice President – Finance and Senior Vice President – Finance & Member Operations of the Company in December 2008.  Mr. DeSimone began his tenure with Herbalife in November 2007.

27.    Desmond Walsh ("Walsh") has served as President of the Company since January 2010.   Previously, Mr. Walsh served as Senior Vice President, Worldwide Member Sales in January 2004 and Executive Vice President for Worldwide Operations and Sales in April 2008.

28.    DeSimone and Walsh would regularly speak for the Company on conference calls, investor presentations and other public events.   At all times mentioned herein, DeSimone and Walsh had authority to speak for, and on behalf

of, Herbalife, and were speaking within the scope of their employment with the Company.  Herbalife has not repudiated any of their statements described herein.  Accordingly, their statements can be attributed to Herbalife.

**IV.   Defendants' False And Misleading Statements**

29.   Throughout the Class Period, Defendants made false and misleading statements, and failed to disclose material facts, concerning Herbalife's business practices and operations.  Specifically, in periodic regulatory filings, conference calls, and investor presentations, Defendants made false and misleading statements concerning: (1) Herbalife's product sales within its distributor base; (2) income opportunities for Herbalife distributors; (3) Herbalife's product pricing; (4) the operation and purpose of Herbalife Nutrition Clubs; (5) the Company's compliance with laws and regulations; and (6) the Company's operations in China.

**A.   Herbalife's Distributor Base And Retail Sales**

**1.   Background Of False Statements Concerning Retail Sales and Herbalife's Distributor Base**

30.   The issue of "genuine" retail sales is highly material to investors.  Simply put, the more sales that occur within an MLM's distribution network, the less likely it is that the company has true retail demand for its products, and the more likely it is that sales are incidental to the business opportunity.  Thus, if a company has few sales outside the distribution network, it is more likely to constitute an illegal pyramid scheme.

31.   A May 8, 2012 *CNBC* article, for example, explained the importance of tracking sales outside of the distribution base:

> [B]ased on my research and discussions with multi-level marketing experts and former distributors, ***it may be the most relevant question***.

> Without mentioning any company by name, David Vladeck, Director of the Bureau of Consumer Protection of the Federal Trade

1      Commission, told me Monday that *it would be "red flag" if a multi-level marketing company didn't keep track of unrelated customers*.[10]

2      32.     Similarly, noted Herbalife cheerleader John Hempton of Bronte

3 Capital wrote:

> And the most ardent Herbalife bull (and I am an ardent bull) must admit that a multi-level-marketing scheme where all the consumption is by people in the pyramid gives you pause. You have to ask where are the real customers? And if there are no real customers then surely it is a pyramid as a matter of fact (if not a matter of law).[11]

33.     Herbalife reassured investors throughout the Class Period that retail sales served a "fundamental role in our compensation systems, internal controls and operations, including its role as the basis upon which distributor discounts, royalties and bonuses are awarded. In addition, it is used as the basis for certain information included in daily and monthly reports reviewed by our management."[12]

34.     Herbalife claimed that it had procedures in place to emphasize actual retail sales. To actually sell Herbalife products, distributors must supposedly abide by over 150 rules contained in 126 pages of text, or risk losing their distributorship. Two of the most important rules that distributors must follow are the so-called 70% Rule and the 10 Customer Rule. The 70% Rule (Rule 18-C) states that 70% of all products must be sold to consumers or consumed by distributors for personal use, while the 10 Customer Rule (Rule 18-B) requires a

---

[10] *CNBC*, "Reasons to Worry About Herbalife: Greenberg" (May 8, 2012), http://www.cnbc.com/id/47340065 (last accessed May 8, 2015).

[11] John Hempton, "Herbalife Internal Consumption: A Comment" (March 24, 2014), http://brontecapital.blogspot.com/2014/03/herbalife-internal-consumption-comment.html (last accessed May 8, 2015).

[12] *See* 2010 Form 10-K at 53; 2011 Q1 Form 10-Q at 19; 2011 Q2 Form 10-Q at 21; 2011 Q3 Form 10-Q at 21; 2011 Form 10-K at 55; 2012 Q1 Form 10-Q at 19; 2012 Q2 Form 10-Q at 19; 2012 Q3 Form 10-Q at 21.

distributor to sell to at least 10 separate customers to qualify for Royalty Overrides and other bonuses. These rules are designed to separate legitimate MLMs from pyramid schemes.

35.     Herbalife is required to keep information about retail sales, requires its distributors to keep the information, and also frequently touts its various technological applications which make the information readily accessible. First, Herbalife is subject to a specific permanent injunction that applied to both the Company and its executives. In the mid-1980s, the California Attorney General filed suit against Herbalife over certain of its business and marketing practices. The suit, *California v. Herbalife Int'l, Inc.*, No. 92767 (Cal. Sup. Ct.), ended in October 1986 when Herbalife agreed to pay the State of California a settlement amount of $850,000.[13] In addition to paying the State, the Attorney General issued a permanent injunction against the Company (the "Permanent Injunction").

36.     Section 5(A) of the Permanent Injunction prohibits Herbalife from paying its distributors for anything other than retail sales of the Company's products.[14] Section 5(B) requires Herbalife to implement a system to document its

---

[13] Reinforcing the size and importance of the settlement, then-Deputy Attorney General Albert Sheldon publicly stated at the time that the $850,000 that California recovered as a result of the Settlement is the same amount that the State would have recovered if it had taken its case to trial. *Orlando Sentinel*, "Herbalife, California Settle Suit Firm Will Pay $850,000, Reword Product Claims (October 17, 1986), http://articles.orlandosentinel.com/1986-10-17/news/0260250177_1_herbalife-products-civil-penalties (last accessed May 8, 2015).

[14] Retail sales are defined in Section 5(C) as "a sale [of Herbalife's] product(s) in any of the following situations: (1) ***to persons who are not part of defendant's marketing program or distribution system***; or, (2) to persons who are not buying to become part of defendants marketing program or distribution system; or, (3) to persons who, although desirous of becoming or who are a part of defendants' marketing plan or distribution system are buying for their own personal or family use." (emphasis added). Notably, subsection (1) specifically categorizes and delineates those who are completely outside of Herbalife's distribution base and

retail sales, and provides that the Company "shall be in compliance" with Section 5:

> *[A]s long as a verification or documentation system they implement allows them, <u>at any given point in time</u>, to verify or document . . . that any and all participants who receive commissions, bonuses, overrides and/or advancement from defendants in defendants marketing program*, after entry of this judgment, *are based on retail sales* made by or through such participant(s) or others introduced directly or indirectly under participant(s).

37.    The meaning of Section 5(B) of the Permanent Injunction is unambiguous: Herbalife must be able to categorize sales to distributors and non-distributors. This understanding is also shared by mainstream investment media. *The Motley Fool*, for example, noted that this clause "basically means that the company needs to be able to prove it is selling products to non-members at the end of the cycle in order for the distributor commissions to be lawful . . . ."[15]

38.    In addition to the Permanent Injunction which requires these sales to be tracked, the Company's own documents and statements show that Herbalife has immediate access to all of the data that the Permanent Injunction requires it to maintain. Herbalife's Wholesale Product Order Form requires the names and Herbalife ID numbers for distributors and supervisors, and the name, address, phone and email address for product shipment.[16] Its Retail Order Form similarly requires the name, address, phone number and email address of both the distributor

---

who do not intend or want to become Herbalife distributors. In order to be able to perform the analysis required by the Injunction, Herbalife must have the ability to group persons purchasing products into one of these three definitions, including individuals completely outside the distribution network.

[15] *The Motley Fool*, "3 Crucial Questions for Herbalife" (February 7, 2013), http://www.fool.com/investing/general/2013/02/07/3-crucial-questions-for-herbalife.aspx (last accessed May 8, 2015).

[16] Herbalife, *Sales and Marketing Plan and Business Rules* at 40, http://factsaboutherbalife.com/media/2012/12/Marketing-Plan-and-Business-Rules-2012.pdf (last accessed May 8, 2015).

and the customer.[17]  Rule 17-A contractually requires distributors to maintain and provide distributors' retail receipts to the Company upon request.[18]  Even Founder's Circle Member and former Board of Directors member Leon Waisbein told distributors to "[t]rack how many customers you have . . . . Your goal should be to build a customer group of 30-40 people."[19]

39.  Herbalife executives would often boast of the vast swaths of data at their fingertips.  During the April 30, 2013 earnings call for 1Q 2013, Defendant Johnson stated that "[l]ike most large consumer-packaged group companies, we know who we sell our products to.  And like those companies, we then rely upon research tools and techniques to gain a better understanding of the end-use consumer."  In an October 21, 2014 interview with *Los Angeles Magazine*, Johnson confirmed that at Herbalife "***[w]e know all the numbers, we know who recruits people, we know who sells product to someone else.***"[20]  Herbalife had access to such granular data due to the implementation of its Oracle GoldenGate, Agile Product Life Management, Primavera P6, HCM Cloud, and E-Business Suite

---

[17]  Herbalife, *Sales and Marketing Plan and Business Rules* at 42, http://factsaboutherbalife.com/media/2012/12/Marketing-Plan-and-Business-Rules -2012.pdf (last accessed May 8, 2015).

[18]  Notably, on November 22, 2013, Pershing Square offered Herbalife to pay for the cost of providing all of these records to the Company.

[19]  Notes – Leon Waisbein – Sun City Extravanganza 2010 at 14, http://www. actsaboutherbalife.com/media/2012/12/Waisbein-Extravaganza-Notes-2010.pdf (last accessed May 8, 2015).

[20]  *Los Angeles Magazine*, "Big Shots: Michael Johnson" at 13:40 (October 21, 2014),   http://www.lamag.com/citythinkblog/big-shots-michael-johnson/   (last accessed May 8, 2015).

Enterprise Resource Planning ("ERP") IT systems.[21]   Defendant DeSimone explained that Oracle:

> [P]rovides great visibility.  **We get daily sales updates**.
>
> * * *
>
> **[W]e have a detailed distributor database that gives us dozens of metrics on each distributor**.  It is really too much information to look at, but you identify your outliers, and you find distributors that are performing very well and you find out why.   And if they're performing well because they have a nuance for the business model that's valuable, then we commercialize it globally.   We have a lot of access to distributor performance also.[22]

40.     Vice President of Investor Relations Amy Green similarly boasted of Herbalife's technological prowess:

> [W]hat we look at, we do have from a technology standpoint have the ability to do deep dive within the – into a distributorship or into either from corporately we can look at a region, a country, a city, the different layers, **you can kind of peel off the onion to see what kind of granularity you want to look at.   You can look at an individual distributorship, you can look at the whole lineage of a distributor that has a downline**.  But it's not so much looking at a saturation analysis, it's more looking at what the opportunity says because I'm a distributor and I'm looking at my tool, the distributor only sees their business.[23]

41.     The ability to track sales outside of a the distribution base is not unique or even difficult, and other name-brand and successful MLMs do so to

---

[21] Mark Schissell, Herbalife Senior Vice President and Chief Information Officer, lauded the advantages of the HCM Could system because "[i]t had had all the pieces of functionality we needed, whether it was core human resources, whether it was recruiting, talent management, compensation, it was a complete solution." Youtube.com, *Herbalife's Success With Oracle HCM Cloud* at 2:34(October 24, 2013), https://www.youtube.com/watch?v=f7HL0OKBlAc.   Schissell further stated that the "biggest [improvement]" over the previous system "is the quality of the data and the ability to get that data to our executives, to our line-level managers, its changed the culture."  *Id.*

[22] September 7, 2011 Barclays Capital Back to School Consumer Conference.

[23] April 24, 2012 Barclays Capital Retail and Restaurants Conference.

ensure legal compliance and to better serve their customers.  During a January 29, 2013 interview with Jim Cramer on *Mad Money*, for example, Tupperware CEO Rick Goings explained:

> You wouldn't believe the level of detail we have.
>
> * * *
>
> We have a report there of what happened the previous week, what the sales were, what the recruits were, who they were to and people that went to the party.  We manage our business right down to the detail of it.[24]

42.    When faced with pivotal questions regarding retail sales to third party customers, however, Defendants have flatly lied to investors.  Defendants refuse to provide this information to investors, and misrepresent its materiality in SEC filings and other publicly issued statements to investors.

### 2.    False Statements Concerning Sales Of Herbalife Products Within The Company's Distributor Base

43.    During the Class Period, Defendants made false and misleading statements, and omitted to state material facts, regarding sales of Herbalife products within the Company's distributor base.

44.    On May 1, 2012, the Company held an earnings call to discuss its 1Q 2012 financial results.  During the Q&A session, David Einhorn, founder and president of Greenlight Capital, posed several questions which resulted in the following exchange between him and Walsh:

> Q. [Einhorn]: What is the percentage [of final product sales] that is actually sold to consumers that are not distributors?
>
> A. [Walsh}: ***We don't have exact percentage, David, because we don't have visibility to that level of detail***.
>
> Q. [Einhorn]: Do you have an approximation?

---

[24] *CNBC*, "Tupperware CEO on Direct Selling" (January 29, 2013), http://video. cnbc.com/gallery/?video=3000144377 (last accessed May 8, 2014).

A. [Walsh]: So again, going back to our 70 percent rule, *we believe that it's at 70 percent or potentially in excess of that*.

45. On May 2, 2012, Herbalife issued a Form 8-K in response to questioning from Greenlight Capital founder and president David Einhorn on the previous day. In the filing, Herbalife misleadingly stated:

Question #1 from David Einhorn: "First, how much of the sales that you'd make in terms of final sales are sold outside the network and how much are consumed within the distributor base?"

Answer: *We don't track this number and do not believe it is relevant to the business or investors*.

Herbalife believes the majority of its distributors are discount buyers, who become distributors in order to purchase their favorite Herbalife products at a minimum discount of 25 percent (either directly from the company or from their upline distributor/supervisor). In addition, some of these distributors will also share with, or retail the products to other friends, family, and customers.

The percentage of product of any multi-level marketing company consumed by its distributors is substantial. This is not surprising since consumers who are enthusiastic about the products become distributors in order to purchase at a discount and possibly to share and sell the products to others. *In addition, in order to minimize the risk of product being accumulated by distributors, the company has policies in place such as the 70% Rule, the Ten Customer Rule and the Buy Back policy*.

46. Mainstream investors were appalled. A May 8, 2012 *CNBC* article entitled "Reasons to Worry About Herbalife: Greenberg," commented that:

[T]here are reasons for investors to worry.

\* \* \*

The top reason, as it turns out, was the first question Einhorn asked on the call: How much product is sold to customers outside the company?

In a response on its website and in an SEC filing, Herbalife said: "We don't track this number and do not believe it is relevant to the business or investors."

*Yet, based on my research and discussions with multi-level marketing experts[25] and former distributors, it may be the most relevant question.*

47.   While the answers to Einhorn's May 1 questions and the Company's May 2 filing were partially corrective in that they exposed issues with respect to the Company's internal retail sales, Defendants still nevertheless failed to reveal the entire truth to investors; specifically:

a.   Despite having the demonstrated ability to do so, Defendants were not complying with the Permanent Injunction by conceding that they do not track sales outside the network; thus the Company had no rational basis to claim that 70% of sales were outside the network.

b.   On July 5, 2012, Herbalife Principal Accounting Officer Bosco Chiu told the SEC that "we do not rely on the '70% rule' in any meaningful way."[26]

c.   As Pershing Square revealed in the December *Millionaire* presentation, the so-called 70% Rule does not protect against excessive internal consumption.   Only sales leaders, who constitute 19% of total distributors, must comply.   Further, distributors can meet the 70% requirement by selling to their downlines, which by definition does nothing to limit internal consumption.[27]

d.   Between 2007 and 2009, Herbalife only disciplined about 10, but in any event fewer than 25, distributors for violating the 70% Rule,

---

[25] *CNBC*, "Reasons to Worry About Herbalife: Greenberg" (May 8, 2012), http://www.cnbc.com/id/47340065 (last accessed May 8, 2015).

[26] Letter from Bosco Chiu to John Reynolds, Assistant Director (July 5, 2012) http://www.sec.gov/Archives/edgar/data/1180262/000119312512295202/filename1.htm (last accessed May 8, 2015).

[27] *Millionaire* Tr. at 16.

1    equating to fewer than 1 out of every 100,000 distributors.[28]  In fact, most
2    distributors are only audited when they seek to return product to Herbalife.[29]

3        48.    On December 19, 2012, Defendant Johnson called in to CNBC's
4    *Street Signs* in anticipation of Pershing Square's *Millionaire* Presentation that was
5    to take place the next day.  The following exchange occurred between Johnson and
6    co-host Kate Kelly, during which Johnson stated:

7        Q. [Kelly] Can you give us a percentage figure though Mr. Johnson as
         to what percentage of your sales are outside [Herbalife's] distribution
8        network?

9        A. [Johnson] *90%*

10       Q. So the vast majority?

11       A. *Absolutely*.

12       49.    The previously emphasized statements were false and misleading
13   because:

14           a.     On January 10, 2013 during an second, follow-up interview on
15   CNBC's *Squawk on the Street* with Kate Kelly, Johnson flatly confessed that
16   his "90%" statement on December 19, 2012 "was a misstatement . . . .  That
17   was a misstatement on that day" because he was "hyped up."[30]  Johnson
18   further admitted that he "got in a lot of trouble" for making that statement.[31]

19
20
21
22   [28] *Millionaire* Slide 127.

23   [29] *Millionaire* Slide 128.

24   [30] *CNBC*, "CNBC Exclusive: CNBC Transcript: Herbalife Chairman & CEO
25   Michael Johnson Sits Down with Kate Kelly Today on CNBC" (January 10, 2013),
     http://www.cnbc.com/id/100370378 (last accessed May 8, 2015).

26   [31] *CNBC*, "CNBC Exclusive: CNBC Transcript: Herbalife Chairman & CEO
27   Michael Johnson Sits Down with Kate Kelly Today on CNBC" (January 10, 2013),
28   http://www.cnbc.com/id/100370378 (last accessed May 8, 2015).

1         b.     As Pershing Square revealed the next day, the so-called 70%

2    Rule does not protect against excessive internal consumption.   Only sales

3    leaders, who constitute 19% of total distributors, must comply.   Further,

4    distributors can meet the 70% requirement by selling to their downlines,

5    which by definition does nothing to limit internal consumption.[32]

### 3.     False And Misleading Statements Concerning The Composition Of Herbalife's Distributor Base

50.    During the Class Period, Defendants made false and misleading statements, and omitted to state material facts, regarding the composition of Herbalife's distributor base.

51.    In the 2010 Form 10-K, Herbalife broke out its distributors into two main groups, and then into three subgroups:

> ***Approximately 483,000 of our 2.1 million distributors have become sales leaders***, which are comprised of approximately 434,000 sales leaders in the 73 countries where we use our traditional marketing plan and approximately 49,000 China sales employees and licensed business providers operating under our China marketing plan. Collectively, we refer to this group as "sales leaders." ***We believe that the distributors who have not attained the sales leader level can be segmented into three general categories based on their product order patterns: discount buyers, small retailers and potential sales leaders. We define discount buyers as customers who have signed up as distributors to enjoy a discount on their purchases; small retailers as product users and sales people who generate modest sales to friends and family; and potential sales leaders as distributors who are proactively developing a business with the intention of qualifying to become a sales leader***. In 2010, excluding China, ***distributor orders for these three general categories were approximately 29%, 57% and 14%, respectively***.[33]

52.    During the May 1, 2012 earnings call discussing Herbalife's 1Q 2012 results, Einhorn continued his pointed questions for Company executives.   During

---

[32] *Millionaire* Tr. at 16.

[33] 2010 Form 10-K at 5.

the Q&A session, the following exchange occurred during which DeSimone falsely stated:

Q. [Einhorn]: One last question, when you had your previous 10-K, you disclosed three groups of distributors at the low end – you called 29 percent self consumers, 57 percent small retailers, and 14 percent potential sales leaders. Then that disclosure did not repeat in the subsequent 10-K, so I have two questions. First of all, how do you track that and how do you characterize and know which ones are which? And second, why did you stop disclosing that in the last 10-K? Is that something that you've stopped tracking or just stopped disclosing?

A. [DeSimone]: David, hi, this is John. ***The criteria for grouping distributors into different classes was based off of their volume purchases. We're making assumptions that people below a certain volume weren't doing the business, they were buying self consumption***. And I don't remember the exact amounts, but I can get it to you after the call. It's how we delineated between the three classes. The reason we took it out of 10-K is a change in CFO, from Rich to me. ***I didn't view it as valuable information to the business or to the investors.*** However we can easily provide the exact same breakout going forward, if you'd like. I could email it to you and to our investors. Again, I don't remember the exact delineation between the three classes but I can certainly get it to you. Our objective is to be completely transparent.

Q. [Einhorn]: Thanks, I'd appreciate that sort of follow up, that would be helpful. Thanks so much, guys.

53.     In the Form 8-K filed the next day, on May 2, the Company falsely amended and elaborated on certain answers to Einhorn's questions from the previous day:

Question #3 from David Einhorn: "When you had your previous 10-K, you disclosed three groups of distributors at the low end. You called 29 percent self consumers, 57 percent small retailers, and 14 percent potential sales leaders, and then that disclosure did not repeat in the subsequent Form 10-K. I have two questions; first, how do you track that and how do you characterize and know which ones are which? And second, why did you stop disclosing that in the last 10-K? Is that something that you stopped tracking or just stopped disclosing?"

Answer: We segment the distributors who have not attained the supervisor level into three general categories based on their product order patterns: discount buyers, small retailers and potential supervisors. We define discount buyers as customers who have signed up as distributors to receive a discount on their purchase; small retailers as product users and sales people who generate modest sales

to friends and family; and distributors who are actively developing a business with the intention of qualifying to become a supervisor. *We did not include the percentages from the 2011 Form 10-K in our more recent filings because we do not view the information as valuable to the business or to investors.* For complete transparency, however, the full year 2011 information is as follows:

> • *Discount buyers were 27 percent (distributors who receive a 25 percent discount);*

> • *Small retailers were 61 percent (distributors who receive a 35 percent discount);*

> • *Potential supervisors were 12 percent (distributors who receive a 42 percent discount).*

54.     The previously emphasized statements were materially false and misleading.

55.     As part of its investigation, Pershing Square endeavored to find out how much people were actually paying for Herbalife's products.  To do so, they engaged a third party research firm to shoulder the massive burden of analyzing 40,000 Formula 1 sales on eBay in the preceding five years.  The results were stunning: the 750 gram canister of Formula 1 sold for an average of $25 (a 32% discount to the $37 SRP), while the 550 gram Formula 1 canister sold for a 38% discount.[34]   Niteworks, in comparison, sold for a 50% discount on eBay.[35] Importantly, meanwhile, competitors' products, such as GNC's Lean Shake, sold for a premium on eBay.[36]

56.     It makes no economic sense for an individual to sign up as an Herbalife distributor, Pershing Square explained, to simply consume products:

> OK, so Herbalife says the majority of distributors signed up on a discount buyers. They just like the product and [INAUDIBLE] the majority of the distributors are discount buyers and so they become

---

[34] *Millionaire* Slide 107.

[35] *Millionaire* Slides 106-108.

[36] *Millionaire* Slide 109.

distributors and [INAUDIBLE] Herbalife products at minimum discount of 25 percent.

But why would anyone pay $55 to get a 25 percent discount on [INAUDIBLE] when those products are widely available online for discounts of 35 percent or more?[37]

57.     Far from purchasing for just personal consumption, Pershing Square revealed that the majority of Herbalife discount buyers are, in fact, failed distributors.[38]   Corroborating Pershing Square's stunning conclusion is the internal April 2011 study that Actionable Research conducted for Herbalife (discussed below) which shows that only 17% of distributors joined to purchase Herbalife products at discounted prices.

58.     Further, the very fact that Einhorn questioned Herbalife why it did not break out its distributors in 2011 – after having done so every year since 2004 – shows that the statistic is material to investors.  The materiality of this statistic is additionally buttressed by the fact that, on June 5, 2012, the SEC sent a comment letter to Michael Johnson echoing Einhorn's question and requiring the Company to explain why it thought these statistics were immaterial.[39]

59.     On the one hand, Defendants are seemingly unable to harness the massive quantities of data they proclaim to have to indicate what percentage of sales are outside the distribution network; and on the other hand, they are able to represent to investors that 90% of distributors do not resell the products.  Further, in every Form 10-K filed between 2007 and 2010, they are able to group their distributors into sales leaders, discount buyers, small retailers and potential sales

--------------------------------

[37] *Millionaire* Tr. at 15.

[38] *Millionaire* Slide 122.

[39] Letter from John Reynolds to Michael O. Johnson, dated June 5, 2012, http://www.sec.gov/Archives/edgar/data/1180262/000000000012029157/filename1.pdf (last accessed May 8, 2015).

leaders,[40] yet they indicate they are unable to access the kind of data that would allow them to perform that type of segmentation.

60.    Rather than simply revealing the information they are required by law to keep, or could easily obtain by virtue of the distributor agreements and other technology which places this information at Herbalife's fingertips, Herbalife has resorted to commissioning multiple costly research "surveys" which are inconsistent with their previous publicly-issued statements, inconsistent with each other, and inconsistent with secret internal documents.

61.    For example, in early 2012, Herbalife hired Lieberman Research to conduct a study of its distributors and prepare a report (the "Lieberman Report"). While the full Lieberman Report was never fully released to the public, its methodology was summarized at Herbalife's Investor Day presentation on January 10, 2013.[41]   This summary allowed *The New York Times* to observe that "[t]he study was not based on Herbalife's actual sales data.    Instead, Lieberman extrapolated from an Internet survey that the company had more than six million customers."[42]   The Lieberman Report concluded that:

a.    92% of consumers that purchased Herbalife product in the preceding three months were non-distributors;

b.    73% of former distributors joined for product discounts;

---

[40] *See* 2007 Form 10-K at 6, 2007 Form 10-K/A at 4, 2008 Form 10-K at 5, 2009 Form 10-K at 5, 2010 Form 10-K at 5.

[41]    Herbalife,    "Investor    Day    Presentation"    (January    10,    2013) http://files.shareholder.com/downloads/ABEA-48ZAJ9/2270072295x0x627448/ e3de3984-4dff-4ca3-90a1-a1c1cafecb4e/Herbalife_Investor_Day_Presentation_- _01.10.13.pdf (last accessed May 8, 2015).

[42] *The New York Times*, "Seeking a Company's Elusive Sales Data" (February 4, 2013), http://dealbook.nytimes.com/2013/02/04/seeking-a-companys-elusive-sales- data/ (last accessed May 8, 2015).

c.   Nearly half (44%) of all distributors had no earnings expectations when joining Herbalife

62.   On June 11, 2013, Herbalife released the results of another study, conducted by Nielsen Research during April and May of 2013 (the "Nielsen Report").  The Nielson Report found that 87% of consumers were not Herbalife distributors.

63.   Importantly, the results of the Lieberman Report and the Nielsen Report contradict each other.  Key parameters and findings of the Lieberman Report included that 5% of adults purchased an Herbalife product within the prior three months, which was based from a survey of 2,000 interviews conducted; meanwhile, the key parameters and results of the Nielsen Report include that 3.3% of adults purchased an Herbalife product within the prior three months, which was based from a survey of 10,525 interviews conducted.  At the 95% confidence level (which is the accepted standard in survey research), the Lieberman Report estimate of 5% has a margin of error of +/- 0.96%.  That means that with 95% certainty, Lieberman estimates the range for the true population proportion to be between 4.04% and 5.96%.  At the 95% confidence level, the Nielsen Report estimate of 3.3% has a margin of error of +/- 0.34%. That means that with 95% certainty, Nielsen estimates the range for the true population proportion to be between 2.96% and 3.64%.  The results contradict each other because the ranges do not overlap.

64.   Herbalife's commissioned reports directly contradict data gathered by the Direct Selling Association, an industry public relations and lobbying group of which Herbalife is a member.  According to statistics published by the DSA, 36%

of sellers began selling to make extra income, while only 29% joined to get products at a discount.[43]

65.    Most incriminating of all, however, is an internal Herbalife Former Distributor Study conducted by Actionable Research, dated April 2011, that directly contradicts the Lieberman Report and the Nielsen Report.[44]  Significantly, the Actionable report reveals that:

a.    44% of former distributors joined Herbalife to supplement their income, while only 17% joined to purchase product at a discounted price:



**Most former distributors joined Herbalife to supplement their income.**

Reason for Becoming an Herbalife Distributor

| Reason | Percentage |
| --- | --- |
| To supplement your household income | 44% |
| To purchase product for yourself at a discounted price | 17% |
| Needed a job | 13% |
| Saw the opportunity for high income | 10% |
| To become your own boss - job freedom | 10% |
| Other | 6% |

April 2011                    Herbalife Former Distributor Study                    6

---

[43]    Direct Selling Association, "A Few interesting Stats" http://www.directselling411.com/for-sellers/myths-facts/a-few-interesting-stats/ (last accessed May 8, 2015).

[44] This study was first made public on January 26, 2015. *Seeking Alpha*, "Leaked Internal Herbalife Survey Gives FTC More 'Actionable' Results" (January 26, 2015)    http://seekingalpha.com/article/2848956-leaked-internal-herbalife-survey-gives-ftc-more-actionable-results (last accessed May 8, 2015).

1           b.    78% of the distributors were "active in the business," meaning they were attempting to sell product and/or recruit new distributors, and these "active" distributors, 74% worked more than 20 hours per week being "active":




c.    There was no correlation between hours worked and the prospect of converting customers.[45]

66.    As detailed in Section IV.A.1, Defendants are required by virtue of the Permanent Injunction to keep records on various metrics, including sales to consumers outside of the distribution base. Defendants have provided materially different answers to the same basic question regarding tracking retail sales, and

_____

[45] This study was first made public on January 26, 2015. *Seeking Alpha*, "Leaked Internal Herbalife Survey Gives FTC More 'Actionable' Results" (January 26, 2015) http://seekingalpha.com/article/2848956-leaked-internal-herbalife-survey-gives-ftc-more-actionable-results (last accessed May 8, 2015).

have provided the public with information materially contradicting both industry norms and internal documents, indicating that either: (1) Johnson and Walsh are lying about the amount of retail sales outside the distribution network because the true number demonstrates that there is little genuine retail demand for Herbalife's overpriced commodity product; or (2) Herbalife at Johnson's direction is intentionally refusing (despite the legal requirement that Herbalife track sales) to obtain the necessary information.

### 4. Loss Causation: May 1 and May 2, 2012: Herbalife's Partially Corrective Disclosures Send the Stock Tumbling

67. Herbalife's answers to Einhorn's May 1 questions, in addition to the Company's regulatory filing the next day, constitute partially corrective disclosures. The events of May 1 constitute a partial disclosure because they revealed, for the first time, previously nonpublic information. Specifically, Herbalife could not distinguish between sales to distributors and sales to non-distributors. Consequently, Herbalife revealed that it was not, in fact, complying with the Permanent Injunction because it was not maintaining the required records even though it had the demonstrated ability to do so. Herbalife's May 1, 2012 answers to Einhorn's questions shocked the market with new, previously undisclosed nonpublic information. This was the direct and proximate cause of Herbalife's common stock price immediately plummeting $14.02 per share – or 19.94% – to close at $56.30. To analyze this price drop (along with the other corrective disclosures), Lead Plaintiff is submitting the Declaration of Zachary Nye, Ph.D., which is attached as Exhibit H (the "Nye Rep.").[46]

---

[46] Dr. Nye is exceptionally qualified to provide his expert opinion that the corrective disclosures alleged herein caused Herbalife's stock price to drop. His full qualifications and CV can be found in his Report.

68.     The media quickly attributed the stock price decline to the exchange between Einhorn and Herbalife.  *Business Insider* wrote:

> Herbalife . . . was a little more than 36 minutes into its conference call when the operator turned the call's second question over to David Einhorn of Greenlight Capital.

> Seconds later the stock would collapse nearly 20 percent, erasing about $2 billion in market cap.[47]

69.     *The Wall Street Journal* similarly observed that:

> Herbalife Ltd.'s typically mundane quarterly earnings call became more interesting when a noted U.S. hedge-fund manager pressed the maker of nutrition and weight-loss products for details on its financial reporting.

> Shares tumbled 20%, leaving company executives scrambling to defend the business Tuesday.

70.     The conference call began at 11:00 am EDT.  Einhorn began posing his questions at 11:36 EDT, which is the exact time that Herbalife stock began its steep decline.  Nye Rep. ¶¶9-11.  Indeed, an intra-day event study analysis confirms that Herbalife's responses to Einhorn's questions caused the price of Herbalife stock to plummet.  Nye Rep. ¶9, 11.  Overall, Herbalife stock plummeted 19.94% on May 1 to close at $56.30, on unusually heavy volume of over 30.7 million.

71.     The May 2 Form 8-K also constitute a corrective disclosure.  The 8K revealed, for the first time, previously nonpublic information.   Specifically, Defendants viewed compliance with the Permanent Injunction as irrelevant to investors.  The news on May 2, 2012 further directly and proximately hastened Herbalife's plummeting stock price.  Herbalife's stock price continued to plummet on May 2 and 3, to close down 6.39% to $52.70 on May 2 on unusually heavy

---

[47] *Business Insider*, "David Einhorn Singlehandedly Crushed a Stock Today by Asking These Questions" (May 1, 2012) http://www.businessinsider.com/david-einhorn-herbalife-2012-5 (last accessed May 8, 2015).

volume of 23,207,502, and down 12.33% to close at $46.20 on unusually heavy volume of 24,933,903 on May 3, 2012.

72. *Bloomberg* directly attributed the three-day slide to the Company's response to Einhorn's questions, stating that "Herbalife . . . posted a record three-day decline in New York trading after hedge-fund manager David Einhorn questioned the company's disclosures."[48]  An event study analysis confirms that the May 2 Form 8-K directly and proximately caused this price decline.  Nye Rep. ¶¶15-17, 22-23.  At the time, the May 2-3 drop was Herbalife's largest two-day drop in nearly a decade.

## B. Herbalife Distributors' Business and Income Opportunities

### 1. Background To False Statements Concerning Distributors' Business and Income Opportunities

73. Herbalife entices would-be distributors to buy into the program with exaggerated and extravagant promises of quick returns and a newfound luxurious lifestyle in order to add downline distributors to the pyramid.  Well aware that recruiting new distributors forms the heart of Herbalife's business model, Defendants misrepresent the business opportunity to both potential recruits at promotional events, and to investors by touting the strength of its recruiting program.

74. In fact, the Company's promotional materials and distributor presentations are replete with claims that Herbalife provides an opportunity to "be your own boss," "work from home," and "achieve financial freedom."  The Company targets vulnerable demographics and seduces them into the program with numerous misleading testimonials of rags-to-riches stories, immediate financial

---

[48] *Bloomberg*, "Three-Day Decline on Einhorn Query" (May 3, 2012), http://www.bloomberg.com/news/articles/2012-05-03/herbalife-posts-record-three-day-decline-on-einhorn-query (last accessed May 8, 2015).

turnarounds and unlimited business possibilities.  Herbalife's marketing materials are replete with countless examples of supposed testimonials such as:

- "In that first month we were able to save our home. Herbalife saved us from bankruptcy."

- "Thanks to the income opportunity offered by Herbalife, we paid back all our creditors."

- "Within a year of doing business together, we were debt-free and saving money."

- "If I can do it, anybody can.  I only have a high-school education and no business background."

- "I could make like $200 daily and being an Herbalife supervisor, I could make $10,000 to $20,000 monthly."

- "Our income hit $350,000 and our second year, I turned 30 and Miko turned 25 and our income hit $1.1 million."

- "We had become millionaires."

75.    Herbalife also boasts that recruits can attain this level of lifestyle with comparatively easy commitment on the part of a potential distributor.  For instance, in the Company's promotional materials, Herbalife is described as a "fantastic business opportunity" to "be your own boss," that the program is "flexible to fit with your life," has "minimal start-up costs" and requires "no previous experience."[49]  The mantra is compelling: "Anyone can do it!"[50]

76.    The only problem is that it was all completely false.  Chairman's Club member Stephan Gratziani, for example, was caught on video admitting:

_____

[49] Herbalife Opportunity Meeting at 17, 18,  http://factsaboutherbalife.com/media/ 2012/12/Anonymous-UK-Distributor-Presentation-2009-2.pdf (last accessed May 8, 2015).

[50] *Id.*

> We sell people on a dream business, that they can make it. Yet deep down inside, what do we really know? Yeah, We know that the reality is that most of them aren't going to make it.[51]

77.     Defendants are well-aware of the exaggerated and false promises which are used to recruit potential members.  Herbalife frequently spotlights the rags to riches stories of its prominent (and infamous) Founder's Circle and Chairman's Club members. On  January 5, 2007 guidance call, Defendant Johnson explained why:

> [O]ur Chairman's Club who are the real, real go-getters, the real leaders, the people who take the stage, who lead the parade in this company, who are the heavily inspiring, motivating people who have highly aspirational folks.  We will be on the phone with them in two hours to go through this in more depth with more decisions this year as we have got to do. ***They will give us a ton of input*** and say, here is what you need to do and here is the support we need to integrate the market.  Yeah, and together and this will also be be because these are global leaders.

78.     Chairman's Club member Doran Andry, for example, boasted that "[y]ou know, it's really amazing.  I step out of the Ferrari, the Bentley, or whatever, and people go – 'what does that guy do for a living?' – and I go, 'I'm an Herbalife independent distributor,' and people are absolutely amazed."[52]  Andry would often travel around the country on behalf of Herbalife bragging of his own success and assuring others that they too could live the exorbitant lifestyle that he

---

[51] *Seeking Alpha*, "Leaked Internal Herbalife Survey Gives FTC More 'Actionable' Results" (January 26, 2015), http://seekingalpha.com/article/2848956-leaked-internal-herbalife-survey-gives-ftc-more-actionable-results (last accessed May 8, 2015).

[52] Doran Andry's statement was featured in an April 2014 ABC News undercover investigation. *See ABC News*, "Herbalife, Ackman Respond to 'Nightline' Undercover Report" (April 24, 2014) http://abcnews.go.com/Blotter/herbalife-ackman-respond-nightline-undercover-report/story?id=23457777 (last accessed May 8, 2015).  *The Atlantic* described Andry's promotional claims of his income "unrealistic."  *The Atlantic*, "Is Herbalife a Pyramid Scheme?" (June 2014) http://www.theatlantic.com/magazine/archive/2014/06/wall-streets-6-billion-mystery/361624/ (last accessed May 8, 2015).

was showing off.  At a training conference in Chicago, for example, his 80-slide presentation included photos of his $30 million oceanfront mansion, a garage full of cars that included a Rolls Royce, a Bentley and a Ferrari, and photos from lavish vacations that he and his family have taken through Europe, Asia and Africa.[53] Andry has also told prospective distributors that, by following his system, in 10 years a distributor could have 27,475 Nutrition Clubs operating in his downline, annual revenue of nearly $1.4 billion, and net annual income of $55.8 million.[54]

79.    Andry is far from the only distributor who flaunts his success and dreams of lavish lifestyles for Herbalife.  For example:

a.    Chairman's Club Member and current Board member John Tartol has asked "[h]ow many of you would like to make at least a million dollars a year? Every extra million dollars, I find, comes in handy.  2 million? 5 million?"[55]

b.    President's Team Member Michael Burton has bragged that "[j]ust after six months in the business, our income was over $6,000 a month.  And by the eleventh month in the business, we were over $12,000 a month. . . . After sixteen months in the business, we were over $25,000 a month. And that number's staggering—the type of lifestyle you can have with that income. And since then, the income's doubled, tripled, quadrupled. It's just been absolutely exciting. And over the last nine years, we have

---

[53] Doran Andry, "Nutrition Club Vision," http://factsaboutherbalife.com/media/2012/12/Doran_Chicago_Training_Sat_Final.pdf (last accessed May 8, 2015).

[54] Letter from David Klafter to Pamela Jones Harbour dated November 6, 2014, at 14, http://www.factsaboutherbalife.com/media/2014/11/Letter_to_Pamela_Jones_Harbour11.6.14.pdf (last accessed May 8, 2015).

[55] John Tartol, Herbalife 2012 Summit at 4:00 - 4:13, http://www.herbalifepyramidscheme.com/es/perpetrators/john-tartol/ (last accessed May 8, 2015).

made millions, we have been paid millions of dollars for doing this business. And what I know, you could have the same opportunity as we had."  Burton later declared personal bankruptcy.[56]

       c.     Maurice and Sandra Smith, two Executive President's Team members, tell of a similar story.  In a promotional video Maurice Smith states that before Herbalife, "I felt like I was going to die before I ever had a chance to live my life.  And you may be feeling that way too."[57]  Once a factory worker, a presentation featuring their story boasts that they now enjoy life in a home with a "Penthouse Suite bigger than first apartment," three luxury cars in the driveway, and vacations to exotic foreign locations.[58] Herbalife has repeatedly honored them in the *Herbalife Today* magazine, including in 1999, 2001 (for qualifying for the Millionaire Team), 2005 (for qualifying for the President's Team), and in 2011 (for achieving 1 million lifetime volume points).[59]

---

[56]  Herbalife Recruiting Video, Global Home Business Systems 1:40–2:46, *available at* http://www.herbalifepyramidscheme.com/perpetrators/michael-burton/ (accessible by clicking on the link https://vimeo.com/91648899).

[57]  Herbalife Recruiting Video, Total Business Machine at 3:05-4:15, *available at* http://www.herbalifepyramidscheme.com/perpetrators/maurice-sandra-smith/ (accessible by clinking on the link https://vimeo.com/106532209 (last accessed May 8, 2025).

[58] *Total Business Machine Presentation*, "Executive President's Team Members Maurice & Sandra Smith," http://www.herbalifepyramidscheme.com/ media/2014/09/Smith-Exhibit-K.ppt (last accessed May 8, 2015).

[59]  Untitled, http://www.herbalifepyramidscheme.com/media/2014/09/Smith-Exhibit-P.pdf (last accessed May 8, 2015); *Business Today* at 13, *available at* http://www.herbalifepyramidscheme.com/media/2014/09/Smith-Exhibit-Q.pdf (last accessed May 8, 2015); *Herbalife Today* at 27, *available at* http://www.herbalifepyramidscheme.com/media/2014/09/Smith-Exhibit-R.pdf (last accessed May 8, 2015); and *Herbalife Today* at 41, *available at*

d.      Chairman's Club member Stephan Gratziani, who has admitted that "[t]he Herbalife business model, at this point in time, is not based on customers purchasing, it's based on distributors purchasing volume,"[60] stated that "[t]oday, I, you know, live a lifestyle that I never could have thought possible.  I got to see more things than you could have ever imagined possible. Recently, I took my daughter to Washington D.C. She had a chance to walk out on the field with David Villa and F.C. Barcelona in front of 88,000 people.  Where can kids have that experience?  It's only with Herbalife."[61] Gratziani, who has been exposed in the media as discussing deceptive recruiting practices to distributors and management has close ties to Defendant Johnson.  In addressing Gratziani, Defendant Johnson stated that "I know you well enough to know that you are on the climb my friend."[62]

80.      Herbalife would often tout the unrealistic success stories of these individuals (and others) in the *Herbalife Today* magazine.  Pershing Square has

http://www.herbalifepyramidscheme.com/media/2014/09/Smith-Exhibit-S.pdf (last accessed May 8, 2015).

[60] *Business Insider*, "Here's A Leaked Herbalife Video That Bill Ackman Says Captured Deceptive Practices" (December 17, 2014) http://www.businessinsider .com/video-of-herbalife-distributor-gratziani-2014-12 (last accessed May 8, 2014) Additional statements made by Gratziani include: "We tell people, hey, you know, sign on the dotted line, you know, start working from home, it's going to be unbelievable, you're going to have this incredible life. . . . So there really is this situation or this level of inauthenticity that's there" (Video 2, 8:28) and "Who wants to bring their family into a struggle to make it? Who wants to bring their family into an eventual deception?" (Video 2, 7:20).

[61] http://www.factsaboutherbalife.com/stephan-gratziani-chairmans-club-member-profile/ Gratziani's comment begins roughly at 5:30.

[62] *See*   http://www.factsaboutherbalife.com/stephan-gratziani-chairmans-club-member-profile/.

found that, between 1997 and 2004, *Herbalife Today* featured about 393 of these income testimonials. Taken together, the testimonials implied an average annual income of $178,000 per year (which, Pershing Square would later disclose, a distributor would only have a chance of 1 in 5,000 of attaining).

81. In addition to using its distributors' outlandish stories and lifestyles as evidence of purported success, and as Johnson's January 5, 2007 comment suggests, there is also a revolving door of personnel between top distributors and management. Doran Andry's brother, Donte Andry, sits on the Strategy and Planning Committee and the Product Committee for Herbalife North America.[63] The connections, however, run far deeper than that. Former distributors Pedro Cardoso and John Tartol currently serve on the Company's Board of Directors, while distributors-turned-directors Leon Waisbein and Leslie Stanford resigned from the Board in 2009 and 2005, respectively:

    a. Herbalife has described Cardoso as a "direct collaborator of CEO Michael Johnson."[64] According to Reuters, prosecutors in Brazil have charged Cardoso in connection for money laundering in connection with a scheme that embezzled $10.4 million from the Espirito Santo state government.[65] If convicted, Cardoso faces up to 10 years in prison.[66]

---

[63] http://cmwellnessworks.com/about-us/meet-the-team/donte-andry.

[64] http://www.herbalifepyramidscheme.com/media/2014/12/Exhibit-Z1.pdf. The original Portuguese is "colaborador direto do CEO Michael Johnson."

[65] *Reuters*, "Herbalife board member a target in long-running Brazilian fraud case" (November 13, 2014) http://www.reuters.com/article/2014/11/13/us-herbalife-cardoso-idUSKCN0IX2K620141113 (last accessed May 8, 2014). Prior to publication of this story, Reuters noted that this issue "has never been mentioned in Herbalife public disclosures."

[66] *Id.*

b.     Tartol has appeared at Herbalife-sponsored events as recently as December 2013, when he spoke on the Chairman's Club Tour at events in Las Cruces and Orange County.   Defendant Johnson recalls that when he first became CEO, Tartol was "personally training" him.[67]   In 2009 and 2010, Herbalife counted Tartol among its Top 10 distributors in the world.

c.     Waisbein was also among the Company's Top 10 distributors those years.   Even after his 2009 resignation, however, he continued to speak on behalf of Herbalife, including at the 2010 Sun City Extravaganza and at a 2010 "retreat" in Malta where his presentation was entitled *How to get to President's Team?*

d.     Stanford is a Founders' Club member who served on the Board from 2002 to 2005.   Similarly to Waisbein, she continues to appear at promotional events for the Company, most recently in December 2013 in Montreal and in Toronto.

### 2.     False And Misleading Statements Concerning Distributors' Income and Lifestyle Opportunities

82.     Throughout the Class Period, Defendants repeatedly made false and misleading statements, and omitted to state material facts, regarding the income, business and lifestyle opportunities available to Herbalife distributors.

83.     Herbalife regularly boasted of its distributors' near-assured prospects of financial success to the investing public in its annual filings.   Describing its business, the Company falsely stated:

> **We are focused on building and maintaining our distributor network by offering financially rewarding and flexible career opportunities through sales** of quality, innovative and efficacious products to health conscious consumers.   We believe the income

---

[67] *Herbalife Today*, "An interview with CEO Michael O. Johnson at 6 http://herbalifepyramidscheme.com/media/2014/02/JTExhibit-M.pdf (last accessed May 8, 2015).

opportunity provided by our network marketing program appeals to a broad cross-section of people throughout the world, particularly those seeking to supplement family income, start a home business or pursue entrepreneurial, full or part-time, employment opportunities. Our distributors, who are independent contractors, can profit from selling our products and can also earn royalties and bonuses on sales made by the other distributors whom they recruit to join their sales organizations.[68]

84.     The Company also falsely described the income, business and lifestyle opportunities available to distributors when discussing its Network Marketing Program, stating:

In addition to helping our distributors achieve their goals of health and wellness through use of our products, *we offer our distributors, who are independent contractors, attractive income opportunities.* Distributors may earn income on their own sales and can also earn royalties and bonuses on sales made by the distributors in their sales organizations. We believe that our products are particularly well-suited to the network marketing distribution channel because sales of weight management and health and wellness products are strengthened by ongoing personal contact and coaching between retail consumers and distributors. We believe our continued commitment to developing innovative, science-based products will enhance our ability to attract new distributors as well as increase the productivity and retention of existing distributors. Furthermore, our international sponsorship program, which permits distributors to sponsor distributors in other countries where we are licensed to do business and where we have obtained required product approvals, provides a significant advantage to our distributors in developing and growing their businesses.[69]

85.     Herbalife continued to peddle these illusory income opportunities whenever it could on quarterly earnings calls and during conference presentations. During the November 1, 2011 Q3 2011 earnings call the following exchange occurred between an analyst and President Des Walsh, during which Walsh falsely stated:

Q. You have talked a lot about distributor engagement and the increase in the active – average active associates that our leaders. Do

---

[68] *See* 2010 Form 10-K at 5; 2011 Form 10-K at 5.

[69] *See* 2010 Form 10-K at 11; 2011 Form 10-K at 12.

you have a sense of what that's doing to incomes across the range of your distributors? Is part of this, I assume it is kind of obvious, but part of the distributor engagement is people are making a lot more money.

A. [Des Walsh] I don't know that we've got an exact number on that, but there certainly is a correlation because obviously what we see when you've got an increased number of sales leaders is that's driven by the fact of having a stronger customer base ordering more regularly.  And so effectively it is an indication *that we've got people building a long-term sustainable income and of course, the critical part of that . . . is that the results in increased movement up the marketing plan.  So I think you've got a combination of factors, more activity, more customers moving up the marketing plan and that combination then converts into a higher income*.

86.     During the April 24, 2012 Barclays Capital Retail and Restaurants Conference, an analyst again questioned distributors' income opportunities.  The following exchange took place between Senior VP of North America Ibi Fleming and Senior VP of Investor Relations Amy Greene, during which they falsely stated:

Q. Can you talk about an average distributor just how much does that person make, like what kind of – I [don't even have] a ballpark to that?

A. [Fleming] *That's a very difficult question*, because does that distributor work part time, do they work full time? How long they've been in the business? How many customers do they have? So, there's really not –

A. [Greene] What level they're at?

Q. Like top decile?

A. [Fleming] The top decile, I mean, when you start looking at our Chairman – our President [inaudible] certainly they are looking – the President's team members are making six, well under six digits, whereas if you have a new distributor that's six months into working part-time in a nutrition club, if they have – it depends on how many customers that they have coming in that are paying membership fees and how much much tack-on product as they are growing their customer base, how are they – what their sell through is, is that really going to depend – *that really depends – that's a very difficult question to answer, sorry*.

87.     During the May 23, 3012 Citi Global Consumer Conference, CFO John DeSimone falsely told investors that in order to properly calculate

distributors' earnings opportunities, non-sales leaders should be taken into account. Referencing the following presentation slide, DeSimone falsely stated:



[W]hen media and investors over the last couple of weeks have determined the earnings opportunities for distributors, that left bar, the bigger bar [representing non-sales leaders] has been left off. Yet on the prior page, that 82% of the distributors who are single-level are only eligible for that left bar, not for the right bar [representing sales leaders with multi-level earnings opportunity]. So the numerator that is being used has been wrong and the denominator that is being used has been wrong. ***So it comes up with a distorted calculation***.

88.     The previously emphasized statements were materially false and misleading.

89.     Stephen Gratziani, who as a Chairman's Club member had the ear of Herbalife's top executives, admitted to "sell[ing] people on a dream business" while "know[ing] deep down inside that most of them aren't going to make it."

Executives did not need Gratziani to tell them of that fact, however. They had first-hand access to distributor earnings due to the Company's Oracle database systems that gave "daily sales updates" on "dozens of metrics on each distributor" and "the whole lineage of a distributor that has a downline." Thus, they would know that many of the top distributors' income comes not from product sales, but from illicit lead generation recruiting practices. This included Doran Andry, a co-defendant with Herbalife in *Jacobs v. Herbalife Int'l, Inc.*, Case No. CA-02-1431 (C.D. Cal.), where they were sued for deceptive practices regarding lead generation[70] and Shawn Dahl, who Defendant Johnson described as an example of Herbalife's "wonderful culture," – and who was heir to a company whose identical predecessor was found to be a "criminal 'scheme of pyramid selling'" by a Canadian federal court in 2004.[71]

90.    Pershing Square's *Millionaire* Presentation, which was based in part upon non-public Herbalife distributor documents,[72] confirmed that the overwhelmingly vast majority of Herbalife distributors lose money. Pershing Square revealed the massive imbalance of the millions of distributors on the bottom of the ladder compared with the small handful of those on top:

---

[70] Lead generation is an illicit practice that Herbalife and its top distributors engaged in starting in 2001. Distributors would advertise, for example, "work from home" opportunities and then sell those names who responded – the leads – to others for up to $130 each. Distributors known to have used lead generation or similar recurring systems include (but are not necessarily limited to): Shawn Dahl, Doran Andry, Leslie Stanford, John Tartol, Dan Waldron, and Rick and Carla Berg.

[71] *The Globe and Mail*, "Herbalife kept links to Canadian Pyramid Scheme for a decade" (August 15, 2013), http://www.theglobeandmail.com/report-on-business/herbalife-kept-links-to-canadian-pyramid-scheme-for-a-decade/article13789659/ (last accessed May 8, 2015).

[72] *Millionaire* Slide 190, "Manual de entremiento para Distribuidores Herbalife (Buenos Aires, 2001).



91. While these "millions of people" constituted the bulk of Herbalife distributors, they also made up the vast minority of those making any income from distributing Herbalife products.   Pershing Square exposed the stunning fact that 93% of Herbalife distributors make no money at all:

> And a *de minimus* fraction of Herbalife distributors earn enough to achieve the wealth and lifestyle in the [Doran Andry] video that you watched there so only the top 0.04 percent, one in about 2,500 of Herbalife distributors, even earn $300,000 or $336,000 a year and we based off these numbers on their U.S. compensation disclosure so other people around the world are less or even lower.

> What I particularly like is the millionaire team, that is the name that Herbalife has given this level, median income $97,000 a year before expenses.   It's going to take a few years before you become a millionaire.

> ***And then at the bottom of the pyramid, 93 percent of distributors earn no gross compensation as the company defines it***.

OK so this is a more visual way of presenting the same data and I think what is relevant to note here is the top one percent of Herbalife distributors and you know, ***you have to be in the top one percent to be earning $6,000 you know[73] somewhere around there a year in commissions before expenses***.

92.    Pershing Square then revealed that even Herbalife's disclosure of distributor earnings was misleading because it entirely excluded a whole category of distributors.  Ackman explained:

Herbalife leaves off 93 percent of the people who become distributors. They vanish, OK? How do they do this?

Well, first they remove what they call inactive sales leaders. These are people who make nothing. So the people that fail, they don't include in their so-called "disclosure chart". Ninety-three percent of the people are off the chart. ***They don't tell you this. You have to figure this out***.[74]

## Deception #1:
## 93% of Distributors Excluded from the Table

**Herbalife excludes from the table the 93% of its U.S. distributor base earning $0 in "Gross Compensation" (Inactive Sales Leaders and Non-Sales Leaders)**

| Active Leaders | | | | % of Total Distributors |
|---|---|---|---|---|
| Earning Level | % of Total Leaders | % of Active Leaders | Average Earnings (USD) | |
| President's Team | 0.2% | 0.6% | $ 515,689 | 0.04% |
| Millionaire Team | 0.7% | 1.7% | $ 100,195 | 0.1% |
| GET | 2.6% | 6.5% | $ 22,766 | 0.5% |
| World Team | 2.9% | 7.3% | $ 6,224 | 0.5% |
| Supervisor | 33.1% | 83.9% | $ 901 | 5.9% |
| Total | 39.4% | 100.0% | $ 7,348 | 7.0% |
| Inactive Sales Leaders  60.6% | | | $ 0 [(1)] | 10.7% |
| Non-Sales Leaders | | | $ 0 | 82.3% |
| | | | | 100.0% |

(1)  Per the Company's disclosure, Inactive Sales Leader must not be earning any Royalty Overrides [(39.4%)*($7,348) = $2,900; which implies Inactive Supervisors "Gross Compensation" must be $0].

180

---

[73] *Millionaire* Tr. at 10.

[74] *Millionaire* Tr. at 24.

93.     Further demonstrating the falsity of the Company's claims of lavish lifestyles, Herbalife did not disclose "gross income" until July 25, 2012; prior to that date, Herbalife disclosed only active leaders' "average earnings."[75]  Ackman credits Einhorn's May 1, 2012 questions for this revision.  The "gross income" figures are still misleading, however, because they fail to disclose that Pershing Square's investigation found that, across 8,800 distributors, the average expenses of a Sales Leader were approximately $10,000.[76]  Thus, even a World Team distributor, whose gross median compensation is $5,659 per year according to Herbalife, would lose over $4,000 a year due to undisclosed expenses.[77]

94.     Moreover, Pershing Square found that there was essentially no turnover among the higher ranks of distributors, thus making upward progress and the attainment of financial freedom a near impossibility.  Herbalife only retained 25% of its new sales leaders (one of the lowest rungs on the ladder), but 99% of its Millionaire Team (where the median annual compensation is $97,303) and 100% of its President's Team and Chairman's Club (where the median compensation is higher).[78]  From 2004 through 2009, only one new President's Team member was created for every 10,000 new distributors, while the odds of making it to the Millionaire Team – which would allow a new distributor to earn an amount commensurate with Herbalife's testimonial earnings claims (~178k) – is 1 in 5,000.[79]

---

[75] *Millionaire* Tr. at 24-27.

[76] *Jacobs v. Herbalife Int'l, Inc.*, Case No. CV-02-1431 (C.D. Cal.), *Millionaire* Slide 184.

[77] *Millionaire* Slides 74 184.

[78] *Millionaire* Slides 74, 193.

[79] *Millionaire* Slides 194, 197.

95.     When distributors did make money, they made it from recruiting other distributors, not from selling Herbalife products.   In fact, Pershing Square's analysis revealed that distributors can earn over 10 times as much from recruitment as they do by selling Herbalife products.[80]

## C.     The Price Of Herbalife Products

### 1.     Background To False Statements Concerning Product Pricing

96.     Herbalife distributors, of course, are expected to sell Herbalife's products. To do so, however, they are at a severe competitive disadvantage with respect to competitors such as GNC or Slim Fast.   Most notably, Herbalife products are not sold in stores because they can only be purchased through independent distributors.   In contrast, other nutritional powders are readily available in brick and mortar stores such as vitamin and supplement stores, pharmacies, grocery stores and other major retailers.

97.     Formula 1 also lacks a "ready-to-drink" offering, which would hinder immediate sales as compared to the plethora of other nutritional drinks targeted for the same consumer purpose.   Accordingly, Formula 1 does not face limited competition, but rather a multitude of other offerings.   Even more puzzling, Formula 1 costs nearly *three times* as much ($2.87 per 200 calorie serving) as comparable products such as Ensure ($1.03) or Slim-Fast ($1.04), and nearly twice as much as Lean Shake ($1.74).[81]

98.     Herbalife's other products are also priced at points significantly higher than its well-known competition.   For instance, the Company purportedly sells its multivitamin offering at an astounding price of $0.26 per tablet.   In

---

[80] *Millionaire* Exec. Summary at 1; *Millionaire* Tr. at 19.

[81] *Millionaire* Slide 16.

comparison, Centrum is sold at an average price of $0.06 per tablet, One-A-Day at $0.08 per tablet, Nature Made at $0.08 per tablet and GNC Ultra Mega Gold at $0.11 per tablet, for an overall average of $0.08 per tablet.  Similarly, Herbalife's Niteworks L-Arginine supplement purportedly retails at $3.37 per serving, while the average of its major competitors, which include GNC's offering, is a mere $1.22 per serving.

99.   Given the financial results attributed to Formula 1 despite these limitations, one would think that the product's success must be attributable to a massive advertising and/or research and development initiative.   However, Herbalife's budget for actual product advertising is minimal and the overall advertising of the Company is focused almost exclusively on its corporate name and logo, not its products.

100.   Similarly, Herbalife states in its 2011 annual report that its spending on R&D is "not material."[82]  In fact, while the Company stated in the past that it was the first to market and develop a nitric oxide product, those claims proved unfounded.[83]  Herbalife also has repeatedly boasted about its UCLA-led research efforts and has name-dropped this 440 times in SEC filings since its initial public offering in 2004, but has only donated approximately $1.5 million to the UCLA research lab and only a fraction for clinical studies.[84]

### 2.    False Statements Concerning Herbalife Product Pricing

101.   Throughout the Class Period, Defendants made false and misleading statements, and omitted to state material facts, regarding the pricing of Herbalife products.

---

[82] *See* 2011 Form 10-K at 11; *see also* 2012 Form 10-K at 103; 2013 Form 10-K at 103.

[83] *See Millionaire* Slides 34-37.

[84] *See Millionaire* Slide 43.

102.   During the 1Q 2011 earning call that took place on May 3, 2011, an analyst specifically questioned how Herbalife prices its meal replacement products to compete with traditional meals.   The following exchange took place, during which Walsh falsely stated:

> Q. How do we think about inflation and the relative value that your meal replacement shake has been for consumers versus a more standard meal in emerging markets? And maybe as part of that, have you taken your prices up on Formula 1, and do you have a sense of what's happening to the average club price point of a meal replacement?
>
> A. [Des Walsh] . . . ***Philosophically what we always want to do is ensure that our pricing remains consistent*** or a little bit less than inflation, ***and that we're always in a position to ensure that our products are competitive in the marketplace***.
>
> In relation to the clubs, obviously what the clubs have done is given us the ability to reach a much broader segment of the population to whom purchasing products on a monthly basis might not have been affordable in the past. And where we have modest price increases, those are passed on in the club for the most part, but again the philosophy is always to keep price increases generally at or slightly below inflation. That means ***we believe we will always continue to be price competitive in the marketplace***.

103.   The previously emphasized statements were materially false and misleading.

104.   Pershing Square revealed that, when compared to competitors such as Ensure, Slim Fast, and Lean Shake, Herbalife's flagship Formula 1 shake was anywhere between two to three times the price at the suggested real price."[85] Pershing Square also analyzed two other Herbalife products, its multivitamin and Niteworks supplement.   With respect to the multivitamin, Ackman revealed that "[a]gain, here they charge somewhere between three to four times the price of the competition, people I'm sure have heard of Centrum vitamins . . . the pills are three

---

[85] *Millionaire* Tr. at 3.

times as much."[86]   With respect to the Niteworks supplement, Ackman revealed that "[y]ou know, there are many other products in the market and it's commodity product, remarkably, they have a suggested retail price is three times the competition."[87]   Rule 24-C prohibits distributors from advertising prices "to persons who have not had prior personal contact with the Distributor in connection with the Herbalife product opportunity," which gives the misimpression that prices of Herbalife products on Amazon and eBay are suggested retail prices.

105.   Even Herbalife's "massively inflated"[88] product prices were themselves not the end of the story.  Pershing Square revealed that:

> Basically, if you are a distributor, if you are Maria, you don't pay $75 to get the $100 in product, you got to pay $82 because **Herbalife charges a 7% packaging and handling fee on every product that it sells** and packaging and handling fee is based off the $100 so the suggested retail price.

> * * *

> And **notably, this surcharge or packaging and handling fee is an addition to the shipping expense you have to pay which usually is about four percent of the suggested retail price of the products you order which is basically a markup to the cost it cost Herbalife to pay FedEx to send you that product** and unlike the shipping expense which varies based on how much product you sell or whether you pick it up from a distribution center, the surcharge is always applied and so we think the surcharge is just another name for price and we include it in the prices.

> And so in the United States, the surcharge is seven percent but **around the world, Herbalife has gotten more creative** and so this is -- the source -- you can get all these flyers from Google and this is **when they entered Paraguay, they had the seven percent packaging and handling charge, they also had a seven percent administrative charge**.[89]

---

[86] *Id.*

[87] *Id.*

[88] *Millionaire* Tr. at 6.

[89] *Millionaire* Tr. at 13.

1      106.   Relatedly, Pershing also revealed that Herbalife's shipping and
2   handling costs were not representative of the true costs of shipping the Company's
3   products, but rather were fictitious amounts that resulted in large profits for
4   Herbalife:

## Why Are Herbalife's Shipping & Handling <u>Costs</u> So Low?

☒ **<u>HLF has heavier products at a given price point:</u> Peers have significantly higher S&H costs despite selling products that are cheaper to ship**

☒ **<u>HLF has a limited company-operated manufacturing footprint</u>**

☒ **<u>HLF has fragmented distribution:</u> approximately 3 million independent distributors located in 84 countries** [1]

☒ **<u>HLF uses expensive outsourced shipping:</u> outsourced shipping through FedEx, a relatively expensive distribution form**

☒ **<u>HLF products have 'fast-moving' consumption patterns:</u> frequent shipments given customer base and move toward "everyday consumption"**

[1]   Source:  Herbalife FY 2012 Q3 10-Q.                                                                    306

**D.      Herbalife's Nutrition Clubs**

**1.      False Statements Concerning Nutrition Clubs**

22      107.   Throughout the Class Period, Defendants repeatedly made false and
23   misleading statements, and omitted to disclose material information, regarding
24   Herbalife's nutrition clubs.  Given the lack of true consumer demand for Herbalife
25   products combined with the demise of the deceptive lead generation practices,
26   Herbalife was forced to rely upon a new deceptive practice to find recruits which

led to "Nutrition Clubs" that are used in predominantly poor, Latino communities. For example, Walsh stated:

> The daily consumption model that has taken hold in some of our largest markets and it continues to expand into more of our existing markets everyday…***Nutrition clubs are now just one iteration of daily consumption business methods being successfully leveraged by Herbalife Distributors around the world.***[90]

108. Similarly, Johnson stated ***"[w]e believe that daily consumption business methods now generate approximately 40% of our volume."***[91]

109. During the September 7, 2011 Barclays Capital Back to School Consumer Conference, DeSimone falsely told investors:

> Well, I think some of the uniqueness of the Company lies in the distribution. I mean, the product category is a big category that we operate in. ***You're not going to like my answer on competition because strategically we view the competition as fast food. That drives the right behavior for our distributors. It is the steal a meal a day from fast food. It is not to go after other supplement companies. It's to go after McDonald's, to go after KFC.*** To find somebody who is already spending $4 or $5 on an unhealthy meal and spend a little less money and get a healthy meal. ***That's a replacement spend and that's who our competition is***.
>
> * * *
>
> . . . . [T]his is an important benefit, is the product [at nutrition clubs] is sold as a meal. As a meal, the spend becomes a replacement spend, not a discretionary spend. Supplements are generally considered a discretionary spend. So in difficult economic times, discretionary spend can be a challenge, but a replacement spend actually creates a value proposition for us. ***We look at the competition as being fast food. Try to get a consumer to move away from McDonald's and into Herbalife***. It costs less money and you get a better meal. That value proposition creates stickiness in the model.

---

[90] Q4 2010 earnings call (held Feb. 23, 2011). This comment, using substantially similar language, was repeated on the Q1 2011 earnings call (held May 3, 2011).

[91] Q2 2012 Earnings Conference Call (held July 31, 2012). Defendant Johnson also discusses how clubs make products more accessible to customers/consumers in substantially similar form in the Q3 2012 Earnings Conference Call (held Oct. 30, 2012) and Q1 2013 Earnings Conference Call (held Apr. 30, 2013).

110.   During the November 16, 2011 Morgan Stanley Global Consumer Conference, DeSimone falsely stated:

> We try to look, internalize with our distributors and management team, that **our real competitor is fast food.  Right?  We try to steal a meal a day from fast food**.

111.   During the March 8, 2012 Bank of America Merrill Lynch Consumer and Retail Conference, DeSimone falsely stated:

> **When you have a [nutrition] club, it's the equivalent of having a job**, it helps you know what to do to be successful.

112.   During the May 23, 2012 Citi Global Consumer Conference, DeSimone falsely told investors:

> **The selling proposition in a club is strategically position it against fast food**. So the objective is to find somebody who is already spending money on an unhealthy meal and have them come into the club and spend a little less on a healthy meal. So it is positioned as a cost savings. Right. Which I think means as -- there is more inflation in meat protein than there is in plant protein, which is what we use. So I think the selling proposition that exists today will probably continue to be enhanced based on the inflation that is expected.

113.   During the May 22, 2012 Janney Consumer Conference, DeSimone falsely told investors:

> [A]s Michael [Johnson] would say, we're making share in all the cases because **we're not just trying to take a meal replacement shake away from somebody who's already buying it.  We're trying to take it away from fast food**, people who haven't tried the product before

114.   The previously emphasized statements were materially false and misleading.

115.   Pershing Square revealed that, despite grandiose statements to the contrary, there is no possible way that the Nutrition Clubs could possibly compete with fast food.  Far from the active social centers portrayed to investors and in Herbalife marketing materials, Pershing Square's investigators spent a year undercover visiting clubs to reveal that clubs in Queens and Omaha resembled shuttered businesses or homes:









116.   Ackman then revealed the startling reasons for the state of the Nutrition Clubs:

> So if you look at those clubs, you'll notice **there's no exterior signage, no mention of Herbalife or its logo**. The windows are covered, you can't see inside. There's no advertising or promotion. **There's no depiction of a product**.

> When you think of McDonalds when you go buy, it's like a hamburger and it's like there's a price and so on. It can't tell whether the club is open or closed and the product is presented in a Styrofoam cup, OK. Why is that?

> Well, the rules for nutrition clubs, and again, these are all being on our website, but **if it is a residential nutrition club, you are not allowed to have exterior signage of any kind**. Imagine going into a business with a retail location and you can't let anyone in.

> **If it's not residential, you can have a sign but it can't imply that's a store, restaurant or retail location and doesn't invite product purchase. It can't say it has any relationship to Herbalife. It can't promote shakes or products which is what they're extensively selling here. And it can't state whether the club is open or closed**.

1
2
3

It goes on. No product or other promotional displays can be visible from the exterior. No advertising or attracting any traffic. You must cover the windows to ensure the interior of the club is not visible. You must not state, imply or suggest that any retail products are available for purchase. What are they actually doing in here?

4
5

And you can't charge a membership fee because, you know, people may not want to buy a product here but they might want to join the club. But you can only charge a fee to cover operating costs. You can't earn a retail process.

6

* * *

7
8
9

Now, imagine you operate a McDonalds. We actually know something about the fast food business and we're going to go into fast food business. Rule number one is no signage, so that big M thing, done, OK? No advertising or promotion, no.

10

Windows? You can't see any. These are same three products, they're all liquids to every customer to breakfast, lunch and dinner.

11
12

Open or closed sign, not allowed to attract customers or people who walk in, OK? It clearly don't have a drive thru. No sales of product or complimentary offerings.[92]

13

14

15

16

17

18

19

117.   Pershing Square's insight into the competitive fast food business is unique; during the Class Period, it owned a substantial stake in Burger King. Indeed, using data from Burger King, Ackman showed that any purported "competition" existed in the fantasies of Herbalife executives, as the exponential growth of the Nutrition Clubs did not negatively impact Burger King's sales. Importantly, this data compared Burger Kings and Nutrition Clubs in Mexico, the country which Herbalife regularly boasted was its crown jewel:[93]

20
21
22
23
24
25
26
27
28

---

[92] *Millionaire* Tr. at 38.

[93] *Millionaire* Tr. at 38-39.



### Despite What Seems to be Impressive Growth, Herbalife Doesn't Appear to be "Stealing Meals" from Fast Food

(1)  Source: Herbalife filings, Burger King. Represents Herbalife "Retail Sales."
(2)  Pershing Square estimates, per Herbalife filings, presentations, and transcripts.

294

**2.    Additional Information Is Revealed About The Nutrition Clubs Deceptive Practices Which Further Demonstrates Defendants' Knowledge of the Fraud**

118.   On July 22, 2014, Pershing held a webcast on its investigation into Herbalife's nutrition clubs, entitled *The Big Lie*.  Pershing's July 2014 presentation demonstrated the contradictory nature of Herbalife's nutrition club practices, including the fact that the Company claims the role of nutrition clubs is to promote daily consumption, yet the Company imposes onerous restrictions precluding retail sales and advertising, causing clubs to lose money on a retail basis.

119.   In actuality, the real purpose of nutrition clubs is recruitment, as clubs are used as free labor and training centers imposing unrealistic goals on unsuspecting, low-income and inexperienced individuals seeking a purportedly lucrative business opportunity.    Training programs, including Club 100,

Universidad del Exito and Herbalife's own Best of the Best, have exploited the club system through various methods, including: (i) deceptive income claims; (ii) deceiving "trainees" into believing they are 'investing' in an education with a valuable pay-off—a substantial cost in time and money for the trainee; (iii) demands of duplication for success; (iv) creating fake club traffic consisting of 'trainees' and their family members and friends who are required to consume and purchase shakes in order to "advance" within the program; (v) promoting inventory loading; and (vi) violating federal labor laws applicable to unpaid employees.[94]

120.  For example, Club 100 is one of the most prominent "training programs" in use by top Herbalife distributors.[95]  Club 100 originated in Mexico, and promises participants that if they complete the Club 100 training they will advance to the President's Team which purportedly pays half a million dollars a year for the rest of a member's life.[96]  President's Team members are the top thousand out of 3.9 million distributors.[97]  Club 100 requires trainees to visit other clubs and consume shakes and get a "stamp" proving their required attendance and consumption.  Trainees have to "learn" how to make shakes (which is as simple as combining formula and water) time and time again, and must pay for the cost of each shake or get people to consume them.  They must go on certification "tours" of upline distributors' facilities and while there, purchase shakes.  If a participant has paid enough into the system, they are allowed to take new recruits and show them "successful" clubs.

---

[94] *Big Lie* Slides 148-157.

[95] *Big Lie* Slides 182, 211.

[96] *Big Lie* Slide 86-88.

[97] *Big Lie* Presentation at 37:58.

121.   These clubs have "phantom and fictitious" customers, which create the illusion of a successful enterprise. The majority of the participants do not have any type of advanced or even basic education, and a formal "graduation" ceremony takes place for those who have fulfilled the requirements, which often takes years. Thus, Club 100 and the other systems which copy it create the impression that the "trainees" are genuine retail customers, and Herbalife generates substantial revenues from the mandatory consumption inherent in these "training" programs.

122.   Defendants have admitted that they closely monitor Distributor Methods of Operation ("DMOs") – that include nutrition clubs:

> In addition, new ideas and DMOs, are being generated in many of our regional markets and are globalized where applicable, through the combined efforts of distributors, country management or regional and corporate management. ***Examples of DMOs include the Club concept in Mexico***, Premium Herbalife Opportunity Meetings in Korea, the Healthy Breakfast concept in Russia, and the Internet/Sampling and Weight Loss Challenge in the U.S. ***Management's strategy is to review the applicability of expanding successful country initiatives throughout a region, and where appropriate, financially support the globalization of these initiatives***.[98]

123.   As Johnson explained during the 2Q 2012 earnings call, Herbalife attributed 40% of total sales volume to the Nutrition Clubs, and Pershing Square has calculated that the Nutrition Clubs' contribution margins may be in excess of 80% of operating income and earnings per share – both of which are vital to EBITDA.   Without this significant contribution from the Nutrition Clubs, Herbalife would be in breach of the 3.5x Maximum Consolidated Total Leverage Ratio covenant in its Credit Agreement.[99]

**E.   Herbalife's Purported Compliance With Laws And Regulations**

**1.   Background To False Statement Regarding Compliance**

---

[98] 2010 Form 10-K at 56.

[99] *Big Lie* Slide 231.

124.   Herbalife's distribution and sales plan are tightly constrained by numerous longstanding laws and regulations.  The core of these rules is Section 5 of the FTC Act, 15 U.S.C. § 45, which provides that "unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful."  The FTC describes this law as "[t]he basic consumer protection statute enforced by the Commission . . . ."[100]  Former CFO Rich Goudis acknowledged to investors that "[t]here's very strong FTC rules that we measure ourselves against . . . ."[101]

125.   In addition to statutes and regulations, case law also strictly confines the Company's operations.  Herbalife disclosed that:

> We also are subject to the risk of private party challenges to the legality of our network marketing program. . . . We believe that our network marketing program satisfies the standards set forth in the Omnitrition case and other applicable statutes and case law defining a legal network marketing system . . . .[102]

126.   The *Omnitrition* case, *Webster v. Omnitrition*, 79 F.3d 776 (9th Cir. 1996), held that Omnitrition was operating a pyramid scheme in violation of state

---

[100] https://www.ftc.gov/about-ftc/what-we-do/enforcement-authority.

[101] September 3, 2008 Goldman Sachs Global Retailing Conference.  Indeed, the FTC has warned the public that "[i]f the money you make is based on your sales to the public, it may be a legitimate multilevel marketing plan. If the money you make is based on the number of people you recruit and your sales to them, it's not. It's a pyramid scheme."  FTC, "Multilevel Marketing," https://www.ftc.gov/tips-advice/business-center/guidance/multilevel-marketing.  Similarly, the SEC was arned that one "hallmark[] of a pyramid scheme" is an "[e]mphasis on recruiting. If a program primarily focuses on recruiting others to join the program for a fee, it is likely a pyramid scheme.  Be skeptical if you will receive more compensation for recruiting others than for product sales."  SEC, "Beware of Pyramid Schemes Posting as Multi-Level Marketing Programs," http://www.sec.gov/investor/alerts/ia_pyramid.htm#.VA4Y7vldV8E.

[102] 2010 Form 10-K at 21.

and federal law.  *Omnitrition* quoted the FTC's so-called *Koscot* Test[103] it used to determine what constitutes a pyramid scheme:

> The Federal Trade Commission has established a test for determining what constitutes a pyramid scheme. Such contrivances
>
>> are characterized by the payment by participants of money to the company in return for which they receive (1) the right to sell a product and (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users.
>
> *Id.* (emphasis in original). ***The satisfaction of the second element of the Koscot test is the sine qua non of a pyramid scheme: "As is apparent, the presence of this second element, recruitment with rewards unrelated to product sales, is nothing more than an elaborate chain letter device in which individuals who pay a valuable consideration with the expectation of recouping it to some degree via recruitment are bound to be disappointed.*" *Id.* We adopt the Koscot standard here and hold that the operation of a pyramid scheme constitutes fraud for purposes of several federal antifraud statutes.[104]

127.   Recently, in *FTC v. BurnLounge, Inc.*, 753 F.3d 878 (9th Cir. 2014), the Ninth Circuit unanimously affirmed Judge Wu's finding that BurnLounge was a pyramid scheme[105] and extended *Omnitrition*, explaining that:

---

[103] The *Koscot* Test derives from *In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106, 1181 (1975), *aff'd mem. sub nom.*, *Turner v. F.T.C.*, 580 F.2d 701 (D.C. Cir. 1978).

[104] *Omnitrition*, 79 F.3d at 781-82.

[105] Notably, the Amended Final Judgment and Order for Permanent Injunction defined "prohibited marketing scheme" as "an illegal pyramid sales scheme . . . in which participants pay money or valuable consideration in return for which they obtain the right to receive rewards for recruiting other participants into the program, and those rewards are unrelated to the sale of products or services to ultimate users. For purposes of this definition, "sale of products or services to ultimate users" does not include sales to other participants or recruits or to the participants' own accounts." *FTC v. BurnLounge, Inc.*, Case No. CV 07-3654-GW (FMOx) (C.D. Cal.) Slip. Op. at 5 (March 1, 2012).

Satisfaction of the second prong of the *Omnitrition* test is "the *sine qua non* a pyramid scheme" and is characterized by "recruitment with rewards unrelated to product sales." In *Omnitrition*, this court found that a MLM business was a pyramid scheme because "[t]he mere structure of the scheme suggests that Omnitrition's focus was in promoting the *program* rather than selling *the products*." The FTC has explained that in a pyramid, "participants purchase the right to earn profits by recruiting other participants, who themselves are interested in recruitment fees rather than the sale of products."

\* \* \*

BurnLounge's focus was recruitment and that the rewards it paid, in the form of cash bonuses, were primarily for recruitment rather than for sales of merchandise. Recruiting was built into the compensation structure in that recruiting led to eligibility for cash rewards, and more recruiting led to higher rewards. . . . Selling packages was a way of recruiting new Moguls—in fact, it was the only form of recruitment— because purchasing a package was necessary to become a Mogul and earn cash rewards.[106]

128.   Distributor Rule 8-J gives Herbalife "absolute discretion" to "take whatever actions or measures" are "deem[ed] necessary and appropriate" in response to distributor violations.  However, despite the strict laws and regulations governing Herbalife, it did not have a chief of compliance until Pamela Jones Harbour was appointed as Senior Vice President of Global Member Compliance and Privacy on October 6, 2014.  Indeed, Herbalife's compliance department was shrouded in mystery during the Class Period, as the Company was never fully honest with investors even with respect to such basic information such as how many people worked in that department.  On August 15, 2013, for example, Herbalife stated that it had a "350-strong global distributor business practices and compliance team,"[107] Just two months later, CNBC reported that Herbalife spokesperson Barb Henderson said there were 250 compliance staff members worldwide.[108]  Even assuming a department of 350 people, that means there was

---

[106] *BurnLounge*, 753 F.3d at 884 (emphasis original).

[107]   http://www.theglobeandmail.com/report-on-business/herbalife-kept-links-to-canadian-pyramid-scheme-for-a-decade/article13789659/.

[108] http://www.cnbc.com/id/101103661.

one compliance staff member for every 6,000 distributors – and this does not take into account accommodating the challenges of geography, time zones, language barriers and other logistical impediments.   Further, the Company has never disclosed the amount of money or resources it spends (annually or quarterly) on compliance.

129.   As detailed herein, Herbalife's recruiting and business practices do not comply with FTC guidance or the *Omnitrition* or *Burnlounge* restrictions, contrary to their numerous Class Period statements.

## 2.   False Statements Concerning Herbalife's Compliance With Laws And Regulations

130.   Throughout the Class Period, Defendants repeatedly made false and misleading statements, and omitted to state material facts, regarding Herbalife's compliance with applicable laws, regulations and rules.   The first of these false statements occurred on February 22, 2011.   In its 2010 Form 10-K, Herbalife misleadingly stated:

> All of our officers and directors are subject to a permanent injunction issued in October 1986 pursuant to the settlement of an action instituted by the California Attorney General, the State Health Director and the Santa Cruz County District Attorney. We consented to the entry of this injunction without in any way admitting the allegations of the complaint. **The injunction** prevents us and our officers and directors from making specified claims in future advertising of our products and ***required us to implement some documentation systems with respect to payments to our distributors***. At the same time, the injunction does not prevent us from continuing to make specified claims concerning our products that have been made and are being made, provided that we have a reasonable basis for making the claims.[109]

131.   Herbalife also issued the following statements in substantially identical form in 2010 and 2011 Form 10-Ks:

Network Marketing Program

---

[109] 2010 Form 10-K at p. 20 (filed February 22, 2011).   Herbalife's Forms 10-K going back to 2004 include identical statements.

Our network marketing program is subject to a number of federal and state regulations administered by the FTC and various state agencies as well as regulations in foreign markets administered by foreign agencies. Regulations applicable to network marketing organizations generally are directed at ensuring that product sales ultimately are made to consumers and that advancement within our organization is based on sales of the organization's products rather than investments in the organization or other non-retail sales related criteria. For instance, in some markets, there are limits on the extent to which distributors may earn royalty overrides on sales generated by distributors that were not directly sponsored by the distributor. **When required by law, we obtain regulatory approval of our network marketing program or, when this approval is not required, the favorable opinion of local counsel as to regulatory compliance**.

\* \* \*

**We believe that our network marketing program satisfies the standards set forth in the Omnitrition case and other applicable statutes and case law defining a legal network marketing system**, in part based upon significant differences between our marketing system and that described in the Omnitrition case.

\* \* \*

Compliance Procedures

In order to comply with regulations that apply to both us and our distributors, we conduct considerable research into the applicable regulatory framework prior to entering any new market to identify all necessary licenses and approvals and applicable limitations on our operations in that market. Typically, we conduct this research with the assistance of local legal counsel and other representatives. **We devote substantial resources to obtaining the necessary licenses and approvals and bringing our operations into compliance with the applicable limitations. We also research laws applicable to distributor operations and revise or alter our distributor manuals and other training materials and programs to provide distributors with guidelines for operating a business, marketing and distributing our products and similar matters, as required by applicable regulations in each market.**[110]

132.    Herbalife also gave the false impression that its distributors were zealously policing each other to ensure compliance with all laws, rules and regulations.  During the April 24, 2012 Barclays Capital Retail and Restaurants Conference, Senior Vice President and Managing Director Ibi Fleming falsely stated:

---

[110] 2010 Form 10-K at 20-22; 2011 Form 10-K at 22-24.

And from a direct selling standpoint, we have very – the [distributors] rules and distributors have to abide by an ethic. ***Our CEO – our Chairman and CEO talk constantly to distributors and internally about always taking the high roads***, because it is an industry that's regulated, it's an industry that various players in it. . . . And by being a large player in the space, ***it's important that our distributors understand the importance of adhering to rules*** and we work with them on a constant basis for that.

133. Vice President of Investor Relations Amy Greene then falsely compounded upon Fleming's lie:

And it's self-regulated. ***I mean, out distributors will be the first ones to call us to tell us and they don't say, he, look, I know the distributor and he is in my organization, but there's something weird going on. so they are the first ones who report it***, because they want to protect their business.

134. The previously emphasized statements were materially false and misleading.

135. Indeed, senior Herbalife executives have admitted that they are "expect[ing] some form of disciplinary action" as a result of the FTC's investigation. In addition, Johnson has made repeated admissions that his statements regarding sales outside of the distribution network (and thus, the Company's compliance with the 70% Rule) were not true, including that "the lawyers are going to go crazy" and that he "got in a lot of trouble" for speaking on the matter.

136. Relatedly, despite its ability to easily do so through its information technology systems and distributor rules, Herbalife admitted that it does not comply with the Permanent Injunction. The internal April 2011 Actionable Report directly contradicts the Lieberman Research and Nielsen Reports, which Herbalife regularly touted as proof of compliance with the law. Moreover, the Lieberman Research and Nielsen Reports also contradict each other.

137. With respect to the 70% Rule, in the past decade, the Company has only disciplined about ten distributors for violating the rule:

## Herbalife's Lax Enforcement of Its Rules

▶ **Between 2006 and 2009, Herbalife possibly disciplined about 10, but fewer than 25, distributors for violating the 70% Rule (fewer than 1 out of every 100,000 distributors)**

**Deposition of Jacqueline Miller in Herbalife v. Ford (2009):**

*Mr. Stephens: (Ford Counsel)*
*"Have more than 50 distributors since January of 2006 been disciplined for violating the 70-percent rule?"*

*Ms. Miller: (Herbalife Employee)*
*"I don't believe so."*

*Mr. Stephens:*
*"Have more than 25 distributors been disciplined for violating that rule?"*

*Ms. Miller:*
*"I don't believe so."*

*Mr. Stephens:*
*"Have more than 10 distributors been disciplined for violating the 70-percent rule?"*

*Ms. Miller:*
*"That's possible."*

138.   Indeed, Herbalife only audits distributors' compliance with its policies and procedures (which directly flow from the FTC's *Amway* decision) when distributors seek to return product to the Company:

## Herbalife's Lax Enforcement of Its Rules *(cont'd)*

▶ **Herbalife appears to audit compliance only when distributors seek to return product to the company**

**Deposition of Jacqueline Miller in Herbalife v. Ford (2009):**

*Mr. Stephens: (Ford Counsel)*
*"How did you know about the 1200 [audits performed for the ten customer rule]?"*

*Ms. Miller: (Herbalife Employee)*
*"I asked."*

*Mr. Stephens:*
*"Who did you ask?"*

*Ms. Miller:*
*"Julie Delaney… She works for Jenny [Heinrich]… She's director or senior director. She's been in the refunds and repurchase area, and I think she might have responsibility for the audits."*

▶ **Distributors seeking to return product to the Company who cannot demonstrate compliance with the rules will have their previous rewards payments netted against their product return. In many cases, this "clawback" is greater than the returned value of the products**

128

139.   Herbalife's compensation scheme, which Pershing Square revealed pays distributors 10 times (or more) to recruit than to sell products,[111] runs afoul of both *Omnitrition* and *BurnLounge* because it promotes recruiting over selling products.   As the Ninth Circuit has held, this is the *sine qua non* of a pyramid scheme.

140.   The numerous examples of illicit conduct and wrongdoing that Pershing Square detailed evince that Herbalife was actively flouting laws and regulations meant to protect consumers from deceptive MLM practices, and was operating as an illegal pyramid scheme.

**F.   Loss Causation:  Pershing Square's December 20, 2012 Report Reveals That Herbalife Lied About Its Business Practices And Operations**

141.   The statements detailed above in IV.B-E were first exposed to the market as false by Pershing Square.   On December 20, 2012, Pershing Square founder and CEO Bill Ackman,[112] along with two other Pershing Square

---

[111] *Millionaire* Exec. Summary at 1.

[112] Ackman is an established and highly credible Wall Street hedge fund manager. He is not known as a short-seller.  As of December 16, 2014, Pershing Square had only one other short position, which is undisclosed[112] and comprises only 1% of its portfolio.  Pershing Square International posted a return of 32.8 percent for the first 10 months of 2014, making it the No. 1 fund in Bloomberg Markets' annual ranking of the best-performing large hedge funds. Ackman's past successes in shorting stock, which he rarely does absent extraordinary circumstances, include taking a short position in MBIA stock in 2002.  He accused MBIA Inc., a triple-A rated bond insurer, of being insolvent and shorted the stock.  For five years, virtually no one believed him.  Finally, in 2007, the financial crisis exposed MBIA's troubles and the company's stock collapsed. *The Washington Post*, "The big bad 'alpha wolf'? William Ackman, like it or not, sits atop the hedge-fund world" (January 23, 2015)   http://www.washingtonpost.com/business/the-big-bad-alpha-wolf-william-ackman-like-it-or-not-sits-atop-the-hedge-fund-world/2015/01/22/722b1ab6-a0e7-11e4-b146-577832eafcb4_story.html (last accessed May 8, 2015).

---

employees, presented the *Millionaire* Presentation at a Sohn Conference Foundation Special Event in New York.  The in-depth, 334-slide presentation lasted over three hours.  Ackman summarized that:

> ***We started work in the summer of 2011. Our analysis became more intensive beginning in December of 2011. We went public in December of 2012, and our team of analysts and lawyers who worked on the idea had done an enormous amount of work over that period of time. We sought independent legal advice and an independent assessment*** of Herbalife's legitimacy from a highly regarded law firm. We also gave a heads-up to one of the regulators prior to releasing the presentation, but we had not had any sort of meaningful dialogue with regulators prior to going public with the idea.[113]

142.  To explain and detail the laboriously arduous process by which Pershing Square and Ackman conducted their painstaking investigation, Lead Plaintiff has provided the expert opinion of Dr. John Taylor, attached as Exhibit I (the "Taylor Report").[114] During this year-and-a-half long analysis period, Pershing Square, *inter alia*, spent millions of dollars to conduct its investigation, which included hiring a third party research firm to analyze 40,000 eBay transactions over a five year span, obtained non-public documents, and investigated dozens of nutrition clubs in Queens, New York and Omaha, Nebraska.  Taylor Rep. ¶16.

143.  As a result of the *Millionaire* Presentation, Pershing Square exposed, for the first time, unfair and fraudulent practices that were hidden from investors, law enforcement, investors and consumers, along with a litany of false statements by Herbalife officials.  Taylor Rep. ¶17.  What set this effort by Pershing Square apart from other criticisms of Herbalife was the enormous investment of time,

---

[113] *Seeking Alpha*, "An Exclusive Interview with Pershing Square's Bill Ackman," (December 18, 2014), http://seekingalpha.com/article/2765435-an-exclusive-interview-with-pershing-squares-bill-ackman (last accessed May 8, 2015).

[114] Dr. Taylor is eminently qualified to opine on the methodology and tactics that Pershign Square used to analyze and expose Herbalife's fraud.  His qualifications and full CV can be found in his Report.

expertise, and money to reveal this information.  The knowledge, resources, skills and expertise entailed in Pershing Square's analysis makes it highly unlikely that anyone else could have conducted this investigation and revealed this information. Taylor Rep. ¶18.  Indeed, shortly after the *Millionaire* Presentation hedge fund manager Whitney Tilson of T2 Partners LLC exclaimed that "***Pershing Square's analysis of Herbalife is the most remarkable piece of investment analysis I have ever seen.  Simply astonishing***."[115]

144.  After the presentation was over, Ackman would tell Andrew Ross Sorkin (of *The New York Times* and *CNBC*) why he was motived to expose Herbalife's hidden fraud:

> You've had millions of low-income people around the world who've gotten their hopes up that there's an opportunity for them to become millionaires or hundred-thousand-aires or some number like that, and they've been duped." . . . ***"We simply want the truth to come out.*** If distributors knew the probability of making $95,000 a year—which is the millionaire team, as they call it—was a fraction of 1 percent, no one would ever sign up for this. ***And we simply exposed that fact. The company has done their best to try to keep that from the general public.***[116]

145.  The *Millionaire* Presentation was a corrective disclosure that exposed the truths of Herbalife's business practices and operations.  The *Millionaire* Presentation sent Herbalife common stock into another nosedive.  As a direct and proximate result of the *Millionaire* Presentation, Herbalife stock declined 9.75%, to close at $33.70 on December 20, 2012 on volume of 34,508,678.  The stock continued its decline on December 21, to close down 19.08% to $27.27, on volume of 43,353,236.

---

[115] *The Wall Street Journal*, "Witney Tilson: I'm Shorting Herbalife, Too" (December 26, 2012)  http://blogs.wsj.com/marketbeat/2012/12/26/whitney-tilson-im-shorting-herbalife-too/ (last accessed May 8, 2015).

[116] *Vanity Fair*, "The Big Short War," (April 2013), http://www.vanityfair.com/news/2013/04/bill-ackman-dan-loeb-herbalife (last accessed May 8, 2015).

146.   An event study analysis confirms that both the decline on December 20 and the continuing decline on December 21 are directly and proximately caused by Pershing Square's *Millionaire* Presentation.  Nye Rep. ¶¶30, 33.

### G.   False Statements Concerning Herbalife's Chinese Operations

147.   Throughout the Class Period, Defendants repeatedly made false and misleading statements, and omitted to state material facts, regarding Herbalife's Chinese operations and the Company's compliance with Chinese law. In its 2010 Form 10-K, Herbalife falsely stated:

> ***Due to restrictions on direct selling in China, our full-time employed sales representatives in China are compensated with wages, bonuses and benefits and our licensed business providers in China are compensated with service fees instead of the distributor allowances and royalty overrides utilized in our traditional marketing program***. Because of local country regulatory constraints, we may be required to modify our typical distributor incentive plans as described above. Consequently, the total distributor discount percentage may vary over time.[117]

148.   Herbalife tweaked its language beginning with the Form 10-Q for 3Q 2011, but nevertheless falsely stated:

> ***Due to restrictions on direct selling in China,*** our sales employees in China, prior to the transition into independent service providers, were compensated with wages, bonuses and benefits and ***our independent service providers in China are compensated with service fees instead of the distributor allowances and royalty overrides utilized in our traditional marketing program.*** Compensation to China sales employees and independent service providers are included in selling, general and administrative expenses. Because of local country regulatory constraints, we may be required to modify our typical distributor incentive plans as described above.[118]

---

[117] 2010 Form 10-K at 54.  This statement is repeated in substantially similar form in the following: Q1 2011 Form 10-Q at 20 and Q2 2011 Form 10-Q at 22.

[118] Q3 2011 Form 10-Q at 22.  This statement is repeated in substantially similar form in the following: 2011 Form 10-K at 56; Q1 2012 Form 10-Q at 20; Q2 2012 Form 10-Q at 20; Q3 2012 Form 10-Q at 22; and 2012 Form 10-K at 55.

149.   The Company once again changed the language of the disclosure beginning with the Form 10-Q for 1Q 2013, falsely stating:

> *Due to restrictions on direct selling in China, our independent service providers in China are compensated with service fees instead of the distributor allowances and royalty overrides utilized in our traditional marketing program.* Compensation to China independent service providers is included in selling, general and administrative expenses.
>
> Because of local country regulatory constraints, we may be required to modify our distributor incentive plans as described above.[119]

150.   Herbalife's lies and misrepresentations carried over to its earnings calls and investor presentations.  During the 1Q 2011 earnings call on May 3, 2011, an analyst specifically asked about the Company's Chinese operations.  Des Walsh falsely stated in response:

> [W]e have been consistently cautious about China since we opened five years ago.  We continue to be cautious today.  It's drive by a number of factors, first obviously China is a challenging environment. *You know that we have a marketing plan that is vastly different there from the rest of the world.*  We don't have the ability to have our international leaders engaged in China, so all of these factors are factors which incline us to have us be consistently cautious about China.

151.   During the October 29, 2013 3Q 2013 earnings call, analysts continued to question the Company's Chinese operations.  Des Walsh falsely stated in response one of these questions:

> Meredith I am not sure what you are referring because frankly *aside from our normal commercial challenges there are no issues in China* or India. In China as you know we recently received another license and as anytime we get licenses in China part of the process is the central government goes out to all of the existing provinces in which we have licenses and asks for local officials to give us sort of

---

[119] Q1 2013 Form 10-Q at 24.  This statement is repeated in substantially similar form in the following: Q2 2013 Form 10-Q at 26; Q3 2013 Form 10-Q at 26; 2013 Form 10-K at 56 (member used instead of distributor); Q1 2014 Form 10-Q at 26 (member used instead of distributor); Q1 2014 Form 10-Q at 29 (member used instead of distributor).

good (health and seal) approval on based on that any further licensees are granted.

So China is probably the most regulated market in which we operate. *It is a different model there from the rest of the world but obviously we are very comfortable with our business in China*, while at the same time remaining cautious simply because it is China.

152.   During that same 3Q 2013 earnings call, Walsh also falsely stated that:

[I]n relation to China you will always hear us use the word cautious *but purely in relation to the fact that it's China, not in relation to our business. Our business in China is absolutely solid* and so when we hear NuSkin or anybody talk in complementary terms about our business in China, what I think they are referencing is the fact *that our business in China is solidly based on daily consumption*.[120]

153.   Later, during the same February 19 earnings call, the following exchange occurred, during which John DeSimone falsely stated:

Q. I want to go back to China for a moment. And just -- can you -- is there anything for you to say about increased government involvement or scrutiny on your business or whether the scrutiny they have on other (MLM) businesses is having impact on you, or you think it will?

A. [DeSimone]: …You know, China is an ever-changing, evolving marketplace. I think, you know, *we're comfortable that we're in compliance with today's regulations* and we're also comfortable that if they -- regulations mature, that we can be in compliance with wherever they go. And the thing to remember is our business is based on people taking our product every day and that model with work and we can certainly adjust it accordingly as needed in the marketplace.

154.   The previously emphasized statements were materially false and misleading.

155.   To become a Distributor in China, an individual needs to accumulate the equivalent of $9,800 of sales in three months.[121]  Because the 2012 annual GDP

---

[120] Q3 2013 Earnings Conference Call (held Oct. 29, 2013).

[121] *China* Slide 20.

per capita in China was $6,091,[122] distributors are incentivized to – and must – recruit other downline members if they are to make money. Distributors are compensated in two ways: a 30% retroactive credit that is essentially a discount on Herbalife products, and an "hourly" consulting fee – which is comprised of three forms of rewards based on volume points accumulated by the distributor's downline:

## Distributor Incentives

**Incentive Compensation of Distributors . . .**

▶ **30% Retroactive Credits**

▶ **"Hourly Consulting Pay"**— a deceptive term . . .

Comprised of three forms of recruiting rewards based on Volume Points accumulated by a Distributor's downline:

  (1) Commission,

  (2) Management Bonus, and

  (3) Mark Hughes Dividend

Source: Interviews with Herbalife Distributors in China

23

156.   As the presentation slide states, the hourly consulting pay is not based on any "consulting" work.  Pershing Square explains:

> *Hourly consulting pay is not based on consulting and nor is it based on hours. It is one hundred percent based on commissions from downline sales and bonuses based on sales targets*. . . .  So how does it work? Each distributor status is assigned an hourly consulting rate. Herbalife calculates how much money is owed to a distributor based

---

[122] *China* Slide 22.

on a fixed percentage of commissions from downline sales and bonuses. Herbalife divides what is owed to the distributor via the distributor's hourly consulting rate. ***To arrive at a purely fictional number of hours spent consulting*** . . .

* * *

***What we saw is, it actually enables them to publically talk about this to recruits and to introductory seminars without seeming to break the law. Right? And, urn, in other research I've done, you really didn't see them publically talk about their pay scheme because it was clearly crossing a line. But what we see is that in these meetings a distributor can stand up in front of a hundred or two hundred people and talk about this business consulting because-because they've kind of legitimized it. They seemingly legitimized it.***

* * *

Because the reality is those activities have nothing to do with hourly consulting pay. Hourly consulting pay is a totally fictional thing which simply disguises what is a traditional multilevel marketing compensation plan. . . . Distributors we spoke with routinely emphasized that consulting fees are the primary source of income for distributors and not a retail sale.[123]

157.   First-hand accounts from Chinese distributors confirm that the "consulting fee" that the Company's Chinese distributors are paid has nothing to do with consulting and in actuality is designed to mask the fact that distributors are paid in percentages of retail sales, just like in the rest of the world and in violation of Chinese law.[124] Indeed, hand-drawn diagrams from Chinese distributors universally show the pyramid-like structure.[125]

158.   Using an internal Herbalife document that it had acquired, Pershing Square confirmed that the Company was compensating Chinese distributors similarly to distributors in other countries – in direct violation of Chinese law.  The

---

[123] *China* Tr. at 17.

[124] *Id.*

[125] *China* Slides 30-35

document, a spreadsheet dated 2010, shows Herbalife's 2009 China results and presents a five-year China model:

**An Internal Herbalife Document Confirms how Herbalife Calculates Hourly Consulting Pay**

This screen shot from an internal document from 2010 shows how Herbalife calculates "China Royalty Overrides" – also called "China Sales Employees." The key inputs are:
>  Line 54 – "Rebate" – 25.0%
>  Line 55 – "R/O" for Royalty Overrides – 15.0%
>  Line 56 – "P/B" for Production Bonuses – 7.0%
>  Line 57 – "MH Bonus" for Mark Hughes Bonus – 1.0%
>  Line 58 – China Bonus 1.0%

Herbalife International
2010 Five-Year Plan Projected Pro Forma Financial Model

|  |  |  | Actual | Forecast T04 | Modeled | | | |
|---|---|---|---|---|---|---|---|---|
|  |  | Unit | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
| 53 | China Royalty Overrides |  |  |  |  |  |  |  |
| 54 | Rebate (inner/outer) | % RS |  | 25.0% | 25.0% | 25.0% | 25.0% | 25.0% |
| 55 | R/O (inner/outer/promo) | % RS |  | 15.0% | 15.0% | 15.0% | 15.0% | 15.0% |
| 56 | P/B (inner/outer/promo) | % RS |  | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% |
| 57 | MH Bonus (RS) | % RS |  | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% |
| 58 | China Bonus (RS) | % RS |  | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% |
| 59 | China Retail Sales | LC (k) |  | 206,612 | 1,622,604 | 1,868,454 | 2,212,642 | 2,655,171 |
| 60 | China Retail Sales | $ (k) |  | 206,612 | 237,693 | 273,707 | 324,127 | 388,952 |
| 61 | China Royalty Overrides | % RS |  | 47.9% | 47.9% | 47.9% | 47.9% | 47.9% |
| 62 | China Sales Employees | % RS |  | 46.7% | 46.7% | 46.7% | 46.7% | 46.7% |
| 63 | China Sales Employees | LC (k) |  | 96,417 | 757,196 | 871,923 | 1,032,540 | 1,239,048 |
| 64 | China Sales Employees | $ (k) | 79,082 | 96,417 | 110,921 | 127,727 | 151,255 | 181,506 |
| 65 | China Sales Empl Incr. Inc/(Dec) | BPS |  |  |  |  |  |  |
| 66 | China Out of Country Royalty Overrides | % RS |  | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% |
| 67 | China Product Mix |  |  |  |  |  |  |  |
| 68 | Inner + Outer Retail Sales | % RS |  | 97.5% | 97.5% | 97.5% | 97.5% | 97.5% |
| 69 | Inner + Outer + Promo Retail Sales | % RS |  | 97.7% | 97.7% | 97.7% | 97.7% | 97.7% |

Source: Herbalife financial information spreadsheets from 2010.

44

159.  Pershing Square's analysis of the internal spreadsheet reveals that Herbalife calculates royalty compensation in China as percentages of retail sales – just as the Company calculates royalty overrides in the rest of the world.[126]

160.  Pershing Square could not have arrived at this stunning conclusion without the internal spreadsheet.  Line 64 of the spreadsheet, "China Sales Employees," reveals a figure of $79,082; this amount directly corresponds to the $79.1 million that Herbalife described as "[c]ompensation to China sales employees" in its 2009 Form 10-K:

---

[126] *China* Slide 50.

## An Internal Herbalife Document Confirms how Herbalife Calculates Hourly Consulting Pay

> **The 2009 actual expense for "China Sales Employees" (a/k/a "China Royalty Overrides") of $79,082,000 matches the $79.1 million Herbalife later reported as its 2009 "compensation to China sales employees and service fees to China licensed business providers."**

| | | Actual | Forecast T04 | | Modeled | | |
|---|---|---|---|---|---|---|---|
| | | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
| 53 | China Royalty Overrides | | | | | | |
| 54 | Rebate (inner/outer) | | 25.0% | 25.0% | 25.0% | 25.0% | 25.0% |
| 55 | R/O (inner/outer/promo) | | 15.0% | 15.0% | 15.0% | 15.0% | 15.0% |
| 56 | P/B (inner/outer/promo) | | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% |
| 57 | MH Bonus (RS) | | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% |
| 58 | China Bonus (RS) | | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% |
| 59 | China Retail Sales | 206,612 | 1,622,604 | 1,868,454 | 2,212,642 | 2,655,171 | |
| 60 | China Retail Sales | 206,612 | 237,693 | 273,707 | 324,127 | 388,952 | |
| 61 | China Royalty Overrides | 47.9% | 47.9% | 47.9% | 47.9% | 47.9% | |
| 62 | China Sales Employees | 46.7% | 46.7% | 46.7% | 46.7% | 46.7% | |
| 63 | China Sales Employees | 96,417 | 757,196 | 871,923 | 1,032,540 | 1,239,048 | |
| 64 | China Sales Employees | 79,082 | 96,417 | 110,921 | 127,727 | 151,255 | 181,506 |

Form 10-K

FOR ANNUAL AND TRANSITION REPORTS
PURSUANT TO SECTIONS 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934

☐ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the fiscal year ended December 31, 2010
☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the transition period from ____ to ____

Commission file number: 1-32381

**HERBALIFE LTD.**
(Exact name of Registrant as specified in its Charter)

(3) Compensation to China sales employees and service fees to China licensed business providers totaling $87.3 million and $79.1 million and $70.3 million for the years ended December 31, 2011, 2009 and 2008, respectively, are included in selling, general and administrative expenses while distributor compensation for all other countries is included in royalty overrides.

Source: Herbalife financial information spreadsheets from 2010 and Herbalife's 2010 year-ended 10K                    45

161.  In another, hidden row in a separate tab in the model, Herbalife also (somewhat confusingly) called the $79,082 figure "China Royalties."

## An Internal Herbalife Document Confirms how Herbalife Calculates Hourly Consulting Pay

> **A different schedule in the internal Herbalife model provides more detail on its China historical and projected financials.  In a hidden row, Herbalife here refers to the same $79,082,000 simply as "China Royalties."**

Herbalife International
2010 Five-Year Plan Projected Pro Forma Financial Model

| | | | Base Case | | Actual | | | | | Forecast T04 | | Modeled | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Unit | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
| 37 | Net Sales (USD) - Excl. Marketing Fund Revenue | | | | | | | | | | | | |
| 38 | China | | | | | | | | | | | | |
| 39 | China Distribution | $ (k) | 837 | 5,110 | 32,069 | 75,960 | 146,210 | 152,500 | 189,927 | 217,752 | 250,744 | 296,934 | 356,321 |
| 40 | China Manufacturing | | | | | | | | | | | | |
| 41 | Total China | $ (k) | 837 | 5,110 | 32,069 | 75,960 | 146,210 | 152,500 | 189,927 | 217,752 | 250,744 | 296,934 | 356,321 |
| 42 | Net Sales to VP | | | | | | | | | | | | |
| 43 | China | | | | | | | | | | | | |
| 44 | China Distribution | NS/VP | 0.6 | 1.1 | 1.2 | 1.2 | 1.3 | 1.3 | 1.31 | 1.32 | 1.32 | 1.32 | 1.32 |
| 45 | China Manufacturing | | | | | | | | | | | | |
| 46 | Total China | NS/VP | | 1.1 | 1.2 | 1.2 | 1.3 | 1.3 | 1.31 | 1.32 | 1.32 | 1.32 | 1.32 |
| 47 | Operating Expenses (USD)* | | | | | | | | | | | | |
| 48 | China | | | | | | | | | | | | |
| 49 | China Distribution | $ (k) | 750 | 6,158 | 24,476 | 21,315 | 37,632 | 38,656 | 48,048 | 55,635 | 62,123 | 70,376 | 80,024 |
| 50 | China Royalties | | | | | 31,331 | 70,489 | 79,082 | 96,417 | | | | |
| 51 | China Manufacturing | | (679) | (737) | (737) | (818) | (685) | (1,139) | (269.4) | | | | |
| 52 | Total China | $ (k) | 71 | 5,421 | 23,739 | 20,497 | 36,947 | 37,517 | 47,778 | 55,635 | 62,123 | 70,376 | 80,024 |
| 53 | Operating Expenses (USD) as % of Net Sales* | | | | | | | | | | | | |
| 54 | China | | | | | | | | | | | | |
| 55 | China Distribution | % NS | 89.7% | 120.5% | 76.3% | 28.1% | 25.7% | 25.3% | 25.3% | 25.5% | 24.8% | 23.7% | 22.5% |
| 56 | China Manufacturing | | | | | | | | | | | | |
| 57 | Total China | % NS | 8.5% | 106.1% | 74.0% | 27.0% | 25.3% | 24.6% | 25.2% | 25.5% | 24.8% | 23.7% | 22.5% |

Source: Herbalife financial information spreadsheets.                    46

162.   To project the China Royalty Override over the next five years, Herbalife takes the Retail Sales figure in line 60 and multiplies that number by the rebate and bonus percentages which are highlighted in the red box:

### An Internal Herbalife Document Confirms how Herbalife Calculates Hourly Consulting Pay

Herbalife's methodology for forecasting "China Sales Employees" (a/k/a "China Royalty Overrides") for 2010 and beyond was simply to multiply its China Retail Sales projection by the various  Rebate, Royalty Override, Production Bonus, Mark Hughes and China Bonus percentages.

**Herbalife International**
2010 Five-Year Plan Projected Pro Forma Financial Model

| | | | Actual | Forecast T04 | Modeled | | | |
|---|---|---|---|---|---|---|---|---|
| | | Unit | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
| 53 | China Royalty Overrides | | | | | | | |
| 54 | Rebate (inner/outer) | % RS | | 25.0% | 25.0% | 25.0% | 25.0% | 25.0% |
| 55 | R/O (inner/outer/promo) | % RS | | 15.0% | 15.0% | 15.0% | 15.0% | 15.0% |
| 56 | P/B (inner/outer/promo) | % RS | | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% |
| 57 | MH Bonus (RS) | % RS | | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% |
| 58 | China Bonus (RS) | % RS | | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% |
| 59 | China Retail Sales | LC (k) | | 206,612 | 1,622,604 | 1,868,454 | 2,212,642 | 2,655,171 |
| 60 | China Retail Sales | $ (k) | | 206,612 | 237,693 | 273,707 | 324,127 | 388,952 |
| 61 | China Royalty Overrides | % RS | | 47.9% | 47.9% | 47.9% | 47.9% | 47.9% |
| 62 | China Sales Employees | % RS | | 46.7% | 46.7% | 46.7% | 46.7% | 46.7% |
| 63 | China Sales Employees | LC (k) | | 96,417 | 757,196 | 871,923 | 1,032,540 | 1,239,048 |
| 64 | China Sales Employees | $ (k) | 79,082 | 96,417 | 110,921 | 127,727 | 151,255 | 181,506 |
| 65 | China Sales Empl Incr. Inc/(Dec) | BPS | | | | | | |
| 66 | China Out of Country Royalty Overrides | % RS | | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% |
| 67 | China Product Mix | | | | | | | |
| 68 | Inner + Outer Retail Sales | % RS | | 97.5% | 97.5% | 97.5% | 97.5% | 97.5% |
| 69 | Inner + Outer + Promo Retail Sales | % RS | | 97.7% | 97.7% | 97.7% | 97.7% | 97.7% |

Source:  Herbalife financial information spreadsheets.                                                     47

163.   Once the China Retail sales number is multiplied by each of the percentages in the red box, the products of each of those equations added together to get the China Sales Employee figure in line 64.  It is also apparent based on the percentages that the royalty compensation easily surpasses 30%, in violation of Chinese law.

164.   When the spreadsheet is compared with distributor payout information that Herbalife disclosed in its 2009 Investor Day Presentation in the U.S., it becomes clear that, contrary to Herbalife's claims and Chinese law, the Company

is compensating its Chinese distributors with royalty overrides in amounts that are nearly identical to its American distributors:



Source: Herbalife financial information spreadsheets and Herbalife's 2009 Investor Day Presentation

165. Pershing Square Partner Ben Hakem explained that:

The first bucket is the fifty percent, hypothetical discount or retail profit that we've talked a lot about in the past. But more importantly, they highlight the various pieces of the royalty override expense. Which include, as noted here, a fifteen percent royalty override, a seven percent production bonus and a one percent Mark Hugh bonus. The footnote on this chart says, actual results referenced in Herbalife 2010 eight 10K, not including China.

\* \* \*

*When you go back and compare the percentages that Herbalife used to drive their China royalties number and multiplying it against retail sales, you see that they simply used the same percentages in the rest of the world.*

\* \* \*

[A]nd if you go through it again, on line fifty five a fifteen percent royalty override which is the same as the rest of the world. Seven

percent production bonus and one percent Mark Hugh bonus but-but, uh, you know, this extra one percent China bonus which would appear, uh, that it would indicate a greater, even a greater emphasis on recruiting compensation in China. Now, note also that this China sales employee expense number also includes the-the twenty five percent rebate which - which is likely just another form of the discount. That they had in other markets.

*So, in conclusion, based upon Herbalife's own internal documents, Herbalife does not calculate China sales employees also known as China royalties based on hourly consulting fees. Instead, they calculate royalty compensation in China as percentages of retail sales, just like they do in the rest of the world.*

## H.    Loss Causation:  The China Presentation Causes A Further Stock Price Decline

166.    The March 11, 2014 presentation focused on China because the importance of China to Herbalife's bottom line cannot be overstated.   The Company has described China as a "strategically important market."[127]   In fact, in 2014, 9.6% of all Retail Sales in 2014 were attributed to China, 14.4% of all Product Sales were attributed to China, and 13.3% of Net Sales were attributed to China.[128]   The media has taken note.  One analyst has observed that:

China is becoming more and more important to everyday business for Herbalife. Despite being one of the areas of major growth for the company, according to its last earnings report, China has the populace necessary to be a major driver for Herbalife for the next couple of years.[129]

167.    Due to China's core importance, Herbalife has announced that there are manufacturing plants there in order capture the nation's growth.[130]    The

---

[127] Press Release, "Herbalife Plans Expansion of Manufacturing Capabilities in China" (July 31, 2014), *available at* http://ir.herbalife.com/releasedetail.cfm?ReleaseID=863349 (last accessed May 8, 2015).

[128] 2014 Form 10-K at 51.

[129] *Seeking Alpha*, "Is Herbalife Recklessly Leveraged On China?" (August 1, 2014)   http://seekingalpha.com/article/2371005-is-herbalife-recklessly-leveraged-on-china (last accessed May 8, 2015).

[130] *Id.*

Company also stated that "[w]e have seen continued adoption and acculturation of daily consumption DMOs in the China market, aided by continued acceptance of a Preferred Customer program which was launched during 2013. We have also implemented on-line ordering in China."[131]  Accordingly, Herbalife is incentivized to mask its Chinese compensation plan in order to maintain the viability of this lucrative market.

168.   The in-depth *China* Presentation contained 63 slides and lasted over 75 minutes.  As *The Wall Street Journal* later confirmed, the report was based on interviews with Herbalife's Chinese distributors and "internal documents."[132]  To conduct these interviews, Pershing Square retained OTG Research Group ("OTG"), which sent investigators (including native citizens of mainland China) to visit corporate-owned stores, attend introductory seminars, and meet with a dozen Herbalife distributors outside of corporate-owned stores in Shanghai, Guangzhou and Hefei.[133]  *See also* Taylor Rep. ¶23.  Aaron Smith-Levin, principal of OTG, would say of the investigation to *Forbes*:

> Not many investment funds, or research companies for that matter, have the time, patience, resources or the network to get this kind of work done anywhere in the world, . . .   There can be a massive amount of logistics involved. Dealing with all of that is part of our niche.

* * *

---

[131] Form 10-K at 58.

[132] *The Wall Street Journal*, "Ackman Report on Herbalife in China Figures in Probe" (April 1, 2015) http://www.wsj.com/articles/ackman-report-on-herbalife-in-china-figures-in-probe-1427925043 (last accessed May 8, 2015).

[133] *China* Tr. at 9-10.

The trick is not just doing this work, but in doing it at 20 stores across the country simultaneously week after week, month after month. Investors don't want to deal with that mess. . . .[134]

169.   When all was said and done, between the inception of the *Millionaire* Presentation and the publication of the *China* Presentation, Pershing Square spent nearly $50 million to investigate and expose Herbalife's fraudulent business practices.  Taylor Rep. ¶23.  Due to the *China* Presentation, Pershing Square again exposed fraudulent and deceptive practices that were hidden from investors, law enforcement, investors and consumers.  In doing so, Pershing Square also exposed that Herbalife's statements regarding its Chinese operations and compliance with Chinese law were false.  Taylor Rep. ¶24.  Pershing Square again distinguished itself from other criticisms of Herbalife due to its enormous investment of time, expertise, and money to reveal this information.  The knowledge, resources, skills and expertise entailed in performing this investigation and analysis makes it highly unlikely that anyone else could duplicate Pershing Square's reports.  Taylor Rep. ¶25.

170.   The March 11, 2014 *China* Presentation was a corrective disclosure that exposed the truth that Herbalife was operating illegally in China.

171.   As a direct and proximate result of the *China* Presentation, Herbalife stock declined 1.16% on volume of 3,117,019, to close at $65.39.  Notably, *The New York Times* attributed the decline directly to Ackman's revelation that Herbalife was operating illegally in China:

Shares in Herbalife fell by more than 2 percent on Tuesday as the hedge fund manager William A. Ackman accused the company…of "operating illegally" in China….Speaking during a conference call that lasted more than two hours, Mr. Ackman called the company's

---

[134] *Forbes*, "The Man Helping Bill Ackman Investigate Herbalife in China" (April 1, 1014)   http://www.forbes.com/sites/nathanvardi/2014/04/01/the-man-helping-bill-ackman-investigate-herbalife-in-china/ (last accessed May 8, 2015).

accounting of its Chinese business "highly misleading"…Pointing to internal documents obtained from a former employee at Herbalife, Mr. Ackman argued that Herbalife's Chinese operations were identical to its business in other countries such as the United States and Mexico.  That would be problematic because Chinese laws prohibit any multilevel marketing and direct marketing, Mr. Ackman said.[135]

## V.    Loss Causation

### A.    The Revelation Of Defendants' Wrongful Conduct Directly Caused Harm To The Class

172.  Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class. Throughout the Class Period, the Defendants' false and misleading statements detailed in Sections IV.A.2-3; IV.B.2; IV.C.2; IV.D.1; IV.E.2; and IV.G introduced artificial inflation into the Company's common stock price, and/or prevented artificial inflation in the Company's common stock price from dissipating.  Consequently, Lead Plaintiff and the Class purchased Herbalife common stock at artificially inflated prices during the Class Period

173.  Herbalife's ensuing disclosures on these topics, as described herein, revealed to the market the fraudulent nature of these statements and the extent of the misrepresentations and omissions contained in Herbalife's public statements that form the primary basis of this action.  When the truth about the Company was revealed to the market, the price of the Company's common stock declined in response, as the artificial inflation caused by Defendants' material omissions and false and misleading statements was removed from the price of Herbalife common

---

[135] *The New York Times*, "Herbalife Shares Fall as Ackman Makes New Accusations" (March 11, 2014) http://dealbook.nytimes.com/2014/03/11/herbalife-shares-fall-as-ackman-makes-new-accusations/?_r=0 (last accessed May 8, 2015).

stock, thereby causing substantial damage to Lead Plaintiff and other members of the Class.

**B.** **Herbalife's Investor Day Presentation Does Nothing To Buoy Its Devastated Share Price**

174. The market's reaction to the corrective disclosures was swift and harsh. Untold numbers of investors lost staggering amounts of money, and billions of dollars' worth of market cap was erased in just minutes.

175. Between December 26, 2012 and Herbalife's January 10, 2013 presentation, Herbalife's share price gradually increased. This increase, however, was directly caused, in part, by other large investors' significant purchases of Herbalife stock, not by any disproval or falsification of Ackman's thesis. Nye Rep. ¶¶36-44.

176. Importantly, the remaining increases in Herbalife's share price can all be attributed to normal market activity, with no Herbalife-specific cause. Nye Rep. ¶¶45-46. Notably, *The Wall Street Journal Blog* observed that that valuations of shares of other multi-level marketers had moved with Herbalife: "[i]nvestors in direct-selling companies have seen the value of their shares rise and fall with each twist in the Herbalife drama," including NuSkin and Usana.[136]

**VI.** **Post Class Period Events Confirm Herbalife's Fraudulent Practices**

177. Even prior to the end of the Class Period, the pressure began mounting on Herbalife as more voices joined the chorus calling for regulatory intervention to end the Company's abusive practices. On January 9, 2013, the *New York Times* and *Wall Street Journal* reported that the SEC opened an inquiry into the Company. The *New York Times* article stated that "[t]he agency's enforcement

---

[136] *The Wall Street Journal Blog*, "Herbalife Drama shines Light on Direct-Selling Stocks," (January 15, 2013) http://blogs.wsj.com/marketbeat/2013/01/15/herbalife-drama-shines-light-on-direct-selling-stocks/ (last accessed May 8, 2015).

unit has opened an investigation into the company, according to a person briefed on the matter. The inquiry . . . is likely to examine the company's sales practices."'[137]

178.   Notably, a formal SEC investigation is typically launched when the SEC staff concludes after an informal inquiry that a securities law violation has occurred.   Accordingly, the full extent of the fallout from Defendants' fraud is unclear as the "Commission generally neither confirms nor denies the existence of an inquiry or investigation unless and until made a matter of public record in proceedings instituted before the Commission or in court" to "to protect the integrity and effectiveness of our investigative process and to preserve the privacy of the individuals and entities involved."[138]

179.   As the Class Period was drawing to a close, Herbalife's problems also began to manifest outside of the U.S.  The *New York Post* reported on January 28, 2014 that Canada's top consumer regulator had launched a formal probe into complaints that Herbalife runs a pyramid scheme.[139]   The Competition Bureau, which is similar in scope to the U.S. FTC—except it can bring criminal charges— declined to comment.   On this news, Herbalife's stock price dropped approximately 3% on January 28, 2013 from a closing of $64.06 on January 27, 2014 to $62.54 on January 28, 2014.

---

[137] *The New York Times*,  "S.E.C. Opens Investigation Intro Herbalife" (January 9, 2013),     http://dealbook.nytimes.com/2013/01/09/s-e-c-opens-investigation-into-herbalife/ (last accessed May 8, 2015).

[138] Letter from Mary Jo White to Senator Edward J. Markey (March 4, 2014), http://www.markey.senate.gov/imo/media/doc/2014-03-04_SEC_re_Herbalife.pdf (last accessed May 8, 2015).

[139] *New York Post*, "Canadian regulator probing Herbalife" (January 28, 2014), http://nypost.com/2014/01/28/canadian-regulator-probing-herbalife/ (last accessed May 8, 2015).

180.   On March 12, 2014, Herbalife disclosed that the FTC had begun a civil investigation into the Company's business practices.[140]   The Company's stock, which had been halted, fell as much as 17% following the news and closed down more than 7% on March 12, 2014.  Fox Business later reported on October 7, 2014 that after discussions with "attorneys, academics and former FTC officials," Herbalife "[s]enior executives" were "expect[ing] some form of disciplinary action" as a result of the investigation.[141]

181.   On April 11, 2014, the *Financial Times* reported that the United States Department of Justice ("DOJ") and the Federal Bureau of Investigation ("FBI") had opened a criminal probe of Herbalife.  Herbalife's stock price closed at $51.48 per share, a drop of more than 14% from a previous close of $59.84 on April 10, 2014.[142]

182.   A few days later, on April 14, 2014, the *New York Post* reported that New York Attorney General Eric Schneiderman is investigating Herbalife with at least two whistleblowers coming forward and providing sworn testimony to

---

[140]  The FTC's investigation was opened in the wake of the formal probe of Herbalife by the Canadian Competition Bureau announced on January 28, 2014.  The Competition Bureau is similar in mission and scope to the FTC, except that it can bring criminal charges.

[141]  *Fox Business*, "Herbalife Execs: All But Certain FTC Won't Shut Down Company" (October 7, 2014)  http://www.foxbusiness.com/industries/2014/10/07/herbalife-execs-all-but-certain-ftc-wont-shut-down-company/ (last accessed May 8, 2015).

[142]  *Yahoo! Finance*, "FBI conduct a probe into Herbalife: sources" (April 11, 2014) http://finance.yahoo.com/news/fbi-conducting-probe-herbalife-source-211828762--sector.html (last accessed May 8, 2015).

Schneiderman's investigators.[143]   Attorney General Schneiderman also fielded complaints from former distributors who say they were defrauded by Herbalife.

183.   On April 17, 2014, yet another investigation into Herbalife was announced.  A spokeswoman for Illinois Attorney General Lisa Madigan stated that Madigan's office had "received consumer complaints and are investigating based on those complaints."   Latino groups in particular had urged Madigan to investigate the Company.[144]

184.   After the close of the stock market, on July 28, 2014, the Company shocked the investing public when it posted quarterly earnings and revenue that fell significantly short of Wall Street estimates.  Notably, the earnings marked the first time since 2008 that Herbalife missed estimates.  The Company also stated that 2014 sales would grow by 8.5 percent to 10.5 percent, slower than the range of 10 percent to 12 percent it predicted in April. As a result, Herbalife shares plummeted nearly 14% from a close of $67.48 on July 28, 2014 to close at $58.35 on July 29, 2014.  A July 29, 2014 *New York Post* article entitled "Street Doubts Herbalife Growth Story After Earnings Miss," commented on Herbalife's declining U.S. market results after heightened regulatory scrutiny regarding the Company's illegitimate practices.[145]   The article noted that "[i]nvestors are no longer buying Herbalife's growth story" after its first earnings miss in five years.

---

[143] *New York Post*, "NY attorney general probes Herbalife: sources" (April14, 2014)  http://nypost.com/2014/04/14/ny-attorney-general-probes-herbalife-sources/ (last accessed May 8, 2015).

[144] "Madigan's Office Investigating Herbalife Pyramid Scheme Allegations" (April 17,   2014),   http://www.progressillinois.com/quick-hits/content/2014/04/17/ madigans-office-investigating-herbalife-pyramid-scheme-allegations (last accessed May 8, 2015).

[145] *New York Post*, "Street doubts Herbalife growth story after earnings miss" (July 29,   2014)   http://nypost.com/2014/07/29/street-doubts-herbalife-growth-story-after-earnings-miss/ (last accessed May 8, 2015).

185.   On November 3, 2014 Herbalife announced financial results for 3Q 2014.   For the second straight quarter, Herbalife failed to beat Wall Street's expectations.   Defendants reported a decline of over 90% in net income per diluted share, from $1.32 to $0.13.   Commenting on the quarter, Defendant Johnson cited "changes" and "initiatives" such as "first order limits" that were being implemented to "drive long term improvements in activity, productivity and retention of [Herbalife's] Sales Leaders."   A *Forbes* article released that same day noted that:

> One consistent feature of the never-ending war over Herbalife used to be the company's powerful ability to deliver earnings every quarter that impressed Wall Street.   But the diet shake seller has apparently lost its ability to consistently deliver on the financial front.

186.   The article also confirmed that Pershing Square's revelations forced the Company to attempt to legitimize some of its practices, stating:

> . . . [I]t appears that billionaire hedge fund manager William Ackman's campaign against Herbalife has forced the company to change its operations in a way that has made it harder for the company to keep delivering huge financial results in the face of heightened regulatory scrutiny.   Prior to this summer, Herbalife had beaten earnings expectations for 21 straight quarters.

187.   On a quarterly conference call held on November 4, 2014, the Company acknowledged that recent changes have hurt performance, describing "a number of build it better initiatives" that are causing a "temporary reset."   For example, Johnson stated:

> We are making changes to the business model that will not only improve our way of doing business but also improve our results. This period of transition for the company is an important chapter in our history and one that will make us stronger. Some of these changes, however, take time to be digested and implemented by our members and as a result, this has affected our performance for the short term, yet we manage for the long term, and we firmly believe that the changes we are making are all the right ones for the healthy growth of our company, and they give us tremendous confidence for our future"

188.   Herbalife's stock price declined on November 4 by 19.84%, from $55.90 to $44.26, on this news of forced changes to its business practices.   Nye

Rep. ¶¶50-56.   Analysts following the Company similarly attributed Herbalife's declining financial results to forced changes in its business practices.  For example, a November 5, 2014 report issued by Barclays entitled "Doing the Right Thing Can Hurt" blamed the poor quarter on changes in the business model such as limiting the size of a first order and new standards to qualify as a sales leader.  The first order limit prevents a new distributor from ordering more than 1100 volume points on their first order, which will lengthen the time it will take for a distributor to become a sales leader.   The Company also implemented changes to its marketing campaign, because of the rampant misleading claims distributors were making about the efficacy of Herbalife's products.  The report stated: "[i]t is not exactly clear why these changes are being made so quickly, but the negative publicity around HLF's business model probably provided a strong incentive to take action now."

189.   On February 26, 2015, Defendants reported financial results for the fourth quarter and year end 2014.  Compared with previous years, the results were nothing short of disastrous, and yet further proof that changed business practices Ackman caused were directly and negatively impacting Herbalife's bottom line:

| | Year Ended December 31, | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2014 | | 2013 | | 2012 | | 2011 | | 2010 |
| Net income | $ | 308.7 | $ | 527.5 | $ | 464.0 | $ | 415.0 | $ 292.9 |
| *Growth Rate* | | *-41%* | | *14%* | | *12%* | | *42%* | |
| **Earnings per share** | | | | | | | | | |
| Basic | $ | 3.58 | $ | 5.14 | $ | 4.13 | $ | 3.53 | $ 2.46 |
| *Growth Rate* | | *-30%* | | *24%* | | *17%* | | *43%* | |
| Diluted | $ | 3.40 | $ | 4.91 | $ | 3.94 | $ | 3.32 | $ 2.32 |
| *Growth Rate* | | *-31%* | | *25%* | | *19%* | | *43%* | |

190.   During the 4Q and YE 2014 earnings call on that day, Johnson told analysts:

The enhancements we started making to our marketing plan at the end of quarter two last year as part of our broader transition had a greater

short-term impact than anticipated on volumes and net sales in key markets.

\* \* \*

[O]ur consolidated results were also negatively affected by the impact of declines in four markets, the U.S., Mexico, Brazil, and [Korea]... Each of these four markets is being impacted slightly differently by the marketing plan changes discussed by Michael.  And importantly, we expect these changes to cycle through in 2015.

191.   These disappointing results caused Herbalife's share price to close down 10.94%, from $34.82 to $31.01, a decline that was directly caused by the further implementation of more conservative business practices and the consequent reduction in profitability.  Nye Rep. ¶¶58-61.

192.   On May 1, 2015, *Seeking Alpha* reported that Herbalife products are being stockpiled in warehouses across Mexico.[146]   The stockpiling is part of practice called "field sales," first mentioned in February 2015, whereby high-level distributors buying large volumes of products, storing them in a network of warehouses across Mexico and then selling them to lower-level distributors.  While Herbalife purported to end the practice in 2014, a March 9, 2015 BTIG Research report nevertheless found that field sales accounted for 70% of all sales in Mexico.[147]   *Seeking Alpha* reported that three Chairman's Club members were among those who owned the warehouses.[148]   One high-level distributor described to *Seeking Alpha* how several upper-level distributors banded together to buy

---

[146] *Seeking Alpha*, "Herbalife's Top Distributors Hold Warehouses Full Of Product In Mexico – Why?" (May 1, 2015) http://seekingalpha.com/article/3127346-herbalifes-top-distributors-hold-warehouses-full-of-product-in-mexico-why   (last accessed May 8, 2015).

[147] *Id.*   According to February 23, 2015 Barclays research report, Herbalife purported to eliminate the use of field sales as of November 1, 2014.

[148] *Id.*

products and then filled out a form instructing Herbalife to reallocate credit for those purchases to lower-level distributors.  This allowed the top distributors to "help out" those beneath them while using their own purchases to earn commissions.[149]   This practice directly contravenes Herbalife's public compensation plan substantially undermines the Company's goal of daily consumption.   The high-level distributor further stated that "[g]roups have implemented strategies that go against independent sales of Herbalife products . . . *Michael Johnson has reports about these discrepancies and anomalies*."[150]

193.   On May 4, 2005, Herbalife opaquely announced that it had closed the third amendment to extend its syndicated credit agreement,[151] which consists of a revolving credit facility and a term loan.  "[A]mong other things" – which remain undisclosed – the amendment reduces the capacity on the Company's revolving credit facility from $700 million[152] to $425 million, and extends the maturity of that $425 million from March 9, 2016 until March 9, 2017.  Significantly, upon closing the amendment Herbalife is required to pay a forced acceleration of $51 million on the revolving credit facility and an additional $20 million on a term loan (for a total of $71 million), and to further reduce the balance of the revolving credit facility to $425 million (which  matures on March 9, 2017) with an additional $24 million in payments in September 2015.   Notably, only the maturity of the

---

[149] *Id.*

[150] *Id.*

[151] *Herbalife Announces Amendment to Extend Credit Facility* (May 4, 2015) http://files.shareholder.com/downloads/ABEA-48ZAJ9/4125919357x0x826169/ 2E035022-4B9A-454E-AD63-107AC417DF5E/HLF_News_2015_5_4_General_ Releases.pdf (last accessed May 8, 2015).   Herbalife filed a Form 8-K containing this press release on May 6, 2015.

[152] The press release did not disclose the total amount of the revolver, but in its 2014 Form 10-K at 64, Herbalife stated that it was for $700 million.

revolving credit facility was extended; the maturity of the term loan was not. Undisclosed in the press release, but mentioned by DeSimone during the 1Q 2015 earnings call, is that the amendment also significantly restricts Herbalife's ability to buy back stock by requiring a dollar pay down on the term note for every dollar used to buy back stock.

194.   Analysts quickly concluded that, as a result of these payments and the subsequent reclassification of Herbalife's short-term debt, the Company's creditors moved to reduce their exposure to the Herbalife.[153]  One analyst wrote:

> Since the disclosure of the FTC's CID, it seems apparent that Herbalife' bank group has been getting nervous. Cash management policies changed and changed abruptly last year. The company went from buying back stock at a furious pace to buying back none. . . . The truth, of course, is that the bank group dropped the hammer on the company and has been squeezing them ever since.

> * * *

> To summarize, Herbalife paid its bankers $7 million in order to receive a reduction in credit capacity from $1.2 billion to $425 million with the banker securing additional incentives for the company to draw down its revolver even further in the future and collect $100 million in capital back no later than September 15.

> When you consider the idea that as a general rule, banks want to be in the business of lending money it becomes apparent pretty quickly that this is one credit that this particular bank group can't wait to leave in the rear-view mirror.

> What else can we glean from this little transaction?

> Obviously, Herbalife had nowhere else to turn for access to credit.[154]

---

[153] *Seeking Alpha*, "Herbalife: Good News on Debt Might Not Be Such Good News After All (May 5, 2015), http://seekingalpha.com/article/3138776-herbalife-good-news-on-debt-might-not-be-such-good-news-after-all (last accessed May 8, 2015).

195.   The reason for the banks' move to reduce their exposure to Herbalife soon became apparent.   On May 5, 2015, Herbalife added yet another governmental investigation to the list – this time, with criminal consequences:

> The Department of Justice recently sought information from the Company, certain of its Members and others regarding allegations being made about the business practices of the Company and its Members.  In the future, these and other governmental authorities may determine to seek information from the Company and other persons relating to these same or other allegations.[155]

196.   With respect to the Company's financial results, net sales were down year-over year in every region but China:[156]

| Net sales by geographic region: | 3 Months Ended: | | |
|---|---|---|---|
| | 3/31/2015 | 3/31/2014 | % Change |
| North America | $       226.7 | $       247.8 | (8.5) |
| Mexico | 123.6 | 142.7 | (13.4) |
| South and Central America | 161.7 | 244.7 | (33.9) |
| EMEA | 186.4 | 211.2 | (11.7) |
| Asia Pacific | 242.8 | 280.4 | (13.4) |
| China | 164.2 | 135.8 | 20.9 |
| Total Net Sales | $     1,105.40 | $     1,262.60 | (12.5) |

197.   With China's low per capita GDP, these results further indicate that the Company is continuing to target low-income and economically disadvantaged demographics while sales in legacy markets such as North America continue to decline.

198.   The fact that Herbalife is changing its practices indicates that there are genuine legal infirmities in its business model, which the Company is belatedly

---

[154] *Seeking Alpha*, "FTC: There's Never Been A Better Time To Arrest Herbalife," (May 7, 2015), http://seekingalpha.com/article/3152946-ftc-theres-never-been-a-better-time-to-arrest-herbalife (last accessed May 8, 2015).

[155] 1Q 2015 Form 10-Q at 13.

[156] 1Q 2015 Form 10-Q at 14.

trying to "reset" in the wake of tremendous regulatory scrutiny.   The implementation of these changes in the wake of the Pershing findings and increased regulatory scrutiny have already harmed investors.   The above financial reports and reaction by the market and analysts following Herbalife evidence the fact that Herbalife's illegitimate business practices are not sustainable, and further demonstrate the veracity of Pershing's findings.

## VII.   Johnson's Highly Unusual And Suspicious Stock Sales Support A Strong Inference of Scienter

199.   In addition to the facts detailed herein which set forth at minimum, Defendants' deliberate recklessness,   Defendant Johnson was motivated to perpetuate the fraudulent scheme alleged herein in order to benefit from the artificially inflated price of the Company's common stock through insider sales that were highly suspicious in both amount and timing.   While in possession of material, nonpublic information regarding Herbalife's business practices, Johnson sold approximately 2.12 million shares of the Company's common stock at artificially inflated prices, reaping enormous insider trading proceeds of over $126 million.[157]

### A.   The Value And Amount of Sales Were Highly Unusual

200.   The Class Period sales of Herbalife stock by Defendant Johnson were highly unusual and suspicious as measured by (i) the total amount and percentage of shares sold; (ii) the contrast with Johnson's prior trading history; and (iii) the timing of sales.   Such sales raise a strong inference of scienter.

#### 1.   Johnson's Extraordinary Amount And Percentage Sold

201.   Johnson's massive $126 million in proceeds from selling over 2.1 million shares of Herbalife common stock in a relatively short time frame of 14

---

[157] On a split-adjusted basis, Defendant Johnson sold 2.30 million shares.

months, from March 1, 2011 through May 1, 2012, made him the highest-paid CEO in America in 2011.[158]

202.   Notably, the amount and percentage sold is highly suspicious. According to Herbalife's 2011 proxy filing, at the start of the Class Period, Johnson beneficially owned 2,571,668 shares of Herbalife common stock as of February 28, 2011, equating to 5,143,336 shares on a split-adjusted basis.  From March 1, 2011 through May 1, 2012, Johnson sold 2,303,414 shares (on a split-adjusted basis) of Herbalife common stock representing 45% of the 5.14 million shares he held at the start of the Class Period, a material percentage of nearly half his holdings.

### 2.    The Sales Were Inconsistent With Prior Trading

203.   Johnson's Class Period sales were not only large in both absolute and percentage terms, but also inconsistent with his selling activity during the three years prior to the Class Period, from  January 1, 2008 through December 31, 2010 (the "Comparison Period").

204.   During the entirety of the Comparison Period, Johnson sold 588,236 shares of Herbalife stock, resulting in proceeds of $28.9 million.  During the three year span within the Class Period, Defendant Johnson engaged in a selling spree of 2,119,473 shares for proceeds of $126,060,784.[159]   Adjusting for the May 2011 stock split, Johnson sold the equivalent of 1,176,652 shares of Herbalife during the Comparison Period, still less than half the 2.30 million share amount he sold on split-adjusted basis during a short period at the beginning of the Class Period.

---

[158]*The Guardian*, "Michael Johnson of Herbalife: America's highest paid CEO in 2011" (May 2, 2012) http://www.theguardian.com/business/2012/may/02/michael-johnson-highest-paid-ceo (last accessed May 8, 2015).

[159]  The $126 million in proceeds from Johnson's Class Period sales was approximately ***102 times*** the base salary Johnson earned as CEO during the Class Period.  Defendant Johnson's 2013 base salary was $1,236,000.

205.   Thus, Defendant Johnson increased his stock sales by *3.7 times*, from 588,326 shares to 2,119,473 shares; *2.1 times* on a split-adjusted basis.  Defendant Johnson's sales—as measured in dollars—is also striking.   Defendant Johnson's sales increased more than ***four-fold*** during the Class Period, from approximately $28.9 million during the Comparison Period to over $126 million during the Class Period.



### 3.      The Timing Of The Stock Sales Was Suspicious

206.   Also suspicious was the timing of Defendant Johnson's Class Period sales as they occurred during a period when Herbalife was announcing "record" quarterly and yearly financial results and was continually raising guidance which led to a more than doubling of Herbalife's stock price in a short time frame. Equally, if not more suspicious, was the fact that Johnson implemented an

overlapping trading plan which doubled the number of shares he was selling during this time frame.



207.   Defendant Johnson had no sales during late-2012 and 2013, as the Company's stock had drastically fallen in response to the market's increased awareness regarding the Company's fraudulent business model, in particular Einhorn's questioning and Pershing Square's investigation into Herbalife's business practices.  Defendant Johnson thus sold and profited before the impact of the investigations into Herbalife's business practices would be made public and would negatively impact the stock price.

208.   Also significant, is that Johnson's Class Period sales corresponded with the Company's share buybacks.[160]  Specifically, the Expert Report of Paul

---

[160] Significantly, Johnson took more than two years to sell Herbalife stock after his May 1, 2012 sales, until May 2014, subsequent to and during 1Q14 and 2Q14 repurchases—effectuating a large insider sale to reap **over $13 million in profits**. *See* Hodgson Rep., Appendix IV: Herbalife Share Buyback Analysis.

Hodgson, which Lead Plaintiff submits herewith as Exhibit J (the "Hodgson Report"),[161] concluded that "no effort was made to suspend Mr. Johnson's trading while instituting major company share buyback programs."  Hodgson Rep. 10. Moreover, during 2013, Johnson did not exercise stock options, "coincident with a significantly low level of share repurchases by the company after 1Q2013." Hodgson Rep. 10.

### B.   The Trading Plans Adopted By Johnson Cannot Shield Him From Liability

209.   Johnson's use of multiple 10b5-1 trading plans raises significant red flags and suspicion that the proper purpose of these plans was subverted.  Michael Johnson sold 2,119,473 shares via these 10b5-1 trading plans during the class period and all shares resulted from the exercise of stock options. All the sales were from the exercise of stock options and Johnson sold approximately 90% of the shares he exercised.   Hodgson concludes that "[a]n examination of Johnson's trading plans and trading activities raised a number of the red flags commonly applied by corporate law firms, the Securities and Exchange Commission, the Council for Institutional Investors and academic research."  Hodgson Rep. at 10.

210.   During the Class Period, Johnson operated four separate trading plans. Johnson's multiple, and at times overlapping, plans were highly unusual and suspicious and were utilized contrary to the intended purpose of having these plans.  The Hodgson Report finds that common red flags for abusive trading plans that were evident in Johnson's use of trading plans include:

> a.    Abnormal stock divestment: All of Johnson's 2,119,473 shares sold during the Class Period resulted from the exercise of stock options, which is indicative of his desire to reduce exposure to Herbalife common

---

[161] Hodgson is eminently qualified to offer his expert opinion.  His full CV can be found appended to his report.

stock.  In addition, Johnson's last plan was for one sale.  Hodgson Rep. 10-12.

  b. The use of multiple, overlapping plans: Johnson operated four separate 10b5-1 trading plans during the Class period, including two plans that overlapped.[162] Hodgson Rep. 13-14.

  c. No "seasoning period":  Johnson's first trade under the 10b5-1 plan occurred without a reasonable amount of time passing since the time of adoption of the plan.  Hodgson Rep. 14.

  d. Irregular, inconsistent and asymmetrical disclosures: Johnson's first trading plan was announced via a press release, while none of the other plans were publicly announced (including the two overlapping plans and the plan for the single sale). Hodgson Rep. 14-15.  Further, Johnson's first plan required him to retain 50% of the net proceeds in stock (Hodgson Rep. at 12), but the other three plans do not.

  e. Scheduling of major stock buyback programs concurrent with 10b5-1 sales:  From March 31, 2011 through June 30, 2014, Herbalife bought back approximately 42.3 million shares at a cost of $2.4 billion, while during this time Johnson was engaged in large stock sales via his trading plans.  Hodgson Rep. 15-16.

211. The Hodgson Report concludes that:

> ***It is my opinion that both the use of the plans and their internal operation are so inconsistent as to be suspicious in nature.*** One plan set trading dates every three months for a year, while another was

---

[162] Morrison & Foerster, Herbalife's counsel in *Herbalife v. Ford*, No. 07-cv-2529 (C.D. Cal.) and *Jacobs v. Herbalife*, No. 02-cv-01431(C.D. Cal.), advised its clients that "a person should not maintain multiple Rule 10b5-1 plans for a single issuer because it raises suspicion that the person is seeking to evade the requirements of the rule . . . ." "Frequently Asked Questions About Rule 10b5-1 Plans" (2015) http://media.mofo.com/files/Uploads/Images/FAQ10b51.pdf (last accessed May 8, 2015).

adopted apparently to execute a single trade over the course of just two days. One plan was disclosed via press release, stressing the CEO's promise to retain a large portion of the shares resulting from stock option exercise, while subsequent plans were neither publicly disclosed nor did they involve any requirement to retain stock. Nor did the length of time between plan adoption and first trade follow any discernible pattern, with one plan's first trade within days of adoption while another not until over four months later. Sometimes plans ran consecutively, sometimes they ran concurrently. For these reasons, *it is clear that there was no oversight of the operation of Mr. Johnson's 10b5-1 plans, as even a minimum level of supervision would have drawn attention to the many red flags that these plans were raising*.

For the aforesaid reasons, it is my opinion that *Mr. Johnson's use of 10b5-1 trading plans subverted the original intended application of these plans and that the sales conducted within the plans should no longer be subject to the safe harbor provisions bestowed upon them*.[163]

## VIII.  **Applicability of the Presumption of Reliance: The Fraud on the Market Doctrine**

212.   At all relevant times, the market for Herbalife common stock was an open, efficient and well-developed market for the following reasons, among others:

a.      Herbalife's common stock met the requirements for listing and was listed and actively traded on the NYSE under the symbol "HLF" and the NYSE is a highly efficient and automated market;

b.      As a public company, Herbalife filed periodic public reports with the SEC;

c.      The average daily trading volume for Herbalife common stock during the Class Period was 2,992,675 shares, thus providing an average weekly trading volume over 16% above the threshold indicative of an efficient market;

d.      Herbalife regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire

---

[163] Hodgson Rep. at 17.

services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

e.   Herbalife was followed by securities analysts employed by major brokerage firms, including Argus Research Corp., SunTrust Robinson Humphrey Inc., Barclays Capital Inc., Wedbush Morgan Securities, D.A. Davidson & Company, Caris & Company and S&P Capital IQ.  Each of these reports was publicly-available and entered the public marketplace;

f.   Institutional investors reported owning a majority of all Herbalife common stock during the Class Period.  Currently, over 90% of total shares are held by institutional owners, according to Yahoo Finance. This high level of institutional ownership of Herbalife common stock during the Class Period indicates that the market price was reflective of active trading by sophisticated and knowledgeable investors; and

g.   As a result of the foregoing, the market for Herbalife common stock promptly digested current information regarding the Company from all publicly-available sources and reflected such information in the Company's common stock price.   Under these circumstances, all purchasers of Herbalife's common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices and a presumption of reliance applies.

h.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Lead Plaintiff's fraud claims are grounded in Defendants' omissions of material fact of which there is a duty to disclose.  As this action involves Defendants' failure to disclose material adverse information regarding Herbalife's business practices, financial results and condition and internal controls—information that

Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered such information important in the making of investment decisions.

## IX. Inapplicability Of The Statutory Safe Harbor

213. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false or misleading statements pleaded in this Complaint. The statements alleged to be false or misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

214. To the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Herbalife and the Individual Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading. Defendants are liable for the statements pleaded because, at the time each of those statements was made, Defendants knew the statement was false and the statement was authorized and/or approved by an executive officer of Herbalife who knew that such statement was false when made.

## X. Class Action Allegations

215. Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or

otherwise acquired Herbalife's common stock during the Class Period and were damaged thereby (the "Class"). Excluded from the Class are (i) Defendants; (ii) members of the immediate family of each Individual Defendant; (iii) any person who was an officer or director of Herbalife during the Class Period; (iv) any firm, trust, corporation, officer, or other entity in which any Defendant has or had a controlling interest; (v) any person who participated in the wrongdoing alleged herein; and (vi) the legal representatives, agents, affiliates, heirs, beneficiaries, successors-in-interest, or assigns of any such excluded party.

216. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Throughout the Class Period, Herbalife's common stock was actively traded on the NASDAQ, an efficient market. As of February 12, 2014, the Company had more than 101 million shares of common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds of thousands of members in the Class.

217. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class predominate over questions that may affect individual Class members, including:

a.    Whether Defendants violated the federal securities laws;

b.    Whether Defendants misrepresented material facts concerning Herbalife;

c.    Whether Defendants' statements omitted material facts necessary to make the statements not misleading in light of the circumstances under which they were made;

d.   Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

e.   Whether Defendants engaged in perpetrating a manipulative and deceptive device and/or scheme and/or otherwise engaged in a fraudulent course of conduct;

f.   Whether the Herbalife SEC filings issued during the Class Period, which contained financial information (*e.g.*, its Forms 10-K, 10-Q and 8-K) contained untrue or materially misleading statements;

g.   Whether the prices of the Company's common stock were artificially inflated; and

h.   The extent of damages sustained by Class members and the appropriate measure of damages.

218.   The claims of Lead Plaintiff is typical of those of the Class.

219.   Lead Plaintiff will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation.   Lead Plaintiff has no interests that conflict with those of the Class.

220.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XI.   <u>Claims Brought Pursuant to the Exchange Act</u>

### FIRST CLAIM FOR RELIEF

**For Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5(b)**
**(Against Defendants Herbalife And Michael Johnson)**

221.   Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

222.   During the Class Period, Defendants disseminated or approved the false statements specified herein, which they knew or recklessly disregarded were misleading in that they failed to disclose material facts necessary in order to make

the statements made, in light of the circumstances under which they were made, not misleading, and they contained material misrepresentations.

223.   These Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Herbalife common stock during the Class Period.   As detailed herein, the misrepresentations contained in, or the material facts omitted from, these Defendants' public statements, concerned, among other things, the Company's improper business and operational practices.

224.   These Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the Class; made various false and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements with a reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of securities, which were intended to, and did: (i) deceive the investing public, including Lead Plaintiff and the Class, regarding, among other things, Herbalife's business practices and operations; (ii) artificially inflate and maintain the market price of Herbalife stock; and (iii) cause members of the Class to purchase the Company's common stock at artificially inflated prices.

225.   Defendant Herbalife is liable for all materially false and misleading statements made during the Class Period, as alleged above.

226.   Herbalife is further liable for the false and misleading statements made by the Company's officers in press releases and during conference calls and at conferences with investors and analysts, as alleged above, as the makers of such statements and under the principle of *respondeat superior*.

227.   Defendant Johnson, as a top executive and director of the Company, is liable as a direct participant in the wrongs complained of herein.  Through his positions of control and authority as an officer and director of the Company, he was able to and did control the content of the public statements disseminated by Herbalife.  Johnson had direct involvement in the daily business of the Company and participated in the preparation and dissemination of the false and misleading statements, as set forth above.

228.   As described above, these Defendants acted with scienter throughout the Class Period in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.

229.   Lead Plaintiff and the Class have suffered damages in that they paid artificially inflated prices for Herbalife common stock.  Lead Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

230.   As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the Class suffered damages in connection with their purchases of Herbalife stock during the Class Period.

**SECOND CLAIM FOR RELIEF**

**For Violations Of Section 20(a) Of The Exchange Act**
**(Against Defendant Michael Johnson)**

231.   Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

232.   This Count is asserted against Michael Johnson for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of Lead Plaintiff and all members of the Class.

233.   As alleged in detail above, Herbalife and Johnson committed a primary violation of the federal securities laws through its knowing and/or reckless dissemination of materially false and misleading statements and omissions throughout the Class Period.

234.   During his tenures as an officers and director of Herbalife, Johnson was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act.  By reason of his positions of control and authority as an officer and director of the Company, Johnson had the power and authority to cause Herbalife to engage in the wrongful conduct complained of herein.  As set forth in detail above, Johnson able to and did control, directly and indirectly, and exert control over Herbalife, including the content of the public statements made by the Company during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

235.   In his capacity as CEO and Chairman of the Company, and as more fully described above, Johnson had direct involvement in the day-to-day operations of Herbalife and in the Company's financial reporting and accounting functions. Johnson was also directly involved in providing false information and certifying and/or approving the false statements disseminated by Herbalife during the Class Period, including filings with the SEC.

236.   Johnson received various written and oral reports from different divisions of the Company, and attended in-person and telephonic meetings, on a routine basis.  Johnson's knowledge of and participation in the Company's affairs through the various reports he received and/or had access to, and the meetings he attended, are described above.

237.   By reason of his positions as an officer and director of Herbalife, as can be seen by his corresponding ability to influence and control the Company, Johnson is a "controlling person" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to direct the management and activities of the Company and its employees, and to cause the Company to engage in the unlawful conduct complained of herein.  Because of his positions, Johnson had access to adverse nonpublic financial information about Herbalife and acted to conceal the same, or knowingly or recklessly authorized and approved the concealment of the same.  Moreover, Johnson was also involved in providing false information and certifying and/or approving the false statements disseminated by the Company during the Class Period regarding its improper business practices and operations.  Johnson was provided with or had access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

238.   As set forth above, Herbalife violated Section 10(b) of the Exchange Act by its acts and omissions alleged in this Complaint.  By virtue of his position as a controlling person of the Company and as a result of his own aforementioned conduct, Johnson is liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead

Plaintiff and the other members of the Class who purchased or otherwise acquired Herbalife common stock.

239.   As a direct and proximate result of these Johnson's conduct, Lead Plaintiff and the Class suffered damages in connection with their purchase or acquisition of Herbalife stock.

## XII.   **Prayer For Relief**

240.   Wherefore, Lead Plaintiff prays for judgment individually and on behalf of the Class, as follows:

a.   Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b.   Awarding Lead Plaintiff and the Class members damages, including interest;

c.   Awarding Lead Plaintiff reasonable costs, including attorneys' and experts' fees; and

d.   Awarding such equitable/injunctive or other relief for the benefit of the Class as the Court may deem just and proper.

## XIII.  **Jury Demand**

241.   Lead Plaintiff demands a trial by jury for all issues so triable.

Dated: May 8, 2015                    Respectfully submitted,


By:  */s/ Jon A. Tostrud*

**TOSTRUD LAW GROUP, P.C.**
Jon A. Tostrud (SBN 199502)
1925 Century Park East, Suite 2125
Los Angeles, CA 90067
Telephone:  (310) 278-2600
Facsimile:  (310) 278-2640
E-mail:      jtostrud@tostrudlaw.com

*Local Counsel and Counsel for Lead Plaintiff*

**SAXENA WHITE P.A.**
Maya Saxena (*pro hac vice*)
Lester R. Hooker (241590)
Brandon T. Grzandziel (*pro hac vice*)
5200 Town Center Circle, Suite 601
Boca Raton, FL 33486
Telephone:   (561) 394-3399
Facsimile:   (561) 394-3382
E-mail:      msaxena@saxenawhite.com
             lhooker@saxenawhite.com
             brandon@saxenawhite.com

*Lead Counsel and Counsel for Lead Plaintiff*

**PROOF OF SERVICE VIA ELECTRONIC POSTING PURSUANT TO CENTRAL DISTRICT OF CALIFORNIA LOCAL RULES AND ECF GENERAL ORDER NO. 10-07**

I, the undersigned, say:

I am a citizen of the United States and am employed in the office of a member of the Bar of this Court. I am over the age of 18 and not a party to the within action. My business address is 1925 Century Park East, Suite 2125, Los Angeles, California 90067.

On  May 8, 2015, I caused to be served the following documents:

- **SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

All signatories listed in this filing, and on whose behalf the filings are submitted, concur in the filings' content and have authorized the filings.

By posting the document to the Electronic Case Filing ("ECF") Website of the United States District Court for the Central District of California, participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 8, 2015, at Los Angeles, California.


*/s/ Jon A. Tostrud*
Jon A. Tostrud

# Mailing Information for a Case 2:14-cv-02850-DSF-JCG Abdul Awad v. Herbalife Ltd. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Patrick V Dahlstrom**
  pdahlstrom@pomlaw.com

- **Jonathan C Dickey**
  jdickey@gibsondunn.com

- **Daniel S Floyd**
  dfloyd@gibsondunn.com,jarneson@gibsondunn.com

- **Lionel Zevi Glancy**
  lglancy@glancylaw.com

- **Michael M Goldberg**
  mmgoldberg@glancylaw.com,dmacdiarmid@glancylaw.com,info@glancylaw.com

- **Brandon T Grzandziel**
  brandon@saxenawhite.com

- **Lester R Hooker**
  lhooker@saxenawhite.com,e-file@saxenawhite.com

- **Sarah L Kushner**
  skushner@gibsondunn.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com

- **Francis P McConville**
  fmcconville@labaton.com

- **Alexander K Mircheff**
  amircheff@gibsondunn.com,mostrye@gibsondunn.com,inewman@gibsondunn.com,cnowlin@gibsondunn.com,lgadberry@gibsondunn.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com

- **Maya Saxena**
  msaxena@saxenawhite.com

- **Jon A Tostrud**
  jtostrud@tostrudlaw.com,acarter@tostrudlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)