**SAXENA WHITE P.A.**
Maya Saxena (*pro hac vice*)
Lester R. Hooker (SBN 241590)
Brandon T. Grzandziel (*pro hac vice*)
5200 Town Center Circle, Suite 601
Boca Raton, FL 33486
Telephone:   (561) 394-3399
Facsimile:   (561) 394-3382
E-mail:       msaxena@saxenawhite.com
               lhooker@saxenawhite.com
               brandon@saxenawhite.com

*Lead Counsel for the Class and*
*Counsel for Lead Plaintiff*

**TOSTRUD LAW GROUP, P.C.**
Jon A. Tostrud (SBN 199502)
1925 Century Park East, Suite 2125
Los Angeles, California 90067
Telephone:   (310) 278-2600
Facsimile:   (310) 278-2640
E-mail:       jtostrud@tostrudlaw.com

*Local Counsel for the Class and*
*Counsel for Lead Plaintiff*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| IN RE HERBALIFE, LTD. SECURITIES LITIGATION | No. 2:14-CV-02850-DSF (JCGx) |
| | **CLASS ACTION** |
| | **LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** |
| | Hearing:   July 20, 2015<br>Time:       1:30 P.M.<br>Place:      Courtroom 840<br>              255 East Temple St.<br>              Los Angeles, CA 90012<br>Judge:     Hon. Dale S. Fischer |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................iii

I.      INTRODUCTION .................................................................................... 1

II.     LEGAL STANDARD ............................................................................. 2

III.    ARGUMENT .......................................................................................... 2

        A.    Oklahoma Has Pled Actionable Misstatements ........................... 2

              1.    The Falsity Of Defendants' Statements Does Not Depend
                    On A Regulatory Determination That Herbalife Is A
                    Pyramid Scheme ................................................................... 2

                    i.    "That Was A Misstatement": False Statements
                          Concerning Sales Of Herbalife Products ....................... 3

                    ii.   We Are "Expect[ing] Some Form Of Disciplinary
                          Action": False Statements Concerning Herbalife's
                          Legal And Regulatory Compliance ................................. 5

                    iii.  "Most Of Them Aren't Going To Make It":  False
                          Statements Concerning Distributors' Income And
                          Lifestyle Opportunities ................................................. 7

                    iv.   False Statements Concerning Product Pricing ................ 8

                    v.    "We're Trying To Take It Away From Fast Food":
                          False Statements Concerning Nutrition Clubs ................ 9

                    vi.   False Statements Concerning Chinese Operations ......... 10

        B.    Oklahoma Has Pled Loss Causation ........................................... 11

              1.    Standard For Pleading Loss Causation .................................. 11

              2.    Herbalife's Response To David Einhorn's Questions Was
                    A Corrective Disclosure ..................................................... 12

              3.    The *Millionaire* And *China* Presentations Were Corrective
                    Disclosures ........................................................................ 13

        C.    Defendants Knew They Were Lying To Investors ........................ 20

              1.    Defendants Knew They Were Lying To Investors .................. 21

              2.    Johnson's Suspicious Stock Sales Add To An Already-
                    Strong Inference Of Scienter ............................................... 23

IV.     CONCLUSION ...................................................................................... 25

# **TABLE OF AUTHORITIES**

## **Cases**

*Abuhamdan v. Blyth, Inc.*,
  9 F. Supp. 3d 175 (D. Conn. 2014) ...................................................................7

*Acticon AG v. China N.E. Petroleum Holdings, Ltd.*,
  692 F.3d 34 (2d Cir. 2012) ...........................................................................19

*Batwin v. Occam Networks, Inc.*,
  2008 WL 2676364 (C.D. Cal. July 1, 2008) ..................................................23, 24

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) .......................................................................20

*Collier v. ModusLink Global Solutions, Inc.*,
  9 F. Supp. 3d 61 (D. Mass. 2014)...................................................................21

*Eastwood Enters, LLC v. Farha*,
  2009 WL 3157668 (M.D. Fla. Sept. 28, 2009) .................................................21

*FTC v. BurnLounge, Inc.*,
  753 F.3d 878 (9th Cir. 2014) ..........................................................................6

*Gebhart v. SEC*,
  595 F.3d 1034 (9th Cir. 2010) ........................................................................4

*Henning v. Orient Paper, Inc.*,
  2011 WL 2909322 (C.D. Cal. Jul. 20, 2011) ....................................................14

*In Bare Escentuals, Inc. Sec. Litig.*,
  745 F.Supp.2d 1052 (N.D. Cal. 2010).............................................................23

*In re Apple Computer Sec. Litig.*,
  886 F.2d 1109 (9th Cir. 1989) .......................................................................23

*In re Bridgepoint Educ. Inc. Sec. Litig.*,
  2013 WL 5206216 (S.D. Cal. Sept. 13, 2013) ..................................................25

*In re Countrywide Fin. Corp. Deriv. Litig.*,
  554 F. Supp. 2d 1044 (C.D. Cal. 2008).......................................................24, 25

*In re Countrywide Fin. Corp. Sec. Litig.*,
  588 F. Supp. 2d 1132 (C.D. Cal. 2008).............................................................25

*In re Cutera Sec. Litig.*,
  610 F.3d 1103 (9th Cir. 2010) ....................................................................8, 14

*In re Daou Sys., Inc. Sec Litig.*,
  411 F.3d 1006 (9th Cir. 2005) ...................................................................11, 23

*In re Gilead Sciences Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008)..........................................................16, 17, 18, 19

*In re Immune Response Sec. Litig.*,
   375 F. Supp. 2d 983 (S.D. Cal. 2005) ................................................22

*In re Juniper Networks, Inc. Sec. Litig.*,
   542 F. Supp. 2d 1037 (N.D. Cal. 2008) .............................................20

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
   2015 WL 392669 (N.D. Cal. Jan. 29, 2015) .................................passim

*In re New Century*,
   588 F. Supp. 2d 1206 (C.D. Cal. 2011) ..............................................24

*In re NVIDIA Corp. Sec. Litig.*,
   2011 WL 4831192 (N.D. Cal. Oct. 12, 2011) .....................................24

*In re Omnicom Group, Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010) ...............................................................19

*In re Omnivision Techs.*,
   2005 WL 1867717 (N.D. Cal. July 29, 2005) .....................................23

*In re PMI Grp., Inc. Sec. Litig.*,
   2009 WL 1916934 (N.D. Cal. Jul. 1, 2009) ........................................24

*In re Questcor Sec. Litig.*,
   2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) ..................................23, 24

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
   266 F. Supp. 2d 1150 (C.D. Cal. 2003) ..............................................23

*In re UTStarcom, Inc. Sec. Litig.*,
   617 F. Supp. 2d 964 (N.D. Cal. 2009) ................................................25

*In re VeriFone Holdings, Inc. Sec. Litig.*,
   704 F.3d 694 (9th Cir. 2012) ...................................................4, 20, 21

*Kyung Cho v. UCBH Holdings, Inc.*,
   890 F. Supp. 2d 1190 (N.D. Cal. 2012) ..............................................21

*Loos v. Immersion Corp.*,
   762 F.3d 880 (9th Cir. 2014) .......................................................16, 21

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ...........................................................16

*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013) .........................................................16

*Middlesex Ret. Sys. v. Quest Software Inc.*,
   527 F. Supp. 2d 1164 (C.D. Cal. 2007) ..............................................23

*N.M. State Inv. Council v. Ernst & Young LLP*,
   641 F.3d 1089 (9th Cir. 2011) ...........................................................20

*Nathanson v. Polycom, Inc.*,
  2015 WL 1517777 (N.D. Cal. Apr. 3, 2015)......................................11, 19

*No. 84 Empl.-Teamster Joint Council Pens. Trust Fund v. Am. W. Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003)................................................................24

*Ore. Pub. Empl. Ret. Fund v. Apollo Grp. Inc.*,
  774 F.3d 598 (9th Cir. 2014)................................................................11

*Pub. Empl. Ret. Sys. of Miss. v. Amedisys, Inc.*,
  769 F.3d 313 (5th Cir. 2014) ....................................................16, 17, 18

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014) ..................................................................3

*Scott v. ZST Digital Networks, Inc.*,
  2012 WL 538279 (C.D. Cal. Feb. 14, 2012)..................................18, 19

*Snellink v. Gulf Resources, Inc.*,
  870 F. Supp. 2d 930 (C.D. Cal. 2012) ................................................14

*South Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008)................................................................21

*Tellabs v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)............................................................................21

*Valadez-Lopez v. Chertoff*,
  656 F.3d 851 (9th Cir. 2011) ..................................................................2

*W. Palm Beach Police Pen. Fund v. DFC Global Corp.*,
  2015 WL 3755218 (E.D. Pa. June 16, 2015) ..............................8, 9, 10

*Webster v. Omnitrition*,
  79 F.3d 776 (9th Cir. 1996) ....................................................................6

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ................................................................20

**Rules**

Fed. R. Civ. P. 9(b) ..............................................................11, 13, 18

Fed. R. Civ. P. 12(b)(6) ................................................2, 13, 16, 18

# I.     __INTRODUCTION__

The particularized facts in Plaintiff's Second Amended Complaint ("SAC")[1] fully remedy the infirmities that the Court perceived with the prior complaint.

First, the SAC details specific categories of false statements, and provides detailed reasons for falsity for each statement and category of statement.  The SAC then provides specific facts and support evincing that Defendants either knew or were reckless in not knowing of the falsity of their Class Period representations.

Second, with respect to scienter, at least five ongoing investigations by various governments or government agencies – including a criminal probe – are described in the SAC.  Senior Herbalife executives are quoted as expecting "disciplinary action" as a result of those investigations.  Defendant Johnson admitted that he made a "misstatement" concerning crucial information that goes to the very foundation of whether Herbalife is a lawful, legitimate operation.  Scienter is also bolstered by a detailed analysis of Johnson's sale of over $126 million worth of Herbalife stock through multiple overlapping 10b-5 trading plans, the existence of which alone raises numerous red flags.

Finally, the SAC describes how the various disclosures concerning Herbalife's fraud caused investors substantial losses after the artificial inflation was removed from the Company's stock price.  Due to the exposure of the Company's illicit practices as well as the prolonged government scrutiny, they have been forced to take remedial actions which have *already* caused a major adverse shift in Herbalife's business model and earnings.  Thus, despite the fact that the government investigations including have not yet concluded, shareholders have already sustained significant injuries.

---

[1] All "¶__" references herein are to the Second Amended Class Action Complaint for Violation of the Federal Securities Laws (ECF No. 94).  All capitalized terms not defined herein have the meanings as defined in the SAC.  "Order" means the Order on Defendants' Motion to Dismiss.  ECF No. 82.

In their motion, Defendants attempt to improperly rewrite the SAC's allegations.  Oftentimes, Defendants confuse the SAC with the prior complaint and argue against the non-operative complaint.  Indeed, Defendants' motion is notable not for what it says, but for what it does ***not*** say.  The incriminating and well-pled facts that Defendants do not address are legion, and include:

- The Company's admission that it does not comply with a permanent injunction placed on it (the meaning and requirements of which it also does not dispute);

- The CEO's admission that he made a "misstatement" for which he "got in a lot of trouble";

- Senior executives' admission that Herbalife was expecting "disciplinary" action as a result of an FTC investigation; and

- Allegations regarding the falsity of statements concerning the composition of Herbalife's distributor base.

As demonstrated herein, the SAC is more than sufficient to survive a motion to dismiss.  Defendants' motion should be denied in its entirety.

## II. <u>LEGAL STANDARD</u>

The standards on a Rule 12(b)(6) motion to dismiss a securities fraud complaint are well-known to the Court.  Order at 2.  While Defendants' arguments repeatedly reference the now-superseded allegations of the dismissed Amended Class Action Complaint, such arguments are impermissible and should be disregarded in their entirety.  *Valadez-Lopez v. Chertoff*, 656 F.3d 851, 857 (9th Cir. 2011) ("[I]t is well-established that an amended complaint supersedes the original, the latter being treated thereafter as non-existent.").

## III. <u>ARGUMENT</u>

### A.  **Oklahoma Has Pled Actionable Misstatements**

#### 1.  **The Falsity Of Defendants' Statements Does Not Depend On A Regulatory Determination That Herbalife Is A Pyramid Scheme**

It is no secret that many consider Herbalife to be an illegal pyramid scheme.

Indeed, multiple criminal and civil investigations are pending based precisely on these allegations.  ¶¶180-81.  A final disposition of these regulatory investigations (which may take years), however, *is not* required to determine that the statements detailed in the SAC are false and misleading.

As set forth below, the SAC "identif[ies] particular misrepresentations concerning specific components of Herbalife's operations."  Order at 13.  Each statement is accompanied by multiple, corroborating reasons why it is false.  None of these reasons require the Court to find that Herbalife is a pyramid scheme.  Oklahoma has therefore pled actionable false statements.  *Reese v. Malone*, 747 F.3d 557, 567 (9th Cir. 2014) ("To plead falsity, a complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading.").[2]

### i.     "That Was A Misstatement": False Statements Concerning Sales Of Herbalife Products

Herbalife's retail sales are a fundamentally important metric for the Company.[3]  In 1986, Herbalife agreed to be bound by a Permanent Injunction pursuant to the settlement reached in *California v. Herbalife Int'l, Inc.*, No. 92767 (Cal. Sup. Ct.).   The Permanent Injunction required Herbalife to track and

---

[2] "It is permissible for Plaintiffs to rely on a short seller report . . . to allege falsity at the pleading stage."  *Snellink v. Gulf Resources, Inc.*, 870 F. Supp. 2d 930, 939 (C.D. Cal. 2012).

[3] Herbalife itself explained that its retail sales served a "fundamental role in our compensation systems, internal controls and operations, including its role as the basis upon which distributor discounts, royalties and bonuses are awarded."  ¶33.  The percentage of sales to customers outside the distributor base is an even more important question.  CNBC told its audience that "it may be the most relevant question."  ¶31.  Even self-described Herbalife "ardent bull" John Hempton of Bronte Capital admitted that "a multi-level-marketing scheme where all the consumption is by people in the pyramid gives you pause."  ¶32.  Under FTC guidance and binding Ninth Circuit precedent, payment for recruiting unrelated to the sale of the product to ultimate users is "the *sine qua non* of a pyramid scheme."  *Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776, 781 (9th Cir. 1996).  The ability to track sales outside of the distributor base is neither unique nor difficult, as Tupperware CEO Rich Goings explained during a January 29, 2014 interview. ¶41.

distinguish sales to distributors from sales to non-distributors.[4]    ¶¶36-37. Defendants do not dispute this fact.    Defendants also had sophisticated IT capabilities that allowed the Company direct access to granular data, to the point where Defendant Johnson told *Los Angeles Magazine* that "[w]e know all the numbers, we know who recruits people, we know who sells product to someone else."[5]    ¶39.    Yet despite the Permanent Injunction's requirements and the Company's demonstrated IT capabilities, Defendants were unable to respond directly when questioned about the allocation of sales, with answers widely ranging from "[we] do not believe it is relevant" to "90%[,] absolutely." ¶¶45, 48.

As an initial matter, all of Defendants' statements regarding retail sales were false, because despite the Permanent Injunction they later admitted that they had no ability to track this data.  *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 706 (9th Cir. 2012) (falsity found where "no legitimate basis" for reported numbers existed); *Gebhart v. SEC*, 595 F.3d 1034, 1042-43 (9th Cir. 2010) ("fail[ure] to perform any meaningful investigation . . . created the substantial [and obvious] risk . . . that their representations were not true." (second and third alteration in original)).    Johnson's statement that 90% of sales were to non-distributors is similarly false.  Johnson **admitted** that his 90% figure "***was a misstatement***" (¶49), and underscored the falsity of his statement by confessing to CNBC that he "got in a lot of trouble" for making it.  *Id.*

Defendants try to explain away Johnson's admitted misstatement by positing that he was referring to the percentage of U.S. households purchasing Herbalife

---

[4] The mainstream financial media shared this understanding of the Permanent Injunction.  *The Motley Fool*, for example, explained that it "basically means that the company needs to be able to prove it is selling products to non-members at the end of the cycle in order for the distributor commissions to be lawful . . . ." ¶37.

[5] Similarly, Vice President of Investor Relations Amy Green boasted that "you can kind of peel off the onion to see what kind of granularity you want to look at.  You can look at an individual distributorship, you can look at the whole lineage of a distributor." ¶40.

products that were not also distributors.  Their explanation, however, ignores the clear context of the question: "[c]an you give us a percentage figure . . . as to what percentage of your sales are outside [Herbalife's] distribution network?"  ¶48. Defendants then double down by claiming that he was relying on facts presented in the Herbalife Investor Day presentation.  Mot. at 17 (citing ECF No. 62-24). However, Johnson's misstatement was made on December 19, 2012 (¶48), while the data from the Investor Day presentation was not released until January 10, 2013 (¶61).  Defendants offer no facts to rescue their conclusory assertion that Johnson was relying on non-public information to answer such a fundamental question.  Even if he was relying on non-public information, however, the source of his claims was the Lieberman Research report, which was directly contradicted by the Nielsen Report and the internal Actionable Report.  ¶¶63, 65.[6]

### ii.   We Are "Expect[ing] Some Form Of Disciplinary Action": False Statements Concerning Herbalife's Legal And Regulatory Compliance

On October 7, 2014, after discussions with "attorneys, academics and former FTC officials," Herbalife "[s]enior executives" admitted that they were "expect[ing] some form of disciplinary action" as a result of the FTC's investigation.  ¶180.  Defendants cannot plausibly maintain that on the one hand, they strictly adhered to the law, while on the other, they expect to be subject to "disciplinary action" for violating the law.

In addition to the 1986 Permanent Injunction, with which Defendants admitted noncompliance (¶44), Defendants also touted their compliance with other

---

[6] Nor does Walsh's May 1, 2012 reference to the purported 70% Rule constitute the get out of jail free card that Defendants contend.  Indeed, just two months after Walsh referenced the rule, Herbalife Principal Accounting Officer Bosco Chiu told the SEC that "we do not rely on the '70% rule' in any meaningful way."  ¶47(b). Relatedly, Plaintiff alleges that Herbalife falsely and misleadingly described the contribution of its distributor base.  ¶¶50-53.  Notably, Defendants do not argue against the false and misleading nature of those statements, thus conceding this point for purposes of their motion.

laws, including *Webster v. Omnitrition*, 79 F.3d 776 (9th Cir. 1996).  ¶¶125-26, 131.[7]  But Defendants' reliance on the so-called 70% Rule as proof of legal compliance with *Omnitrition* (¶131) cannot shield them from liability.  Johnson has admitted that his statements regarding sales outside of the distribution network (and thus, the Company's compliance with the 70% Rule) were not true.  ¶49(a). He followed up his admission by explaining that he "got in a lot of trouble" the last time he spoke about compliance and that "the lawyers [went] crazy."  ¶135.

Even the documents that Defendants use to tout their compliance are unreliable.  Defendants often paraded the Lieberman Report as proof that the Company was complying with the 70% Rule.  ¶60.  But the Lieberman Report contradicts the results in the Nielsen Report, which Defendants also touted as supposed proof of their compliance with the law.  ¶¶62-63.  **Both** the Lieberman and Nielsen Reports, moreover, are contradicted by a report from Actionable Research, conducted roughly a year-and-a-half earlier, which Defendants knew of but was unreleased to the public until January 2015.  ¶65.  Notably, Defendants do not even attempt to address the glaring inconsistencies in these reports.

Finally, Defendants' actions simply do not live up to their words.  Herbalife has only disciplined about 10 distributors over the past decade for violating the 70% Rule.  ¶137.  This is no surprise, as Herbalife did not have a chief of compliance until October 2014.  ¶128.  Worse yet, Herbalife reported vastly different numbers in its compliance staff, and even accepting the larger figure equates to just one compliance staff member for every 6,000 distributors.  *Id.*[8]

---

[7] *Omnitrition* held, quoting the FTC's *Koscot* Test, that "the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users" is "the *sine qua non* of a pyramid scheme."  *Omnitrition*, 79 F.3d at 781-82.  *Omnitrition* was recently affirmed by *FTC v. BurnLounge, Inc.*, 753 F.3d 878 (9th Cir. 2014).

[8] Defendants attempt evade liability by hiding behind vague cautionary language. But that cannot save them here.  Both the "bespeaks caution" doctrine and the PSLRA safe harbor only apply to forward-looking statements.  *In re New Century*,

### iii.   "Most Of Them Aren't Going To Make It":   False Statements Concerning Distributors' Income And Lifestyle Opportunities

Throughout the Class Period, Herbalife regularly enticed socio-economically disadvantaged recruits to become distributors with promises of extravagant income and luxurious lifestyles.   ¶¶74-75, 77-80.   Stephen Gratziani, who Defendant Johnson endearingly referred to as "my friend," was caught on video admitting that "[D]eep down inside, what do we really know? Yeah. We know that the reality is that most of them aren't going to make it."   ¶¶76, 79.   In fact, a stunning 93% of Herbalife distributors made no money at all.[9]   ¶91.   The lack of any financial opportunity is due to several factors, including (i) Herbalife manipulating its income statistics by excluding "inactive sales leaders" and "non-sales leaders" from its reported figures (¶93); (ii) Herbalife excluding roughly $10,000 worth of expenses that a Sales Leader would have to make back before breaking even (¶93);

---

588 F. Supp. 2d 1206, 1225-26 (C.D. Cal. 2008) (Pregerson, J.) (collecting authorities).   Defendants do not even attempt to assert that their statements concerning compliance with legal regulations are forward-looking, because they are not.   Even if Defendants' statements were forward-looking, which they are not, Defendants' arguments would still fail.   "[R]eferences to generalized cautionary language" will not suffice.   *Id.*   Here, the disclosure that Herbalife is susceptible to regulatory and private challenges due to its business model is so vague and conclusory as to be meaningless.   Nearly every company in every industry is subject to regulatory and private challenges.   The cited language could just as easily apply to a bank, a telecommunications company, or a mining or forestry company.   For these reasons, their reliance on *Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175 (D. Conn. 2014) is inapplicable.   That opinion specifically found that the cautionary language only applied to forward-looking statements.   *Id.* at 193.   *Abuhamdan* also found, unlike here, that the language at issue was specific and non-boilerplate.   *Id.*

[9] Defendants' disclosure of the *Jacobs v. Herbalife* lawsuit does not insulate them from liability.   The plaintiffs in that case alleged that Newest Way To Wealth ("NWTW"), a "system operated by certain independent distributors of Herbalife products" including Doran Andry – not Herbalife itself – misled them about income opportunities.   *See* Dickey Decl. Ex. F at 135.   The plaintiffs only sought to hold Herbalife vicariously liable for NWTW's misdeeds.   *Id.*   In any event, Herbalife settled the case "[w]ithout in any way admitting liability or wrongdoing."   *Id.*   Defendants cannot credibly contend that Herbalife investors should have known that 93% of the Company's distributors would not make money based upon a regulatory disclosure of a lawsuit in which Herbalife denied all wrongdoing.

and (iii) the lack of any turnover among the higher ranks of distributors (¶94).

Defendants characterize these statements as so obviously unimportant that no one would believe them.  Their current assertions, however, directly contradict the April 2011 Actionable Research Report, which was never released to the public (¶65), and revealed that 44% of distributors joined Herbalife "[t]o supplement . . . household income."  ¶65(a).  Defendants' promises of financial success are not puffery, especially considering that Herbalife uses its top distributors (including four Board members) to peddle false dreams of illusory lavish lifestyles.  ¶¶73-80, 89.  *W. Palm Beach Police Pen. Fund v. DFC Global Corp.*, 2015 WL 3755218, at *13 (E.D. Pa. June 16, 2015) (statements regarding "fundamental aspect[s] of business "are of vital importance to investors").[10]

### iv.    False Statements Concerning Product Pricing

Defendants do not even try to explain the massive three-fold price disparities between Herbalife's products and those of the competition.  ¶¶98-99.  Nor do they address the additional hidden packaging and handling fees tacked on top of the price, or the fact that the shipping costs for these products bore no rational relation to what it cost to ship the products.  ¶¶104-05.  The best Defendants can muster are vague references to brand loyalty and the benefits of the MLM model for nutrition products, which directly contradict the data presented to them in the April 2011 internal Actionable Report that revealed that a mere 17% of distributors signed up

---

[10] Defendants' implications to the contrary, neither *Ore. Pub. Empl. Ret. Fund v. Apollo Group Inc.*, 774 F.3d 598, 606 (9th Cir. 2014), nor *In re Cutera Sec. Litig.*, 610 F.3d 1103, 111 (9th Cir. 2010) hold that false statements regarding income and business opportunities are immaterial as a matter of law.  Even considering those cases' "objective verification" requirement, however, the fact that 93% of Herbalife distributors make no money at all (¶91) objectively verifies that Defendants' statements were false.

1    to enjoy the product at a discounted price.[11]   ¶65(a).

2            **v.    "We're Trying To Take It Away From Fast Food":**
3            **False Statements Concerning Nutrition Clubs**

4            Defendants simply cannot avoid the fact that they repeatedly boasted to

5    investors that the Nutrition Club's direct competition was fast food.  *E.g.*, ¶¶109,

6    110, 112, 113.  But there was no possible way that Herbalife could "steal a meal a

7    day from fast food."  ¶110.  First, Herbalife imposed onerous restrictions on the

8    Nutrition Clubs and their operators, including prohibiting signage, logos or

9    mentions of Herbalife, prohibiting any indication whether the club was opened or

10   closed, prohibiting product promotion and advertising, and requiring covered

11   windows such that a passer-by could not see into the club.[12]   ¶116.  Far from the

12   vibrantly active social centers Defendants portrayed them as, an investigation of

13   the actual nutrition clubs resembled shuttered businesses and homes.[13]   ¶115.

14           Second, Defendants can point to no evidence that Herbalife's attempt to

15   "take it away from fast food" (¶113) actually worked.  In fact, the opposite is true.

16   As Nutrition Clubs began to exponentially increase their footprint in Mexico in

17   2004, sales of fast food competitor Burger King did not decrease, as would be

18   expected, but actually increased.  ¶117.  This fact is particularly important because

19   Nutrition Clubs originated in Mexico, and Defendants often boasted that the

20   Mexican model could be replicated in other countries.  *Id.*

21

22

23

24   [11] Further, Defendants do not explain how, with all of the supposed benefits of the
     MLM model for nutrition products, GNC, Ensure and Slim-Fast are still able to
25   maintain lower product price points than Herbalife.  ¶97.

26   [12] Given these onerous restrictions, Defendants do not articulate how Nutrition
     Clubs were supposed to help Herbalife sell products.

27   [13] Notably, Defendants do not challenge the veracity of any of the photographs of
     Herbalife's Nutrition Clubs.
28

Third, Herbalife did not disclose that many of the Nutrition Clubs lost money on a retail basis.  ¶118.  The "training" programs implemented in conjunction with the Nutrition Clubs exploited the Club system by, among other deceptive means, creating fake club traffic consisting of trainees who were required to purchase and consume Herbalife products in order to advance their own status.[14]  ¶¶119-120.  These required purchases resulted in so-called "field sales," a practice whereby high-level distributors would purchase large volumes of products, store them in a network of warehouses and resell them to lower-level distributors.  ¶192.  Field sales accounted for 70% of all sales in Mexico (*id*.), another fact that Defendants do not dispute.

### vi.        False Statements Concerning Chinese Operations

Throughout the Class Period, Defendants told investors that, "due to restrictions on direct selling in China," Herbalife could not compensate its Chinese distributors in the same manner that it compensated all other distributors.  ¶¶147-49.  Walsh described the purported Chinese compensation scheme as "vastly different . . . from the rest of the world."  ¶150.

As Herbalife's internal documents prove, however, the so-called "service fees" with which its Chinese distributors were ostensibly compensated are in reality nothing more than disguised commissions based on sales and recruiting, and are no different from the distributor compensation systems in place in the rest of the world.  ¶¶158-63.  Indeed, when Herbalife's internal documents are compared to the 2009 Investor Day Presentation in the U.S., it becomes clear that the "service

---

[14] Defendants cannot credibly contend that a distributor who is required to purchase products from a Nutrition Club in order to advance within the organization is not a "phantom and fictitious" customer.  Notably, Defendants do not dispute that these programs required trainees to purchase Herbalife products to advance within the organization.  Herbalife used these forced sales to buoy the Nutrition Club's contribution to Herbalife's EBITDA, without which the Company would have been in breach of the Total Leverage Ratio covenant in its Credit Agreement.  ¶123.

1  fees" paid to Chinese distributors are nearly identical to the royalty overrides paid

2  to American distributors.   ¶¶164-65.   Notably, Defendants do not meaningfully

3  challenge the existence or veracity of these documents.[15]

4          **B.    Oklahoma Has Pled Loss Causation**

5              **1.    Standard For Pleading Loss Causation**

6          To plead loss causation, a plaintiff merely needs to set forth specific facts

7  which "demonstrate a causal connection between the deceptive acts that form the

8  basis for the claim of securities fraud and the injury."  *Apollo*, 774 F.3d at 605

9  (holding Rule 9(b) applies to pleading loss causation).   A plaintiff, however, "is

10 not required to show that a misrepresentation was the ***sole*** reason for the

11 investment's decline in value in order to establish loss causation"; rather, "as long

12 as the misrepresentation is one substantial cause of the investment's decline in

13 value, other contributing forces will not bar recovery under the loss causation

14 requirement. . . ."  *In re Daou Sys., Inc. Sec Litig.*, 411 F.3d 1006, 1025 (9th Cir.

15 2005) (emphasis original); *Nathanson v. Polycom, Inc.*, 2015 WL 1517777, at *11

16 (N.D. Cal. Apr. 3, 2015) (same).   Finally, a corrective disclosure need not mirror

17 the false statement or admit fraud.   *Nathanson*, 2015 WL 1517777, at *13; *In re*

18 *Montage Tech. Group. Ltd. Sec. Litig.*, 2015 WL 392669, at *8 (N.D. Cal. Jan. 29,

19 2015).

20         Oklahoma has pled loss causation for the three corrective disclosures here.

21 Each of these corrective disclosures reveals that Defendants' prior statements were

22 materially false and misleading.   None of the disclosures rely on the premise that

23 Herbalife is a pyramid scheme to correct previously undisclosed information.

24  ────────────────

25 [15] Defendants simply cannot reconcile their baseless assertion that Oklahoma
    presents "no particular facts" with the internal spreadsheet that it repeatedly cites
    and excerpts.  ¶¶158-164.  Defendants' repeated public acknowledgements and
26 explanations that Chinese law requires the compensation scheme there to be
    different (¶¶147-49), coupled with the unchallenged internal spreadsheet proving
27 that the compensation is not, in fact, different, suffices at this stage to show that
    Defendants are knowingly operating in violation of Chinese law.

28

## 2.    Herbalife's Response To David Einhorn's Questions Was A Corrective Disclosure

On May 1, 2012, David Einhorn asked very simple questions regarding the allocation of sales between distributors and non-distributors.  As the SAC makes clear (and despite Defendants' deliberate attempts to obfuscate the issue), it is Herbalife's response to Einhorn's questions – not the questions themselves – that partially revealed the truth to the market.[16]    ¶67.   Specifically, Herbalife's admission that it was unable to distinguish between sales to distributors and non-distributors revealed that it was not adhering to the 1986 Permanent Injunction, and this fundamental – and intentional – failure to track a fundamental statistic cast considerable doubt on the legitimacy of the Herbalife business enterprise.  *Id.*

In response to this revelation, Herbalife stock plummeted 19.94%.  *Id.*  An intra-day event study confirms that Herbalife's stock price began its precipitous decline in tandem with Herbalife's responses to Einhorn's questions.  ¶70.   In addition, *The Wall Street Journal* and *Business Insider* directly attributed the stock price decline to the Einhorn colloquy.  ¶¶68-69.  Herbalife's stock price continued to decline on May 2 and 3 (which Defendants do not address), a fact confirmed both by Dr. Nye's event study and by *Bloomberg*.  *Id.*

Contrary to Defendants' insistence, Oklahoma does not allege that Herbalife is a pyramid scheme because it failed to track its sales to non-distributors.  Rather, Oklahoma alleges that Herbalife misled investors into believing that it was complying with the 1986 Permanent Injunction when, in fact, it was not.  ¶¶67-72.  Defendants cannot simply assert, as they have done, that no falsity was revealed

---

[16] For this reason, contrary to Defendants' assertion, the Court's prior analysis does not apply to the SAC.  As the Court recognized, Einhorn's questions "prompted the disclosure that Herbalife does not track certain information."  Order at 8.  In the SAC, Oklahoma alleges that the 1986 Permanent Injunction required Herbalife to track certain pieces of information – a fact that Defendants do not dispute – and that its failure to do so constituted a violation of the Permanent Injunction. ¶¶35, 130.  Because "Einhorn's inquiry related to Herbalife's business model" (Order at 8), it is not necessary to find that Herbalife is a pyramid scheme in order to find that Herbalife misrepresented its compliance with the Permanent Injunction.

because data tracking is not relevant to Oklahoma's allegations.[17]   Oklahoma clearly details how and why Herbalife was required to distinguish between distributors and non-distributors as a result of the Permanent Injunction, as well as Herbalife's admission that it does not.  ¶130.  Oklahoma has adequately pled – and Defendants appear to concede – that while Herbalife was required to keep this data, it did not, and the Company's stock price plummeted as a result.

### 3.   The *Millionaire* And *China* Presentations Were Corrective Disclosures

The second and third corrective disclosures occurred on December 20, 2012 and March 11, 2014, when investor Bill Ackman, CEO of Pershing Square, revealed in his *Millionaire* and *China* presentations that Herbalife was lying about many of its fundamental business operations.[18]  ¶¶145-46, 170-71.  As a result of the *Millionaire* Presentation, Herbalife common stock declined 9.75% on December 20, and declined another 19.08% on December 21.  ¶145.  As a result of the *China* Presentation, Herbalife's stock declined 1.16%.  ¶170.  Notably, *The New York Times* directly attributed the March 2014 decline to Ackman's revelation that Herbalife was operating illegally in China.  ¶171.[19]

---

[17]  Far from "generalized comments," Herbalife's ability to track data was specifically pled, and included the names of 5 specific software suites that the Company used.  Again, Defendants nowhere say that any of this information is incorrect or inaccurate.  The level of granular detail that Herbalife achieved through its data tracking capabilities was wide-ranging, a fact of which Defendant Johnson boasted: "*[w]e know all the numbers*, we know who recruits people, we know who sells product to someone else."  ¶39 (emphasis added).  Despite purportedly knowing "all the numbers," Herbalife was suspiciously unable (or unwilling) to provide the very information concerning true retail sales that these numbers were meant to espouse.

[18]  Ackman concluded, based on the *Millionaire* and *China* presentations, that Herbalife is operating illegally as a pyramid scheme.  As clearly detailed in the SAC, however, it is not Ackman's ***conclusion*** that Oklahoma alleges constitutes the corrective disclosures.  Rather, it is the ***disclosed facts*** that lead Ackman to his conclusion that constitute the corrective disclosures.

[19]  Though Dr. Nye determined that the price declines on December 20-21 were statistically significant and caused directly by the *Millionaire* Presentation (Nye Rep. ¶¶30, 33), Defendants posit that he ignored the reaction of analysts and the news media.  Then, when Dr. Nye observes that *The New York Times* attributes the

It is no secret that Ackman and Pershing Square were (and continue to be) short on Herbalife stock. But as the Court correctly recognized, Ackman was entirely upfront about this fact. Hr'g Tr. 20:16-18. The Court also correctly observed that it had "no reason to think that Mr. Ackman is not credible . . . ." (*id.* at 28:2-3), an important factor in the loss causation analysis. While Defendants struggle to paint Ackman's short position as a disqualifying factor, their arguments are contradicted by the case law. Simply put, "[a] short seller report may be used to establish loss causation." *Snellink*, 870 F. Supp. 2d at 942 (loss causation sufficiently pled based on a single short seller report); *see also Henning v. Orient Paper, Inc.*, 2011 WL 2909322, at *8 (C.D. Cal. Jul. 20, 2011) (Fairbank, J.) (loss causation sufficiently pled based on short seller's revelation of fraud).

Both the *Millionaire* and *China* presentations were meticulously researched. ¶¶141, 168. Even though the first presentation, *Millionaire*, occurred in December 2012, the investigation began in the summer of 2011. ¶141. Between then and the March 2014 publication of *China*, Ackman spent nearly $50 million investigating Herbalife. ¶169. While the presentations are based, in part, on publicly available information, both *Millionaire* and *China* contain non-public information that was revealed to investors for the first time. *Millionaire*, for example, contained analyses and facts based upon a third party research firm's own analysis of 40,000

---

March 11 drop to the *China* Presentation, Defendants cry foul because the phrase "statistically significant" is not used. As an initial matter, Dr. Nye did not ignore analyst reports in the wake of the *Millionaire* Presentation. Nye Rep. ¶¶32 (citing *Associated Press* article). Further, Dr. Nye controlled for Herbalife-specific news in his analysis. *Id.* Nye Rep. ¶¶3-4. Defendants cannot credibly claim that the market rejected Ackman's presentation when Herbalife's stock began a multi-day decline at precisely the moment that Ackman's presentation began. *Id.* ¶¶28-31. In any event, Oklahoma has far surpassed any requirement for a Rule 12(b)(6) motion. Nothing in *Apollo* or any other Ninth Circuit opinion requires a plaintiff to demonstrate with expert testimony at this early stage of the case that a stock price drop is statistically significant, or that a predetermined quantum of analysts attribute the stock price drop to a corrective disclosure, even under Rule 9(b).

1  eBay transactions over a five year span,[20] as well as prior court testimony[21] and on-

2  site investigations of Nutrition Clubs in Queens and Omaha.[22]   ¶¶115, 142.

3  Ackman himself saw *Millionaire* as revealing previously hidden information,

4  explaining that "[w]e simply wanted the truth to come out . . . The company has

5  done their best to try to keep that from the general public." ¶144.

6        *China*, meanwhile, was based in large part on an internal Herbalife

7  spreadsheet (which Defendants do not address), as well as interviews with a dozen

8  Chinese distributors, attendance at distributor seminars, and visits to corporate-

9  owned stores.   ¶¶157-168.   The principal investigator overseeing the Pershing

10  investigation explained that "[n]ot many investment funds, or research companies

11  for that matter, have the time, patience, resources or the network to get this kind of

---

[20] While eBay itself is a public auction site, Defendants offer no support for their conclusory assertion that 40,000 transactions covering 5 years' worth of data are also publicly available.  And far from being conjecture, Dr. Taylor's conclusion that it would be unlikely for others to analyze this data is objectively correct. Oklahoma is unaware of anyone who has performed the same analyses that Pershing Square did, and Defendants offer no examples of their own.  Finally, the analyses of eBay transactions are not, as Defendants misrepresent, offered to show that Herbalife is a pyramid scheme.  Rather, the analyses is used to show that Herbalife misrepresented the composition of its distributors base (¶¶55-56) – an allegation, which as described above, Defendants do not challenge.

[21] Defendants' assertion that the deposition from *Herbalife v. Ford* said nothing about compliance with Herbalife's controls ignores that the deposition testimony clearly states that only between 10 and 25 distributors have been disciplined for violating the 70% Rule. ¶137.  Under their own theory, Defendants' assertion that the market knew Herbalife was a pyramid scheme as a result is irrelevant because no conclusion or finding of fact to that effect ever issued.

[22] Defendants assert that any passer-by would be able to tell if a club were closed or run out of someone's house – but as explained above, Oklahoma alleges that Defendants misled investors by claiming that the Nutrition Clubs were in direct competition with fast food.  ¶¶107-113.  The photographs evidence the severe restrictions placed upon Nutrition Clubs, unknown to the general public (or to anyone who does not have the financial resources to investigate scores of clubs thousands of miles from each other) that prevent them from competing with fast food.  ¶¶115-116.  Finally, Oklahoma never suggests, once again contrary to Defendant's misrepresentations, that the truth about Nutrition Clubs proves that Herbalife is a pyramid scheme.

work done anywhere in the world . . . ." ¶168.[23]

In any event, even if the Court finds that *Millionaire* and *China* were based entirely on publicly available information (which they were not), Oklahoma has still properly pled loss causation under *Pub. Empl. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313 (5th Cir. 2014) and *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049 (9th Cir. 2008). First, Defendants incorrectly suggest that Pershing Square's presentations must be accompanied by either a regulatory finding or an admission of wrongdoing in order to find loss causation. The Court has correctly observed that "a plaintiff is not required to allege an outright admission of fraud." Order at 2-3 (quoting *Loos v. Immersion Corp.*, 762 F.3d 880, 888-89 (9th Cir. 2014)); *see also Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 (9th Cir. 2008) ("[N]either *Daou* nor *Dura* require an admission or finding of fraud before loss causation can be properly pled.").[24]

In *Amedisys*, the Fifth Circuit found that plaintiffs had adequately pled loss

---

[23] These facts cure the Court's concerns that the prior complaint did not include particularized allegations identifying the non-public information in the presentations. Order at 9 n.11. Defendants nevertheless point to the disclaimers at the beginning of each presentation in support of their assertion that the reports contained only publicly available information. The actual language of the disclaimers, however simply states that the presentation is based on publicly available information; it does not state that the presentation is entirely or solely based on publicly available information. *See* Ex. B at 8 (ECF No. 94); Ex D at 15 (ECF No. 94); Ex G at 4 (ECF No. 94). Defendants' argument, which improperly elevates form over substance by deliberately disregarding the clearly apparent non-public information, should be disregarded.

[24] In *Montage Tech.*, the court found loss causation caused by a third party report. It distinguished *Loos*, explaining, like here, that "defendants rely on [*Loos*] to support the proposition that the Gravity Report revealed only a risk of fraud, and therefore did not constitute the predicate "corrective disclosure" necessary to show loss causation. *Loos* addressed the question of whether an announcement of an investigation into potentially fraudulent conduct, without more, is sufficient to allege loss causation. Here, by contrast, the Gravity Report, upon which plaintiffs rely, did not announce an investigation; rather, it announced the ***findings*** of its investigation: fraudulent conduct." 2015 WL 392669, at *8 (internal citations omitted). *Meyer v. Greene*, 710 F.3d 1189, 1198-99 (11th Cir. 2013), is thus inapplicable because the *Millionaire* and *China* presentations announced the ***findings*** of Pershing Square's investigation – not just (as discussed above) Ackman's ***opinion*** or the risk that Herbalife is a pyramid scheme.

causation based in part on a *Wall Street Journal* article that included a "detailed analysis" of Medicare data by a college professor.  769 F.3d at 318.  The Court of Appeals reversed the district court's finding that the article could not "as a matter of law, constitute a corrective disclosure" because it stated that the "analysis was 'based on publicly available Medicare records.'"  *Id*. at 323. The Fifth Circuit explained:

> **Under a Rule 12(b)(6) analysis, it is plausible that, as the Appellants allege, the efficient market was not aware of the hidden meaning of the Medicare data that required expert analysis, especially where the data itself is only available to a narrow segment of the public and not the public at large.** Thus, although a disclosure of mere confirmatory information will not cause a change in the stock price because the current price already reflects the information available, we find it plausible that this information was not merely confirmatory.

*Id*. (emphasis added).  Notably explaining the "expert analysis" at issue in *Amedisys* was an expert report that plaintiffs submitted as an exhibit to a motion for reconsideration made after the district court's ruling.  *Id*. at n.3

The Fifth Circuit's *Amedisys* holding is wholly consistent with Ninth Circuit law.  In *Gilead Sciences*, 536 F.3d at 1053-54, the plaintiffs alleged that an FDA warning letter published in August 2003 did not cause a stock price reaction (despite also being disclosed in the company's Form 10-Q), until October 2003, when "the public finally realized the impact of . . . the Warning Letter."  Finding that the district court had committed reversible error, the Ninth Circuit held:

> The Warning Letter, which discussed only two instances of off-label marketing, would not necessarily trigger a market reaction because it did not contain enough information to significantly undermine Gilead's July 2003 pronouncements concerning demand for Viread. ***It is not unreasonable that physicians—the targets of the off-label marketing—would respond to the Warning Letter while the public failed to appreciate its significance***.

*Id*. at 1058 (emphasis added).[25]

---

[25] Because the Ninth Circuit has explicitly held that groups with certain expertise may understand the nature of a corrective disclosure prior to the general public, Defendants' belabored insistence that "behind the scenes efforts" have no bearing on the loss causation analysis should be ignored.  As *Gilead Sciences* made clear,

Here, while "the public failed to appreciate [the] significance" (*Gilead Sciences*, 536 F.3d at 1058) of the disparate bits and pieces of information regarding Herbalife, "the hidden meaning of the . . . data . . . required expert analysis" (*Amedisys*, 769 F.3d at 323), which took the form of the *Millionaire* and *China* presentations.  Oklahoma describes in detail how *Millionaire* and *China* required an exceptional amount of expertise and investment of time and money to ultimately reveal the falsity of Defendants' statements.  ¶¶143, 169.  The massive resources needed to bring the truth to light were "only available to a narrow segment of the public" (*Amedisys*, 769 F.3d at 323) that had the financial wherewithal and available expertise to bankroll an investigation, such as Pershing Square.  As the plaintiffs did in *Amedisys*, Oklahoma submitted a respected expert's analyses (ECF No. 94-9) to explain how and why this disparate information could only be understood by experts.  Only someone with the knowledge, resources, skills and expertise as Ackman and Pershing Square could have understood, pieced together, and presented the information on Herbalife.  Taylor Rep. ¶¶15-17; 23-25.

Oklahoma has properly pled loss causation.  *Montage Tech.*, 2015 WL 392669, at *9 (loss causation properly pled under Rule 9(b) where plaintiffs allege that third party research report "shocked the market" when released causing stock price to fall).  At minimum, a question of fact exists, inappropriate for resolution on a Rule 12(b)(6) motion, whether the *Millionaire* and *China* presentations constitute corrective disclosures.  *Scott v. ZST Digital Networks, Inc.*, 2012 WL 538279, at *12 (C.D. Cal. Feb. 14, 2012) (Feess, J.) ("In light of the market's non-reaction to the previous article—a drop in the Company's share price of one percent, according to Plaintiff—and its vigorous reaction to the publication of the

---

even if a piece of information was unquestionably made public prior to the date that the company's stock price declined, a plaintiff can still properly plead loss causation.  536 F.3d at 1053-54.

April 21, 2011 article, the Court concludes that the issue is not appropriate for resolution at the pleading stage.");[26] *Montage Tech.*, 2015 WL 392669, at *8 ("[A]bsolute certainty is not required to adequately plead loss causation.").[27]

Defendants' conjecture regarding the behavior of Herbalife's stock price on days not alleged to be corrective disclosures has no bearing on the loss causation analysis.[28]  Dr. Nye clearly explains that, based upon his regression analysis, the gradual residual price increase after the *Millionaire* Presentation was not due to the Company's attempts to rebut the presentation.   Nye Rep. ¶¶36-46.   "[B]asic economic principles preclude dismissing a complaint on these grounds." *Nathanson*, 2015 WL 1517777, at *13 (stock price recovery within two months of corrective disclosure is "not inconsistent with the theory that the price was artificially inflated"); *see also Acticon AG v. China N.E. Petroleum Holdings, Ltd.*, 692 F.3d 34, 36 (2d Cir. 2012) (holding that stock price recovery after the class period "does not negate the inference that [plaintiff] has suffered economic loss" because the price rebound could be explained by external events).[29]

---

[26] Notably, *ZST Digital* rejected Defendants' arguments that the market had learned of purportedly corrective information six months earlier than plaintiffs had alleged based on the company's stock price reaction.  2012 WL 538279, at *11.

[27] Defendants rely on *In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501 (2d Cir. 2010) for the proposition that a negative characterization of previously disclosed facts cannot constitute a corrective disclosure.  Aside from conflicting with Ninth Circuit laws as articulated in *Gilead Sciences*, *Omnicom* was decided on a motion for summary judgment, not a motion to dismiss.  *Id.* at 504.  A full factual record therefore existed in that case that allowed the court to definitively state that the corrective disclosure at issue was nothing more than a "negative characterization." Here, no such factual record exists, making such a determination improper.  *ZST Digital*, 2012 WL 538279, at *11 (loss causation adequately pled where defendants argued accounting discrepancies had been disclosed six months earlier than plaintiffs alleged).

[28] *See, e.g., No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003) (analysis of "other factual events that occurred during the class period and the impact of those events on [defendant company] and its stock prices" constitutes a "fail[ure] to accept Plaintiffs' allegations as true and construe them in the light most favorable to Plaintiffs.").

[29] Notably, Defendants offer nothing in the way of scientific testimony to counter Dr. Nye's conclusion.  And while their cherry-picked analysts may have rejected

## C.     Defendants Knew They Were Lying To Investors

To establish scienter, the Ninth Circuit requires a plaintiff to "state with particularity facts giving rise to a strong inference that defendants acted with the intent to deceive or with deliberate recklessness as to the possibility of misleading investors."   *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008).   A "strong inference" is one that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."   *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009).   In other words, a tie goes to the plaintiff.   In the Ninth Circuit, recklessness "has long sufficed to establish scienter for § 10(b) purposes."   *In re Juniper Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037, 1046 (N.D. Cal. 2008).   A plaintiff may establish scienter by alleging facts indicating that the defendants "knew, or should have known" of the falsity of their statements.   *See N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1098 (9th Cir. 2011).[30]

In evaluating scienter, a court must "accept all factual allegations in the complaint as true" and determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."   *Verifone*, 704 F.3d at 701

---

the *Millionaire* Presentation, Defendants cannot credibly claim that the same could be said of the market as a whole given that Herbalife's stock price cratered in response to the Presentation.   Indeed, *The Wall Street Journal Blog* observed that that other MLM stocks had moved with Herbalife: "[i]nvestors in direct-selling companies have seen the value of their shares rise and fall with each twist in the Herbalife drama," including NuSkin and Usana."   ¶176.   The fact that several large investors increased their holdings in Herbalife in the wake of the *Millionaire* Presentation is irrelevant to whether the market rejected Pershing Square's presentation.   As Defendants concede, this is how an efficient market functions; under their theory, no investor would ever invest in a distressed company or a company that had admitted to any scintilla of wrongdoing.

[30] "Falsity may itself be indicative of scienter where it is combined with allegations regarding a management's role in the company that are particular and suggest that the defendant had actual access to the disputed information, and where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter. *Zucco Partners*, 552 F.3d at 1000 (quotation marks and citation omitted) (citing *South Ferry*, 542 F.3d at 785).

(emphasis in original)).  Thus, "the strength of an inference cannot be decided in a vacuum." *Id*.  Moreover, "*Tellabs* [*v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)] permits a series of less precise allegations to be read together to meet the PSLRA requirement." *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).

### 1.    Defendants Knew They Were Lying To Investors

Oklahoma has pled detailed facts showing that Defendants acted with intent to deceive investors, summarized below:[31]

| Paragraph(s) | Inference of Scienter |
|---|---|
| ¶180 | Herbalife "senior executives" are "expect[ing] some form of disciplinary action" as a result of the FTC investigation. |
| ¶¶180-183, 195 | Investigations into Herbalife – including criminal investigations of the Company and its top distributors – were announced by the FTC, the DOJ, the FBI, the New York AG, the Illinois AG and the Canadian Competition Bureau.[32] |
| ¶¶35-41 | The 1986 Permanent Injunction requires Herbalife to be able to distinguish between sales to distributors and sales to non-distributors – a fact that Defendants do not dispute.  Herbalife admittedly has the computer and logistical systems in place to easily track this information.  Yet, Herbalife admitted on May 1, 2012 that it does not do so. Other MLMs, such as Tupperware, regularly track this information. |
| ¶¶49(a), 135 | In January 2013, Johnson confessed to CNBC that his statement that 90% of Herbalife's sales were to non-distributors "was a misstatement" because he was "hyped up."  Johnson further admitted that he "got in a lot of trouble" for making that statement. |

[31] Taken together, as required under *Tellabs*, these facts sufficiently scienter as to both Johnson and Herbalife. *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1205 (N.D. Cal. 2012) ("In light of the imputation of [officer's] scienter through respondeat superior, the Court finds that Plaintiffs have sufficiently alleged a primary violation of Section 10(b) and Rule 10b-5 by the Bank.").

[32] Defendants' claims regarding post-Class Period events should be rejected. While *Loos* held that "the announcement of an investigation, without more, is insufficient to establish loss causation, 762 F.3d at 890, Oklahoma did not allege that these events caused losses.  But the announcement of an investigation – especially with an admission that disciplinary action in expected – can add to an inference of scienter. *Collier v. ModusLink Global Solutions, Inc.*, 9 F. Supp. 3d 61, 76 (D. Mass. 2014) (SEC inquiry into company adds to inference of scienter); *Eastwood Enters, LLC v. Farha*, 2009 WL 3157668, at *4 (M.D. Fla. Sept. 28, 2009) ("the pendency of an investigation serves to suggest that a fraud may have occurred.").

| | |
|---|---|
| ¶¶60-66 | Two reports that Defendants used to tout their compliance with the law – the January 2013 Lieberman Research Report and the May 2013 Nielsen Research Report – contradict each other with respect to several important metrics.  More incriminatingly, however, both of these reports are contradicted by the April 2011 Actionable Research Report, which was known to Defendants but not made public until 2015.  Importantly, Defendants do not contest the veracity of the Actionable Research Report. |
| ¶¶158-165 | Despite explaining that the Company's compensation scheme for Chinese distributors is different than for the rest of the world, an internal Herbalife spreadsheet provides proof that the Company's Chinese distributors are compensated exactly the same as other distributors.[33] |
| ¶¶76, 79(d) | Chairman's Club member Stephan Gratziani, who Johnson endearingly referred to as "my friend," admitted that Herbalife actively and knowingly deceives distributors with respect to income and business opportunities. |
| ¶¶81(b)-(d) | There is a revolving door between top Herbalife distributors and management, including four distributors who are serving or who have served on the Company's Board, and who continue to shill for the Company at events designed to recruit new distributors, despite knowing that 93% of distributors do not make money. |
| ¶192 | Defendant Johnson received reports as late as May 2015 with "discrepancies and anomalies" regarding "field sales," a practice that accounts for 70% of all sales in Mexico but was reported to have ended no later than November 2014. |
| ¶¶119-123 | Instituting requirements, under the guise of programs such as Club 100, Universidad del Exito and Best of the Best, that Nutrition Club trainees purchase products from other Nutrition Clubs for several years, in order give the illusion of sales to buoy the Nutrition Clubs' contribution margins to EBITDA. |
| ¶¶124-128 | Despite intense regulatory scrutiny, the Company maintains a weak compliance structure.  There was no chief of compliance until October 2014.  Further, there is no public consensus on how many people work in the compliance department, with the number changing depending on when the Company was asked and who was asked. |
| ¶¶186-91 | Herbalife is forced to change certain of its business practices, resulting in missed Wall Street expectations, as a direct result of Pershing Square's revelations. |
| ¶¶193-194 | Herbalife's creditors reduced the Company's borrowing capacity from $1.2 billion to $425 million and further restricted the Company's ability to buy back its stock.  Herbalife's quick concession to these terms strongly implies that it cannot find more |

---

[33] "[T]he fact that the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter."  *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1022 (S.D. Cal. 2005).

favorable terms elsewhere.

## 2. Johnson's Suspicious Stock Sales Add To An Already-Strong Inference Of Scienter

Johnson's stock sales add to an already-strong inference of scienter.  To evaluate the suspiciousness of insider selling, courts consider the amount and percentage of shares sold, the timing of sales, and the consistency with prior trading history.  *In re Questcor Sec. Litig.*, 2013 WL 5486762, at *15 (C.D. Cal. Oct. 1, 2013).  How the Court weighs and evaluates insider trading allegations depends on the allegations and circumstances of each individual case. *See Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1187 (C.D. Cal. 2007) (finding that stock sales over a five-year period contributed to an inference of scienter without any comparison to trading history).

The 2.12 million shares Johnson sold for over $126 million represented 45% of his shares held at the start of the Class Period, which exceeds the amounts found suspicious in other cases.[34]  ¶¶199, 201-02.  *Daou*, 411 F.3d at 1024 (1.5 million shares sold for $30.5 million); *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1169 (C.D. Cal. 2003) (7.6% of holdings sold for $18 million); *In re Omnivision Techs.*, 2005 WL 1867717, at *4 (N.D. Cal. July 29, 2005) (18% of one individual's holdings); *Questcor*, 2013 WL 5486762, at *16 (sales of 30-60% of holdings together with profits of $101 million were also substantial and supported scienter).[35]

---

[34] Defendants' argument concerning not alleging sales by other "in-the-know executives" in the SAC is simply a distraction.  *See Batwin*, 2008 WL 2676364, at *14 (finding insider trading allegations sufficient despite fact that only two of the nine individual defendants made sales during the class period); accord *Seebeyond Techs.*, 266 F. Supp. 2d at 1168-69 *Lipton v. Pathogenesis*"

[35] The cases that Defendants cite to are factually distinguishable.  In *In re Bare Escentuals, Inc. Sec. Litig.*, 745 F.Supp.2d 1052 (N.D. Cal. 2010) "no defendant sold more than 20% of their stock at any given time," unlike here where Johnson sold approximately 90% of the shares he exercised.  ¶209. In *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989), "defendants collectively sold a slightly greater number of shares during an equal period of time just before the class period than they did during the class period."

Defendants' assertion that scienter is negated because Johnson increased his holdings over the Class Period is inaccurate because according to Herbalife's proxies, Johnson's holdings *did* decrease during the Class Period, from 5.14 million to 4.54 million.  Hodgson Rep. Appendix II.  Further, Johnson did not purchase a single share on the open market during the Class Period.  If anything, the fact that Defendants "practically sold every share that [they] acquired during the Class Period" amplifies the inference of scienter.  *Am. W.*, 320 F.3d at 939.[36] Courts have therefore held that retaining significant portions of holdings during the Class Period does not negate an inference of scienter.  *New Century*, 588 F. Supp. 2d at 1232.  Moreover, each share that vested during the Class Period did so at an inflated price, conferring further improper financial benefits.

The timing of Johnson's sales is also suspicious because Johnson sold during the period when Herbalife was engaged in a large share repurchase.  *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1067-68 (C.D. Cal. 2008) (insider sales during company stock repurchase "contribute to a strong inference of scienter").[37]  Regardless of how Defendants spin it, Johnson disposed of stock at a faster rate during the Class Period than the three years prior to the Class Period (i.e., the "Comparison Period").  Johnson increased his stock sales 3.7x (2.1x on a split-adjusted basis), from 588,326 shares to 2,119,473 shares from the Comparison Period to the Class Period.  ¶205.  These sales resulted in gains

---

[36] *In re NVIDIA Corp. Sec. Litig.*, 2011 WL 4831192, at *10 (N.D. Cal. Oct. 12, 2011) is distinguishable as the defendant there only sold 186,000 shares for $3 million.  In *In re PMI Grp., Inc. Sec. Litig.*, 2009 WL 1916934, at *10 (N.D. Cal. Jul. 1, 2009) plaintiffs, unlike here, gave no data about prior trading history.

[37] Defendants rely on the erroneous "long class period" fallacy that ignores Plaintiff's well-founded theory of suspicious selling.  The "length of the Class Period in this case suggests not that Plaintiffs are grasping for straws to build their case, but rather that Defendants were able to ride the wave of their misleading marketing for the entire Class Period." *Questcor*, 2013 WL 5486762, at *15 (citing *Batwin v. Occam Networks, Inc.,* 2008 WL 2676364, at *14 (C.D. Cal. Jul. 1, 2008)

1  increasing four-fold, from $28.9 million during the Comparison Period to over

2  $126 million during the Class Period.  *Id.*

3      Johnson's multiple trading plans not only do not negate scienter, but are

4  suspicious in their own right.  ¶210.  *In re Countrywide Fin. Corp. Sec. Litig.*, 588

5  F. Supp. 2d 1132,1188 (C.D. Cal. 2008) (CEO's frequent amendment of trading

6  plans "appear[ed] to defeat the very purpose of the 10b5-1 plans.").[38]   The

7  protection afforded by 10b5-1 plans is undermined by (i) Johnson's abnormal stock

8  divestment; (ii) ***four separate 10b5-1 plans operated during the Class Period***; (iii)

9  no seasoning period for Johnson's trades; (iv) inconsistent disclosures for the plans

10  (the first 10b5-1 plan was announced via press release and required him to retain

11  50% of the net proceeds in stock, while the others did not); and (v) Herbalife

12  buying back 42.3 million shares at a cost of $2.4 billion while Johnson was

13  engaged in large stock sales.  ¶210; Hodgson Rep. at 15-16.  So long as "Plaintiff

14  is able to allege that Defendants' trading activity was suspicious in context,

15  Defendants may not use trading plans at the pleading stage to defeat an inference

16  of scienter." *In re Bridgepoint Educ. Inc. Sec. Litig.*, 2013 WL 5206216, at *27

17  (S.D. Cal. Sept. 13, 2013); *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964,

18  976 n.16 (N.D. Cal. 2009) (same).

19  ## IV.   <u>CONCLUSION</u>

20      For all of these reasons, Defendants' motion to dismiss the Second Amended

21  Complaint should be denied in its entirety.

22  Dated: June 24, 2015                    Respectfully submitted,

23

24                              By:  */s/ Jon A. Tostrud*

25                              **TOSTRUD LAW GROUP, P.C.**

26  _____

27  [38] With respect to certain details of Johnson's plans (such as the fact that he maintained multiple plans), Herbalife's counsel in other cases generally advise to not do the exact things that Johnson did.  ¶205(b).

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jon A. Tostrud (SBN 199502)
1925 Century Park East, Suite 2125
Los Angeles, CA 90067
Telephone:   (310) 278-2600
Facsimile:   (310) 278-2640
E-mail:       jtostrud@tostrudlaw.com

*Local Counsel for the Class and*
*Counsel for Lead Plaintiff*

**SAXENA WHITE P.A.**
Maya Saxena (*pro hac vice*)
Lester R. Hooker (SBN 241590)
Brandon T. Grzandziel (*pro hac vice*)
5200 Town Center Circle, Suite 601
Boca Raton, FL 33486
Telephone:   (561) 394-3399
Facsimile:   (561) 394-3382
E-mail:       msaxena@saxenawhite.com
               lhooker@saxenawhite.com
               brandon@saxenawhite.com

*Lead Counsel for the Class and*
*Counsel for Lead Plaintiff*

**PROOF OF SERVICE VIA ELECTRONIC POSTING PURSUANT TO CENTRAL DISTRICT OF CALIFORNIA LOCAL RULES AND ECF GENERAL ORDER NO. 10-07**

I, the undersigned, say:

I am a citizen of the United States and am employed in the office of a member of the Bar of this Court. I am over the age of 18 and not a party to the within action. My business address is 1925 Century Park East, Suite 2125, Los Angeles, California 90067.

On June 24, 2015, I caused to be served the following document:

- **LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

All signatories listed in this filing, and on whose behalf the filings are submitted, concur in the filings' content and have authorized the filings.

By posting the document to the Electronic Case Filing ("ECF") Website of the United States District Court for the Central District of California, participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 24, 2015, at Los Angeles, California.


*/s/ Jon A. Tostrud*
Jon A. Tostrud

# Mailing Information for a Case 2:14-cv-02850-DSF-JCG Abdul Awad v. Herbalife Ltd. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Patrick V Dahlstrom**
  pdahlstrom@pomlaw.com

- **Jonathan C Dickey**
  jdickey@gibsondunn.com

- **Daniel S Floyd**
  dfloyd@gibsondunn.com,jarneson@gibsondunn.com

- **Lionel Zevi Glancy**
  lglancy@glancylaw.com

- **Michael M Goldberg**
  mmgoldberg@glancylaw.com,dmacdiarmid@glancylaw.com,info@glancylaw.com

- **Brandon T Grzandziel**
  brandon@saxenawhite.com

- **Lester R Hooker**
  lhooker@saxenawhite.com,e-file@saxenawhite.com

- **Sarah L Kushner**
  skushner@gibsondunn.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com

- **Francis P McConville**
  fmcconville@labaton.com

- **Alexander K Mircheff**
  amircheff@gibsondunn.com,mostrye@gibsondunn.com,inewman@gibsondunn.com,cnowlin@gibsondunn.com,lgadberry@gibsondunn.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com

- **Maya Saxena**
  msaxena@saxenawhite.com

- **Jon A Tostrud**
  jtostrud@tostrudlaw.com,acarter@tostrudlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)