1  **SAXENA WHITE P.A.**
   Maya Saxena (*pro hac vice*)
2  Lester R. Hooker (SBN 241590)
   Brandon T. Grzandziel (*pro hac vice*)
3  5200 Town Center Circle, Suite 601
   Boca Raton, Florida  33486
4  Telephone:   (561) 394-3399
   Facsimile:   (561) 394-3382
5  E-mail:      msaxena@saxenawhite.com
                lhooker@saxenawhite.com
6               brandon@saxenawhite.com

7  *Lead Counsel for the Class and*
   *Counsel for Lead Plaintiff*
8
   **TOSTRUD LAW GROUP, P.C.**
9  Jon A. Tostrud (SBN 199502)
   1925 Century Park East, Suite 2125
10 Los Angeles, California 90067
   Telephone:   (310) 278-2600
11 Facsimile:   (310) 278-2640
   E-mail:      jtostrud@tostrudlaw.com
12
   *Local Counsel for the Class and*
13 *Counsel for Lead Plaintiff*

14              **UNITED STATES DISTRICT COURT**

15             **CENTRAL DISTRICT OF CALIFORNIA**

16                    **WESTERN DIVISION**

17  IN RE HERBALIFE, LTD.          ) No. 2:14-CV-02850-DSF (JCGx)
    SECURITIES LITIGATION          )
18                                 ) **CLASS ACTION**
                                   )
19                                 ) **THIRD AMENDED CLASS**
                                   ) **ACTION COMPLAINT FOR**
20                                 ) **VIOLATION OF THE FEDERAL**
                                   ) **SECURITIES LAWS**
21                                 )
                                   ) **DEMAND FOR JURY TRIAL**
22  _____)

23

24

25

26

27

28

# **TABLE OF CONTENTS**

I.      Introduction ...................................................................................1

II.     Parties ...........................................................................................5

     A.      Lead Plaintiff ...................................................................... 5

     B.      Defendants ........................................................................... 5

     C.      Non-Party Actors ................................................................ 6

III.    Herbalife's Fraud ..........................................................................6

     A.      Background Of Herbalife And Its Distributor Base........................... 6

     B.      Tracking Internal Consumption Is Vital To The Ability Of An MLM To Distinguish Itself From A Pyramid Scheme......................10

     C.      Herbalife's Computer Systems Provide Defendants With Unmatched Data Access ..................................................15

     D.      Johnson Is "100% Engaged" With All Aspects Of The Company.....19

     E.      Defendants Recklessly Fail To Provide Basic Answers To Questions Concerning Herbalife's Fundamental Business ...............28

IV.     Defendants' False And Misleading Statements ...........................33

     A.      False Statements Regarding Compliance With *Omnitrition* And Herbalife's Ability To Track Retail Sales .......................................33

     B.      False Statements Regarding The Composition Of Herbalife's Distributor Base ..................................................................38

     C.      False Statements Regarding Herbalife's Certification of Disclosure .41

V.      The Truth Emerges: Herbalife Does Not Track Sales Or Adhere To The 70% Rule In Violation Of *Omnitrition* And The Permanent Injunction......................................................................41

     A.      Loss Causation: The May 1-2, 2012 Partially Corrective Disclosures Send Herbalife's Stock Tumbling ................................41

     B.      Loss Causation: The December 20, 2012 Corrective Disclosure Craters Herbalife's Stock ...................................................47

          1.      News Of Pershing Square's Short Position Hits The Markets On December 19 ........................................47

          2.      December 20: Pershing Square Reveals Herbalife's Fraudulent Practices.................................................48

     C.      Herbalife's Stock Price Rebound Is Attributable To Regular Market Forces ..................................................................56

VI.    Post Class Period Events Confirm Herbalife's Fraudulent Practices ...........59

VII.   Johnson's Highly Unusual And Suspicious Stock Sales Support A Strong Inference of Scienter.........................................................................68

     A.    The Value And Amount of Sales Were Highly Unusual .................69

         1.    Johnson's Extraordinary Amount And Percentage Sold..........69

         2.    The Sales Were Inconsistent With Prior Trading ...................69

         3.    The Timing Of The Stock Sales Was Suspicious ...................71

     B.    The Trading Plans Adopted By Johnson Cannot Shield Him From Liability.................................................................................72

VIII.  Applicability of the Presumption of Reliance: The Fraud on the Market Doctrine ...........................................................................................74

IX.    Inapplicability Of The Statutory Safe Harbor...............................................76

X.     Class Action Allegations................................................................................77

XI.    Jurisdiction And Venue..................................................................................79

XII.   Claims Brought Pursuant to the Exchange Act.............................................79

XIII.  Prayer For Relief...........................................................................................83

XIV.  Jury Demand..................................................................................................84

# I.    Introduction[1]

1.    Herbalife is a multi-level marketing company ("MLM") specializing in nutrition and weight management supplements.  MLMs employ a system of direct selling that relies on independent distributors, usually private individuals, to reach customers by word-of-mouth.  Because MLMs frequently involve constant recruitment of new distributors and a pyramid-like financial structure, the business model has been subject to harsh criticism and tight oversight and regulation.

2.    Like other MLMs, Herbalife is subject to various federal and state consumer protection and anti-pyramid statutes that together form a comprehensive consumer protection umbrella.  Specifically, Herbalife repeatedly touted to investors that it "satisfies the standards set forth in" *Webster v. Omnitrition*, 79 F.3d 776 (9th Cir. 1996).  At all relevant times, *Omnitrition* was the definitive Ninth Circuit opinion that defined the permissible scope of legitimate MLM marketing and sales practices, and clearly explained when those practices crossed the line to constitute an illicit pyramid scheme.  In particular, *Omnitrition* unmistakably established the importance of selling products to "ultimate users" – meaning customers who are outside of an MLM's distribution base, even after taking into account personal consumption.

---

[1]  Lead Plaintiff the Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters"), on behalf of itself and all persons or entities that purchased or otherwise acquired the common stock of Herbalife, Ltd. ("Herbalife" or the "Company") between February 23, 2011 and December 19, 2012, inclusive (the "Class Period") and were damaged thereby (the "Class"), alleges the following upon personal knowledge as to themselves and their acts, and upon information and belief as to all other matters, based upon the investigation of counsel.  Lead Counsel's investigation included, among other things: (i) a review of public filings and press releases by Herbalife with the United States Securities and Exchange Commission ("SEC"); (ii) media and analyst reports about the Company; and (iii) publicly available data relating to Herbalife common stock.  Many of the facts related to the claims and defenses in this action are known only by the Defendants, or are exclusively within their custody or control.  Lead Plaintiff believes that substantial additional evidentiary support for its allegations will be developed after a reasonable opportunity for discovery.

3.     Despite assuring investors that it complied with the laws governing MLMs, Herbalife has a demonstrated history of controversial practices dating back to the mid-1980s when it was sued by several individuals and the California Attorney General over various marketing schemes and false health claims, which ultimately led to a permanent injunction that the California Attorney General imposed on Herbalife (the "Permanent Injunction").  The Permanent Injunction compels Herbalife to, among other things, tie its distributors' compensation scheme to the retail sales of its products.  In doing so, the Permanent Injunction required Herbalife to distinguish sales within its distribution base from sales outside of its distribution base.  Indeed, the Permanent Injunction unambiguously defines "retail sales" to include sales outside of its distributor base.  Mainstream financial media such as *The Motley Fool* noted that this "basically means that the company needs to be able to prove it is selling products to non-members at the end of the cycle in order for the distributor commissions to be lawful . . . ."

4.     Despite these legal requirements, Herbalife was unable (or unwilling) to comply with, and follow, clearly established and binding law.  CEO Michael Johnson knew since at least 2005 that the Company was in danger of finding itself on the wrong side of *Omnitrition*.  But instead of proactively working to correct the Company's deficiencies, for the better part of a decade Herbalife refused to enforce basic anti-pyramid protections such as the 70% Rule.

5.     As a result, the stock price of Herbalife was materially and artificially inflated during the Class Period.  While artificially inflated, Defendant Johnson (the highest paid CEO in America in 2011) sold over 2.1 million shares of Herbalife stock for over $126 million, exercising an astonishing 90% of his acquired stock options.  These sales were highly suspicious as they were executed pursuant to multiple, overlapping 10b5-1 trading plans which failed to follow several important industry accepted practices governing the use of such trading

plans.  Johnson was selling a massive amount of Herbalife shares through abusive trading plans, well aware that the Company was not in compliance, or at a minimum recklessly had no way of knowing whether it was in compliance, with the Permanent Injunction and *Omnitrition*.

6.     The Company's façade first began to crumble on May 1, 2012, when Herbalife revealed that it could not, despite clear governing law, distinguish between sales to distributors and sales to non-distributors, and nonetheless grossly misrepresented the amount of sales outside the network as 70%.  Despite the marked ability to provide this information due to the Company's technological sophistication and record-keeping requirements imposed on the distributors, Herbalife continually refused to reveal the "true" number of retail sales outside of its distribution network.  Instead, Defendants provided investors with wildly inconsistent answers ranging from 70%, to 90%, to "we don't track this number." Defendant Johnson went so far as to admit that he was "in a lot of trouble" for speaking to CNBC about the issue.

7.     While investors had cause for concern regarding the Company's lack of verifiable retail sales outside the distribution network, additional information was subsequently revealed that demonstrated that Herbalife had materially misrepresented the nature and scope of its business practices.  On December 20, 2012, Pershing Square founder and CEO Bill Ackman, a well-known hedge fund manager presented an expose on Herbalife at an investment conference in New York.  The presentation, entitled *Who Wants to be a Millionaire?* (the "*Millionaire* Presentation"), was extraordinarily detailed and based on a lengthy investigation and expert analyses.

8.     As a result of the *Millionaire* Presentation, Pershing Square exposed, for the first time, unfair and fraudulent practices that were hidden from investors, law enforcement and consumers.  In addition, Pershing Square laid bare a litany of

false statements by Herbalife officials with respect to the Company's policies for ensuring that distributors were adhering to the 70% Rule and controls (or lack thereof) for enforcing the Company's policies and obligations under consumer protection laws as well as the Permanent Injunction.

9.     After the Pershing Square presentation, numerous regulators launched investigations into the Company's business practices and operations, including investigations by the FTC, the Canadian Competition Bureau, the New York Department of Justice, the New York Attorney General's Office, and the Illinois Attorney General's Office. According to the Company's Form 10-Q filed on May 5, 2015, the Department of Justice is now seeking additional information about Herbalife's business practices from the Company as well as its distributors. The investigations not only concern the deceptive nature of Herbalife's business practices but also Defendants' statements to the investing public, as evidenced by the ongoing investigation by the SEC. Significantly, a recent report from *Fox Business* quoted Herbalife executives, who have admitted that they are "expect[ing] some form of disciplinary action" as a result of the FTC's investigation.

10.     Events subsequent to the Class Period confirm the accuracy of the Pershing Square presentations' conclusions, and confirm that impact of Defendants' illegitimate practices have already taken a toll on the Company's financial results. For example, the Company's net income for FY 2014 dropped 41% compared with 2013, while its earnings per share declined by 30%. The disastrous results continued into 2015, when it announced that net sales saw double-digit declines for every geographic area but China. Ominously, Herbalife also announced at this time that the Company's bank lending syndicate was beginning to reduce its exposure to the Company, prompting widespread analyst concern. Most significantly, Herbalife has had to radically revise its marketing

program practices in light of their exposure by Pershing Square and in the face of overwhelming regulatory scrutiny, which has caused several earnings misses, as well as a re-shifting of earnings guidance and valuation of the Company.  Investors are no longer buying the previously-touted Herbalife growth story, and have already sustained significant damages even without any final government action.

## II.   Parties

### A.   Lead Plaintiff

11.   Lead Plaintiff Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters") purchased publicly-traded Herbalife common stock at artificially inflated prices during the Class Period and has been damaged thereby. As of June 30, 2012, Oklahoma Firefighters held over $1.7 billion in net assets for the benefit of over 23,000 members who have actively participated in firefighting activities in the state of Oklahoma.   Evidence of Oklahoma Firefighters' transactions in the Company's common stock during the Class Period is attached as Exhibit A.

### B.   Defendants

12.   Defendant Herbalife, Ltd. ("Herbalife" or the "Company") is a network marketing company that sells weight management, nutritional supplement and personal care products through a global network of independent distributors. The Company was founded in 1980, is based in George Town, the Cayman Islands and has its principal executive offices in this District, in Los Angeles.  Herbalife's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "HLF."

13.   Defendant Michael O. Johnson ("Johnson") has served as the Chief Executive Officer ("CEO") at Herbalife since he joined the Company in April 2003 and as the Company's Chairman of the Board of Directors ("Board") since May 2007.

14.     Defendant Johnson signed and certified Herbalife's 2010 Form 10-K and 2011 Form 10-K pursuant to both Rule 13a-14(a) and Section 906 of Sarbanes-Oxley.

15.     Defendants Herbalife and Johnson are collectively referred to herein as "Defendants."

**C.     Non-Party Actors**

16.     John DeSimone ("DeSimone") has served as Chief Financial Officer ("CFO") of the Company since January 2010.  Previously, DeSimone served as Senior Vice President – Finance and Senior Vice President – Finance & Member Operations of the Company in December 2008.  Mr. DeSimone began his tenure with Herbalife in November 2007.

17.     Desmond Walsh ("Walsh") has served as President of the Company since January 2010.  Previously, Walsh served as Senior Vice President, Worldwide Member Sales in January 2004 and Executive Vice President for Worldwide Operations and Sales in April 2008.

18.     DeSimone and Walsh would regularly speak for the Company on conference calls, investor presentations and other public events.  At all times mentioned herein, DeSimone and Walsh had authority to speak for, and on behalf of, Herbalife, and were speaking within the scope of their employment with the Company.  Herbalife has not repudiated any of their statements described herein. Accordingly, their statements can be attributed to Herbalife.

**III.   Herbalife's Fraud**

**A.     Background Of Herbalife And Its Distributor Base**

19.     Herbalife is an MLM that sells weight management and nutritional products worldwide.  The Company offers products in four principal categories consisting of weight management; targeted nutrition; energy, sports, and fitness; and other nutrition.

20.     As an MLM, Herbalife does not operate "brick and mortar" stores, nor does the Company sell its products online directly to consumers.  The Company instead depends on a network of independent distributors (or, as Herbalife later termed them, "Members") to sell its products.  According to Herbalife's 2010 Form 10-K, Herbalife's distributors can earn income in two ways: by "selling our products" and by "earn[ing] royalties and bonuses on sales made by other distributors whom they recruit to join their sales organizations."[2]

21.     At the start of the Class Period, Herbalife claimed to have 2.1 million distributors, which it broke out into two main groups, and then into three subgroups:

> Approximately 483,000 of our 2.1 million distributors have become sales leaders, which are comprised of approximately 434,000 sales leaders in the 73 countries where we use our traditional marketing plan and approximately 49,000 China sales employees and licensed business providers operating under our China marketing plan. Collectively, we refer to this group as "sales leaders." We believe that the distributors who have not attained the sales leader level can be segmented into three general categories based on their product order patterns: discount buyers, small retailers and potential sales leaders. We define discount buyers as customers who have signed up as distributors to enjoy a discount on their purchases; small retailers as product users and sales people who generate modest sales to friends and family; and potential sales leaders as distributors who are proactively developing a business with the intention of qualifying to become a sales leader. In 2010, excluding China, distributor orders for these three general categories were approximately 29%, 57% and 14%, respectively.[3]

22.     Similarly, Herbalife told investors that it had approximately 2.7 million distributors in its 2011 Form 10-K, of which 548,000 were sales leaders.[4]

23.     According to Herbalife's 2010 Form 10-K and its marketing materials, to attain "sales leader" status a distributor needs to accumulate either (i)

---

[2] 2010 Form 10-K at 5.  The recruits are known as a distributor's "downline," while the distributor is known as a recruit's "upline."

[3] 2010 Form 10-K at 5.

[4] 2011 Form 10-K at 5.

4,000 volume points in one month, or (ii) 2,500 volume points in two consecutive months.[5]  A volume point is a form of internal currency created by Herbalife for use in its program.  Volume points are assigned to each of Herbalife's products and are based on the suggested retail price of its products in the United States.  One volume point is roughly equal to one U.S. dollar.  Herbalife told newly minted distributors in its 2012 Marketing Plan and Business Rules (the "Marketing Plan") that "[a]s you order products, you accumulate credit for the amount of Volume Points that are applicable to the products ordered.  These accumulated Volume Points become your sales production and are used for purposes of qualifications and benefits."[6]

24.    Sales leaders are also compensated based on their recruitment efforts.  First, sales leaders can be compensated through volume purchased by their downline.  Sales leaders are also compensated through the use of royalty overrides and production bonuses.  According to the Marketing Plan, royalty overrides are monthly commissions earned by sales leaders that range between 1% to 5% of their downline volumes, up to the third downline level.  Sales leaders can therefore earn royalty overrides of up to 15% (5% x 3 downline levels).  Herbalife provides the following example of how royalty overrides work:[7]

---

[5] Distributors who meet these requirements are known as a "Supervisors."  A Supervisor is the fifth rung on the distributor ladder, but it is the lowest classification level of a sales leader.  Notably, Herbalife informs distributors that they can skip levels 2, 3, and 4 on the ladder and advance immediately to Supervisor status.  Marketing Plan at 4.

[6] Marketing Plan at 6.  The Marketing Plan is attached as Exhibit B.

[7] Marketing Plan at 13.

**Royalty Override Example**

| | | |
|---|---|---|
| YOU | 2,500 Volume Points | = Your Total Royalty Override = 1,500 Royalty Points |
| First-Level Supervisor | 10,000 Volume Points | = 5% = 500 Royalty Points |
| Second-Level Supervisor | 10,000 Volume Points | = 5% = 500 Royalty Points |
| Third-Level Supervisor | 10,000 Volume Points | = 5% = 500 Royalty Points |

25.    Production bonuses are separate bonuses available to certain high-level distributors that range from 2% to 7% of their entire downline volume.

26.    The Marketing Plan laid out each of the 24 rungs on the Herbalife ladder, from the lowest "Distributor" to the highest "10 Diamond Founder's Circle."[8]   Notably, the simple accumulation of volume points would only get a distributor to World Team status, which is rung six on the ladder.  To get to the next level (the Global Expansion Team) and beyond, a sales leader needs to accumulate royalty override points, which can only be accomplished by recruiting a downline.

27.    Importantly, Herbalife clearly warned distributors in the Marketing Plan that they were required to abide by certain rules if they wanted to be paid royalty overrides and production bonuses:[9]

> ***Supervisors who meet the specified requirements to earn Royalty Overrides must also comply with Herbalife's*** 10 Retail Customers Rule and the ***70% Rule***, to earn and receive both Royalty Overrides and Production Bonus. The Supervisor must confirm their adherence to these requirements by submitting the Earnings Certification Form

---

[8] Marketing Plan at 4-5.

[9] Marketing Plan at 14.

each month. ***If the Supervisor fails to comply with either of these rules, the Royalty Overrides and Production Bonus will not be paid to the Distributor***.

28.     In every annual and quarterly filing during the Class Period, Herbalife disclosed to investors that "***'[r]oyalty overrides' are our most significant expense***."[10]

## B.     Tracking Internal Consumption Is Vital To The Ability Of An MLM To Distinguish Itself From A Pyramid Scheme

29.     An Herbalife distributor can only sell products to two categories of people: other Herbalife distributors in the downline (internal sales), or to individuals unaffiliated with Herbalife (external sales).  The ratio of internal sales to external sales is one factor that the Federal Trade Commission and others analyze in distinguishing a legitimate MLM from an illegitimate pyramid scheme. Simply put, the more sales that occur within an MLM's distribution network, the less likely it is that a company has true retail demand for its products, and the more likely it is that sales are incidental to recruiting additional individuals to join the network.  Thus, if a company has few sales outside the distribution network, it is more likely to constitute an illegal pyramid scheme.

30.     Consequently, beginning with *In re Amway Corp.*, 93 F.T.C. 618, 715-16 (1979), a baseline has emerged in the MLM industry known as the 70% Rule.  Stated generally, the 70% Rule requires a distributor to have sold 70% of previously purchased product before reordering more product.[11]  The 70% Rule balances a distributor's desire and ability to personally consume products with a sales requirement to avoid inventory loading.[12]  Herbalife's 70% Rule is encoded

---

[10] 2010 Form 10-K at 54; 2011 Form 10-K at 56; 1Q 2011 Form 10-Q, at 20; 2Q 2011 Form 10-Q, at 22; 3Q 2011 Form 10-Q at 22; 1Q 2012 Form 10-Q at 20; 2Q 2012 Form 10-Q at 20;3Q  2012 Form 10-Q at 22.

[11] *See generally In re Amway Corp.*, 93 F.T.C. 618, 715-16 (1979).

[12] The Direct Selling Association defines "inventory loading" as "purchas[ing] inventory in an amount which unreasonably exceeds that which can be expected to be resold and/or consumed by the independent salesperson within a reasonable

as Rule 18-C in the Marketing Plan, and states that "[i]n order to qualify for and receive Royalty Overrides, Production Bonuses, and other bonuses paid by Herbalife, at least 70% of the total value of Herbalife products a Distributor purchases each Volume Month must be sold or consumed that month."[13]

31.   *Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776 (9th Cir. 1996) is the Ninth Circuit's definitive interpretation of the 70% Rule.  *Omnitrition* began by quoting the FTC's so-called *Koscot* Test[14] that it uses to determine what constitutes a pyramid scheme:

> The Federal Trade Commission has established a test for determining what constitutes a pyramid scheme. Such contrivances
>
>> are characterized by the payment by participants of money to the company in return for which they receive (1) the right to sell a product and (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users.
>
> *Id.* (emphasis in original). ***The satisfaction of the second element of the Koscot test is the* sine qua non *of a pyramid scheme: "As is apparent, the presence of this second element, recruitment with rewards unrelated to product sales, is nothing more than an elaborate chain letter device in which individuals who pay a valuable consideration with the expectation of recouping it to some degree via recruitment are bound to be disappointed.*" *Id.* We adopt the *Koscot* standard here and hold that the operation of a pyramid

---

period of time." http://www.dsa.org/code-of-ethics/code-of-ethics-(full-text)#loading. (last accessed August 27, 2015).

[13] Marketing Plan at 72.

[14] The *Koscot* Test derives from *In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106, 1181 (1975), *aff'd mem. sub nom.*, *Turner v. F.T.C.*, 580 F.2d 701 (D.C. Cir. 1978).  The FTC has warned the public that "[i]f the money you make is based on your sales to the public, it may be a legitimate multilevel marketing plan. If the money you make is based on the number of people you recruit and your sales to them, it's not.  It's a pyramid scheme."   FTC, "Multilevel Marketing," https://www.ftc.gov/tips-advice/business-center/guidance/multilevel-marketing. (last accessed August 27, 2015). Similarly, the SEC was arned that one "hallmark[] of a pyramid scheme" is an "[e]mphasis on recruiting. If a program primarily focuses on recruiting others to join the program for a fee, it is likely a pyramid scheme.  Be skeptical if you will receive more compensation for recruiting others than for product sales."   SEC, "Beware of Pyramid Schemes Posting as Multi-Level Marketing Programs," http://www.sec.gov/investor/alerts/ia_pyramid.htm#.VA4Y7vldV8E. (last accessed August 27, 2015).

scheme constitutes fraud for purposes of several federal antifraud statutes.[15]

32.     The Ninth Circuit proceeded to focus on this second *Koscot* element, and whether Omnitrition's 70% Rule satisfied it:

> The key to any anti-pyramiding rule in a program like Omnitrition's, where the basic structure serves to reward recruitment more than retailing, is that the rule must serve to tie recruitment bonuses to actual retail sales in some way. Only in this way can the second Koscot factor be defeated. Omnitrition has failed to prove that as a matter of law its rules operate in that manner.
>
> * * *
>
> Second, Omnitrition produced no evidence of enforcement of its 70% rule. It merely states that, in order to place further orders [distributors] must "certify" that they have sold 70% of the product they previously ordered. There is no evidence that this "certification" requirement actually serves to deter inventory loading. ***Importantly, the requirement can be satisfied by non-retail sales to a supervisor's own downline [distributors]. This makes it less likely that the rule will effectively tie royalty overrides to sales to ultimate users, as Koscot requires.***
>
> In addition, ***plaintiffs have produced evidence that the 70% rule can be satisfied by a distributor's personal use of the products. <u>If Koscot is to have any teeth, such a sale cannot satisfy the requirement that sales be to "ultimate users" of a product.</u>***[16]

33.     Evidencing the material nature of *Omnitrition*'s restrictions on Herbalife's network marketing program, Herbalife assured investors in its annual filings that it "***satisfies the standards set forth in the Omnitrition case*. . . .**" These assurances first appeared in the 2004 Form 10-K and were also contained in Herbalife's 2010 Form 10-K and 2011 Form 10-K.[17]

34.     In addition to being subject to *Omnitrition*, Herbalife and its executives were (and continue to be) bound by the Permanent Injunction that applies to both the Company and its executives.  In the mid-1980s, the California Attorney General filed suit against Herbalife over certain of its business and

---

[15] *Omnitrition*, 79 F.3d at 781-82 (emphasis added).

[16] *Omnitrition*, 79 F.3d at 783 (emphasis added).

[17] 2010 Form 10-K at 22; 2011 Form 10-K at 22.

marketing practices. The suit, *California v. Herbalife Int'l, Inc.*, No. 92767 (Cal. Sup. Ct.), ended in October 1986 when Herbalife agreed to pay the State of California a settlement amount of $850,000 and be bound by the Permanent Injunction imposed on the Company.

35.     Section 5(A) of the Permanent Injunction prohibits Herbalife from paying its distributors for anything other than retail sales of the Company's products. "Retail sales" are defined as:

> [A] sale [of Herbalife's] product(s) in any of the following situations: (1) *to persons who are not part of defendant's marketing program or distribution system*; or, (2) to persons who are not buying to become part of defendants marketing program or distribution system; or, (3) to persons who, although desirous of becoming or who are a part of defendants' marketing plan or distribution system are buying for their own personal or family use.[18]

36.     Section 5(B) requires Herbalife to implement a system to document its retail sales, and provides that the Company "shall be in compliance" with Section 5:

> [A]s long as a verification or documentation system they implement allows them, at any given point in time, to verify or document . . . *that any and all participants who receive commissions, bonuses, overrides and/or advancement from defendants in defendants marketing program*, after entry of this judgment, *are based on retail sales* made by or through such participant(s) or others introduced directly or indirectly under participant(s).

37.     With respect to the Permanent Injunction, Herbalife informed investors in its annual regulatory filings that "[a]ll of our officers and directors are subject to a permanent injunction . . . . *The injunction . . . required us to*

---

[18] Permanent Injunction Section 5(C) (emphasis added). Notably, subsection (1) specifically categorizes and delineates those who are completely outside of Herbalife's distribution base and who do not intend or want to become Herbalife distributors. In order to be able to perform the analysis required by the Injunction, Herbalife must have the ability to group persons purchasing products into one of these three definitions, including individuals completely outside the distribution network.

1   *implement some documentation systems with respect to payments to our*

2   *distributors*."[19]

3       38.     The meaning of the Permanent Injunction is unambiguous: Herbalife

4   must be able to categorize and distinguish between sales inside the distribution

5   base and sales outside of the distribution base.  This understanding is also shared

6   by the mainstream investment media.  *The Motley Fool*, for example, noted that it

7   "basically means that the company needs to be able to prove it is selling products

8   to non-members at the end of the cycle in order for the distributor commissions to

9   be lawful . . . ."[20]

10      39.     Indeed, the importance of being able to distinguish internal sales from

11  external sales – and thus satisfy both the terms of *Omnitrition* and those of the

12  Permanent Injunction – were vital to Herbalife.   A May 8, 2012 *CNBC* article

13  explained the importance of tracking sales outside of the distribution base:

14          [B]ased on my research and discussions with multi-level marketing
            experts and former distributors, ***it may be the most relevant question***.
15
            Without mentioning any company by name, David Vladeck, Director
16          of the Bureau of Consumer Protection of the Federal Trade
            Commission, told me Monday that ***it would be "red flag" if a multi-***
17          ***level marketing company didn't keep track of unrelated customers***.[21]

18      40.     Similarly, John Hempton of Bronte Capital, a self-described Herbalife

19  "ardent bull," wrote:

20          And the most ardent Herbalife bull (and I am an ardent bull) must
            admit that a multi-level-marketing scheme where all the consumption
21          is by people in the pyramid gives you pause. You have to ask where

22

23  _____

24  [19] 2004 Form 10-K at 18; 2005 Form 10-K at 20; 2006 Form 10-K at 20; 2007
    Form 10-K at 20; 2007 Form 10-K/A at 18; 2008 Form 10-K at 20; 2009 Form 10-
    K at 21; 2010 Form 10-K at 20; 2011 Form 10-K at 22; 2012 Form 10-K at 20.

25  [20] *The Motley Fool*, "3 Crucial Questions for Herbalife" (February 7, 2013),
26  http://www.fool.com/investing/general/2013/02/07/3-crucial-questions-for-
    herbalife.aspx (last accessed August 27, 2015).

27  [21] *CNBC*, "Reasons to Worry About Herbalife: Greenberg" (May 8, 2012),
28  http://www.cnbc.com/id/47340065 (last accessed August 27, 2015)

are the real customers? And if there are no real customers then surely it is a pyramid as a matter of fact (if not a matter of law).[22]

41.     Herbalife's own documents and statements plainly demonstrate that the Company has immediate access to all of the data that *Omnitrition* and the Permanent Injunction require it to maintain.  Herbalife's Wholesale Product Order Form requires the names and Herbalife ID numbers for distributors and supervisors, and the name, address, phone and email address for product shipment.[23]  Its Retail Order Form similarly requires the name, address, phone number and email address of both the distributor and the customer.[24]  Rule 17-A contractually requires distributors to maintain and provide distributors' retail receipts to the Company upon request.[25]  Even Founder's Circle Member and former Board of Directors member Leon Waisbein told distributors to "[t]rack how many customers you have . . . . Your goal should be to build a customer group of 30-40 people."[26]

42.     Thus, to ensure compliance with *Omnitrition*, the 70% Rule and the Permanent Injunction, Herbalife simply has to require distributors to provide the names of their customers to the Company.

## C.     Herbalife's Computer Systems Provide Defendants With Unmatched Data Access

43.     Submission of customer names to Herbalife to ensure compliance would not result in an avalanche of paper, nor thousands of records sitting

---

[22] *Bronte Capital*, "Herbalife internal consumption: a comment" (March 24, 2014), http://brontecapital.blogspot.com/2014/03/herbalife-internal-consumption-comment.html.

[23] Marketing Plan at 40.

[24] Marketing Plan at 42.

[25] Notably, on November 22, 2013, Pershing Square offered Herbalife to pay for the cost of providing all of these records to the Company.

[26] Notes – Leon Waisbein – Sun City Extravaganza 2010 at 14, http://www.factsaboutherbalife.com/media/2012/12/Waisbein-Extravaganza-Notes-2010.pdf (last accessed August 27, 2015).

forgotten in a filing cabinet.  In fact, in order to comply with the 70% Rule and not run afoul of other anti-pyramid laws, MLMs employ advanced computer and logistical systems to drill down into their distributors' sales data and records. During a January 29, 2013 interview with Jim Cramer on *Mad Money*, for example, Tupperware CEO Rick Goings explained:

> You wouldn't believe the level of detail we have.
>
> * * *
>
> We have a report there of what happened the previous week, what the sales were, what the recruits were, who they were to and people that went to the party.  We manage our business right down to the detail of it.[27]

44.     Herbalife and its executives would similarly often boast of the unmatched ability to track distributor sales the resulting vast swaths of data ostensibly at their fingertips by virtue of its sophisticated information systems. This took place unabated both during and after the Class Period.

45.     During the Class Period, at the September 7, 2011 Barclay's Back to School Consumer Conference,[28] DeSimone explained that the Company's Oracle computer system:

> [P]rovides great visibility.  **We get daily sales updates**.
>
> * * *
>
> **[W]e have a detailed distributor database that gives us dozens of metrics on each distributor**.  It is really too much information to look at, but you identify your outliers, and you find distributors that are performing very well and you find out why.  And if they're performing well because they have a nuance for the business model that's valuable, then we commercialize it globally.  **We have a lot of access to distributor performance also**.

---

[27] *CNBC*, "Tupperware CEO on Direct Selling" (January 29, 2013), http://video. cnbc.com/gallery/?video=3000144377 (last accessed August 27, 2015).

[28] The Barclay's Back to School Consumer Conference is an annual public event at which consumer companies as diverse as Herbliafe, Altria, Pepsico and Kellogs present on issues facing the companies and the industry. Thomson Reuters transcribed Herbalife's presentation at this conference.

46.     Also during the Class Period, at the April 24, 2012 Barclays Capital Retail and Restaurant Conference,[29] Vice President of Investor Relations Amy Green similarly boasted of Herbalife's technological prowess:

> [W]hat we look at, we do have from a technology standpoint have the ability to do deep dive within the – into a distributorship or into either from corporately we can look at a region, a country, a city, the different layers, *you can kind of peel off the onion to see what kind of granularity you want to look at. You can look at an individual distributorship, you can look at the whole lineage of a distributor that has a downline*. But it's not so much looking at a saturation analysis, it's more looking at what the opportunity says because I'm a distributor and I'm looking at my tool, the distributor only sees their business.

47.     Defendant Johnson was no stranger to Herbalife's sophisticated information systems and apparent ability to track the tiniest details of its distributors, and also actively boasted of Herbalife's purported prowess.  During the 1Q 2013 earnings call, Johnson stated that "[l]ike most large consumer-packaged group companies, *we know who we sell our products to*.  And like those companies, *we then rely upon research tools and techniques to gain a better understanding of the end-use consumer*."  Notably, Johnson made this comment a mere three months after he admitted that his avowal that 90% of Herbalife's sales were to non-distributors was "a misstatement."  *See* ¶¶6, 69.  In an October 21, 2014 interview with *Los Angeles Magazine*, Johnson confirmed that at Herbalife "*[w]e know all the numbers, we know who recruits people, we know who sells product to someone else.*"[30]

48.     Herbalife had access to such granular data due to the implementation of its Oracle GoldenGate, Agile Product Life Management ("PLM"), Primavera

---

[29] This conference is also an annual public event at which retail and restaurant companies as diverse as The Cheesecake Factory, Herbalife and Dollar General present on various issues.  Thomson Reuters transcribed Herbalife's presentation at this conference.

[30] *Los Angeles Magazine*, "Big Shots: Michael Johnson" at 13:40 (October 21, 2014),   http://www.lamag.com/citythinkblog/big-shots-michael-johnson/   (last accessed August 27, 2015).

P6, HCM Cloud, and E-Business Suite Enterprise Resource Planning ("ERP") IT systems.[31] Working closely with Oracle, Herbalife implemented each of these systems to better manage the company, its employees and distributors, and importantly, its supply chain and product management capabilities:

a. A 2012 Oracle case study specifically revealed that Herbalife implemented the PLM suite in part to remedy the problem of "shar[ing] product information both internally and with regulators."[32] As a result, Herbalife's PLM suite "enhanced efficiency and visibility" throughout Herbalife, while also ostensibly "supporting better informed decisions and regulatory compliance."[33]

b. Similarly, a May 2010 Oracle case study on Herbalife's Primavera implementation[34] revealed that the software suite "Enabled executives to view real-time IT project timeline and costing data for corporate initiatives as well as projects related to the company's various nutrition, weight management and personal care product lines."

c. An Infosys case study on the implementation of Herbalife's Oracle Applications R11.5.9 system revealed that the software suite allowed Herbalife to achieve better supply chain planning, which reduced out of

---

[31] Mark Schissell, Herbalife Senior Vice President and Chief Information Officer, lauded the advantages of the HCM Could system because "[i]t had had all the pieces of functionality we needed, whether it was core human resources, whether it was recruiting, talent management, compensation, it was a complete solution." Youtube.com, *Herbalife's Success With Oracle HCM Cloud* at 2:34 (October 24, 2013), https://www.youtube.com/watch?v=f7HL0OKBlAc. (last accessed August 27, 2015) Schissell further stated that the "biggest [improvement]" over the previous system "is the quality of the data and the ability to get that data to our executives, to our line-level managers, it's changed the culture." *Id.*

[32] http://www.oracle.com/us/products/applications/agile/enterp-prod-lifecycle-manag-rept-1621419.pdf, at 21 (last accessed August 27, 2015).

[33] *Id.*

[34] http://www.oracle.com/oms/eppm/herbalife-customer-snapshot-1707367.pdf (last accessed August 27, 2015).

stock products and improved inventory turn-around time and warehouse efficiency.[35]

49.     As Johnson and other Herbalife senior executives boasted, these systems gave them unparalleled access to granular sales data on every Herbalife distributor.

**D.      Johnson Is "100% Engaged" With All Aspects Of The Company**

50.     In addition to closely examining every facet of every detail of every distributor's volume point purchases and sales lines, Herbalife executives worked closely with the distributors to market and sell products.  Johnson in particular was front and center when it came to dealing with distributors' sales and marketing issues.  In his October 21, 2014 *Los Angeles Magazine* interview, Johnson boasted of being "100% engaged," to the point of being "OCD" because "no detail is too big or too small":

> Q.    [Giselle Fernandez]: How much would you say the Company has your imprint and identity in it?
>
> A.    [Michael Johnson]:  Well that's a good question.  I think you have to ask a distributor that.  You have to ask, you know, somebody who is participating in the business.
>
> *On a very personal level, I'm 100% engaged*.  And love the Company, love what we do, love the way we go to market . . . . I'm impassioned about this place.  I am, you know, *everybody will tell you I'm OCD, you know, in here that I'm that no detail is too big or too small* . . . .
>
> Q.    [Fernandez]:  You just gave me a tour of the Company and *you know every minute detail of every division*, its history, the ingredients in products, the seeds that go into making your soy products . . . . *How much of your passion is now reflected in the brand?*
>
> A.    [Johnson]: *Probably too much*.[36]

---

[35] http://www.infosys.com/Oracle/case-studies/Pages/herbalife-oracleimplementation.aspx. (last accessed August 27, 2015).

[36] *Los Angeles Magazine*, "Big Shots: Michael Johnson" at 2:18 (October 21, 2014), http://www.lamag.com/citythinkblog/big-shots-michael-johnson/ (last accessed August 27, 2015).

51.     Johnson went on to explain that "the Company is personal to me."[37] Indeed, his "OCD" level of involvement with every minute aspect of Herbalife's business was his hallmark, and began long before the Class Period started.  On a January 5, 2007 guidance call, Johnson described the mutually beneficial relationship between senior executives (including himself) and top distributors:

> [O]ur Chairman's Club who are the real, real go-getters, the real leaders, the people who take the stage, who lead the parade in this company, who are the heavily inspiring, motivating people who have highly aspirational folks.  *We will be on the phone with them in two hours to go through this in more depth with more decisions this year as we have got to do.  They will give us a ton of input* and say, here is what you need to do and here is the support we need to integrate the market.  Yeah, and together and this will also be because these are global leaders.

52.     This was not an isolated, one-off comment.  Johnson repeatedly told investors how he worked closely with all of the Company's distributors – not just those in the Founder's Circle or Chairman's Club.  He described how "[a]t every one of these big [distributor] events I spend time with probably ten distributors who are distributors starting their business, on their way up trying to figure it out . . . ."[38]

53.     Johnson's relationship with distributors was not limited to helping them out of the gate.   He was also closely involved with the Company's distributors and compliance function due to the tight regulation of the MLM industry.   During the April 24, 2012 Barclays Capital Retail and Restaurants Conference,[39] Senior Vice President and Managing Director Ibi Fleming told

---

[37] *Los Angeles Magazine*, "Big Shots: Michael Johnson" at 10:47 (October 21, 2014), http://www.lamag.com/citythinkblog/big-shots-michael-johnson/ (last accessed August 27, 2015).

[38] *Los Angeles Magazine*, "Big Shots: Michael Johnson" at 6:22 (October 21, 2014), http://www.lamag.com/citythinkblog/big-shots-michael-johnson/ (last accessed August 27, 2015).

[39] Herbalife's presentation at this conference was public and transcribed by Thomson Reuters.

investors that "*Our CEO – our Chairman and CEO talk constantly to distributors and internally* about always taking the high roads, *because it is an industry that's regulated* . . . ."  Johnson himself would later describe how he "worked closely with our distributor leadership," "as hard and vigorously as we can" to purportedly ensure that distributors abide by Herbalife's rules, which Johnson stated were "the ethos of this Company."[40]

54.    Despite this purported emphasis on compliance, however, Herbalife did not have a chief of compliance until after the Class Period, when Pamela Jones Harbour was appointed as Senior Vice President of Global Member Compliance and Privacy on October 6, 2014.  Indeed, Herbalife's compliance department was shrouded in mystery as the Company was never fully honest with investors even with respect to such basic information such as how many people worked in that department.  On August 15, 2013, for example, Herbalife stated that it had a "350-strong global distributor business practices and compliance team,"[41]  Just two months later, CNBC reported that Herbalife spokesperson Barb Henderson said there were 250 compliance staff members worldwide.[42]  Further, the Company has never disclosed the amount of money or resources it spends (annually or quarterly) on compliance.

55.    Top Herbalife distributors shared such a close relationship with senior executives that there was a veritable revolving door between the two groups.  Further still, Johnson enjoys close personal relationships with many of the distributors and executives who have passed through this revolving door.  Former

---

[40] *Los Angeles Magazine*, "Big Shots: Michael Johnson" at 12:01 (October 21, 2014), http://www.lamag.com/citythinkblog/big-shots-michael-johnson/ (last accessed August 27, 2015).

[41]    http://www.theglobeandmail.com/report-on-business/herbalife-kept-links-to-canadian-pyramid-scheme-for-a-decade/article13789659/ (last accessed August 27, 2015).

[42] http://www.cnbc.com/id/101103661 (last accessed August 27, 2015).

distributors Pedro Cardoso and John Tartol currently serve on the Company's Board of Directors, while distributors-turned-directors Leon Waisbein and Leslie Stanford resigned from the Board in 2009 and 2005, respectively:

> a. Herbalife has described Cardoso as a "direct collaborator of CEO Michael Johnson."[43]

> b. Tartol has appeared at Herbalife-sponsored events as recently as December 2013, when he spoke on the Chairman's Club Tour at events in Las Cruces and Orange County.  Defendant Johnson recalls that when he first became CEO in 2003, Tartol was "personally training" him.[44]  In 2009 and 2010, Herbalife counted Tartol among its Top 10 distributors in the world.

> c. Waisbein was also among the Company's Top 10 distributors those years.  Even after his 2009 resignation, however, he continued to speak on behalf of Herbalife, including at the 2010 Sun City Extravaganza and at a 2010 "retreat" in Malta where his presentation was entitled *How to get to President's Team?*

> d. Stanford is a Founders' Club member who served on the Board from 2002 to 2005.  Similarly to Waisbein, she continues to appear at promotional events for the Company, most recently in December 2013 in Montreal and in Toronto.

---

[43] http://www.herbalifepyramidscheme.com/media/2014/12/Exhibit-Z1.pdf.   (last accessed August 27, 2015).  The original Portuguese is "colaborador direto do CEO Michael Johnson."

[44] *Herbalife Today*, "An interview with CEO Michael O. Johnson at 6 http://herbalifepyramidscheme.com/media/2014/02/JTExhibit-M.pdf (last accessed August 27, 2015).

e.      Doran Andry's brother, Donte Andry, sits on the Strategy and Planning Committee and the Product Committee for Herbalife North America.[45]

56.    In addition to this revolving door, Herbalife would also often use its top distributors from the Founder's Circle, Chairman's Club and President's Club to shill the lifestyle opportunities supposedly awaiting new distributors:

a.      Chairman's Club member Doran Andry, who boasted that he would often "step out of the Ferrari, the Bentley, or whatever,"[46] told distributors at a training session in Chicago that they could reach annual revenues of nearly *$1.4 billion* and net annual incomes of *$55.8 million* by becoming Herbalife distributors.[47]

b.      Chairman's Club Member and current Board member John Tartol has asked "[h]ow many of you would like to make at least a million dollars a year? Every extra million dollars, I find, comes in handy.  2 million? 5 million?"[48]

---

[45] http://cmwellnessworks.com/about-us/meet-the-team/donte-andry  (last accessed August 27, 2015).

[46] Doran Andry's statement was featured in an April 2014 ABC News undercover investigation. *See ABC News*, "Herbalife, Ackman Respond to 'Nightline' Undercover Report" (April 24, 2014) http://abcnews.go.com/Blotter/herbalife-ackman-respond-nightline-undercover-report/story?id=23457777    (last    accessed August 27, 2015).

[47] Letter from David Klafter to Pamela Jones Harbour dated November 6, 2014, at 14,   http://www.factsaboutherbalife.com/media/2014/11/Letter_to_Pamela_Jones_ Harbour11.6.14.pdf (last accessed August 27, 2015).  Unsurprisingly, *The Atlantic* described Andry's promotional claims of income as "unrealistic." *The Atlantic*, "Is Herbalife    a    Pyramid    Scheme?"    (June    2014)    http://www.theatlantic.com/ magazine/archive/2014/06/wall-streets-6-billion-mystery/361624/    (last    accessed August 27, 2015).

[48] John    Tartol,    Herbalife    2012    Summit    at    4:00    -    4:13, http://www.herbalifepyramidscheme.com/es/perpetrators/john-tartol/ (last accessed August 27, 2015).

c. Chairman's Club member Stephan Gratziani, who Johnson endearingly told "I know you well enough to know that you are on the climb my friend,"[49] boasted that "[t]oday, I, you know, live a lifestyle that I never could have thought possible. I got to see more things than you could have ever imagined possible. Recently, I took my daughter to Washington D.C. She had a chance to walk out on the field with David Villa and F.C. Barcelona in front of 88,000 people. Where can kids have that experience? It's only with Herbalife."[50]

d. Maurice and Sandra Smith, two Executive President's Team members, tell of a similar story. In a promotional video Maurice Smith states that before Herbalife, "I felt like I was going to die before I ever had a chance to live my life. And you may be feeling that way too."[51] Once a factory worker, a presentation featuring their story boasts that they now enjoy life in a home with a "Penthouse Suite bigger than first apartment," three luxury cars in the driveway, and vacations to exotic foreign locations.[52]

---

[49] *See* http://www.factsaboutherbalife.com/stephan-gratziani-chairmans-club-member-profile/ (last accessed August 27, 2015).

[50] http://www.factsaboutherbalife.com/stephan-gratziani-chairmans-club-member-profile/ (last accessed August 27, 2015). Gratziani's comment begins roughly at 5:30.

[51] Herbalife Recruiting Video, Total Business Machine at 3:05-4:15, *available at* http://www.herbalifepyramidscheme.com/perpetrators/maurice-sandra-smith/ (accessible by clicking on the link https://vimeo.com/106532209 (last accessed August 27, 2015).

[52] *Total Business Machine Presentation*, "Executive President's Team Members Maurice & Sandra Smith," http://www.herbalifepyramidscheme.com/media/2014/09/Smith-Exhibit-K.ppt (last accessed August 27, 2015).

e.      President's Team Member Michael Burton has bragged that "[j]ust after six months in the business, our income was over $6,000 a month.  And by the eleventh month in the business, we were over $12,000 a month. . . . After sixteen months in the business, we were over $25,000 a month. And that number's staggering—the type of lifestyle you can have with that income. And since then, the income's doubled, tripled, quadrupled. It's just been absolutely exciting. And over the last nine years, we have made millions, we have been paid millions of dollars for doing this business. And what I know, you could have the same opportunity as we had."[53]

57.      Notably, it would be impossible for distributors to achieve these fantastical incomes without recruiting massive downlines – and the resulting royalty override and production bonus payments from those downlines.   As Pershing Square later revealed, the median annual compensation for World Team members, the highest distributor level achievable without recruited downlines in pace, was just $5,659.[54]

58.      The distributor compensation structure resulted in two outcomes. First, it incentivized distributors to recruit downlines to make more money. Johnson himself recognized this fact.  At the September 5, 2007 Goldman Sachs Annual Global Retailing Conference, then-CFO Rich Goudis and Johnson described top Herbalife distributors as:

---

[53] Herbalife Recruiting Video, Global Home Business Systems 1:40–2:46, *available at* http://www.herbalifepyramidscheme.com/perpetrators/michael-burton/ (accessible by clicking on the link https://vimeo.com/91648899) (last accessed August 27, 2015).

[54] *Who Wants to be a Millionaire* ("*Millionaire*") Slide 74.   The *Millionaire* Presentation is attached as Exhibit C.

[Goudis]: So then you're looking at now our retail sales, because the single biggest opportunity for those supervisors is their 50% off list discount. That's the biggest component of their income. They get a small piece on their royalties, because they really haven't strted building a sales organization yet to get rewards down below. Whereas someone up in the very top, they're $2+ million, they're probably working on very little retail margin, because they're not really retailers.

[Johnson]: **They're recruiters**.

59.     Second, the compensation structure that Herbalife pushed would result in Herbalife paying royalty overrides and production bonuses to its distributors. These bonuses are the Company's "most significant expense" and purportedly only paid subject to verification that they were earned pursuant to the 70% Rule.

60.     As described above, *Omnitrition* and the 70% Rule were supposed to cut a balance by recognizing and allowing for a distributor's personal consumption, while simultaneously putting restrictions in place to prevent inventory loading.

61.     The *New York Post* reported that as far back as 2005, Johnson saw problems with distributors' inventory loading practices – which were supposed to be prevented by the 70% Rule – personally lamenting that "[w]hen the credit card bill comes, the spouse says, '[h]ow are we going to pay for this? You didn't sell this stuff. It's in the garage. It's in the pantry.'"[55] The *Post* quoted Johnson as exhorting Herbalife distributors that they "gotta do things right because Rich [Goudis, then Herbalife's CFO] and *I have one major job . . . to say out of jail. We go to the gray-bar hotel together if you don't operate with ethics*." As of 2005, Johnson was therefore on notice of the 70% Rule, the inventory loading problems that it was intended to prevent, and that violation of the strict laws regulating MLMs (including *Omnitrition*) could result in criminal liability.

---

[55] "Video reveals Herbalife boss saw 'pyramiding' signs early on," *New York Post*, June 25, 2015, *available at*  http://nypost.com/2015/06/25/video-reveals-herbalife-boss-saw-pyramiding-signs-early-on/ (last accessed August 27, 2015).

62.     Johnson was once again put on notice of Herbalife's compliance with *Omnitrition* and its formulation of the 70% Rule in 2009 as a result of *Herbalife Int'l of Am., Inc. v. Ford, et al.*, Case No. 07-CV-2529 GAF (FMOx) (C.D. Cal.). In that case, Herbalife sued a group of former distributors.  Those distributors counter-claimed, alleging that Herbalife operated an endless chain pyramid scheme in violation of state and federal law.   As part of their discovery efforts, the counterclaimants deposed several Herbalife executives:

a.     Vice President of Distributor Policy Administration Jacqueline Miller testified that Herbalife conducted no audits to verify compliance with the 70% Rule (except in the context of a broader investigation), and would not investigate alleged 70% Rule violations on their own.[56]   Instead of tracking between internal and external sales, Miller testified that Herbalife would simply add up amounts from a distributor's retail receipts to ascertain if those amounts were at least 70% of what that distributor had purchased.[57] Miller also testified that, as of February 11, 2009, Herbalife had conducted no studies to determine whether the 70% Rule is effective.[58]

b.     Michael McKee, Vice President of Sales and Marketing, testified that in the 500 to 1,000 distributor training events that he attended, he never remembered anyone educating trainees about the 70% Rule.[59]   In fact, McKee testified that he did not even know what the 70% Rule was, and

---

[56] Deposition of Jacqueline A. Miller, Volume 1 (February 11, 2009), at 25:14-28:11. *Herbalife Int'l of Am. Inc. v. Ford*, Case No. 07-CV-2529, (C.D. Cal.) (ECF No. 143-2).

[57] *Id*. at 70:7-12.

[58] *Id*. at 96: 5-8.

[59] Deposition of Mike McKee (February 18, 2009), at129:10-14. *Herbalife Int'l of Am. Inc. v. Ford*, Case No. 07-CV-2529, (C.D. Cal.) (ECF No. 143-4).

1   that he did not train on the Rule because he did not consider it to be

2   "exciting stuff."[60]

3       63.    On February 18, 2009, Johnson signed a declaration attesting that he

4   has a "general knowledge regarding the case and its issues," was "briefed by others

5   at Herbalife" on the case, and had "discussion with counsel" about the case.[61]

6       64.    On August 25, 2009, Judge Fees issued a Memorandum and Order on

7   the parties' cross-motions for summary judgment. Judge Fees discussed

8   Herbalife's 70% Rule and found, citing *Omnitrition*, that "Herbalife's entire

9   business model appears to incentivize primarily the payment of compensation that

10   is 'facially unrelated to the sale of the product to ultimate users because it is paid

11   based on the suggested retail price of the amount ordered from [Herbalife], rather

12   than based on actual sales to customers.'"[62]

13       **E.    Defendants Recklessly Fail To Provide Basic Answers To Questions Concerning Herbalife's Fundamental Business**

14

15       65.    As the "100% engaged," "OCD" CEO that he was, Johnson was

16   aware of the application of *Omnitrition* and the 70% Rule to Herbalife as early as

17   2005 and in any event no later than 2009. Indeed, the 70% Rule was the only

18   protection keeping Herbalife from needlessly paying out tens of millions of dollars

19   of bogus royalty overrides and production bonuses to distributors.

20       66.    During a May 1, 2012 earnings call on which Johnson participated,

21   Greenlight Capital founder and president David Einhorn posed a series of simple

22   questions to Herbalife executives, first asking "[w]hat is the percentage [of final

23

24   _____

[60] *Id.* at 127:21-128:9.

25   [61] "Declaration Of Michael O. Johnson In Support Of Joint Stipulation Re: Plaintiff Herbalife International Of America, Inc.'s Motion For A Protective Order Concerning Defendants' Notice Of Deposition Of Michael Johnson," *Herbalife Int'l of Am. Inc. v. Ford*, Case No. 07-CV-2529, (C.D. Cal.) (ECF No. 139)

26

27   [62] *Herbalife Int'l of Am. Inc. v. Ford*, Case No. 07-CV-2529, (ECF No. 374 at 16) (C.D. Cal.) "Memorandum and Order."

28

product sales] that is actually sold to consumers that are not distributors?" Specifically citing Herbalife's 70% Rule, Walsh explained "[s]o again, going back to our 70 percent rule, we believe that it's at 70 percent or potentially in excess of that." The next day, on May 2, Herbalife filed a Form 8-K stating that "in order to minimize the risk of product being accumulated by distributors, the company has policies in place such as the 70% Rule . . . ."

67.    On June 27, 2012 SEC Assistant Director John Reynolds wrote directly to Johnson asking him to clarify "why the 70% Rule should not be considered a part of your core business model."[63]   On July 5, 2012, Herbalife responded.  Johnson stayed silent, instead requiring Principal Accounting Officer Bosco Chiu to bear the brunt of the SEC's inquiry.  Shockingly, Chiu told the SEC that "we do not rely on the '70% rule' in any meaningful way."[64]  Chiu's statement fatally undermined Walsh's reliance on the 70% Rule to ensure that products were being sold outside of Herbalife's distribution base.

68.    Despite the ease of relying on Herbalife's unparalleled access to distributor data to satisfy the 70% Rule to establish genuine retail sales to non-distributors – indeed, despite the requirement of doing so under *Omnitrition*'s binding precedent – Herbalife simply did not do so.  And they continued to be dogged by questions regarding sales to non-distributors.  On December 19, 2012, Johnson called in to CNBC's *Street Signs* in anticipation of Pershing Square's *Millionaire* Presentation that was to take place the next day.  The following exchange occurred between Johnson and co-host Kate Kelly, during which Johnson stated:

---

[63] June 27, 2012 Letter from John Reynolds to Michael Johnson.

[64] July 5, 2012 Letter from Bosco Chiu to John Reynolds. Notably, Chiu also acknowledged that Herbalife "ay not assert Staff comments as a defense in any proceeding initiated by the Commission or any person under the federal securities laws of the United States."

Q.      [Kelly]: Can you give us a percentage figure though Mr. Johnson as to what percentage of your sales are outside [Herbalife's] distribution network?

A.      [Johnson]: **90%**

Q.      [Kelly]: So the vast majority?

A.      [Johnson]: *Absolutely*.

69.     Johnson's "absolute[]" statement lacked any factual basis.  The only possible support for his statement – that the Company relied on the 70% Rule – was demolished when Chiu told the SEC months earlier that Herbalife did not rely on that rule "in any meaningful way."  Johnson acknowledged the blatant falsity of his statement just one month later.  On January 10, 2013 during an second, follow-up interview on CNBC's *Squawk on the Street*, Johnson flatly confessed that his "90%" statement on December 19, 2012 "was a misstatement . . . . ***That was a misstatement on that day***" he made because he was "hyped up."[65]  Johnson further admitted that he "***got in a lot of trouble***" for making that statement.[66]

70.     In a last-ditch attempt to show that genuine retail demand for its products existed among non-distributors, Herbalife has resorted to commissioning multiple costly research "surveys" which are inconsistent with their previous publicly-issued statements, inconsistent with each other, and inconsistent with secret internal documents.

71.     For example, in early 2012, Herbalife hired Lieberman Research to conduct a survey of its distributors and prepare a report (the "Lieberman Report").  Johnson often touted this report as evidence that Herbalife had customers outside

---

[65] *CNBC*, "CNBC Exclusive: CNBC Transcript: Herbalife Chairman & CEO Michael Johnson Sits Down with Kate Kelly Today on CNBC" (January 10, 2013), http://www.cnbc.com/id/100370378 (last accessed August 27, 2015).

[66] *CNBC*, "CNBC Exclusive: CNBC Transcript: Herbalife Chairman & CEO Michael Johnson Sits Down with Kate Kelly Today on CNBC" (January 10, 2013), http://www.cnbc.com/id/100370378 (last accessed August 27, 2015).

of the Company's distribution network.[67]  While the Lieberman Report was never fully released to the public, its methodology was summarized at Herbalife's Investor Day presentation on January 10, 2013.[68]  This summary allowed *The New York Times* to observe that "[t]he study was not based on Herbalife's actual sales data.  Instead, Lieberman extrapolated from an Internet survey that the company had more than six million customers."[69]  The Lieberman Report found that:

> a.    92% of consumers that purchased Herbalife product in the preceding three months were non-distributors;

> b.    73% of former distributors joined for product discounts;

> c.    44% of all distributors had no earnings expectations when joining Herbalife.

72.    After the Class Period, on June 11, 2013, Herbalife released the results of another study, conducted by Nielsen Research during April and May of 2013 (the "Nielsen Report").  The Nielson Report found that 87% of consumers were outside of the Herbalife distribution base.  As with the Lieberman Report, Johnson touted the Nielsen Report as evidence that Herbalife's products were being sold to non-distributors.

---

[67] For example, during the 3Q 2012 earnings call, Johnson used the Lieberman Report for his assertion that "more than 90% [of customers] were outside [of Herbalife's] distribution network."   Similarly, the night before Ackman's *Millionaire* presentation, on December 19, 2012, Johnson touted the Lieberman report on CNBC for supposedly proving that Herbalife had "millions upon millions of customers."   http://www.cnbc.com/id/100328911 (last accessed August 27, 2015).

[68] Herbalife, "Investor Day Presentation" (January 10, 2013) http://files.shareholder.com/downloads/ABEA-48ZAJ9/2270072295x0x627448/e3de3984-4dff-4ca3-90a1-a1c1cafecb4e/Herbalife_Investor_Day_Presentation_-_01.10.13.pdf (last accessed August 27, 2015).

[69] *The New York Times*, "Seeking a Company's Elusive Sales Data" (February 4, 2013), http://dealbook.nytimes.com/2013/02/04/seeking-a-companys-elusive-sales-data/ (last accessed August 27, 2015).

73.     Importantly, the results of the Lieberman Report and the Nielsen Report contradict each other.   Key parameters and findings of the Lieberman Report included that 5% of adults purchased an Herbalife product within the prior three months, which was based from a survey of 2,000 interviews conducted; meanwhile, the key parameters and results of the Nielsen Report include that 3.3% of adults purchased an Herbalife product within the prior three months, which was based from a survey of 10,525 interviews conducted.   At the 95% confidence level (which is the accepted standard in survey research), the Lieberman Report estimate of 5% has a margin of error of +/- 0.96%.   That means that with 95% certainty, Lieberman estimates the range for the true population proportion to be between 4.04% and 5.96%.   At the 95% confidence level, the Nielsen Report estimate of 3.3% has a margin of error of +/- 0.34%. That means that with 95% certainty, Nielsen estimates the range for the true population proportion to be between 2.96% and 3.64%.   The results contradict each other because the ranges do not overlap.

74.     The Lieberman and Nielsen Reports directly contradict a non-public Herbalife study to which the Company's senior executive had access. Sometime in late 2010 or early 2011, Herbalife commissioned Actionable Research to conduct a study of distributors who had left Herbalife.   The resulting Herbalife Former Distributor Study, dated April 2011 (the "Actionable Report"), directly contradicts the Lieberman Report and the Nielsen Report.[70]   Significantly, the Actionable Report reveals that:

a.       44% of former distributors joined Herbalife to supplement their income while only 17% joined to purchase product at a discounted price.

---

[70] The Actionable Report was nonpublic and known to Defendants throughout the Class Period.  The Actionable Report was not made public until January 26, 2015. *Seeking Alpha*, "Leaked Internal Herbalife Survey Gives FTC More 'Actionable' Results" (January 26, 2015) http://seekingalpha.com/article/2848956-leaked-internal-herbalife-survey-gives-ftc-more-actionable-results (last accessed August 27, 2015).

This information directly contradicts the Lieberman Report's finding that 73% of distributors joined for product discounts.

b.  78% of the distributors were "active in the business," meaning they were attempting to sell product and/or recruit new distributors.  Of those "active in the business distributors," 74% worked more than 20 hours per week.  This information directly contradicts the Lieberman Report's finding that 44% of distributors did not have an income expectation when signing up with Herbalife.

c.  Only 55% of distributors sold at least half of their product to customers.[71]  Nearly all of the remaining 45% consumed the products personally or "gave them" to immediate family.

75.  The Actionable Report revealed that Herbalife's distributors were not adhering to the 70% Rule, since only half of the distributors were selling half of their products to customers.  The same inventory loading dangers that Johnson first identified in 2005 were still present during the Class Period.  Moreover, as made clear by the testimony in the *Ford* action, Herbalife was doing nothing to remedy its distributors' violations of the 70% Rule.

## IV.  Defendants' False And Misleading Statements

### A.  False Statements Regarding Compliance With *Omnitrition* And Herbalife's Ability To Track Retail Sales

76.  In its 2010 Form 10-K, Herbalife falsely stated that:

We also are subject to the risk of private party challenges to the legality of our network marketing program. For example, in *Webster v. Omnitrition International, Inc.* , 79 F.3d 776 (9th Cir. 1996), the multi-level marketing program of Omnitrition International, Inc., or Omnitrition, was successfully challenged in a class action by Omnitrition distributors who alleged that Omnitrition was operating an illegal "pyramid scheme" in violation of federal and

---

[71] "Customers" is not defined, and it is unclear whether it combines distributors and non-distributors.

state laws. ***We believe that our network marketing program satisfies the standards set forth in the Omnitrition case*** and other applicable statutes and case law defining a legal network marketing system, in part based upon significant differences between our marketing system and that described in the Omnitrition case.[72]

77.     This false statement was repeated in substantially identical form in Herbalife's 2011 Form 10-K.[73]

78.     The previously emphasized statements were false and misleading because:

a.     Herbalife admitted that at the time they were made, the Company could not distinguish between sales to distributors and sales to non-distributors.  As *Omnitrition* held, "[i]f Koscot is to have any teeth, such a sale [within the distributor base] cannot satisfy the requirement that sales be to 'ultimate users' of a product."

b.     Because Herbalife could not distinguish between internal and external product sales, the royalty overrides and production bonuses paid to top distributors (which were the Company's "most significant expense") were, under *Omnitrition*, "unrelated to the sale of the product to ultimate users."

c.     Only two months later, on July 5, 2012, Herbalife Principal Accounting Officer Bosco Chiu told the SEC that "we do not rely on the '70% Rule' in any meaningful way," contrary to the Company's perceived existing and historical Company practices.

d.     Johnson has admitted that his statements regarding sales outside of the distribution network (and thus, the Company's compliance with the

---

[72] 2010 Form 10-K at 21 (filed February 22, 2011).

[73] 2011 Form 10-K at 22 (filed February 21, 2012).

70% Rule) were not true, including that he "got in a lot of trouble" for speaking on the matter.

79.     In its 2010 Form 10-K, Herbalife misleadingly stated that:

All of our officers and directors are subject to a permanent injunction issued in October 1986 pursuant to the settlement of an action instituted by the California Attorney General, the State Health Director and the Santa Cruz County District Attorney. We consented to the entry of this injunction without in any way admitting the allegations of the complaint. *The injunction* prevents us and our officers and directors from making specified claims in future advertising of our products and *required us to implement some documentation systems with respect to payments to our distributors*.[74]

80.     This false statement was repeated in substantially identical form in Herbalife's 2011 Form 10-K.[75]

81.     The previously emphasized statements were false and misleading because:

a.     Despite being able to "peel back the onion" and thereby have purportedly unparalleled access to distributor sales data, Herbalife's implementation of its documentation systems did not permit it to distinguish between sales to distributors and sales to non-distributors as the Permanent Injunction requires.

b.     Herbalife has the documented ability, through the use of the customer information required to be provided on its wholesale and retail order forms, to ascertain which of its customers are distributor and which are not.  Yet the Company has resorted to peddling the Lieberman and Nielson Reports which are inconsistent with each other and inconsistent with the nonpublic April 2011 Actionable Report.

---

[74] 2010 Form 10-K at p. 20 (filed February 22, 2011).

[75] 2011 Form 10-K at 22 (filed February 21, 2012).

82.     At the September 7, 2011 Barclays Capital Back to School Consumer Conference, DeSimone misleadingly told the public that Herbalife's computer systems:

> [P]rovide[] great visibility. **We get daily sales updates**.
>
> * * *
>
> **[W]e have a detailed distributor database that gives us dozens of metrics on each distributor**. It is really too much information to look at, but you identify your outliers, and you find distributors that are performing very well and you find out why. And if they're performing well because they have a nuance for the business model that's valuable, then we commercialize it globally. We have a lot of access to distributor performance also.[76]

83.     At the April 24, 2012 Barclays Capital Retail and Restaurants Conference , Vice President of Investor Relations Amy Green similarly boasted of Herbalife's technological prowess:

> [W]hat we look at, we do have from a technology standpoint have the ability to do deep dive within the – into a distributorship or into either from corporately we can look at a region, a country, a city, the different layers, **you can kind of peel off the onion to see what kind of granularity you want to look at. You can look at an individual distributorship, you can look at the whole lineage of a distributor that has a downline**. But it's not so much looking at a saturation analysis, it's more looking at what the opportunity says because I'm a distributor and I'm looking at my tool, the distributor only sees their business.[77]

84.     The previously emphasized statements were false and misleading because Herbalife admitted that it was unable to distinguish between sales to distributors and sales to non-distributors, which is required under *Omnitrition* and the Permanent Injunction, and one factor used to distinguish pyramid schemes from legitimate MLMs.

85.     On May 1, 2012, the Company held an earnings call to discuss its 1Q 2012 financial results. During the Q&A session, David Einhorn, founder and

---

[76] September 7, 2011 Barclays Capital Back to School Consumer Conference.

[77] April 24, 2012 Barclays Capital Retail and Restaurants Conference.

president of Greenlight Capital, posed several questions which resulted in the following exchange between him and Walsh:

Q.  [Einhorn]: What is the percentage [of final product sales] that is actually sold to consumers that are not distributors?

A.  [Walsh]: We don't have exact percentage, David, because we don't have visibility to that level of detail.

Q.  [Einhorn]: Do you have an approximation?

A.  [Walsh]: So again, **going back to our 70 percent rule, we believe that it's at 70 percent or potentially in excess of that**.

86.  The previously emphasized statement was false and misleading because:

a.  Herbalife had no reasonable basis to make this statement because the testimony of its executives in the *Ford* case revealed that the Company did not enforce the 70% Rule and that those responsible for training distributors on its meaning and application have admitted that they are unaware of the Rule.

b.  Just two months later, on July 5, 2012, Herbalife Principal Accounting Officer Bosco Chiu told the SEC that "we do not rely on the '70% Rule' in any meaningful way."

87.  On May 2, 2012, Herbalife issued a Form 8-K in response to questioning from David Einhorn on the previous day.  In the filing, Herbalife misleadingly stated:

Question #1 from David Einhorn: "First, how much of the sales that you'd make in terms of final sales are sold outside the network and how much are consumed within the distributor base?"

Answer: ***We don't track this number and do not believe it is relevant to the business or investors***.

Herbalife believes the majority of its distributors are discount buyers, who become distributors in order to purchase their favorite Herbalife products at a minimum discount of 25 percent (either directly from the company or from their upline distributor/supervisor). In addition, some of these distributors will also share with, or retail the products to other friends, family, and customers.

The percentage of product of any multi-level marketing company consumed by its distributors is substantial. This is not surprising since consumers who are enthusiastic about the products become distributors in order to purchase at a discount and possibly to share and sell the products to others. ***In addition, in order to minimize the risk of product being accumulated by distributors, the company has policies in place such as the 70% Rule, the Ten Customer Rule and the Buy Back policy***.

88.     The previously emphasized statement was false and misleading because:

a.     It revealed that Herbalife did not, in fact, track sales to non-distributors ***at all*** and did not even consider them to be "relevant," despite *Omnitrition*'s holding that they contributed to the "sine qua non" sign of an illegitimate pyramid scheme.

b.     This new disclosure further flipped the statement made just one day prior on its head.  Instead of the majority of purchasers being consumers ***outside*** the distribution network, Herbalife admitted that the majority of customers were ***inside*** the network, or purchasing for self-consumption.  This statement is directly contradicted by the Actionable Report, which revealed that nearly half of distributors joined Herbalife to supplement their income.

c.     Just two months later, on July 5, 2012, Herbalife Principal Accounting Officer Bosco Chiu told the SEC that "we do not rely on the '70% Rule' in any meaningful way."

**B.     False Statements Regarding The Composition Of Herbalife's Distributor Base**

89.     In its 2010 Form 10-K, Herbalife broke out its distributors into two main groups, and then into three subgroups:

***Approximately 483,000 of our 2.1 million distributors have become sales leaders***, which are comprised of approximately 434,000 sales leaders in the 73 countries where we use our traditional marketing plan and approximately 49,000 China sales employees and licensed business providers operating under our China marketing plan. Collectively, we refer to this group as "sales leaders." ***We believe that the distributors who have not attained the sales leader level can be***

*segmented into three general categories based on their product order patterns: discount buyers, small retailers and potential sales leaders. We define discount buyers as customers who have signed up as distributors to enjoy a discount on their purchases; small retailers as product users and sales people who generate modest sales to friends and family; and potential sales leaders as distributors who are proactively developing a business with the intention of qualifying to become a sales leader.* In 2010, excluding China, *distributor orders for these three general categories were approximately 29%, 57% and 14%, respectively.*[78]

90.     During the May 1, 2012 earnings call discussing Herbalife's 1Q 2012 results, Einhorn continued his pointed questions for Company executives.  During the Q&A session, the following exchange occurred during which DeSimone falsely and misleadingly stated:

Q.     [Einhorn]: One last question, when you had your previous 10-K, you disclosed three groups of distributors at the low end – you called 29 percent self consumers, 57 percent small retailers, and 14 percent potential sales leaders. Then that disclosure did not repeat in the subsequent 10-K, so I have two questions. First of all, how do you track that and how do you characterize and know which ones are which? And second, why did you stop disclosing that in the last 10-K? Is that something that you've stopped tracking or just stopped disclosing?

A.     [DeSimone]: David, hi, this is John. The criteria for grouping distributors into different classes was based off of their volume purchases. ***We're making assumptions that people below a certain volume weren't doing the business, they were buying self consumption.*** And I don't remember the exact amounts, but I can get it to you after the call. It's how we delineated between the three classes. The reason we took it out of 10-K is a change in CFO, from Rich to me. ***I didn't view it as valuable information to the business or to the investors.*** However we can easily provide the exact same breakout going forward, if you'd like. I could email it to you and to our investors. Again, I don't remember the exact delineation between the three classes but I can certainly get it to you. Our objective is to be completely transparent.

Q.     [Einhorn]: Thanks, I'd appreciate that sort follow up, that would be helpful. Thanks so much, guys.

---

[78] 2010 Form 10-K at 5.

91.     In the Form 8-K filed the next day, on May 2, the Company falsely amended and elaborated on certain answers to Einhorn's questions from the previous day:

> Question #3 from David Einhorn: "When you had your previous 10-K, you disclosed three groups of distributors at the low end. You called 29 percent self consumers, 57 percent small retailers and 14 percent potential sales leaders, and then that disclosure did not repeat in the subsequent Form 10-K. I have two questions; first, how do you track that and how do you characterize and know which ones are which? And second, why did you stop disclosing that in the last 10-K? Is that something that you stopped tracking or just stopped disclosing?"

> Answer: We segment the distributors who have not attained the supervisor level into three general categories based on their product order patterns: discount buyers, small retailers and potential supervisors. We define discount buyers as customers who have signed up as distributors to receive a discount on their purchase; small retailers as product users and sales people who generate modest sales to friends and family; and distributors who are actively developing a business with the intention of qualifying to become a supervisor. *We did not include the percentages from the 2011 Form 10-K in our more recent filings because we do not view the information as valuable to the business or to investors.* For complete transparency, however, the full year 2011 information is as follows:

> • *Discount buyers were 27 percent (distributors who receive a 25 percent discount);*

> • *Small retailers were 61 percent (distributors who receive a 35 percent discount);*

> • *Potential supervisors were 12 percent (distributors who receive a 42 percent discount).*

92.     The previously emphasized statements were materially false and misleading because:

a.     Herbalife's "assumptions" based on purchase volume were directly contradicted by the Actionable Report, which revealed that nearly half of distributors joined Herbalife to supplement their income.

b.     Herbalife had no way of verifying that the this purchased volume was legitimate.  The Company did not audit distributors to enforce the 70% Rule, and the Company's Chief Accounting Officer later informed

the SEC that the Company did not rely upon the Rule in "any meaningful way."

**C.    False    Statements    Regarding    Herbalife's    Certification    of Disclosure**

93.    Pursuant to Exchange Act Rule 13a-14(a), Defendant Johnson signed the following certifications in Herbalife's 2010 Form 10-K and 2011 Form 10-K:

> I, Michael O. Johnson, certify that:
>
> 1. I have reviewed this Annual Report on Form 10-K of Herbalife Ltd.;
>
> 2. Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact* necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report . . . .[79]

94.    The previously emphasized statements were materially false and misleading because Johnson described himself as "100% engaged," to the point of "OCD."  Since at least 2005 he was aware of the problems that the 70% Rule and *Omnitrition* were intended to counteract.  Yet he certified the Forms 10-K despite knowing that the statements regarding compliance with *Omnitrition* (¶76, above) and the classification of Herbalife's distributor base (¶89, above), were materially false and misleading.

**V.    The Truth Emerges: Herbalife Does Not Track Sales Or Adhere To The 70% Rule In Violation Of *Omnitrition* And The Permanent Injunction**

**A.    Loss Causation: The May 1-2, 2012 Partially Corrective Disclosures Send Herbalife's Stock Tumbling**

95.    On May 1, 2012, the Company held an earnings call to discuss its 1Q 2012 financial results.  During the Q&A session, David Einhorn, founder and president of Greenlight Capital, posed several questions which resulted in the following exchange with Walsh:

---

[79] 2010 Form 10-K at Ex. 31.1 (filed February 22, 2011); 2011 Form 10-K at Ex. 31.1 (filed February 22, 2012).

1
2
3

> Q.   [Einhorn]: What is the percentage [of final product sales] that is actually sold to consumers that are not distributors?
>
> A.   [Walsh]: ***We don't have exact percentage, David, because we don't have visibility to that level of detail.***

4
5

> Q.   [Einhorn]: Do you have an approximation?
>
> A.   [Walsh]: So again, ***going back to our 70 percent rule, we believe that it's at 70 percent or potentially in excess of that.***

6   96.   Herbalife's answers to Einhorn's May 1 questions constitute a
7   partially corrective disclosure because they revealed, for the first time, previously
8   nonpublic information: that, despite the requirements of *Omnitrition* and the
9   Permanent Injunction, Herbalife was unable to distinguish sales to distributors
10  from sales to non-distributors, even though it was required and had the
11  demonstrated ability to do so.

12  97.   Herbalife's May 1, 2012 answers to Einhorn's questions shocked the
13  market with new, previously undisclosed nonpublic information.  The conference
14  call began at 11:00 am EDT and Einhorn began posing his questions at 11:36 EDT,
15  which is the exact time that Herbalife stock began its steep decline.  This was the
16  direct and proximate cause of Herbalife's common stock price immediately
17  plummeting $14.02 per share – or 19.94% – to close at $56.30.  This price decline
18  was statistically significant at the 95% confidence level.  An intraday event study
19  confirms the timing of the share price decline:

20
21
22
23
24
25
26
27
28



98.    The media also quickly attributed the stock price decline to Herbalife's answers to Einhorn's questions, taking note not only of the questions, but more importantly of Herbalife's failure to answer those questions with any specifics or reference to supporting data.   The *Associated Press*, for example, described Walsh's answers as "the big picture":

THE SPARK: During Herbalife's Tuesday morning call with analysts and investors, Greenlight Capital's David Einhorn asked exactly how much of the company's products are sold to consumers who are not distributors. Einhorn also asked why the company did not disclose its breakdown of different kinds of distributors in the last regulatory filing, while it had in previous quarters.

THE BIG PICTURE: Herbalife executives said on the call that they couldn't provide specific numbers regarding the percentage of its products purchased by consumers, rather than by distributors, who then resell them. But they said that the company generally sells about 70 percent of its products to consumers, or to distributors for their own personal use.

The executives also attributed the lack of a distributor breakdown in the company's last quarterly report to the hiring of a new chief

financial officer, who didn't realize how important those details are to investors.[80]

99.    *The Wall Street Journal* noted that:

Herbalife Ltd.'s typically mundane quarterly earnings call became more interesting when a noted U.S. hedge-fund manager pressed the maker of nutrition and weight-loss products for details on its financial reporting.

Shares tumbled 20%, leaving company executives scrambling to defend the business Tuesday.[81]

100.    *Business Insider* similarly explained that:

Herbalife . . . was a little more than 36 minutes into its conference call when the operator turned the call's second question over to David Einhorn of Greenlight Capital.

Seconds later the stock would collapse nearly 20 percent, erasing about $2 billion in market cap.[82]

101.    Despite Herbalife's admission, Walsh nonetheless informed investors that sales to non-distributers were 70% or potentially in excess of 70%.  Thus, while investors had cause for alarm based on the revelation that Defendants had misrepresented Herbalife's ability to track data on this level, investors were reassured by Walsh's assurance that at *least* 70% of sales were to outside consumers, creating the false impression that while the "visibility" into sales was not as transparent as previously represented, it was still sufficient to accurately estimate the number of true outside retail sales.  As detailed herein, Walsh's 70% representation meant that the vast majority of the Company's sales were to purchasers not connected with the Herbalife business opportunity, and that there was enormous genuine retail demand for the Herbalife shakes and diet products.  Walsh's affirmation regarding the 70% figure was therefore highly material.

---

[80] "Shares of Herbalife plunge after Einhorn questions company executives on distribution system," *Associated Press Newswires*, May 1, 2012.

[81] Joan E. Solsman, "Herbalife's Surprise Plunge," *The Wall Street Journal*, May 1, 2012.

[82] "David Einhorn Singlehandedly Crushed A Stock Today By Asking These Questions," *Business Insider*, May 1, 2012.

102.   On May 2, 2012, Herbalife issued a Form 8-K in response to questioning from Greenlight Capital founder and president David Einhorn on the previous day.  As detailed in Section IV, this statement was false.  However, this statement was also a partially corrective disclosure.  In the filing, Herbalife stated:

> Question #1 from David Einhorn: "First, how much of the sales that you'd make in terms of final sales are sold outside the network and how much are consumed within the distributor base?"
>
> Answer: ***We don't track this number and do not believe it is relevant to the business or investors***.
>
> Herbalife believes the majority of its distributors are discount buyers, who become distributors in order to purchase their favorite Herbalife products at a minimum discount of 25 percent (either directly from the company or from their upline distributor/supervisor).  In addition, some of these distributors will also share with, or retail the products to other friends, family, and customers.  The percentage of product of any multi-level marketing company consumed by its distributors is substantial.  This is not surprising since consumers who are enthusiastic about the products become distributors in order to purchase at a discount and possibly to share and sell the products to others.  ***In addition, in order to minimize the risk of product being accumulated by distributors, the company has policies in place such as the 70% Rule, the Ten Customer Rule and the Buy Back policy***

103.   The 8-K revealed, for the first time, previously nonpublic information.  Specifically, Defendants viewed compliance with *Omnitrition* and the Permanent Injunction as irrelevant to investors.

104.   The news on May 2, 2012 further directly and proximately hastened Herbalife's plummeting stock price.  Herbalife's stock price continued to plummet on May 2 and 3, to close down 6.39% to $52.70 on May 2 on unusually heavy volume of 23,207,502, and down 12.33% to close at $46.20 on unusually heavy volume of 24,933,903 on May 3, 2012.  The price declines on May 2 and 3 were statistically significant at the 95% confidence level.

105.   *Bloomberg* directly attributed the three-day slide to the Company's response to Einhorn's questions, stating that "Herbalife . . . posted a record three-day decline in New York trading after hedge-fund manager David Einhorn

questioned the company's disclosures."[83]   At the time, the May 2-3 drop was Herbalife's largest two-day drop in nearly a decade.

106.   Mainstream investors were understandably appalled.  A May 8, 2012 *CNBC* article entitled "Reasons to Worry About Herbalife: Greenberg," commented that:

> [T]here are reasons for investors to worry.
>
> * * *
>
> The top reason, as it turns out, was the first question Einhorn asked on the call: How much product is sold to customers outside the company?
>
> In a response on its website and in an SEC filing, Herbalife said: "We don't track this number and do not believe it is relevant to the business or investors."
>
> ***Yet, based on my research and discussions with multi-level marketing experts and former distributors, it may be the most relevant question.***[84]

107.   While the answers to Einhorn's May 1 questions and the Company's May 2 filing were partially corrective in that they exposed issues with respect to the Company's internal retail sales, Defendants still nevertheless failed to reveal the entire truth to investors with respect to the amount of outside sales.

---

[83]   *Bloomberg*, "Three-Day Decline on Einhorn Query" (May 3, 2012), http://www.bloomberg.com/news/articles/2012-05-03/herbalife-posts-record-three-day-decline-on-einhorn-query (last accessed August 27, 2015). A multi-day event window is not unusual in academic event studies or in analysis for securities litigation. Former SEC staff members have noted that a multi-day event period is common practice: "The main advice is to carefully identify the exact dates during which the information in question reached the market, and then restrict the window to a short period if possible, generally two or three days around each release of new information . . . .  [D]epending upon market factors, the window often can extend beyond the close of trading the day after the public announcement. Mitchell, Mark L. and Jeffrey M. Netter, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer*, (February 1994), 49, pp. 545–590 at 558–9.

[84]   *CNBC*, "Reasons to Worry About Herbalife: Greenberg" (May 8, 2012), http://www.cnbc.com/id/47340065 (last accessed August 27, 2015).

**B.    Loss Causation: The December 20, 2012 Corrective Disclosure Craters Herbalife's Stock**

**1.    News Of Pershing Square's Short Position Hits The Markets On December 19**

108.  At 1:58 pm on December 19, 2012, CNBC reported breaking news that Pershing Square founder and CEO Bill Ackman considered Herbalife to be a "pyramid scheme" and had held a short position in Herbalife common stock for 7-8 months.[85]  Though holding a short position, Ackman is notably not known as a short seller.[86]  At 2:05 pm, Dow Jones News reported Herbalife's share price had dropped 11% before a trading halt.[87]

109.  Ackman publicly stated that day that he had been examining Herbalife for about 15 months and that "[w]e have done our homework here."[88]  Importantly, Ackman did not release the details of his presentation on December 19, instead promising that he would "detail the reasons for his bet against Herbalife, which

---

[85] "Pershing Square's Ackman Short Herbalife," CNBC, December 19, 2012; Hedge Fund Manager Ackman Shorting Herbalife, Calls Company a 'Pyramid Scheme' – CNBC," Dow Jones News Service, December 19, 2012.

[86] Ackman is an established and highly credible Wall Street hedge fund manager. He is not known as a short-seller. As of December 16, 2014, Pershing Square had only one other short position, which is undisclosed and comprises only 1% of its portfolio. Pershing Square International posted a return of 32.8 percent for the first 10 months of 2014, making it the No. 1 fund in Bloomberg Markets' annual ranking of the best-performing large hedge funds. Ackman's past successes in shorting stock, which he rarely does absent extraordinary circumstances, include taking a short position in MBIA stock in 2002. He accused MBIA Inc., a triple-A rated bond insurer, of being insolvent and shorted the stock. For five years, virtually no one believed him.  Finally, in 2007, the financial crisis exposed MBIA's troubles and the company's stock collapsed. *The Washington Post*, "The big bad 'alpha wolf'? William Ackman, like it or not, sits atop the hedge-fund world" (January 23, 2015)  http://www.washingtonpost.com/business/the-big-bad-alpha-wolf-william-ackman-like-it-or-not-sits-atop-the-hedge-fund-world/2015/01/22/722b1ab6-a0e7-11e4-b146-577832eafcb4_story.html (last accessed August 27, 2015).

[87] "Herbalife Shares Drop 11% Before Halt," *Dow Jones News Service*, December 19, 2012.

[88] "WSJ 2nd UPDATE: Pershing's Ackman Shorting Herbalife; Calls Company 'Pyramid Scheme'," *Dow Jones News Service*, December 19, 2012; "Pershing Square's Ackman shorts Herbalife," *Reuters News*, December 19, 2012.

1  he's calling his 'new investment idea,' at what is being billed as an 'Inaugural

2  Sohn Conference Special Event' on Thursday in New York."[89]

3        110.   On December 19 Herbalife stock closed down 12.14%, at $37.34.

4  News releases attributed the decline to the news of Ackman's short position in

5  Herbalife stock.  For example, the *Los Angeles Times* observed that:

6  > Investors dumped Herbalife Ltd. shares Wednesday after a news
7  > report that New York hedge fund manager Bill Ackman was shorting
> the stock and considered the nutrition company a "pyramid scheme."

8  > The stock fell $5.16, or 12.1%, to $37.34 in heavy trading after CNBC
> first reported that Ackman's fund had been shorting the company for
9  > months. Short-sale investors seek to profit by betting on a decline in a
> company's stock.

10
> Ackman, founder and chief executive of Pershing Square Capital
11  > Management, said he plans to explain his concerns about Herbalife "in
> exhaustive detail" on Thursday at a conference in New York.[90]
12

13        111.   The events occurring on December 19, 2012 are not a corrective

disclosure, since Ackman's detailed findings were not revealed until the next day.
14

15        **2.      December 20: Pershing Square Reveals Herbalife's Fraudulent Practices**

16        112.   On December 20, 2012, Bill Ackman, along with two other Pershing

17  Square employees, presented the *Millionaire* Presentation at the Sohn Conference

18  Foundation Special Event in New York.   The in-depth, 334-slide presentation

19  lasted over three hours.   Ackman summarized how his firm was able to put

20  together such a massive undertaking:

21  > ***We started work in the summer of 2011. Our analysis became more
> intensive beginning in December of 2011. We went public in
22  > December of 2012, and our team of analysts and lawyers who
> worked on the idea had done an enormous amount of work over that
23  > period of time. We sought independent legal advice and an
> independent assessment*** *of Herbalife's legitimacy from a highly
24  > regarded law firm. We also gave a heads-up to one of the regulators*

25

26  [89] "Pershing Square's Ackman shorts Herbalife," *Reuters News*, December 19, 2012.

27  [90] "Herbalife is hit by fund firm's short bets," *Los Angeles Times*, December 20, 2012.
28

prior to releasing the presentation, but we had not had any sort of meaningful dialogue with regulators prior to going public with the idea.[91]

113.   During this year-and-a-half long analysis period, Pershing Square spent millions of dollars to conduct its investigation, which included:

a.      Obtaining, reviewing and analyzing non-public documents including (i) Herbalife Australasia Pty Ltd. Earnings Certification Form (6-25-11); (ii) Manual de Entremiento para Distribuidores Herbalife; (iii) Statement of Average Gross Compensation of Irish Supervisors; (iv) Statement of Average Gross Compensation of US Supervisors – 2011; and (v) Nutrition Club presentations by independent distributors;[92]

b.      Hiring a third party research firm  to analyze 40,000 Formula 1 eBay transactions over a five year period;[93]

c.      Obtaining copies of *Herbalife Today* (which were only available to distributors) and analyzing 393 income testimonials therein covering a seven year period;[94]

d.      Obtaining, reviewing and analyzing multiple non-public distributor presentations and video clips,[95] including from Shawn Dahl's Online Business Systems' lead generation business;[96]

e.      Deploying on-the-ground investigators to Nutrition Club locations in Queens, New York and Omaha, Nebraska;[97]

---

[91] *Seeking Alpha*, "An Exclusive Interview with Pershing Square's Bill Ackman," (December 18, 2014), http://seekingalpha.com/article/2765435-an-exclusive-interview-with-pershing-squares-bill-ackman (last accessed August 27, 2015).

[92] *Millionaire* Presentation at 126 (Herbalife Australasia Pty Ltd. Earnings Certification Form (6-25-11)), 190 (Manual de Entremiento para Distribuidores Herbalife), 192 (Statement of Average Gross Compensation of Irish Supervisors), 210 (Statement of Average Gross Compensation of US Supervisors – 2011), and 7 (Nutrition Club presentations by independent distributors).

[93] *Id.* at 107.

[94] *Id.* at 197.

[95] *Millionaire* Slides  at  7, 9, 53, 58, 73, 75, 78, 79, 86, 145, 173.

[96] *Id.* at 323.

f.      Obtaining court documents and sworn deposition testimony from other lawsuits, including *McDowell v. Herbalife*, Case No. 00-2011 (W.D. Wash.); *Herbalife Int'l of America, Inc. v. Ford et al.*, Case No. CV 07-2529 (C.D. Cal.); and *Jacobs v. Herbalife Int'l, Inc.*, Case No. CV-02-1431 (C.D. Cal.);[98]

g.      Analyzing international markets, including years of financial data from Japan, Israel, Spain, France, Germany, and Russia;[99]

h.      Conducting in-depth research regarding multi-level marketing and pyramid schemes, including reviewing SEC and FTC guidance (*e.g.* "Bottom Line about Multilevel Marketing Plans" (Oct. 2009)), international and state anti-pyramid laws and consumer protection statutes, case law, and scholarly articles (*e.g.* Vander Nat, Peter J and Keep, William W. (2002), "Marketing Fraud: An approach for differentiating Multi-level Marketing from Pyramid schemes." *Journal of Public Policy and Marketing*. Vol 21-1, 139-151)), and consulting with and seeking out the opinions of outside legal experts;[100]

i.      Reviewing and analyzing the Company's regulatory filings, conference call transcripts, investor presentations, news articles and media appearances,  as well as reviewed those of competitors (*e.g., GNC, Abbott* and Unilever), fast food restaurants (*e.g.*, Burger King, McDonald's and Starbucks), and other MLMs (*e.g.*, Avon, Tupperware).[101]

114.   After the presentation was over, Ackman would tell Andrew Ross Sorkin (of *The New York Times* and *CNBC*) that he was motived to expose Herbalife's hidden fraud because he "simply want[ed] the truth to come out."[102]

---

[97] *Id*. at 270.

[98] *See id*. at 164, 313, and 325.

[99] *Id*. at 251-256.

[100] *Id.* at 232.

[101] *Id.* 53, 245, 294.

[102] *Vanity Fair*, "The Big Short War," (April 2013), http://www.vanityfair.com/news/2013/04/bill-ackman-dan-loeb-herbalife (last accessed August 27, 2015).

115.   What set this effort by Pershing Square apart from other criticisms of Herbalife was the enormous investment of time, expertise, and money to reveal this information.   The knowledge, resources, skills and expertise entailed in Pershing Square's analysis makes it highly unlikely that anyone else could have conducted this investigation and revealed this information.   Indeed, nobody else has undertaken a similar endeavor.   So groundbreaking was Ackman's analysis that shortly after the *Millionaire* Presentation hedge fund manager Whitney Tilson of T2 Partners LLC exclaimed that "***Pershing Square's analysis of Herbalife is the most remarkable piece of investment analysis I have ever seen.   Simply astonishing***."[103]

116.   Based upon the non-public information enumerated above, Pershing Square's *Millionaire* Presentation revealed that Herbalife never abided by the 70% Rule – and thus could never have been in compliance with *Omnitrition* and the Permanent Injunction – and that the majority of its non-sales leaders were actual failed distributors.

117.   Pershing Square revealed that in the past decade, Herbalife has only disciplined about ten distributors for violating the 70% Rule:

---

[103] *The Wall Street Journal*, "Witney Tilson: I'm Shorting Herbalife, Too" (December 26, 2012)   http://blogs.wsj.com/marketbeat/2012/12/26/whitney-tilson-im-shorting-herbalife-too/ (last accessed August 27, 2015).

1

## Herbalife's Lax Enforcement of Its Rules

2

► **Between 2006 and 2009, Herbalife possibly disciplined about 10, but fewer than 25, distributors for violating the 70% Rule (fewer than 1 out of every 100,000 distributors)**

3

4

5

**Deposition of Jacqueline Miller in Herbalife v. Ford (2009):**

6

**Mr. Stephens: (Ford Counsel)**
*"Have more than 50 distributors since January of 2006 been disciplined for violating the 70-percent rule?"*

7

**Ms. Miller: (Herbalife Employee)**
*"I don't believe so."*

8

**Mr. Stephens:**
*"Have more than 25 distributors been disciplined for violating that rule?"*

9

**Ms. Miller:**
*"I don't believe so."*

10

**Mr. Stephens:**
*"Have more than 10 distributors been disciplined for violating the 70-percent rule?"*

11

**Ms. Miller:**
*"That's possible."*

12

13   118.   Indeed, Herbalife only audits distributors' compliance with its policies

14   and procedures when distributors seek to return product to the Company:

15

## Herbalife's Lax Enforcement of Its Rules *(cont'd)*

16

► **Herbalife appears to audit compliance only when distributors seek to return product to the company**

17

18

**Deposition of Jacqueline Miller in Herbalife v. Ford (2009):**

19

**Mr. Stephens: (Ford Counsel)**
*"How did you know about the 1200 [audits performed for the ten customer rule]?"*

20

**Ms. Miller: (Herbalife Employee)**
*"I asked."*

21

**Mr. Stephens:**
*"Who did you ask?"*

22

**Ms. Miller:**
*"Julie Delaney… She works for Jenny [Heinrich]… She's director or senior director. She's been in the refunds and repurchase area, and I think she might have responsibility for the audits."*

23

24

25   ► **Distributors seeking to return product to the Company who cannot demonstrate compliance with the rules will have their previous rewards payments netted against their product return. In many cases, this "clawback" is greater than the returned value of the products**

26

128

27

28

119.   Pershing Square also revealed that the majority of distributors did not, as Herbalife claimed, purchase products for personal consumption, but rather were in fact failed distributors.[104]   Pershing Square exposed the stunning fact that 93% of Herbalife distributors earn no compensation:

> And a *de minimus* fraction of Herbalife distributors earn enough to achieve the wealth and lifestyle in the [Doran Andry] video that you watched there so only the top 0.04 percent, one in about 2,500 of Herbalife distributors, even earn $300,000 or $336,000 a year and we based off these numbers on their U.S. compensation disclosure so other people around the world are less or even lower.

> What I particularly like is the millionaire team, that is the name that Herbalife has given this level, median income $97,000 a year before expenses. It's going to take a few years before you become a millionaire.

> ***And then at the bottom of the pyramid, 93 percent of distributors earn no gross compensation as the company defines it.***[105]

120.   Pershing Square then revealed Herbalife was able to hide this fact because it excluded a whole category of distributors, which it termed "inactive sales leaders," and defined as those distributors who did not generate at least 2,500 volume points after being promoted to Supervisor status.[106]   Notably, this definition would only include Supervisors (the lowest form of sales leaders), since World Team members and above are required to generate at least 2,500 volume points in four consecutive months to maintain their status.[107]   Ackman explained:

> Herbalife leaves off 93 percent of the people who become distributors. They vanish, OK? How do they do this?

> Well, first they remove what they call inactive sales leaders. These are people who make nothing. So the people that fail, they don't include in their so-called "disclosure chart". Ninety-three percent of the

---

[104] *Millionaire* Slide 122.

[105] *Millionaire* Tr. at 10.  The Transcript is attached as Exhibit D.

[106] *Millionaire* Slide 179.

[107] Marketing Plan at 4.

people are off the chart. ***They don't tell you this. You have to figure this out***.[108]

121.   Indeed, it makes no economic sense for anyone to sign up as an Herbalife distributor, Pershing Square explained, to simply consume products.  As part of its investigation, Pershing Square endeavored to find out how much people were actually paying for Herbalife's products.  To do so, they engaged a third party research firm to shoulder the massive burden of analyzing 40,000 Formula 1 sales on eBay in the preceding five years.  The results were stunning: the 750 gram canister of Formula 1 sold for an average of $25 (a 32% discount to the $37 SRP), while the 550 gram Formula 1 canister sold for a 38% discount.[109]  Niteworks, in comparison, sold for a 50% discount on eBay.[110]  Meanwhile, competitors' products, such as GNC's Lean Shake, sold for a premium on eBay.[111]  Ackman explained:

> OK, so Herbalife says the majority of distributors signed up on a discount buyers. They just like the product and [INAUDIBLE] the majority of the distributors are discount buyers and so they become distributors and [INAUDIBLE] Herbalife products at minimum discount of 25 percent.

> But why would anyone pay $55 to get a 25 percent discount on [INAUDIBLE] when those products are widely available online for discounts of 35 percent or more?[112]

122.   Corroborating Pershing Square's stunning conclusion is the internal April 2011 study that Actionable Research conducted for Herbalife (discussed in Section III(E)) which shows that only 17% of distributors joined to purchase Herbalife products at discounted prices, while nearly half joined to supplement

---

[108] *Millionaire* Tr. at 24.

[109] *Millionaire* Slide 107.

[110] *Millionaire* Slides 106-108.

[111] *Millionaire* Slide 109.

[112] *Millionaire* Tr. at 15.

their income and over three-quarters spent more than twenty hours per week
attempting to do so.

123.    Pershing Square found that when distributors did make money, they
made it from recruiting other distributors, not from selling Herbalife products.    In
fact, Pershing Square's analysis revealed that distributors can earn over 10 times as
much from recruitment as they do by selling Herbalife products.[113]    Herbalife
kindled these income fantasies by publishing testimonials in its distributors-only
magazine, *Herbalife Today*.    Pershing Square has found that, between 1997 and
2004, *Herbalife Today* featured about 393 of these income testimonials.    Taken
together, the testimonials implied an average annual income of $178,000 per year
(which, Pershing Square would later disclose, a distributor would only have a
chance of 1 in 5,000 chance of attaining).[114]    It was impossible to earn this annual
income as an Herbalife distributor without recruiting others and earning royalty
overrides and production bonuses based off of them.

124.    The *Millionaire* Presentation sent Herbalife common stock into
another nosedive.    As a direct and proximate result of the *Millionaire* Presentation,
Herbalife stock declined 9.75%, to close at $33.70 on December 20, 2012 on
volume of 34,508,678.    The stock continued its decline on December 21 as a direct
and proximate result of the *Millionaire* Presentation, to close down 19.08% to
$27.27, on volume of 43,353,236.    These stock price declines were statistically
significant at the 95% level.

125.    News outlets directly attributed Herbalife's shattered stock directly to
Ackman.    The *New York Post* observed on December 21 that "Ackman has sparked

---

[113] *Millionaire* Tr. at 19.

[114] *Millionaire* Slide 197.

a two-day, sell off of the company's shares . . . ."[115]   The *Associated Press* similarly noted that Pershing Square's presentation "pummeled the company's stock."[116]

126.   Indeed, market observers noted that shares of other MLMs had fallen along with the price of Herbalife shares, recognizing that Herbalife was driving the valuation of the MLM industry as a whole, and not vice versa:

> Largely unremarked in the wake of Herbalife's (HLF) stock shredding the past week is how fellow multilevel marketers NuSkin (NUS) and Usana (USNA) have been also pummeled by stock investors. As HLF is down 40% this month amid Bill Ackman's push against the company, NUS has slumped 27% and USNA is off 25%.[117]

**C.   Herbalife's Stock Price Rebound Is Attributable To Regular Market Forces**

127.   The market's reaction to the corrective disclosures was swift and harsh.  Untold numbers of investors lost staggering amounts of money, and billions of dollars' worth of market cap was erased in just minutes.

128.   Between December 26, 2012 and Herbalife's January 10, 2013 presentation, Herbalife's share price gradually increased.  This increase, however, was caused, in part, by other large investors' significant purchases of Herbalife stock, not by any disproval or falsification of Ackman's thesis.

129.   Importantly, the remaining increases in Herbalife's share price can all be attributed to normal market activity, with no Herbalife-specific cause.  Notably, *The Wall Street Journal Blog* observed that that valuations of shares of other multi-level marketers had moved with Herbalife: "[i]nvestors in direct-selling companies

---

[115] "Flare-up in war of words between Ackman, Herbalife," *New York Post* (December 21, 2012) http://nypost.com/2012/12/21/flare-up-in-war-of-words-between-ackman-herbalife/ (last accessed August 27, 2015).

[116] "Herbalife calls analyst meeting amid firestorm," *Washington Examiner* (December 21, 2012) http://www.washingtonexaminer.com/herbalife-calls-analyst-meeting-amid-firestorm/article/feed/2058437 (last accessed August 27, 2015).

[117] "Market Talk: NuSkin, Usana Have Been Caught in Herbalife's Wake," *Dow Jones News Service*, December 27, 2012.

have seen the value of their shares rise and fall with each twist in the Herbalife drama," including NuSkin and Usana.[118]

130.   The first trading day following the *Millionaire* Presentation on which there was a positive company-specific change in Herbalife's share price was December 26, 2012. On this day, Herbalife stated that in connection with its dispute with Pershing Square, it had hired law firm Boies, Schiller law firm.[119]

131.   From December 26 to the analyst meeting on January 10, 2013, share price increases were associated with news of other investors' significant purchases of Herbalife stock:

a.   Herbalife's share price "surged" on December 31, 2012, on news that hedge fund manager Robert Chapman of Chapman Capital had taken a very large position in the stock.[120]

b.   The largest share price increase during this period was on January 3, 2013, when there was further discussion of purchasing Herbalife shares by John Hempton of Bronte Capital, "Kid Dynamite," and Chapman Capital.[121]

---

[118] "Herbalife Drama shines Light on Direct-Selling Stocks," *The Wall Street Journal Blog* (January 15, 2013) http://blogs.wsj.com/marketbeat/2013/01/15/herbalife-drama-shines-light-on-direct-selling-stocks/ (last accessed August 27, 2015).

[119] "Global Finance: Herbalife Goes on Offensive," *The Wall Street Journal*, December 26, 2012.

[120] "The Morning Brief: Herbalife Surges on News of Activist Chapman's Stake," *Absolute Return + Alpha*, January 1, 2013. A later article quantified the position as 35% of the fund's portfolio. "Activist Takes on Ackman Over Herbalife," *CNBC*, January 2, 2013.

[121] "Bill Ackman's bet against Herbalife triggers unusual response; Many are betting the famed hedge fund manager has reached the wrong conclusion and are bidding up the stock," *The Globe and Mail (Breaking News)*, January 3, 2013.

c.    On January 8, 2013, another date on which Herbalife's share price increased, Robert Chapman of Chapman Capital promised unspecified "big news" about Herbalife "sometime today or early tomorrow."[122]

d.    On January 9, 2013, another increase in Herbalife's share price coincided with news of a major investor, Dan Loeb of hedge fund Third Point, taking a stake in Herbalife.[123]

132.   Herbalife's "Investor Day," where it halfheartedly attempted to rebut Pershing Square's facts, drew the market's attention.   When Herbalife began presenting its case, the share price spiked.[124]   Yet as the *Los Angeles Business Journal* noted, market reactions were mixed:

> On Thursday morning, Herbalife defended itself in a long presentation in New York. Its stock see-sawed during the day as investors parsed words, news, and reaction. Herbalife's chief, Michael Johnson, didn't help his case by being evasive under questioning.[125]

133.   It is therefore not surprising that, by the end of the day, the market remained unconvinced of Herbalife's case.   Herbalife shares closed at $39.24, down a total of 1.78% from the previous day's close.

134.   On January 14, 2013, Herbalife's shares increased by 9.5%.   This news coincided with reports that analyst Timothy Ramey at D.A. Davidson & Co. "reiterated his buy rating on the company, suggesting that Herbalife's fourth-quarter earnings may exceed guidance.[126]   *Bloomberg News* also reported that

---

[122] "Chapman says 'big news' regarding Herbalife coming, Gasparino says," *Theflyonthewall.com*, January 8, 2013.

[123] "Herbalife rallies on Third Point's 8% stake," *CNN Wire*, January 9, 2013.

[124] "WSJ BLOG/MarketBeat: Herbalife's Wild Ride Continues: Shares Jump Again," *Dow Jones News Service*, December 28, 2012.

[125] "Leveling off multilevel marketing. (COMMENT)," *Los Angeles Business Journal*, January 14, 2013.

[126] Monday's movers: Apple closes at 11-month low; Dell surges 13% on buyout talk," *MarketWatch*, January 14, 2013,

1  Herbalife "shares jumped today after analysts at D. A. Davidson & Co. and

2  Barclays Plc said Herbalife may announce stock repurchases this week."[127]

3       135.   On January 15, 2013, Herbalife's shares increased 4.12%, which

4  coincided with news that hedge fund manager John Hempton of Bronte Capital,

5  whose fund owned shares in Herbalife, blogged about his visit to an Herbalife

6  nutrition club in Queens, NY.[128]

7  **VI.    Post Class Period Events Confirm Herbalife's Fraudulent Practices**

8       136.   Even prior to the end of the Class Period, the pressure began

9  mounting on Herbalife as more voices joined the chorus calling for regulatory

10  intervention to end the Company's abusive practices.   On January 9, 2013, *The*

11  *New York Times* and the *Wall Street Journal* reported that the SEC opened an

12  inquiry into the Company.   The *New York Times* article stated that "[t]he agency's

13  enforcement unit has opened an investigation into the company, according to a

14

15

16  _____

17  [127] "Herbalife Rises to Highest Price Since Ackman Pyramid Allegation,"
    *Bloomberg News*, January 14, 2013.  It is well established in the academic finance
18  literature that share repurchases can "signal a manager's confidence in the future"
    and a "belie[f] that [the firm's] stock is substantially undervalued." (Brealey,
19  Richard A., Stewart C. Myers and Franklin Allen, *Principles of Corporate
    Finance*, 8th ed., McGraw-Hill Irwin, 2006, pp. 420, 421.)  On average,
    "announcements of open-market repurchase programs…resulted in an abnormal
20  price rise of 2 percent," while "announcements of offers to buy back shares above
    the market price have prompted a larger rise in the stock price, averaging about 11
21  percent." (*Id.*, citing Comment, R. and G. Jarrell, "The Relative Signaling Power of
    Dutch-American and Fixed Price Self-Tender Offers and Open-Market Share
22  Repurchases," *Journal of Finance*, (September 1991), 46, pp. 1243–1271.)  This
    principle of finance was reflected in the Herbalife share price recovery of
23  December 26 through January 15 described above, as recounted in the following
    news coverage just after that period: "The company said it plans to repurchase
24  shares of Herbalife stock in fiscal 2013, pursuant to its existing authorization – a
    key sign of financial health that analysts and investors have expected…. [A]s the
25  other hedge-fund managers announced their Herbalife investments and analysts
    predicted a share repurchase, the share price has recovered." ("Herbalife reports
26  stronger-than-expected fourth-quarter earnings," McClatchy-Tribune Regional
    News, Winston-Salem Journal, January 17, 2013).

27  [128] "WSJ BLOG/MarketBeat: Ackman's Bet on Herbalife: 'Most Easily Falsified
28  Bear-Thesis I Have Seen,'" *Dow Jones News Service*, January 15, 2013.

person briefed on the matter. The inquiry . . . is likely to examine the company's sales practices."[129]

137.   Notably, a formal SEC investigation is typically launched when the SEC staff concludes after an informal inquiry that a securities law violation has occurred.   Accordingly, the full extent of the fallout from Defendants' fraud is unclear as the "Commission generally neither confirms nor denies the existence of an inquiry or investigation unless and until made a matter of public record in proceedings instituted before the Commission or in court" to "to protect the integrity and effectiveness of our investigative process and to preserve the privacy of the individuals and entities involved."[130]

138.   As the Class Period was drawing to a close, Herbalife's problems also began to manifest outside of the U.S.  The *New York Post* reported on January 28, 2014 that Canada's top consumer regulator had launched a formal probe into complaints that Herbalife runs a pyramid scheme.[131]   The Competition Bureau, which is similar in scope to the U.S. FTC – except it can bring criminal charges – declined to comment. On this news, Herbalife's stock price dropped approximately 3% on January 28, 2013 from a closing of $64.06 on January 27, 2014 to $62.54 on January 28, 2014.

---

[129] *The New York Times*,  "S.E.C. Opens Investigation Intro Herbalife" (January 9, 2013),      http://dealbook.nytimes.com/2013/01/09/s-e-c-opens-investigation-into-herbalife/ (last accessed August 27, 2015).

[130] Letter from Mary Jo White to Senator Edward J. Markey (March 4, 2014), http://www.markey.senate.gov/imo/media/doc/2014-03-04_SEC_re_Herbalife.pdf (last accessed August 27, 2015).

[131] *New York Post*, "Canadian regulator probing Herbalife" (January 28, 2014), http://nypost.com/2014/01/28/canadian-regulator-probing-herbalife/ (last accessed August 27, 2015).

139.   On March 12, 2014, Herbalife disclosed that the FTC had begun a civil investigation into the Company's business practices,[132] and had requested documents and other information dating back to January 1, 2009.  The Company's stock, which had been halted, fell as much as 17% following the news and closed down more than 7% on March 12, 2014.  Fox Business later reported on October 7, 2014 that after discussions with "attorneys, academics and former FTC officials," Herbalife "[s]enior executives" were "expect[ing] some form of disciplinary action" as a result of the investigation.[133]

140.   On April 11, 2014, the *Financial Times* reported that the United States Department of Justice ("DOJ") and the Federal Bureau of Investigation ("FBI") had opened a criminal probe of Herbalife.  Herbalife's stock price closed at $51.48 per share, a drop of more than 14% from a previous close of $59.84 on April 10, 2014.[134]

141.   On April 14, 2014, the *New York Post* reported that New York Attorney General Eric Schneiderman is investigating Herbalife with at least two other whistleblowers coming forward and providing sworn testimony to Schneiderman's investigators.[135]   Attorney General Schneiderman also fielded complaints from former distributors who say they were defrauded by Herbalife.

---

[132]  The FTC's investigation was opened in the wake of the formal probe of Herbalife by the Canadian Competition Bureau announced on January 28, 2014.  The Competition Bureau is similar in mission and scope to the FTC, except that it can bring criminal charges.

[133]  "Herbalife Execs: All But Certain FTC Won't Shut Down Company" *Fox Business*, (October 7, 2014)   http://www.foxbusiness.com/industries/2014/10/07/herbalife-execs-all-but-certain-ftc-wont-shut-down-company/   (last accessed August 27 2015).

[134]  *Yahoo! Finance*, "FBI conduct a probe into Herbalife: sources" (April 11, 2014) http://finance.yahoo.com/news/fbi-conducting-probe-herbalife-source-211828762--sector.html (last accessed August 27, 2015).

[135]  *New York Post*, "NY attorney general probes Herbalife: sources" (April 14, 2014)  http://nypost.com/2014/04/14/ny-attorney-general-probes-herbalife-sources/ (last accessed August 27, 2015).

142.   On April 17, 2014, yet another investigation into Herbalife was announced.  A spokeswoman for Illinois Attorney General Lisa Madigan stated that Madigan's office had "received consumer complaints and are investigating based on those complaints."   Latino groups in particular had urged Madigan to investigate the Company.[136]

143.   After the close of the market on July 28, 2014, Herbalife shocked the investing public when it posted quarterly earnings and revenue that fell significantly short of Wall Street estimates.  Notably, the earnings marked the first time since 2008 that Herbalife missed estimates.  The Company also stated that 2014 sales would be up to 3.5% lower than it predicted in April just three months earlier. In response Herbalife shares plummeted nearly 14%.  A July 29, 2014 *New York Post* article entitled "Street Doubts Herbalife Growth Story After Earnings Miss," commented on Herbalife's declining U.S. market results after heightened regulatory scrutiny regarding the Company's illegitimate practices.[137]   The article noted that "[i]nvestors are no longer buying Herbalife's growth story" after its first earnings miss in five years.

144.   On November 3, 2014 Herbalife announced financial results for 3Q 2014.   For the second straight quarter, Herbalife failed to beat Wall Street's expectations.  Defendants reported a decline of over 90% in net income per diluted share, from $1.32 to $0.13.  Commenting on the quarter, Defendant Johnson cited "changes" and "initiatives" such as "first order limits"[138] that were being

---

[136] "Madigan's Office Investigating Herbalife Pyramid Scheme Allegations" (April 17, 2014), http://www.progressillinois.com/quick-hits/content/2014/04/17/madigans-office-investigating-herbalife-pyramid-scheme-allegations (last accessed August 27, 2015).

[137] *New York Post*, "Street doubts Herbalife growth story after earnings miss" (July 29, 2014) http://nypost.com/2014/07/29/street-doubts-herbalife-growth-story-after-earnings-miss/ (last accessed August 27, 2015).

[138] The first order limit prevents a new distributor from ordering more than 1100 volume points on their first order, which will lengthen the time it will take for a

implemented to "drive long term improvements in activity, productivity and retention of [Herbalife's] Sales Leaders."  A *Forbes* article released that same day confirmed that Pershing Square's revelations forced the Company to attempt to legitimize some of its practices, stating:

> [I]t appears that billionaire hedge fund manager William Ackman's campaign against Herbalife has forced the company to change its operations in a way that has made it harder for the company to keep delivering huge financial results in the face of heightened regulatory scrutiny.  Prior to this summer, Herbalife had beaten earnings expectations for 21 straight quarters.[139]

145.  Analysts following the Company similarly attributed Herbalife's declining financial results to forced changes in its business practices.  For example, a November 5, 2014 report issued by Barclays entitled "Doing the Right Thing Can Hurt stated: "[i]t is not exactly clear why these changes are being made so quickly, but the negative publicity around HLF's business model probably provided a strong incentive to take action now."

146.  On this disappointing news of forced changes to its business practices, Herbalife's stock price declined on November 4 by 19.84%, from $55.90 to $44.26.

147.  On February 26, 2015, Defendants reported financial results for the fourth quarter and year end 2014.  Compared with previous years, the results were nothing short of disastrous, and yet further proof that changed business practices Ackman caused were directly and negatively impacting Herbalife's bottom line:

---

distributor to become a sales leader.  The Company also implemented changes to its marketing campaign, because of the rampant misleading claims distributors were making about the efficacy of Herbalife's products.

[139] "The Herbalife Earnings Machine Sputters, Shares Tumble" *Forbes* (Nov. 3, 2014)  http://www.forbes.com/sites/nathanvardi/2014/11/03/the-herbalife-earnings-machine-sputters-shares-tumble/ (last accessed August 27, 2015).

| | Year Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2014** | | **2013** | | **2012** | | **2011** | | **2010** |
| Net income | $ | 308.7 | $ | 527.5 | $ | 464.0 | $ | 415.0 | $ | 292.9 |
| *Growth Rate* | | *-41%* | | *14%* | | *12%* | | *42%* | | |
| **Earnings per share** | | | | | | | | | |
| Basic | $ | 3.58 | $ | 5.14 | $ | 4.13 | $ | 3.53 | $ | 2.46 |
| *Growth Rate* | | *-30%* | | *24%* | | *17%* | | *43%* | | |
| Diluted | $ | 3.40 | $ | 4.91 | $ | 3.94 | $ | 3.32 | $ | 2.32 |
| *Growth Rate* | | *-31%* | | *25%* | | *19%* | | *43%* | | |

148.  During the 4Q and YE 2014 earnings call on that day, Herbalife blamed the disastrous financial results directly on the changes that the Company was being forced to make:

> The enhancements we started making to our marketing plan at the end of quarter two last year as part of our broader transition had a greater short-term impact than anticipated on volumes and net sales in key markets.
>
> * * *
>
> [O]ur consolidated results were also negatively affected by the impact of declines in four markets, the U.S., Mexico, Brazil, and [Korea]… Each of these four markets is being impacted slightly differently by the marketing plan changes discussed by Michael.  And importantly, we expect these changes to cycle through in 2015.

149.  These disappointing results caused Herbalife's share price to close down 10.94%, from $34.82 to $31.01.

150.  On May 1, 2015, *Seeking Alpha* reported that Herbalife products are being stockpiled in warehouses across Mexico.[140]  The stockpiling is part of practice called "field sales," first mentioned in February 2015, whereby high-level distributors buying large volumes of products, storing them in a network of

---

[140] *Seeking Alpha*, "Herbalife's Top Distributors Hold Warehouses Full Of Product In Mexico – Why?" (May 1, 2015) http://seekingalpha.com/article/3127346-herbalifes-top-distributors-hold-warehouses-full-of-product-in-mexico-why (last accessed August 27, 2015).

warehouses across Mexico and then selling them to lower-level distributors.  While Herbalife purported to end the practice in 2014, a March 9, 2015 BTIG Research report nevertheless found that field sales accounted for 70% of all sales in Mexico.[141]  *Seeking Alpha* reported that three Chairman's Club members were among those who owned the warehouses.[142]  One high-level distributor described to *Seeking Alpha* how several upper-level distributors banded together to buy products and then filled out a form instructing Herbalife to reallocate credit for those purchases to lower-level distributors.  This allowed the top distributors to "help out" those beneath them while using their own purchases to earn commissions.[143]   This practice directly contravenes Herbalife's public compensation plan substantially undermines the Company's goal of daily consumption.   The high-level distributor further stated that "[g]roups have implemented strategies that go against independent sales of Herbalife products . . . **Michael Johnson has reports about these discrepancies and anomalies**."[144]

151.   On May 4, 2005, Herbalife opaquely announced that it had closed the third amendment to extend its syndicated credit agreement,[145] which consists of a revolving credit facility and a term loan.  "[A]mong other things" – which remain undisclosed – the amendment reduces the capacity on the Company's revolving

---

[141] *Id.*   According to February 23, 2015 Barclays research report, Herbalife purported to eliminate the use of field sales as of November 1, 2014.

[142] *Id.*

[143] *Id.*

[144] *Id.*

[145] *Herbalife Announces Amendment to Extend Credit Facility* (May 4, 2015) http://files.shareholder.com/downloads/ABEA-48ZAJ9/4125919357x0x826169/ 2E035022-4B9A-454E-AD63-107AC417DF5E/HLF_News_2015_5_4_General_ Releases.pdf (last accessed August 27, 2015).   Herbalife filed a Form 8-K containing this press release on May 6, 2015.

credit facility from $700 million[146] to $425 million, and extends the maturity of that $425 million from March 9, 2016 until March 9, 2017.  Significantly, upon closing the amendment Herbalife is required to pay a forced acceleration of $51 million on the revolving credit facility and an additional $20 million on a term loan (for a total of $71 million), and to further reduce the balance of the revolving credit facility to $425 million (which  matures on March 9, 2017) with an additional $24 million in payments in September 2015.  Notably, only the maturity of the revolving credit facility was extended; the maturity of the term loan was not. Undisclosed in the press release, but mentioned by DeSimone during the 1Q 2015 earnings call, is that the amendment also significantly restricts Herbalife's ability to buy back stock by requiring a dollar pay down on the term note for every dollar used to buy back stock.

152.   Analysts quickly concluded that, as a result of these payments and the subsequent reclassification of Herbalife's short-term debt, the Company's creditors moved to reduce their exposure to the Herbalife.[147]  One analyst wrote:

> Since the disclosure of the FTC's CID, it seems apparent that Herbalife' bank group has been getting nervous. Cash management policies changed and changed abruptly last year. The company went from buying back stock at a furious pace to buying back none. . . . The truth, of course, is that the bank group dropped the hammer on the company and has been squeezing them ever since.
>
> * * *
>
> To summarize, Herbalife paid its bankers $7 million in order to receive a reduction in credit capacity from $1.2 billion to $425 million with the banker securing additional incentives for the company to

[146] The press release did not disclose the total amount of the revolver, but in its 2014 Form 10-K at 64, Herbalife stated that it was for $700 million.

[147] "Herbalife: Good News on Debt Might Not Be Such Good News After All." *Seeking Alpha* (May 5, 2015), http://seekingalpha.com/article/3138776-herbalife-good-news-on-debt-might-not-be-such-good-news-after-all (last accessed August 27, 2015).

draw down its revolver even further in the future and collect $100 million in capital back no later than September 15.

When you consider the idea that as a general rule, banks want to be in the business of lending money it becomes apparent pretty quickly that this is one credit that this particular bank group can't wait to leave in the rear-view mirror.

What else can we glean from this little transaction?

Obviously, Herbalife had nowhere else to turn for access to credit.[148]

153.   The reason for the banks' move to reduce their exposure to Herbalife soon became apparent.   On May 5, 2015, Herbalife added yet another governmental investigation to the list – this time, with criminal consequences:

The Department of Justice recently sought information from the Company, certain of its Members and others regarding allegations being made about the business practices of the Company and its Members.  In the future, these and other governmental authorities may determine to seek information from the Company and other persons relating to these same or other allegations.[149]

154.   Just three months later, on August 4, 2015, Jim Berklas, Herbalife's Associate General Counsel abruptly resigned.  That same day, the *New York Post* reported that at least one "veteran" Chairman's Club member "has become a whistleblower with law enforcement."[150]  The *Post* also revealed that that the DOJ's probe was wide-ranging, with "a number of top executives and distributors" having "been subpoenaed by the Department of Justice."

---

[148] "FTC: There's Never Been A Better Time To Arrest Herbalife," *Seeking Alpha* (May 7, 2015), http://seekingalpha.com/article/3152946-ftc-theres-never-been-a-better-time-to-arrest-herbalife (last accessed August 27, 2015).

[149] 1Q 2015 Form 10-Q at 13.

[150] "Top Herbalife exec leaves embattled company," *The New York Post*, August 4, 2015, *available at* http://nypost.com/2015/08/04/top-herbalife-exec-leaves-embattled-company/ (last accessed August 27, 2015).

155.   With respect to the Company's financial results, net sales were down year-over year in every region but China:[151]

| Net sales by geographic region: | 3 Months Ended: | | |
|---|---|---|---|
| | 3/31/2015 | 3/31/2014 | % Change |
| North America | $    226.7 | $    247.8 | (8.5) |
| Mexico | 123.6 | 142.7 | (13.4) |
| South and Central America | 161.7 | 244.7 | (33.9) |
| EMEA | 186.4 | 211.2 | (11.7) |
| Asia Pacific | 242.8 | 280.4 | (13.4) |
| China | 164.2 | 135.8 | 20.9 |
| Total Net Sales | $    1,105.40 | $    1,262.60 | (12.5) |

156.   With China's low per capita GDP, these results further indicate that the Company is continuing to target low-income and economically disadvantaged demographics while sales in legacy markets such as North America continue to decline.

157.   The fact that Herbalife is changing its practices indicates that there are genuine legal infirmities in its business model, which the Company is belatedly trying to "reset" in the wake of tremendous regulatory scrutiny.   The implementation of these changes in the wake of the Pershing findings and increased regulatory scrutiny have already harmed investors.  The above financial reports and reaction by the market and analysts following Herbalife evidence the fact that Herbalife's illegitimate business practices are not sustainable, and further demonstrate the veracity of Pershing's findings.

## VII.   Johnson's Highly Unusual And Suspicious Stock Sales Support A Strong Inference of Scienter

158.   In addition to the facts detailed herein which set forth at minimum, Defendants' deliberate recklessness,   Defendant Johnson was motivated to perpetuate the fraudulent scheme in order to benefit from the artificially inflated

---

[151] 1Q 2015 Form 10-Q at 14.

price of the Company's common stock through sales that were highly suspicious in both amount and timing.  While in possession of material, nonpublic information, Johnson sold 2,119,473 million shares of the Company's common stock at artificially inflated prices, reaping enormous insider trading proceeds of $126 million.[152]

### A.  The Value And Amount of Sales Were Highly Unusual

159.  The Class Period sales of Herbalife stock by Defendant Johnson were highly unusual and suspicious as measured by (i) the total amount and percentage of shares sold; (ii) the contrast with Johnson's prior trading history; and (iii) the timing of sales.  Such sales raise a strong inference of scienter.

### 1.  Johnson's Extraordinary Amount And Percentage Sold

160.  Johnson's massive $126 million in proceeds from selling over 2.1 million shares of Herbalife common stock in a relatively short time frame of 14 months, from March 1, 2011 through May 1, 2012, made him the highest-paid CEO in America in 2011.[153]

161.  Notably, the amount and percentage sold is highly suspicious. According to Herbalife's 2011 proxy filing, at the start of the Class Period, Johnson beneficially owned 2,571,668 shares of Herbalife common stock as of February 28, 2011, equating to 5,143,336 shares on a split-adjusted basis.  From March 1, 2011 through May 1, 2012, Johnson sold 2,303,414 shares (on a split-adjusted basis) of Herbalife common stock representing 45% of the 5.14 million shares he held at the start of the Class Period, a material percentage of nearly half his holdings.

### 2.  The Sales Were Inconsistent With Prior Trading

---

[152] On a split-adjusted basis, Defendant Johnson sold 2.30 million shares.

[153]*The Guardian*, "Michael Johnson of Herbalife: America's highest paid CEO in 2011" (May 2, 2012) http://www.theguardian.com/business/2012/may/02/michael-johnson-highest-paid-ceo (last accessed August 27, 2015).

1    162.   Johnson's Class Period sales were not only large in both absolute and

2    percentage terms, but also inconsistent with his selling activity during the three

3    years prior to the Class Period, from  January 1, 2008 through December 31, 2010

4    (the "Comparison Period").

5    163.   During the entirety of the Comparison Period, Johnson sold 588,236

6    shares of Herbalife stock, resulting in proceeds of $28.9 million.  During the three

7    year span within the Class Period, Defendant Johnson engaged in a selling spree of

8    2,119,473 shares for proceeds of $126,060,784.[154]   Adjusting for the May 2011

9    stock split, Johnson sold the equivalent of 1,176,652 shares of Herbalife during the

10   Comparison Period, still less than half the 2.30 million share amount he sold on

11   split-adjusted basis during a short period at the beginning of the Class Period.

12   164.   Thus, Defendant Johnson increased his stock sales by *3.7 times*, from

13   588,326 shares to 2,119,473 shares; *2.1 times* on a split-adjusted basis.  Defendant

14   Johnson's sales, as measured in dollars, is also striking.  Defendant Johnson's sales

15   increased more than *four-fold* during the Class Period, from approximately $28.9

16   million during the Comparison Period to over $126 million during the Class

17   Period.

18

19

20

21

22

23

24

25

26   _____

27   [154]   The $126 million in proceeds from Johnson's Class Period sales was approximately *102 times* the base salary Johnson earned as CEO during the Class

28   Period.  Defendant Johnson's 2013 base salary was $1,236,000.

### 3. The Timing Of The Stock Sales Was Suspicious

165.   Also suspicious was the timing of Defendant Johnson's Class Period sales as they occurred during a period when Herbalife was announcing "record" quarterly and yearly financial results and was continually raising guidance which led to a more than doubling of Herbalife's stock price in a short time frame. Equally, if not more suspicious, was the fact that Johnson implemented an overlapping trading plan which doubled the number of shares he was selling during this time frame.



166.  Defendant Johnson had no sales during late-2012 and 2013, as the Company's stock had drastically fallen in response to the market's increased awareness regarding the Company's fraudulent business model, in particular Einhorn's questioning and Pershing Square's investigation into Herbalife's business practices.  Defendant Johnson thus sold and profited before the impact of the investigations into Herbalife's business practices would be made public and would negatively impact the stock price.

**B.    The Trading Plans Adopted By Johnson Cannot Shield Him From Liability**

167.  Johnson's use of multiple 10b5-1 trading plans raises significant red flags and suspicion that the proper purpose of these plans was subverted.  Johnson sold his shares via these 10b5-1 trading plans during the Class Period and all shares resulted from the exercise of stock options. All the sales were from the exercise of stock options and Johnson sold approximately 90% of the shares he exercised:

168.   These trading plans activities raised a number of the red flags commonly applied by corporate law firms, the Securities and Exchange Commission, the Council for Institutional Investors and academic research:

a.   Multiple and overlapping plans: Johnson operated three separate trading plans, including two that were overlapping.[155]  Herbalife's own counsel in the *Ford* case warned that "a person should not maintain multiple Rule 10b5-1 plans for a single issuer because it raises suspicion that the person is seeking to evade the requirements of the rule . . . ."[156]

b.   Abnormal stock divestment: the first trade under Johnson's first plan occurred three weeks after the plan adoption, with sales occurring every three months thereafter.  The first trade of the second plan occurred more than four months after the second plan was adopted, with trades being made every two months thereafter.  Trades under the third plan were made every two months, but since the second plan was still in operation, trades effectively occurred every month.  This divestment resulted in Johnson selling nearly half of the shares he beneficially owned at the start of the class period during a single 14 month stretch.

c.   Abnormal delay: the first trade of Johnson's first plan occurred just three weeks after the plan's adoption, while the first trade of the third plan occurred approximately five weeks after the plan's adoption.  Best practices dictate a period of at least three months before the adoption of a

---

[155] The first plan was adopted on November 9, 2009; the second on November 19, 2010; and the third on June 7, 2011 (while the second was still in operation).

[156] Frequently Asked Questions About Rule 10b5-1 Plans" (2015) http://media.mofo.com/files/Uploads/Images/FAQ10b51.pdf (last accessed August 27, 2015); *see also* Brandon C. Parris, "Rule 10b5-1 Plans: Staying Out of Trouble," ABA Business Law Section, *Business Law Today*, Volume 17, Number 5 May/June 2008.

trading plan and the execution of the first trade subject to that plan.[157]   A trade that is executed pursuant to a 10b5-1 plan a very short period of time after adoption can heighten the risk for scrutiny, and potentially create the perception that the executive was attempting to use the 10b5-1 plan as cover for a trade based on material, nonpublic information.[158]

      d.    Irregular disclosure: Johnson's first plan was announced via a press release on November 11, 2009.[159]  None of Johnson's other plans were announced (including the multiple overlapping plans).

      e.    Conflicting stock buybacks: during the Class Period Herbalife bought back approximately 15.4 million shares at a cost of approximately $826 million, while during this time Johnson was engaged in large stock sales via his trading plans.

## VIII.  **Applicability of the Presumption of Reliance: The Fraud on the Market Doctrine**

169.   At all relevant times, the market for Herbalife common stock was an open, efficient and well-developed market for the following reasons, among others:

      a.    Herbalife's common stock met the requirements for listing and was listed and actively traded on the NYSE under the symbol "HLF" and the NYSE is a highly efficient and automated market;

      b.    As a public company, Herbalife filed periodic public reports with the SEC;

---

[157] May 9, 2013 letter from CII to SEC (reiteration of a Dec 28, 2012 request) http://www.cii.org/files/issues_and_advocacy/correspondence/2013/05_09_13_cii_letter_to_sec_rule_10b5-1_trading_plans.pdf (last accessed August 27, 2015).

[158] Brandon C. Parris, "Rule 10b5-1 Plans Staying out of Trouble," ABA Business Law Section, *Business Law Today*, Volume 17, Number 5 May/June 2008.

[159] http://ir.herbalife.com/releasedetail.cfm?ReleaseID=543691 (last accessed August 27, 2015).

c.      The average weekly trading volume for Herbalife common stock during the Class Period was over 9.4 million shares, well above the threshold indicative of an efficient market;

d.      Herbalife regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

e.      Herbalife was followed by securities analysts employed by major brokerage firms, including Argus Research Corp., SunTrust Robinson Humphrey Inc., Barclays Capital Inc., Wedbush Morgan Securities, D.A. Davidson & Company, Caris & Company and S&P Capital IQ. Each of these reports was publicly-available and entered the public marketplace;

f.      Institutional investors reported owning a majority of all Herbalife common stock during the Class Period. Currently, over 90% of total shares are held by institutional owners, according to Yahoo Finance. This high level of institutional ownership of Herbalife common stock during the Class Period indicates that the market price was reflective of active trading by sophisticated and knowledgeable investors; and

g.      As a result of the foregoing, the market for Herbalife common stock promptly digested current information regarding the Company from all publicly-available sources and reflected such information in the Company's common stock price. Under these circumstances, all purchasers of Herbalife's common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices and a presumption of reliance applies.

h.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Lead Plaintiff's fraud claims are grounded in Defendants' omissions of material fact of which there is a duty to disclose. As this action involves Defendants' failure to disclose material adverse information regarding Herbalife's business practices, financial results and condition and internal controls—information that Defendants were obligated to disclose during the Class Period but did not— positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered such information important in the making of investment decisions.

## IX.    <u>Inapplicability Of The Statutory Safe Harbor</u>

170.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false or misleading statements pleaded in this Complaint. The statements alleged to be false or misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

171.    To the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Herbalife and the Individual Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that the particular forward-looking statement was materially

false or misleading.  Defendants are liable for the statements pleaded because, at the time each of those statements was made, Defendants knew the statement was false and the statement was authorized and/or approved by an executive officer of Herbalife who knew that such statement was false when made.

## X.   Class Action Allegations

172.   Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Herbalife's common stock during the Class Period and were damaged thereby (the "Class").  Excluded from the Class are (i) Defendants; (ii) members of the immediate family of each Individual Defendant; (iii) any person who was an officer or director of Herbalife during the Class Period; (iv) any firm, trust, corporation, officer, or other entity in which any Defendant has or had a controlling interest; (v) any person who participated in the wrongdoing alleged herein; and (vi) the legal representatives, agents, affiliates, heirs, beneficiaries, successors-in-interest, or assigns of any such excluded party.

173.   The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Throughout the Class Period, Herbalife's common stock was actively traded on the NASDAQ, an efficient market.  As of February 12, 2014, the Company had more than 101 million shares of common stock outstanding.  While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds of thousands of members in the Class.

174.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members

of the Class predominate over questions that may affect individual Class members, including:

      a.     Whether Defendants violated the federal securities laws;

      b.     Whether Defendants misrepresented material facts concerning Herbalife;

      c.     Whether Defendants' statements omitted material facts necessary to make the statements not misleading in light of the circumstances under which they were made;

      d.     Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

      e.     Whether Defendants engaged in perpetrating a manipulative and deceptive device and/or scheme and/or otherwise engaged in a fraudulent course of conduct;

      f.     Whether the Herbalife SEC filings issued during the Class Period, which contained financial information (*e.g.*, its Forms 10-K, 10-Q and 8-K) contained untrue or materially misleading statements;

      g.     Whether the prices of the Company's common stock were artificially inflated; and

      h.     The extent of damages sustained by Class members and the appropriate measure of damages.

175.   The claims of Lead Plaintiff are typical of those of the Class.

176.   Lead Plaintiff will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation. Lead Plaintiff has no interests that conflict with those of the Class.

177.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XI. <u>Jurisdiction And Venue</u>

178.   The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a), 78t-1) and the rules and regulations promulgated thereunder, including Rule 10b-5 (17 C.F.R. § 240.10b-5).

179.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

180.   Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act.  Herbalife maintains its corporate headquarters in this District, and many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

## XII. <u>Claims Brought Pursuant to the Exchange Act</u>

### FIRST CLAIM FOR RELIEF

### For Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5(b)
### (Against Defendants Herbalife And Michael Johnson)

181.   Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

182.   During the Class Period, Defendants disseminated or approved the false statements specified herein, which they knew or recklessly disregarded were misleading in that they failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and they contained material misrepresentations.

183.   These Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Herbalife common stock during the Class Period.   As detailed herein, the misrepresentations contained in, or the material facts omitted from, these Defendants' public statements, concerned, among other things, the Company's improper business and operational practices.

184.   These Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the Class; made various false and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements with a reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of securities, which were intended to, and did: (i) deceive the investing public, including Lead Plaintiff and the Class, regarding, among other things, Herbalife's business practices and operations; (ii) artificially inflate and maintain the market price of Herbalife stock; and (iii) cause members of the Class to purchase the Company's common stock at artificially inflated prices.

185.   Defendant Herbalife is liable for all materially false and misleading statements made during the Class Period, as alleged above.

186.   Herbalife is further liable for the false and misleading statements made by the Company's officers in press releases and during conference calls and at conferences with investors and analysts, as alleged above, as the makers of such statements and under the principle of *respondeat superior*.

187.   Defendant Johnson, as a top executive and director of the Company, is liable as a direct participant in the wrongs complained of herein.   Through his positions of control and authority as an officer and director of the Company, he was able to and did control the content of the public statements disseminated by Herbalife.   Johnson had direct involvement in the daily business of the Company and participated in the preparation and dissemination of the false and misleading statements, as set forth above.

188.   As described above, these Defendants acted with scienter throughout the Class Period in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.

189.   Lead Plaintiff and the Class have suffered damages in that they paid artificially inflated prices for Herbalife common stock.   Lead Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

190.   As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the Class suffered damages in connection with their purchases of Herbalife stock during the Class Period.

### SECOND CLAIM FOR RELIEF

#### For Violations Of Section 20(a) Of The Exchange Act
#### (Against Defendant Michael Johnson)

191.   Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

192.   This Count is asserted against Michael Johnson for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of Lead Plaintiff and all members of the Class.

193.  As alleged in detail above, Herbalife and Johnson committed a primary violation of the federal securities laws through its knowing and/or reckless dissemination of materially false and misleading statements and omissions throughout the Class Period.

194.  During his tenures as an officers and director of Herbalife, Johnson was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act.  By reason of his positions of control and authority as an officer and director of the Company, Johnson had the power and authority to cause Herbalife to engage in the wrongful conduct complained of herein.  As set forth in detail above, Johnson able to and did control, directly and indirectly, and exert control over Herbalife, including the content of the public statements made by the Company during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

195.  In his capacity as CEO and Chairman of the Company, and as more fully described above, Johnson had direct involvement in the day-to-day operations of Herbalife and in the Company's financial reporting and accounting functions. Johnson was also directly involved in providing false information and certifying and/or approving the false statements disseminated by Herbalife during the Class Period, including filings with the SEC.

196.  Johnson received various written and oral reports from different divisions of the Company, and attended in-person and telephonic meetings, on a routine basis.  Johnson's knowledge of and participation in the Company's affairs through the various reports he received and/or had access to, and the meetings he attended, are described above.

197.  By reason of his positions as an officer and director of Herbalife, as can be seen by his corresponding ability to influence and control the Company, Johnson is a "controlling person" within the meaning of Section 20(a) of the

1 Exchange Act and had the power and influence to direct the management and
2 activities of the Company and its employees, and to cause the Company to engage
3 in the unlawful conduct complained of herein.  Because of his positions, Johnson
4 had access to adverse nonpublic financial information about Herbalife and acted to
5 conceal the same, or knowingly or recklessly authorized and approved the
6 concealment of the same.  Moreover, Johnson was also involved in providing false
7 information and certifying and/or approving the false statements disseminated by
8 the Company during the Class Period regarding its improper business practices and
9 operations.  Johnson was provided with or had access to copies of the Company's
10 reports, press releases, public filings and other statements alleged by Lead Plaintiff
11 to be misleading prior to and/or shortly after these statements were issued and had
12 the ability to prevent the issuance of the statements or cause the statements to be
13 corrected.

14      198.   As set forth above, Herbalife violated Section 10(b) of the Exchange
15 Act by its acts and omissions alleged in this Complaint.  By virtue of his position
16 as a controlling person of the Company and as a result of his own aforementioned
17 conduct, Johnson is liable pursuant to Section 20(a) of the Exchange Act, jointly
18 and severally with, and to the same extent as the Company is liable under Section
19 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead
20 Plaintiff and the other members of the Class who purchased or otherwise acquired
21 Herbalife common stock.

22      199.   As a direct and proximate result of these Johnson's conduct, Lead
23 Plaintiff and the Class suffered damages in connection with their purchase or
24 acquisition of Herbalife stock.

25 **XIII.  Prayer For Relief**

26      200.   Wherefore, Lead Plaintiff prays for judgment individually and on
27 behalf of the Class, as follows:

28

1       a.      Declaring this action to be a proper class action pursuant to
2   Rule 23 of the Federal Rules of Civil Procedure;

3       b.      Awarding Lead Plaintiff and the Class members damages,
4   including interest;

5       c.      Awarding Lead Plaintiff reasonable costs, including attorneys'
6   and experts' fees; and

7       d.      Awarding such equitable/injunctive or other relief for the
8   benefit of the Class as the Court may deem just and proper.

9   **XIV.  Jury Demand**

10      201.   Lead Plaintiff demands a trial by jury for all issues so triable.

11  Dated: August 27, 2015              Respectfully submitted,

13                                      By: */s/ Jon A. Tostrud*

14                                      **TOSTRUD LAW GROUP, P.C.**
                                        Jon A. Tostrud (SBN 199502)
15                                      1925 Century Park East, Suite 2125
                                        Los Angeles, CA 90067
16                                      Telephone:  (310) 278-2600
                                        Facsimile:  (310) 278-2640
17                                      E-mail:     jtostrud@tostrudlaw.com

18                                      *Local Counsel and Counsel for Lead*
19                                      *Plaintiff*

20                                      **SAXENA WHITE P.A.**
                                        Maya Saxena (*pro hac vice*)
21                                      Lester R. Hooker (241590)
                                        Brandon T. Grzandziel (*pro hac vice*)
22                                      5200 Town Center Circle, Suite 601
                                        Boca Raton, FL 33486
23                                      Telephone:  (561) 394-3399
                                        Facsimile:  (561) 394-3382
24                                      E-mail:     msaxena@saxenawhite.com
                                                    lhooker@saxenawhite.com
25                                                  brandon@saxenawhite.com

26                                      *Lead Counsel and Counsel for Lead*
                                        *Plaintiff*

27

28

**PROOF OF SERVICE VIA ELECTRONIC POSTING PURSUANT TO CENTRAL DISTRICT OF CALIFORNIA LOCAL RULES AND ECF GENERAL ORDER NO. 10-07**

I, the undersigned, say:

I am a citizen of the United States and am employed in the office of a member of the Bar of this Court. I am over the age of 18 and not a party to the within action. My business address is 1925 Century Park East, Suite 2125, Los Angeles, California 90067.

On  August 27, 2015, I caused to be served the following documents:

- **THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

All signatories listed in this filing, and on whose behalf the filings are submitted, concur in the filings' content and have authorized the filings.

By posting the document to the Electronic Case Filing ("ECF") Website of the United States District Court for the Central District of California, participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 27, 2015, at Los Angeles, California.

*/s/ Jon A. Tostrud*
Jon A. Tostrud

# Mailing Information for a Case 2:14-cv-02850-DSF-JCG Abdul Awad v. Herbalife Ltd. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Patrick V Dahlstrom**
  pdahlstrom@pomlaw.com

- **Jonathan C Dickey**
  jdickey@gibsondunn.com

- **Daniel S Floyd**
  dfloyd@gibsondunn.com,jarneson@gibsondunn.com

- **Lionel Zevi Glancy**
  lglancy@glancylaw.com

- **Michael M Goldberg**
  mmgoldberg@glancylaw.com,dmacdiarmid@glancylaw.com,info@glancylaw.com

- **Brandon T Grzandziel**
  brandon@saxenawhite.com

- **Lester R Hooker**
  lhooker@saxenawhite.com,e-file@saxenawhite.com

- **Sarah L Kushner**
  skushner@gibsondunn.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com

- **Francis P McConville**
  fmcconville@labaton.com

- **Alexander K Mircheff**
  amircheff@gibsondunn.com,mostrye@gibsondunn.com,inewman@gibsondunn.com,cnowlin@gibsondunn.com,lgadberry@gibsondunn.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com

- **Maya Saxena**
  msaxena@saxenawhite.com

- **Jon A Tostrud**
  jtostrud@tostrudlaw.com,acarter@tostrudlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)